**FITZGERALD MONROE FLYNN PC**
JACK FITZGERALD (SBN 257370)
*jfitzgerald@fmfpc.com*
MELANIE R. MONROE (SBN 275423)
*mmonroe@fmfpc.com*
TREVOR FLYNN (SBN 253362)
*tflynn@fmfpc.com*
PETER GRAZUL (SBN 342735)
*pgrazul@fmfpc.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741
***Counsel for Plaintiffs***

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAEEM AZAD and MIHAI CALUSERU, on behalf of themselves, all others similarly situated, and the general public,<br><br>Plaintiffs,<br><br>v.<br><br>CAITLYN JENNER and SOPHIA HUTCHINS,<br><br>Defendants. | Case No: 2:24-cv-9768<br><br><u>CLASS ACTION</u><br><br>**COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT AND FRAUD**<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiffs NAEEM AZAD and MIHAI CALUSERU, individually, and on behalf of all others similarly situated, bring this action against Defendants CAITLYN JENNER and SOPHIA HUTCHINS and allege the following upon their own knowledge, or where they lack personal knowledge, upon information and belief, including the investigation of their counsel.

## INTRODUCTION

1.      Beginning on May 26, 2024, Jenner, a high-profile international celebrity and former Olympic gold-medalist, aided by her business partner and manger, Hutchins, orchestrated a scheme wherein she offered and sold unregistered securities – the cryptocurrency,[1] $JENNER – and fraudulently solicited financially unsophisticated investors throughout the United States and abroad to purchase the unregistered securities, in violation of federal and state law.

2.      $JENNER is a type of cryptocurrency known as a "memecoin." A memecoin is a type of blockchain-based digital asset that draws its inspiration from memes, characters, trends or, as in this case, the social media accounts and online presence of celebrities. Memecoins typically experience monumental increases and decreases in value and price in an exceptionally short periods of time, so that their underlying values soar and crash based on internet culture and viral moments rather than any tangible fundamentals.

3.      Unlike other cryptocurrencies, such as Bitcoin, the overwhelming majority of memecoins, including $JENNER, are not decentralized, have little to no utility or functionality, and are used neither as a store of value nor a medium of exchange. A memecoin derives its value, instead, from the success or failure of its issuer or promoter to attract and sustain community engagement in the project. Investors purchase memecoins with the hope

---

[1] "Cryptocurrency" refers to a group of digital assets whose transactions are secured and verified using cryptography – a scientific practice of encoding and decoding data. Those transactions are often stored on computers distributed throughout the world via a distributed ledger technology called blockchain. The terms "cryptocurrency," "digital asset," "coin," and "token" are used interchangeably throughout this complaint.

that the underlying price will increase in the future as the project grows in popularity, based upon the managerial, entrepreneurial, or promotional efforts of the creator, promoter, issuer, other associated persons or active participants.

4.     Because this type of digital asset is properly classified as a security under federal and California law, before offering $JENNER for sale to the public, Jenner was required to file registration statements with the United States Securities and Exchange Commission, and to comply with all federal and state securities laws, which she willfully failed to do.

5.     Jenner has used her various public social media accounts, which are followed by millions of people, as well as other media outlets, such as podcasts and public statements, to promote $JENNER to investors and to solicit their purchases, ultimately defrauding Plaintiffs and the Class. Since commencing the scheme, Jenner has continuously, systematically, directly, and repeatedly touted $JENNER's ability to increase in value based on her managerial and entrepreneurial efforts, thereby manipulating the market and overall valuation of Jenner's own cryptocurrency, serving her own financial interests.

6.     In fact, Jenner's primary purpose in creating $JENNER was to cross-promote herself and her ventures, and to cultivate a cryptocurrency brand uniquely associated with herself, which she could easily manipulate, which she in fact did manipulate.

7.     As a direct result of Jenner's fraudulent offer for sale and sale of these unregistered securities, Plaintiffs and the Class – many of whom are retail investors and lack the technical and financial sophistication necessary to have evaluated the risks associated with their investment in $JENNER, and were denied the information that would have been contained in the materials required for the registration of $JENNER – have suffered significant damages.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1391 and 1367(a), because Plaintiffs' claims under the Securities Act raise federal questions; and the Court has supplemental jurisdiction over Plaintiffs' claims under California state law.

9.    This Court has personal jurisdiction over Defendants because Defendants are residents of this District and have substantial contacts with this District.

10.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) because Defendants are subject to the Court's personal jurisdiction herein. Furthermore, the acts giving rise to Plaintiffs' claims occurred, among other places, in this District.

## PARTIES

11.    Plaintiff Naeem Azad is a citizen of the United Kingdom and relied on Jenner's false and misleading statements and omissions when investing in $JENNER on both the Solana blockchain and Ethereum blockchain. As set forth in the accompanying Certification attached as Exhibit 1, Azad first purchased $JENNER on the Solana blockchain on May 26, 2024, and on the Ethereum blockchain starting May 31, 2024. Azad has subsequently lost at least $25,000 between both versions of $JENNER. Had it not been for the false and misleading statements and omissions made by Jenner, Plaintiff Azad would not have invested in or held $JENNER.

12.    Plaintiff Mihai Caluseru is a citizen of Romania and a resident of Portgual who relied on Jenner's false and misleading statements and omissions when investing in $JENNER on both the Solana blockchain and Ethereum blockchain. As set forth in the accompanying Certification attached as Exhibit 2, Caluseru first purchased $JENNER on the Solana blockchain on May 26, 2024, and then again on the Ethereum blockchain starting on June 3, 2024. Caluseru estimates total losses of at least $31,000 between both versions of $JENNER. Had it not been for the false and misleading statements and omissions made by Jenner, Caluseru would not have invested in or held $JENNER.

13.    Defendant Caitlyn Jenner is an internationally recognized media personality and former Olympic gold medal-winning decathlete. Jenner is the primary promoter, offeror, and seller of $JENNER. Upon information and belief, during the relevant time period, and continuing today, Jenner was a resident and citizen of California, living in Calabasas, Thousand Oaks, or Malibu, California.

14.     Defendant Sophia Hutchins is a businesswoman, television personality, and CEO of the sunscreen company LUMASOL. She is Jenner's manager and business partner. Hutchins was also the CEO of the $JENNER project and acted as a promoter, manager, and control person for the enterprise, as well as for $JENNER itself. Upon information and belief, during the relevant time period, and continuing today, Hutchins was a resident and citizen of California, living in Malibu, California.

<div align="center"><strong>BACKGROUND AND RELEVANT FACTS</strong></div>

***Blockchain Technology***

15.     A public blockchain is a digital ledger containing information (such as records of financial transactions) immediately available to any member of the public.[2] Unlike traditional ledgers, which are managed and validated by a centralized authority, public blockchains are distributed and decentralized. This structure offers greater transparency as to ownership by being based on consensus as to the accuracy of the transactions consummated on the network. To reach consensus, embedded in each blockchain platform is a software protocol, or consensus mechanism, which provides governance standards over how information is added to the blockchain.

16.     Blockchain-based transactions are considered more secure and trustworthy than ledgers controlled by centralized authorities, like banks, because adding, changing, or removing information from the blockchain is made purposefully difficult, so that it is harder to falsify a transaction or hack into the ledger itself.[3]

---

[2] *See* Jonathan Rohr & Aaron Wright, *Blockchain-based Token Sales, Initial Coin Offerings, and the Democratization of Public Capital Markets,* 70 HASTINGS L.J. 463, 469 (2019) ("At their core, blockchains are decentralized databases maintained by a network of computers. Using public-private key cryptography and strict code-based rules – known as consensus mechanisms – blockchains store tamper-resistant, resilient, and authenticated data, enabling users to engage in pseudonymous transactions.").

[3] *Id.* at 471 ("[B]lockchain-based consensus mechanisms make adding information to a blockchain purposefully difficult and even harder to remove once saved, creating data that is hard to alter once stored. Blockchain-based protocol groups sets of transactions into blocks, which are linked together to form a sequentially ordered chain. Before a block can be added

<div align="center">4</div>

17.    Unlike a bank that exercises complete control over validating any transaction on its ledgers, transactions on decentralized blockchains must be validated by a network of users. To encourage validation of the transactions on a blockchain, validators (sometimes colloquially referred to as "nodes," or "miners") are provided incentives, often in the form of cryptocurrency. Blockchain transactions are typically validated through "Proof of Work" or "Proof of Stake" methods.

18.    For example, Bitcoin, whose "cashtag"[4] is $BTC, operates on a "Proof of Work" blockchain. To generate a new "hash" (or ledger entry) for a block of transactions on the Bitcoin blockchain, validators engage in a mathematical (*i.e.* cryptographic) guessing game requiring their computers to, through brute-force computing, guess the answer to an algorithm. The validator who wins the guessing game broadcasts the new hash to the network and, once confirmed by the other validators, is rewarded with $BTC for their efforts.

19.    "Proof of Stake" blockchains require much less energy than "Proof of Work" blockchains, making them desirable for projects and protocols looking to scale quickly. "Proof of Stake" requires validators to "stake," or lock up, cryptocurrency they already own. Validators staking more cryptocurrency for longer periods of time have the greatest chance of being selected by an algorithm to validate new transactions, much like a lottery system. Once new transactions are validated, the validator earns the blockchain's particular cryptocurrency as a reward.

20.    Since Bitcoin's introduction in 2009, blockchain technology and use cases have grown exponentially via the creation of various cryptocurrencies, smart contract protocols, decentralized finance ("DeFi"), decentralized applications ("DApps"), and decentralized exchanges ("DEXs").

---

to a blockchain, the protocol requires that a valid cryptographic hash for a block (an encrypted representation of the underlying transactional data) is generated.").

[4] A cashtag is a Twitter (X) feature allowing users to click on ticker symbols to search specific cryptocurrencies and digital projects. The feature allows social media users to easily search for posts related to the cryptocurrency, similar to a ticker for a publicly-traded company.

21.    Many blockchains have emerged to provide smart contract functionality. Smart contracts generally refer to small applications stored on a blockchain and executed in parallel by a large set of validators. In the context of public blockchains, the network is designed so that each participant can be involved in and verify the correct execution of any operation. Smart contracts will always be executed as specified and allow anyone to verify the resulting state changes independently. When implemented securely, smart contracts are highly transparent and minimize the risk of manipulation and arbitrary intervention.

22.    Smart contracts have allowed for the genesis of blockchain-based financial infrastructure, known as DeFi. DeFi generally refers to an open, permissionless, and highly interoperable protocol stack built on public smart contract platforms. DeFi does not rely on intermediaries and centralized institutions, but rather on open protocols and DApps.

23.    DeFi uses a multi-layered architecture. To conceptualize:

a.    The *settlement layer* (Layer 1) consists of the blockchain and its native protocol asset (*i.e.* $ETH (Ether) on the Ethereum blockchain). It allows the network to store ownership information securely and ensures that any state changes adhere to its ruleset. The blockchain can be seen as the foundation for trustless execution and serves a settlement and dispute resolution layer.

b.    The *asset layer* (Layer 2) consists of all assets that are issued on top of the settlement layer. This includes the native protocol asset as well as any additional assets that are issued on this blockchain (often referred to colloquially as tokens).

c.    The *protocol layer* (Layer 3) provides standards for specific use cases such as DEXs, debt markets, derivatives, and on-chain asset management. These standards are usually implemented as a set of smart contracts and can be accessed by any user. As such, these protocols are highly interoperable.

d.    The *application layer* (Layer 4) creates user-oriented applications that connect to individual protocols. The smart contract interaction is usually abstracted by a web browser-based front end, making the protocols easier to use.

e.    The *aggregation layer* (Layer 5) is an extension of the application layer. Aggregators create user-centric platforms that connect to several applications and protocols. They usually provide tools to compare and rate services, allow users to perform otherwise complex tasks by connecting to several protocols simultaneously, and combine relevant information in a clear and concise manner.



24.    Integral to DeFi are DEXs, which exist as a set of persistent, non-upgradable smart contracts, *i.e.*, no single entity controls the codebase. So long as the underlying blockchain on which it operates is functional, a DEX will continue to run as coded. DeFi participants use DEXs for two main reasons:

a.    *Providing Liquidity*. Liquidity refers to how much of an asset is available to trade. DEXs rely on third parties to supply liquidity. The liquidity providers ("LPs") are users who deposit crypto assets into a "liquidity pool" to provide liquidity for a particular token pair that "swappers" can trade with. In return for providing liquidity, LPs earn trading fees generated by that pool.

b.    *Swapping*. Unlike traditional centralized cryptocurrency exchanges (or CEXs), DEXs are unique because they allow users to "swap" tokens without third parties facilitating the transaction or taking control of funds. Essentially, users will

send their token to the relevant liquidity pool and receive the equal value of the other paired token in return.

| Criteria | Centralized Exchanges | Decentralized Exchanges |
|---|---|---|
| Decentralization | Operated by centralized organizations. | Operated by users and liquidity providers. |
| Custody of assets | The centralized exchange controls access to crypto assets. | Users have exclusive control over their assets. |
| Impermanent loss | No concerns of impermanent loss due to high liquidity. | Impermanent loss is a highly possible risk in event of market fluctuations. |
| Regulations | Highly regulated | No KYC and AML standards |
| Liquidity | Institutional investors and a large user base ensure higher liquidity. | Lack of regulatory standards and competition from CEXs reduce liquidity. |
| Trading Options | Multiple trading options, including spot trading, futures trading, and others. | Only limited to crypto lending and borrowing and speculative investments. |
| Availability | Depends on the centralized company operating the exchange. | Always accessible to users. |

### *The Ethereum Blockchain and Ecosystem*

25.     The Ethereum blockchain and its greater ecosystem were first conceived in 2013 by programmer Vitalik Buterin. Beginning at first as a "Proof of Work" digital ledger, in September 2022 Ethereum successfully transitioned into a "Proof of Stake" digital ledger, in part due to the increased activity on its network, which made scaling a priority for developers. Ethereum's architecture is designed to facilitate the implementation of smart contracts and DApps as well as support a wide range of DeFi platforms and protocols.

26.     The Native Protocol Asset behind the Ethereum blockchain is Ether, whose cashtag is $ETH. $ETH serves as the means of transferring value and securing Ethereum through staking (*i.e.* as a block reward to successful validators).

27. Users can create tokens on the Ethereum blockchain via ERC-20, is a technical standard that defines a set of rules and functions that an Ethereum-based ERC-20 token must follow to be compatible with the Ethereum ecosystem. Some key features of ERC-20 are: (i) Token Creation, which allows developers to create new tokens with custom specifications, such as supply, decimals, and other attributes; (ii) Token Management, which provides functionalities for minting and burning;[5] and (iii) Token Transfers, which enables secure and efficient transfer of tokens between accounts. These ERC-20 tokens are the *asset layer* of the DeFi stack on Ethereum referenced above.

28. A number of DEXs operate on the Ethereum blockchain, including but not limited to Uniswap, PancakeSwap, and SushiSwap. These DEXs reside on the *protocol layer* of Ethereum referenced above. These DEXs allow for ERC-20 tokens established via the ERC-20 standard to be traded by investors.

### The Solana Blockchain and Ecosystem

29. The Solana blockchain and its greater ecosystem were created in 2017 by former Qualcomm executive Anatoly Yakovenko. Solana is a hybrid "Proof of Stake" open-source distributed ledger, which has the primary objective of significantly enhancing the scalability of blockchain technology. Its architecture is designed to facilitate the creation of smart contracts and DApps, and it supports a wide range of DeFi platforms and protocols.

30. The Native Protocol Asset behind the Solana blockchain is Solana, whose cashtag is $SOL. $SOL serves as the means of transferring value and securing Solana through staking (*i.e.* as a block reward to successful validators).

31. Users can create tokens on the Solana blockchain via the Solana Primary Library ("SPL"), which defines how smart contract tokens on the Solana blockchain operate. The

---

[5] "Minting" refers to creating new tokens or coins. "Burning" refers to sending tokens or coins to a special address on the blockchain ("burn address") where they are no longer able to be accessed or used, and thus effectively destroyed. Burning takes tokens or coins out of circulation, lowering the outstanding supply and theoretically causing the value of remaining "unburned" tokens or coins to increase due to scarcity principles of economics.

operational standards are delineated in the library and must be adhered to by any token created on the Solana blockchain. These SPL tokens are the *asset layer* of the DeFi stack referenced above.

32.    The SPL Token Program, similar to ERC-20 on Ethereum, is a smart contract program within the SPL that enables the creation, management, and transfer of SPL tokens on the Solana blockchain. Some key features of the SPL Token Program include: (i) Token Creation, which allows developers to create new tokens with custom specifications, such as supply, decimals, and other attributes; (ii) Token Management, which provides functionalities for minting and burning; and (iii) Token Transfers, which enables secure and efficient transfer of tokens between accounts.

33.    A number of DEXs operate on the Solana blockchain, including but not limited to Raydium, Jupiter, and Orca. These DEXs reside on the *protocol layer* of the DeFi stack on Solana referenced above. These DEXs allow for SPL tokens established via the SPL Token Program to be traded by investors.

***Origin of Memecoins***

34.    Memecoins have existed within cryptocurrency since the creation of Dogecoin in December of 2013.

35.    Created by its developers to poke fun at Bitcoin – the first cryptocurrency and first legitimate use case of blockchain technology in general – Dogecoin was branded around a popular internet meme at the time: the "doge" Shiba Inu.

 

36.    The founders of the project stated that they chose the name "Dogecoin" to ensure the digital asset was a "joke currency" and "as ridiculous as possible."

37.    Starting around 2019, what had begun as a joke transformed into an unprecedented financial phenomenon, due in no short part to celebrity and high-profile public figure endorsement and solicitation of Dogecoin on social media platforms.

38.    Most notably, Elon Musk began using his Twitter account to endorse and otherwise promote Dogecoin to the public. Over the course of a few years, Musk endorsed Dogecoin several times, directly resulting in drastic price fluctuations. For example:

   a.    On July 17, 2020, Musk tweeted a meme of an arial photo of a dust storm overtaking an urban area, with the face of the Dogecoin Shiba Inu superimposed on the dust cloud, which was labeled "dogecoin standard," while the urban area about to be overtaken by the dust cloud was labeled "global financial system." Above this image, Musk wrote, "It's inevitable." Immediately following this tweet, Dogecoin's price rose roughly 14% in less than two hours.

   b.    On December 20, 2020, Musk tweeted, "One word: Doge," causing the price of Dogecoin to increase by roughly 20% that day.

   c.    On February 10, 2021, Musk tweeted that he had purchased Dogecoin for his son, increasing its price roughly 16% in about 20 minutes.

   d.    On April 15, 2021, Musk tweeted a Dogecoin meme that increased Dogecoin's trading price more than 358% in 2 days.

   e.    On May 8, 2021, Musk made a highly-anticipated appearance on Saturday Night Live, where it was expected he might again promote Dogecoin. At this time, Dogecoin had reached an all-time high market capitalization of $95 billion, and all-time peak trading price of $0.738, an increase of over 36,000% since Musk first endorsed it in April 2019.

39.    During his SNL appearance, however, Musk said Dogecoin was "a hustle." Within 15 minutes, Dogecoin's price had dropped to $0.54 (a more than 26% drop). It lost $20 billion in market capitalization before the SNL episode even finished. Within two days,

Dogecoin's market capitalization dropped to $45 billion and its price to $0.37 – a nearly 50% decrease from its peak. Dogecoin's price continued dropping until it sank to $0.06, a 90% loss, within a year.

40.    Dogecoin's history illustrates the extreme volatility in price and market capitalization that can occur to memecoins, due to high-profile figures' endorsement and promotion, as well as the ability of the market to be influenced by messages or comments directed to these promoters' followers on social media platforms.

***Memecoins Today***

41.    Despite the volatility – or perhaps because of it – interest in memecoins has exploded since the Dogecoin phenomenon. Memecoins have become popular for many reasons: (i) they offer a low barrier of entry for new investors, as they are cheap, easy to buy, and have high potential for returns; (ii) they appeal to the emotions and humor of the general crypto community, which enjoy the memes, jokes, and social buzz surrounding memecoins; and (iii) they benefit from the network effect and the bandwagon effect – as more people join, the increased hype drives up a memecoin's demand and price.

42.    *Millions* of memecoins have emerged since the Dogecoin boom and bust of 2019-2021, many trying to replicate Dogecoin's formula, or to create their own niche. Some were based on other animal memes, like Shiba Inu (a Dogecoin clone), Dogelon Mars (a parody of Elon Musk's Space X project), Samoyedcoin (a dog breed), and Floki Inu (Musk's actual pet dog). Others were based on pop culture references, like Pepe (a frog character), HarryPotterObamaSonic10Inu (a mashup of fictional characters), and MonaCoin (a Japanese anime character).

43.    In the vast majority of cases, the creators of a memecoin are anonymous, which naturally leads to a plethora of scams, rug pulls, and fraud. Nonetheless, the current memecoin market across all blockchains has a total capitalization of roughly $70 billion dollars, representing an over 200% year-over-year increase since the previous year.[6]

---

[6] *See* https://www.coingecko.com/en/categories/meme-token (accessed October 29, 2024).

44.   Solana-based memecoins have particularly become increasingly common, due to the relatively inexpensive transaction fees for investors when buying and selling cryptocurrencies on Solana-based DEXs. With such a parabolic rise in interest in Solana-based memecoins, applications were developed on the network as a response to user demand.

45.   Most notably, Pump.Fun is a Solana-based interface that allows anyone to create a memecoin nearly instantaneously, for free.[7]

46.   Pump.Fun is not a DApp or a DEX. Instead, it is a centralized application controlled by a group of individuals located outside of the United States. Pump.Fun works by interacting on a user's behalf with the SPL Token Program to allow the user to mint a new SPL token via prebuilt smart contracts. Users simply insert a name, image, and description of their memecoin to kickstart the fundraising phase. Essentially, this allows anyone to create a memecoin without needing any technical know-how. Pump.Fun collects a fee on these transactions, facilitating token sales while generating revenue.

47.   Unlike traditional static pricing common in other traditional token sales, Pump.Fun employs a "Bonding Curve" pricing model in which token prices increase with fundraising progress and decrease as tokens are sold. Once the fundraising achieves a certain market value, Pump.Fun adds liquidity to a pool on Raydium (a leading DEX on Solana) and the memecoin then exists and can be traded within the larger Solana ecosystem.

48.   Despite its popularity and innovative approach, Pump.Fun is inherently risky. The platform's accessibility has led to an oversaturation of memecoins, the majority of which lack true value or utility. Especially in the absence of better information, investors often rely on social cues, such as endorsements from well-known figures, to assess potential projects.

49.   Over one million memecoins have been deployed via Pump.Fun since its creation in January 2024, and 95% are estimated to be scams or rug pulls.[8] The entire

---

[7] *See generally* https://pump.fun/board.

[8] *See* https://www.coinspeaker.com/pump-fun-50m-revenue.

phenomenon has been described as a "casino."[9] Inevitably, investors able to buy memecoins the earliest, at their lowest prices, either during Pump.Fun Bonding Curves or by accessing memecoins via the Raydium liquidity pool early on, have the greatest chance of seeing the largest rise in price should the memecoins they purchase go "viral." This tends to result in popular tokens "pumping" when initial interest is high, providing the greatest chance of seeing high returns, and then "dumping" after the initial interest subsides and investors quickly move on to the next "opportunity."

50.    In around May 2024, numerous high-profile celebrities, including Jenner, began using Pump.Fun to launch memecoins on the Solana blockchain associated with their particular brand of stardom. Because of the celebrities' large social media presences, these memecoins were able to attract a significant amount of attention from the public, resulting in the typical "casino" situation, but on a much larger scale. This is especially true because, due to their celebrity creators, the public mistakenly believed these projects had a certain legitimacy that most coins created by anonymous token developers lacked.

51.    As a result of the growing popularity of memecoin investment, particularly in light of increasing celebrity involvement in the craze, on May 29, 2024, the SEC's Office of Investor Education and Advocacy released an Investor Bulletin stating:

> Fraudsters may conduct pump-and-dump schemes with crypto assets, including so-called "memecoins" that refer to popular culture or internet memes. For example, fraudsters may create a memecoin and then tout it on social media – sometimes in what they refer to as a "pre-sale" – to get others to buy and "pump" up, or increase, its price. Then the promoters or others working with them "dump," or sell, before the hype ends, profiting from the pumped up price. Typically, after the promoters sell and take their profit, the price decreases rapidly, and everyone else who bought the token loses most of their money. ***Never make investment decisions based solely on information from social media platforms or apps***.

---

[9] *See* https://cointelegraph.com/news/solana-memecoin-crypto-utility-reputation.

***The First $JENNER Launch (on Solana)***

52.    Two days before the SEC's bulletin was published, on May 26, 2024, Jenner minted $JENNER on the Solana blockchain using Pump.Fun.[10] On her public Twitter account (@Caitlyn_Jenner), which has over 3 million followers, Jenner posted a link to Pump.Fun, where investors could immediately purchase $JENNER from the Bonding Curve.



53.    From the very outset, Jenner began promoting this memecoin as legitimate, created by Jenner herself, poised to be successful, and destined to increase in value as Jenner promised to dedicate her full efforts to the project.



54.    Shortly after the mint – and after insiders had time to accumulate $JENNER before the public was informed by Jenner's tweet – Hutchins appeared in a separate video post on Twitter (*i.e.*, on Twitter "Spaces") affirming that $JENNER was in fact real, and that she was "managing the crypto project."[11]

///

///

///

///

---

[10]    The public blockchain contract address of $JENNER on Solana is https://solscan.io/token/4GJ3TCt5mTgQT5BRKb14AkjddpFQqKVfphxzS3t4foZ9.

[11]    *See* https://www.coindesk.com/markets/2024/05/27/caitlyn-jenner-meme-coin-sows-confusion-as-observers-question-its-provenance.



55.    Due to Jenner's stature as an internationally-recognized public figure, and her own initial promotional efforts on social media, $JENNER almost immediately surpassed the trading threshold on the Pump.Fun Bonding Curve, so it was then available to be traded on Raydium (and, theoretically, all other DEXs existing within the wider Solana ecosystem as well). Not only did Jenner immediately begin touting price and market capitalization targets on the memecoin, astonishingly, $JENNER amassed over $250 million in trading volume via more than 300,000 transactions, ultimately leading to a $43 million market capitalization

value distributed between the approximately 20,000 investors who purchased $JENNER its first day.



56.    However, this initial success was short-lived. Confusion and controversy quickly mounted as social media users began labeling Jenner a grifter because of her simultaneous promotion of another cryptocurrency project, $BBARK, depicted in the since-deleted tweet, below, which appeared based on her and Hutchins' dogs, perhaps meaning to play off the original memecoin, Dogecoin.

*Azad v. Jenner*, Case No. 2:24-cv-9768
CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22



23    57.    As this criticism increased, Jenner posted a series of messages representing that
24  $BBARK[12] was not her personal memecoin, but rather, she was simply "a great fit for the
25  token" and when "approached to invest in this token meme I was all in!"

26

27  _____

28  [12] $BBARK is down 99% since its all-time high, which occurred the day of Jenner's
     promotion.





58.   Jenner's promotion of $BBARK coincided with a plateau and drop in the price of $JENNER, as investors were confused about which project Jenner was truly dedicated to. Jenner assured investors not to worry, saying she was "fully focused on my token $JENNER."

59.    The downfall of the Solana-based $JENNER coin began when it was revealed that Hutchins and Jenner had initially solicited the help of Sahil Arora, a controversial figure within the cryptocurrency industry, to assist in minting $JENNER.

60.    Arora has been accused of orchestrating cryptocurrency scams in the past.[13] Nevertheless, the well-connected influencer has been involved in multiple celebrity-backed cryptocurrency projects and when speaking on the value that celebrities bring to cryptocurrency, has said that generating celebrity memecoin projects is "the only way to make crypto more mainstream and benefit from the attention economy . . . ."[14]

61.    Hutchins and Arora had a pre-existing relationship, and Hutchins was responsible for introducing Arora to Jenner to create the $JENNER project. Jenner and Hutchins used Arora to create $JENNER, intending to enrich themselves, and – according to a "Non-Binding Term Sheet for Promotional Activity Agreement" they signed with Arora – to "generate maximum revenue for [Jenner] within a timeline of 24 hours from the [initial] tweet from [Jenner]" announcing the project.

62.    Arora and Jenner subsequently had a falling out. Arora launched the token on behalf of Jenner, had Jenner promote it, and then "dumped" his portion of $JENNER on the liquidity pool in Raydium or another platform, receiving $SOL in return, and sending the market price crashing – the exact risk that Jenner had a duty to warn investors of when she was soliciting their purchases, which she willfully failed to do for her own financial benefit.

///

///

///

///

---

[13] *See* https://cointelegraph.com/news/sahil-arora-banned-celebrity-memecoin-scams.

[14] *See* https://decrypt.co/232565/crypto-promoter-who-launched-caitlyn-jenner-solana-meme-coin.



63.    Due to Jenner calling her own project and memecoin a "scam[]," $JENNER's market capitalization rapidly plunged to $5 million as confusion ensued and Jenner issued no concrete explanation. Investor holdings began losing the majority of their value very rapidly.

64.    Despite this, Jenner continued to promote the memecoin and assured the public Arora was no longer involved. She promised investors all was well, and that the $JENNER "will do better now," despite having just witnessed the token drop over 80% in mere hours. Jenner promised investors that there would be no relaunch, and that this token on the Solana blockchain would continue to grow and be supported by Jenner and her team.





*The Second $JENNER Launch (on Ethereum)*

65.    Despite her promises to investors and her heavy promotion over the following days, it was evident that the volatility caused by Arora, and the blatant instances of "pump and dumps" that had already occurred, had rocked the community's trust of $JENNER on Solana. But Jenner had a strong financial interest in continuing to promote the memecoin.



66.    However, Jenner also needed a cryptocurrency over which she had full control, and from which she was guaranteed to profit. Jenner therefore minted another memecoin, with a distinct contact address but same cashtag and name – $JENNER – this time on the Ethereum blockchain, as an ERC-20 token.[15] She then immediately went to social media to promote it as an investment opportunity: as an ERC-20 token, the new $JENNER coin was immediately available for trading on the DEX Uniswap.



67.    Naturally, due to the confusion and now-competing memecoin on the Ethereum blockchain, the price of the Solana-based $JENNER began dropping despite Jenner, for a couple of days, continuing to promote it, as well, since she had accumulated her own Solana-based $JENNER and was still hoping this token would increase in price.

---

[15]    The public blockchain contract address of $JENNER on Ethereum is https://etherscan.io/token/0x482702745260ffd69fc19943f70cffe2cacd70e9.



68. However, Jenner's dual promotion quickly ended, and she shortly began to condemn $JENNER on Solana while fully promoting her newly minted $JENNER on Ethereum.


69. Jenner and Hutchens created a separate public social media account for the Ethereum-based $JENNER token, which has routinely been used for its promotion, as well as a website for the token, jennercoineth.com, which later was taken down either after or during the collapse of the project.

70.     Unlike the original $JENNER token, Jenner and her team instituted a 3% "tax" on every Ethereum-based $JENNER transaction. Thus, for every purchase and sale of $JENNER on Ethereum, Jenner receives 3% of the total amount traded directly via the smart contract functionality on the Ethereum blockchain.[16]

71.     This element of Ethereum-based $JENNER has enriched Jenner tremendously, as there have been millions of dollars of transaction volume. Jenner has never properly disclosed this information to investors, and many have paid this transaction tax unknowingly.

72.     Following the creation of $JENNER on Ethereum, Jenner now had and has direct control over her own memecoin, from which she is guaranteed to benefit financially, regardless of its underlying price. Jenner was likely able to profit over $500,000 via this mechanism alone. Much of the cryptocurrency she received as "taxes" was subsequently transferred into the centralized exchange, Coinbase.

**$JENNER (on both blockchains) is a Security**

73.     $JENNER is a security because it constitutes an investment of money in a common enterprise with the reasonable expectation of profit to be derived from the efforts of others. *See SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).

74.     On April 3, 2019, the SEC published its "Framework for 'Investment Contract' Analysis of Digital Assets" (the "Framework"), in which it "provided guidance for analyzing whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions."[17]

75.     Using the Framework's guidance, $JENNER and the manner in which it was offered and sold constitutes an investment contract, and therefore a security, under federal law.

---

[16] *See* https://dexscreener.com/ethereum/0x8588f0c49849c011d5b5e3318bb0d1fb8534266b.

[17] *See* U.S. Securities and Exchange Commission, Framework for "Investment Contract" Analysis of Digital Assets (Apr. 3, 2019), *at* https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.

76.     In the Framework, the SEC cautions potential issuers, "If you are considering . . . engaging in the offer, sale, or distribution of a digital asset, you need to consider whether the U.S. federal securities laws apply." The SEC explained the basics of the *Howey* test:

> The U.S. Supreme Court's Howey case and subsequent case law have found that an "investment contract" exists where there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others. The so-called "Howey test" applies to any contract, scheme, or transaction, regardless of whether it has any of the characteristics of typical securities. The focus of the Howey analysis is not only on the form and terms of the instrument itself (in this case, the digital asset) but also on the circumstances surrounding the digital asset and the manner in which it is offered, sold, or resold (which includes secondary market sales). Therefore, issuers and other persons and entities engaged in the marketing, offer, sale, resale, or distribution of any digital asset will need to analyze the relevant transactions to determine if the federal securities laws apply.

77.     Investors who bought $JENNER invested money or other valuable consideration in a common enterprise. Investors had a reasonable expectation of profit based off the managerial, entrepreneurial, and promotional efforts of Jenner and her team, which included the assistance of Hutchins. Accordingly, $JENNER is a security.

**Investment of Money**

78.     The SEC states in the Framework, "The first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of traditional (or fiat) currency, another digital asset, or other type of consideration."

79.     Here, investors purchasing $JENNER, including Plaintiff, made an investment of money or other valuable consideration (in most cases, $SOL or $ETH), satisfying the first prong of the *Howey* test.

**Common Enterprise**

80.     A common enterprise exists when there is a direct correlation between the promoter's success or failure and the investor's profits or losses. Furthermore, the SEC states

in the Framework that "In evaluating digital assets, we have found that a 'common enterprise' typically exists."

81.    Investors purchasing $JENNER, including Plaintiff, expected their profits to be obtained by the success of Jenner's and Hutchins's marketing, promotional, managerial, and entrepreneurial efforts, therefore establishing broad vertical commonality and hence a common enterprise.

### Expectation of Profits

82.    The Framework states, "When assessing whether there is a reasonable expectation of profit derived from the efforts of others, federal courts look to the economic reality of the transaction." Furthermore, "A purchaser may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, ***such as selling at a gain in a secondary market***." (emphasis added).

83.    The Framework identifies several "characteristics" to help assess whether the "reasonable expectation of profits" element is met and says, "The more [certain] characteristics are present, the more likely it is there is a reasonable expectation of profit." Jenner and $JENNER meet many of these characteristics, including, without limitation, the ones discussed below.

(a) *Characteristic 1* - "<u>The digital asset gives the holders rights to share in the enterprise's income or profits or to realize gains from capital appreciation of the digital asset. The opportunity may result from appreciation in the value of the digital asset that comes, at least in part, from the operation, promotion, improvement, or other positive developments . . . particularly if there is a secondary trading market that enables digital asset holders to resell their digital assets and realize gains.</u>"[18] Since its genesis, $JENNER, on both blockchains, has been marketed as a way for investors to realize gains from capital appreciation. The ability to profit was the focus of the marketing

---

[18] The language quoted and underlined here and in the subparagraphs below is from the Framework setting forth these characteristics.

efforts spearheaded by the $JENNER "team" – Jenner and Hutchins. Moreover, as described herein, $JENNER had a secondary market established on its first day, which enabled holders to resell their holdings at a profit.



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20



21
22
23
24
25
26
27
28

(b) *Characteristic 2* – "<u>The digital asset is transferable or traded on or through a secondary market or platform or is expected to be in the future.</u>" Jenner has facilitated investor access to secondary trading markets on Pump.Fun, various DEXs including Raydium and Uniswap, and has promised to gain listings on a few notable centralized exchanges (CEXs), which never manifested. Plaintiffs and the Class relied on these false and misleading promises by Jenner about CEX listings when they invested in $JENNER, and when these promises did not manifest, holders had no recourse as the price of $JENNER had collapsed so much since the start of the enterprise.





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(c) *Characteristic 3* – "<u>Purchasers reasonably would expect that an AP's efforts will result in capital appreciation of the digital asset and therefore be able to earn a return on their purchase</u>."[19] Jenner has touted on social media on numerous occasions that the purpose of the project is capital appreciation for investors.



(d)    *Characteristic 4* – "<u>The AP is able to benefit from its efforts as a result of holding the same class of digital assets as those being distributed to the publi</u>c." Jenner has, at various times, accumulated significant holdings of both the Solana-based and Ethereum-based $JENNER tokens. Jenner intended to accumulate these tokens at low prices, and to sell at higher prices in the future following an increase in value surrounding increased speculation in the project. Furthermore, she has received a significant amount of revenue from the Ethereum-based $JENNER transaction taxes, likely over $500,000.

---

[19] The Framework defines Active Participant, or AP, as a promoter, sponsor, or other third party (or affiliated group of third parties). As the primary promoter and sponsor of $JENNER, Jenner is an AP.



(e)    *Characteristic 5* – "<u>The digital asset is marketed, directly or indirectly,</u> <u>using . . . the [ability of an AP] to build or grow the value of the . . . digital asset.</u>" On several occasions over the span of multiple months, Jenner promoted the investment opportunity on social media as one which would be successful due to her own ability to build or grow the value of $JENNER. Jenner falsely led investors to believe that the project was a "marathon not a sprint" and that she would be there for the long term to build the project.





32



(f)     *Characteristic 6* – "<u>The digital asset is marketed in terms that indicate it is an investment or that the solicited holders are investors</u>." By promoting $JENNER as a memecoin which could easily and immediately be traded, and touting its ability to rapidly increase in value, Jenner marketed her memecoin as a "fun" investment to investors, regardless of their financial sophistication.

///

///

///

///





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(g)     *Characteristic 7* – "<u>The digital asset is marketed, directly or indirectly, using the future (and not present) functionality of the . . . digital asset, and the prospect that an AP will deliver that functionality</u>." Jenner has leveraged her family's celebrity status to imply $JENNER would have some sort of integrated consumptive or utilitarian purpose in the future. Jenner has also stated her intentions to make $JENNER "the most viral memecoin ever."





(h)   *Characteristic 8* – "<u>The potential . . . appreciation in the value of the digital asset, is emphasized in marketing or other promotional materials</u>." Jenner has continuously and repeatedly emphasized the potential for $JENNER to increase in value in publicly-facing statements on social media, including illustrative graphics depicting financial and trading advice.







36



(i)    *Characteristic 9* – "<u>The availability of a market for the trading of the digital asset, particularly where the AP implicitly or explicitly promises to create or otherwise support a trading market for the digital asset</u>." Jenner actively and repeatedly told investors she would get the Ethereum-based $JENNER listed on major CEXs, so as to increase trading volume and liquidity for investors. These promises were the direct and proximate cause of investors choosing to purchase and hold $JENNER, and when Jenner was not able to successfully get the token listed on multiple reputable

U.S.-based CEXs, either willfully or via incompetence, the project was unable to ever recover, and investors have become unable to recoup their losses. The couple of minor foreign CEXs on which Jenner was able to get $JENNER listed have either begun to or already delisted the token due to lack of trading volume and liquidity following the collapse of the $JENNER project. Jenner used the proceeds she received from the offer and sale of $JENNER to pay for the listings on the foreign CEXs, likely between $10,000 and $40,000 per listing.



(j) *Characteristic 10* – "<u>The digital asset is offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services or those who have a need for the functionality of the [digital asset]</u>." Since there is no consumptive or utilitarian use case for $JENNER, and its entire appeal to investors is based off speculation, the memecoin has been offered and sold broadly to the general public without regard for their need or sophistication.



**Efforts of Others**

84.     The Framework provides that the "inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues: Does the purchaser reasonably expect to rely on the efforts of an AP? Are those efforts 'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise,' as opposed to efforts that are more ministerial in nature?"

85.   The Framework identifies a number of characteristics to help assess whether a purchaser is relying on the efforts of others and states that, "Although no one of the . . . characteristics is necessarily determinative, the stronger their presence, the more likely it is that a purchaser of a digital asset is relying on the 'efforts of others.'" Jenner and $JENNER meet many of these characteristics, including, without limitation, the ones discussed below.

(a) *Characteristic 1* – "An AP is responsible for the development, improvement (or enhancement), operation, or promotion of the [digital asset], particularly if purchasers of the digital asset expect an AP to be performing or overseeing tasks that are necessary for the [digital asset] to achieve or retain its intended purpose or functionality." Both Jenner and Hutchins have made clear to investors that they are leading the $JENNER project and will be performing or overseeing tasks necessary to facilitate an increase in value for $JENNER. For example, Hutchins assisted Jenner by running the project's public Telegram account and by conducting multiple Twitter Spaces sessions where she answered investors' questions. Jenner or Hutchins were responsible for all business-related dealings with CEXs and market makers as well.



*Azad v. Jenner*, Case No. 2:24-cv-9768
CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12



13
14
15
16
17



18    (b)    *Characteristic 2* – "<u>Where the [digital asset] is still in development and the [digital asset] is not fully functional at the time of the offer or sale, purchasers would reasonably expect an AP to further develop the functionality of the [digital asset] (directly or indirectly). This particularly would be the case where an AP promises further developmental efforts in order for the digital asset to attain or grow in value</u>." On numerous occasions, Jenner has promised investors she would be involved with developing $JENNER for the long haul, until the project was successful, since it is her "official memecoin." But since September 2024, Jenner has stopped posting on social media information directly related to $JENNER, both the Telegram account and jennercoineth.com have been shut down, and Jenner has all but abandoned the project, leaving holders with essentially worthless cryptocurrency.



(c)    *Characteristic 3* – "<u>There are essential tasks or responsibilities performed and expected to be performed by an AP, rather than an unaffiliated, dispersed community of network users (commonly known as a 'decentralized network')</u>." There is no decentralized network or "decentralized autonomous organization" ("DAO") behind $JENNER, but only Jenner and Hutchins, who are responsible for the memecoin's development and promotion, including all business, managerial, and entrepreneurial decisions related to the project.

(d)    *Characteristic 4* – "<u>An AP creates or supports a market for, or the price of, the digital asset. This can include, for example, an AP that (1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, 'burning,' or other activities</u>." Not only did Jenner initiate the mint and issuance of $JENNER on both blockchains, but on numerous occasions she has promised investors she would initiate token "buy backs," thereby artificially inflating the market in an attempt to support the underlying price. A major selling ploy Jenner used on the original Solana-based $JENNER holders, to get them to purchase her subsequent Ethereum-based $JENNER (now with a hidden transaction tax), was to promise these buy backs, which were supposed to benefit investors. Jenner never initiated these buy backs in any meaningful way. These false and misleading statements were a direct and proximate cause of the losses suffered by Plaintiffs and the Class.



(e)    *Characteristic 5* – "<u>An AP has a continuing managerial role in making decisions about or exercising judgment concerning . . . the characteristics or rights the digital asset represents including determining whether and where the digital asset will trade. For example, purchasers may reasonably rely on an AP for liquidity, such as where the AP has arranged, or promised to arrange for, the trading of the digital asset on a secondary market or platform</u>." Jenner was responsible for providing the initial liquidity for $JENNER on Ethereum, and has promised to arrange for its trading elsewhere on other secondary markets or platforms.

///
///
///
///
///
///
///
///
///



(f)     *Characteristic 6* – "<u>An AP [makes] . . . managerial judgments or decisions</u> <u>that will directly or indirectly impact the success of the value of the digital asset</u> <u>generally</u>." Jenner, with Hutchins' assistance, is responsible for all managerial judgments or decisions that have any meaningful impact on the success of $JENNER. These include, *inter alia*, business decisions surrounding CEX listings, promotional and marketing budgeting and activities, and timing of mints. Hutchins had assisted Jenner with running the various social media accounts and websites used to promote $JENNER.







(g)  *Characteristic 7* – "<u>Purchasers would reasonably expect the AP to</u> <u>undertake efforts to promote its own interests and enhance the value of the network or</u> <u>digital asset, such as where the AP has the ability to realize capital appreciation from</u> <u>the value of the digital asset. This can be demonstrated, for example, if the AP retains</u>

a stake or interest in the digital asset." Jenner continuously stated she intends to purchase more of her own memecoin, and not only profits from any underlying appreciation of the digital asset, but also from the transaction taxes imposed on every transaction of $JENNER on the Ethereum blockchain.



(h)    *Characteristic 8* – "The AP monetizes the value of the digital asset, especially where the digital asset has limited functionality." As there is no functionality to $JENNER, Jenner continuously solicited investors so to monetize the digital asset and attempt to drive its underlying value higher.



(i)    *Characteristic 9* – "An AP has a continuing managerial role in making decisions about or exercising judgment concerning . . . determining who will receive additional digital assets and under what conditions." Jenner has created additional cryptocurrency projects, including a non-fungible token, with which she has promised to reward $JENNER holders in some fashion, granting its holders ownership rights to her Olympic gold medal. However, this once again did not manifest, and was another proximate and direct cause leading investors to purchase $JENNER.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



47



(j)      *Characteristic 10* – "<u>An AP has a continuing managerial role in making decisions about or exercising judgement concerning . . . making or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital assets</u>." In addition to promising to use some of her transaction tax revenue to fund the 2024 presidential campaign of Donald J. Trump, Jenner promised to use some of the funds she has earned from sales of $JENNER to get the Ethereum-based token listed on prominent CEXs and provide buybacks to holders – both of which never happened and were a proximate and direct cause of losses suffered by Plaintiffs and the Class.

***Jenner Issued, Offered, and Sold Unregistered Securities***

86.      Section 12 of the Securities Act of 1933 states that "[a]ny person who . . . offers or sells a security" in violation of its substantive provisions "shall be liable . . . to the person purchasing such security from him."

87.      This liability attaches to the "owner who passed title, or other interest in the security, to the buyer for value" or a person "***who successfully solicit[ed] the purchase,***

*motivated at least in part by a desire to serve his own financial interest or those of the securities owner.*" *Pinter v. Dahl*, 486 U.S. at 642, 647 (1988) (emphasis added).

88.     Jenner consistently and repeatedly solicited investors, through social media posts, public appearances, and public statements, to purchase $JENNER, both on Solana and Ethereum, to serve her own financial interests. Not only did Jenner benefit from obtaining $JENNER earlier and cheaper than the general public (the value of which was poised to increase based on her own efforts to sustain and grow community interest in the project), but she was motivated by a desire to bring attention to her own particular brand of celebrity. Additionally, Jenner specifically stated on numerous occasions that the project's creation was to benefit her own underlying financial interests, and took concrete steps to achieve that goal by implementing the transaction tax on the Ethereum-based $JENNER.

### Jenner Omitted or Misrepresented Material Information Related to $JENNER

89.     Jenner omitted or misrepresented material information in connection with her solicitation of investors to purchase $JENNER.

90.     Jenner willfully omitted information which would have been deemed by a reasonable investor important to have when buying or selling $JENNER. Such information includes, *inter alia*: Jenner's (and other insiders', such as Hutchins's) personal holdings of $JENNER; the public wallet addresses she uses to hold or trade $JENNER; the price at which she personally has purchased and continued to accumulate $JENNER during relevant period; the financial risks associated with memecoin investment generally, and her project specifically; details surrounding her involvement with Sahil Arora; and detailed and reliable financial forecasts and analyses of the current and future state of the project.

91.     Furthermore, Jenner made false statements, some of which were forward looking, which were known to be false or were made with a reckless disregard for their truth.

92.     For example, Jenner repeatedly touted to investors the ability of $JENNER to increase continuously and exponentially in value, despite knowing the vast majority of memecoins lose over 90% of their value. Jenner also misled investors to believe there would be multiple listings on reputable CEXs and token buy backs, neither of which manifested.

She also suggested $JENNER would see increased utility, which similarly did not manifest. Jenner constantly downplayed or completely omitted the risks involved in investing in $JENNER, and instead chose to paint the investment as an effortless, "fun," no-risk way to make a quick profit. Jenner has promised to create "community" around her online and personal celebrity persona to the benefit of the "early adopters" she has been soliciting without disclosing the risks and possible pitfalls associated with investing in $JENNER.

***The Class Has Suffered Significant Damages from Defendants' Actions***

93.    As a direct result of Jenner's unlawful and fraudulent creation, solicitation, offer, and sale of unregistered securities with Hutchins's assistance, Plaintiffs and the Class – many of whom are retail investors and lack the technical and financial sophistication necessary to have evaluated the risks associated with their investments in $JENNER and were denied the information that would have been contained in the materials required for the registration of $JENNER – have suffered significant damages. Presently, Jenner appears to have all but abandoned the project, no longer actively promotes the memecoin, and has left holders on the hook for serious losses. It is unlikely these losses can ever be recovered, since $JENNER, on both Solana and Ethereum, is down 99% from its all-time highs.

94.    Although the project has failed, trading volume is way down, and Jenner seems to have abandoned the hype, she did post about the project as recently as September of 2024, mocking a person who had lost their life savings investing in $JENNER, and still declaring, "We aren't going anywhere."

///
///
///
///
///
///
///
///



95. Currently, there appears to be a few thousand dollars' worth of trading volume still occurring daily on the Ethereum-based $JENNER.[20] Unless enjoined, there is nothing preventing Jenner from promoting the project at a later date and repeating this fraudulent behavior.



## CLASS ALLEGATIONS

96. While reserving the right to redefine or amend the class definition prior to or as part of a motion seeking class certification, pursuant to Federal Rule of Civil Procedure 23, Plaintiffs seek to represent a "Class" of all persons who purchased $JENNER between the

---

[20] *See* https://etherscan.io/token/0x482702745260ffd69fc19943f70cffe2cacd70e9.

time it was first offered for sale, and the time a Class is notified of certification (the "Class Period"). Excluded from the Class are Defendants, any $JENNER insider, and any entity in which Defendants have or had a controlling interest.

97.     The members of the Class are so numerous that joinder of all members is impracticable. As of November of 2024, there are thousands of public digital wallets either previously transacting in, or currently still hold, $JENNER on both blockchains. Therefore, while the exact number of Class Members is unknown, Plaintiffs believe there are likely thousands of Members of the proposed Class.

98.     Plaintiffs' claims are typical of the claims of other Class Members, as all Class Members were similarly affected by Defendants' wrongful conduct in violation of the laws, as complained of herein.

99.     Plaintiffs will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action litigation.

100.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, among them:

        a.      Whether $JENNER, or the manner in which it was offered and sold, constitute securities under federal law;

        b.      Whether Jenner's offer and sale of $JENNER violated the Securities Act;

        c.      Whether Jenner fraudulently misrepresented or omitted material information in connection with the offer and sale of securities;

        d.      Whether Hutchins is liable as a control person of $JENNER under Section 15(a) of the Securities Act;

        e.      Whether Hutchins (a) knew Jenner's conduct constitutes a breach of duty and gave substantial assistance or encouragement to Jenner to so act, or (b) gave substantial assistance to Jenner in accomplishing a tortious result and Hutchin's own conduct, separately considered, constitutes a breach to the investors;

        f.      To what extent Plaintiffs and the Class have sustained damages; and

g.      The proper measure of damages.

101.    A class action is superior to all other methods of fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class Members may be relativity small, the expense and burden of individual litigation make it impossible for Class Members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

<div align="center">

**CAUSES OF ACTION**

**<u>FIRST CAUSE OF ACTION</u>**

**Unregistered Offer and Sale of Securities**

**In Violation of Sections 5 and 12(a)(1) of the Securities Act**

**(Against Jenner)**

</div>

102.    Plaintiffs realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

103.    Section 5(a) of the Securities Act provides:

Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

15 U.S.C. § 77e(a).

104.    Section 5(c) of the Securities Act provides:

It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security[.]

*Id.* § 77e(c).

105.    Section 12(a)(1) of the Securities Act grants Plaintiffs and the Class a private right of action against any person who offers or sells a security in violation of § 5, and states that such person:

> Shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover consideration for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

*Id.* § 77l(a)(2).

106.    Jenner is a "seller" and "offeror" within the meaning of the Securities Act because she solicited Plaintiffs and the Class to invest in $JENNER for her own financial benefit.

107.    In connection with the sale of unregistered $JENNER, Jenner unlawfully made use of means or instruments of transportation or communication in interstate commerce or of the mails for the purpose of offering, selling, or delivering unregistered securities in direct violation of §§ 5(a), 5(c), and 12(a)(1) of the Securities Act.

108.    The sale of $JENNER constituted sales of unregistered securities under federal law.[21] $JENNER and the manner in which it was offered and sold exhibits the following hallmarks of a security under the test articulated in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946): (a) in order to receive any $JENNER, an investment of money in the form of a cryptocurrency was required; (b) the investment of money was made into the common enterprise; (c) there was an expectation of returns on the investment; and (d) the potential returns depended on Jenner's ability to promote $JENNER and her efforts to grow the project.

109.    Jenner offered or sold $JENNER to Plaintiffs and other Class Members. Plaintiffs and other Class Members purchased $JENNER based on Jenner's offers and solicitations to buy.

---

[21] *See* Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1).

110.   No registration statements have been filed with the SEC or have been in effect with respect to the sale of $JENNER. The sale of $JENNER was not a transaction exempt from the registration requirements of the Securities Act. By reason of the foregoing, Jenner has violated §§ 5(a), 5(c), and 12(a)(1) of the Securities Act.

111.   As a direct and proximate result of Jenner's unregistered sale of securities in violation of the Securities Act, Plaintiffs and other Class Members have suffered damages in connection with their purchases or acquisitions of $JENNER.

112.   Jenner is liable to Plaintiffs and the Class pursuant to the Securities Act for compensatory and equitable relief, including rescission or damages, together with pre- and post-judgment interest, reasonable attorneys' fees, and costs of suit.

<div align="center">

**<u>SECOND CAUSE OF ACTION</u>**

**False and Misleading Statements and Deceptive Omissions**

**In Violation of 12(a)(2) of the Securities Act**

**(Against Jenner)**

</div>

113.   Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

114.   Section 12(a)(2) makes it unlawful to offer or sell a security by the use of a means or instrumentality of interstate commerce by means of a prospectus or oral communication that includes an untrue statement of material fact, or omits a material fact that is necessary to make the statement, in light of the circumstances under which it was made, not misleading. *See* 15 U.S.C. § 77l(a)(2); *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 885 (9th Cir. 2008).

115.   Throughout the Class Period, Jenner offered and sold $JENNER to Plaintiffs and other Class Members by means of written and oral communications, including but not limited to promotional material, social media posts, online advertisements, and public statements.

116.   These written and oral communications contained materially false and misleading statements, and omitted material facts necessary to make the statements not

<div align="center">55</div>

misleading, including but not limited to the following: (i) misrepresentations regarding the potential profitability, functionality, and value of $JENNER; (ii) failing to disclose the risks associated with investing in $JENNER, including regulatory risks and potential lack of liquidity; (iii) misleading statements about the project's financial health, business prospects, and future growth opportunities; (iv) Jenner's and other insiders' own holdings and financial interests in the enterprise; and (v) false and misleading statements about getting $JENNER listed on CEXs.

117.    Plaintiffs and other Class Members relied on these materially false and misleading statements and omissions in deciding to purchase $JENNER offered by Jenner.

118.    As a direct and proximate result of Jenner's actions and omissions, Plaintiffs and the Class have suffered damages in connection with their purchases of the securities.

119.    Jenner is liable to Plaintiffs and the Class pursuant to the Securities Act for compensatory and equitable relief, including rescission or damages, together with pre- and post-judgment interest, reasonable attorneys' fees, and costs of suit.

## THIRD CAUSE OF ACTION

### Securities Fraud

### In Violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b)

### (Against Jenner)

120.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

121.    Jenner, by use of the means instrumentalities of interstate commerce, in connection with the purchase and sale of $JENNER, made to Plaintiffs and other Class Members, untrue statements of material fact, and omitted material facts, with the intent to deceive.

122.    At all times relevant to this action, Jenner was an international superstar celebrity, enjoying widespread reputation and public image as having special and unique influence on marketing and promotional gimmicks.

123. Jenner, by use of the means and instrumentalities of interstate commerce, made false and misleading statements of then-existing fact and omissions of material fact in connection with the purchase and sale of $JENNER to investors and the public, including Plaintiffs and other Class Members, from May 26, 2024, through at least September 2024, thereby artificially inflating the price and/or value of $JENNER.

124. Jenner made the aforesaid false and misleading statements and omissions knowing they were false and deceptive.

125. Jenner, by use of the means and instrumentalities of interstate commerce, also made false and misleading forward-looking statements to Plaintiffs, other Class Members, investors, and the public, in connection with the purchase and sale of $JENNER, from May 26, 2024 through the present, and continues to do so, thus artificially inflating the price and/or value of $JENNER.

126. Jenner made these false and misleading forward-looking statements while simultaneously failing to make meaningful cautionary statements identifying important factors then known to her that could cause actual results to differ materially from those in the purported forward-looking statements.

127. Jenner made the aforesaid forward-looking statements knowing they were false, but hoping that her public persona and online antics could make them true eventually.

128. Jenner, by her false and misleading public statements, knowingly and recklessly lent $JENNER a false character in commerce, namely as a potential to increase in value, and falsely suggested her personality and online celebrity status could support and propel the project indefinitely, thereby artificially inflating the price and/or value of $JENNER.

129. Jenner lent $JENNER this false character with reckless disregard for whether her personality and online celebrity status and antics could in fact support and propel such long-term value.

130. Jenner by her false and misleading public statements knowingly and recklessly lent $JENNER a false character in commerce, namely, that of a fun, profitable and fungible

investment instrument on the cutting edge of technology and pop culture, thereby artificially inflating the price and/or value of $JENNER, while knowing countervailing information about $JENNER's risks that she failed to disclose or adequately disclose to Plaintiffs and the Class.

131.    Jenner's material misstatements and omissions concealed from Plaintiffs and the Class $JENNER's utter dependence on her public statements and online antics for its value; the unsustainability of this support as a basis for $JENNER's value; and the severe extent to which $JENNER is limited in its potential utility, fungibility, and sustainability as an investment.

132.    A primary purpose of Jenner's material misstatements and omissions was to cross-promote herself and to cultivate a cryptocurrency brand uniquely associated with her brand of celebrity, which she could leverage for financial gain, and which she in fact did leverage for financial gain through deployment of her transaction tax on the Ethereum blockchain.

133.    If not for Jenner's material misstatements and omissions, Plaintiffs and other Class Members would not have purchased $JENNER.

134.    During the Class Period, Plaintiffs and other Class Members, in reliance on Jenner's material misrepresentations, purchased $JENNER at artificially inflated prices resulting from her misstatements and omissions.

135.    As a direct and proximate result of Jenner's wrongful conduct in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b), Plaintiffs and the Class suffered economic loss in connection with their purchases of $JENNER, and therefore are entitled to and do seek damages and injunctive relief.

## FOURTH CAUSE OF ACTION

### Violation of Section 15(a) of the Securities Act

### (Against Hutchins)

136.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

137.    Given her interest and control over the $JENNER project, Hutchins acted as a controlling person of the $JENNER project within the meaning of Section 15(a) of the Securities Act.

138.    By virtue of her position as "CEO" of, and participation in the $JENNER project's operations, Hutchins had the power to influence and control, and did influence and control, directly and indirectly, decision making relating to $JENNER, including the decision to engage in the fraudulent offer and sale of unregistered securities.

139.    By virtue of the foregoing, Hutchins is liable to Plaintiffs and the Class as a control person of the $JENNER project under Section 15(a) of the Securities Act, and is jointly and severally liable for any and all damages for which Jenner is liable under the Securities Act.

## FIFTH CAUSE OF ACTION

### Offer, Sale, or Purchase of Securities and Fraudulent or Misleading Actions
### In Violation of California Corp. Code § 25401
### (Against Jenner)

140.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

141.    California Corp. Code § 25401 prohibits fraud in the offer or sale of securities by any person in California.

142.    $JENNER is a security under controlling federal law.

143.    Jenner offered and sold $JENNER in California by means of written and oral communications that included an untrue statements of material facts and omitted material facts necessary to make the statements, in the light of the circumstances under which they were made, not misleading.

144.    Jenner is liable to Plaintiffs and the Class pursuant to California Corp. Code § 25401 for compensatory and equitable relief, including recission or damages, together with pre- and post-judgment interest, reasonable attorneys' fees, and costs of suit.

## SIXTH CAUSE OF ACTION

### Offer and Sale of Unqualified Securities

### In Violation of California Corp. Code § 25110

### (Against Jenner)

145.   Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

146.   California Corp. Code § 25110 prohibits the offer or sale by any person in California of securities that are not qualified through registration.

147.   As described herein, $JENNER is a security under controlling federal law.

148.   Jenner offered and sold $JENNER in California without being properly registered or qualified for offer or sale with any federal or California regulator.

149.   Jenner is liable to Plaintiffs and the Class pursuant to California Corp. Code § 25401 for compensatory and equitable relief, including rescission or damages, together with pre- and post-judgment interest, reasonable attorneys' fees, and costs of suit.

## SEVENTH CAUSE OF ACTION

### Common Law Fraud

### (Against Jenner)

150.   Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

151.   Jenner intentionally and recklessly made material misstatements and omissions of material fact to $JENNER investors including Plaintiffs and other Class Members.

152.   Jenner, for personal financial benefit, made these misrepresentations to induce Plaintiffs and other Class Members to purchase and hold $JENNER, even as the value of the security plummeted.

153.   Plaintiffs and the Class reasonably relied on Jenner's misrepresentations to purchase and hold $JENNER.

154.    Plaintiffs and the Class lost money purchasing and holding $JENNER, when Jenner's misrepresentations turned out to be false.

155.    As a direct and proximate result of Jenner's fraud, Plaintiff and the Class suffered economic loss and therefore are entitled to and do seek damages and injunctive relief, including monies unlawfully or inequitably obtained by Jenner through the deployment of a transaction tax on the Ethereum-based $JENNER.

## EIGHTH CAUSE OF ACTION

### Aiding and Abetting Fraud

### (Against Hutchins)

156.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

157.    Under California law, "[l]iability may . . . be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach to the third person." *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1118 (C.D. Cal. 2003) (citations omitted). "Unlike a conspirator, an aider and abettor does not 'adopt as his or her own' the tort of the primary violator. Rather, the act of aiding and abetting is distinct from the primary violation; liability attaches because the aider and abettor behaves in a manner that enables the primary violator to commit the underlying tort." *Id.*

158.    By promoting $JENNER on social media platforms, holding herself out as the CEO of the $JENNER project, and participating in the project's management and decision making, Hutchins provided assistance that was a substantial factor causing the price of $JENNER to surge and sustain long enough for Jenner to receive a significant amount of revenue via transaction taxes on Ethereum. Moreover, because Hutchins made similar misrepresentations and omissions concerning $JENNER, her conduct breached a duty she

owed to Plaintiffs and other Class Members, to tell the full truth when soliciting their purchase of securities.

159.   Without Hutchins's assistance, Jenner would have been unable to use the misleading marketing strategy she devised to fraudulently market $JENNER, and would not have been able to commit the violations of federal of state securities laws identified herein.

160.   While giving Jenner assistance, Hutchins was aware Jenner was defrauding Plaintiffs and other Class Members, because Hutchins and Jenner have both close business and personal relationships. Moreover, by introducing Jenner to Arora to first mint $JENNER, Hutchins gave substantial encouragement to Jenner to commit the fraud.

161.   Hutchins's substantial assistance and encouragement in the fraud caused Plaintiffs and other Class Members to purchase and hold $JENNER when they otherwise would not have done so.

162.   As a direct and proximate result of Hutchins aiding and abetting Jenner's fraud, Plaintiffs and the Class suffered losses and are entitled to recover from Hutchins their actual damages. Plaintiffs further seek an order enjoining Hutchin's wrongful acts or practices, awarding restitution and disgorgement of all monies generated as a result of such practices, and granting all other relief allowed under California law.

## NINTH CAUSE OF ACTION

### Quasi Contract

### (Against Jenner)

163.   Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

164.   Plaintiffs and other Class Members conferred direct monetary benefits on Jenner in the form of fees paid for transaction taxes on the Ethereum-based $JENNER.

165.   With their money, Jenner unjustly enriched herself.

166.   Jenner has knowledge of the benefits that Plaintiffs and other Class Members conferred on her.

167.   Under principles of equity and good conscience, Jenner should not be permitted to retain the funds and assets she received as a result of her inequitable conduct.

168.   To the extent that Plaintiffs and other Class Members have no other adequate remedy at law, Plaintiffs seeks restitution of all funds and assets that Jenner has unjustly received as a result of her wrongful charge, use, and conversion of transaction taxes on Ethereum-based $JENNER.

## PRAYER FOR RELIEF

169.   WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated, pray for judgment against Defendants as to each and every cause of action, and an Order:

a.   Declaring this action to be a proper class action, appointing Plaintiffs as Class Representatives, and appointing their counsel as Class Counsel;

b.   Requiring Defendants to bear the cost of Class Notice;

c.   Requiring Defendants to pay compensatory, statutory, and punitive damages permitted by law;

d.   Requiring Defendants to disgorge all monies, revenues, and profits obtained by means of any unlawful act or practice;

e.   Awarding pre- and post-judgment interest on any monetary judgment;

f.   Granting appropriate injunctive and declaratory relief;

g.   Awarding reasonable attorneys' fees and costs; and

h.   Granting such further relief that the Court deems necessary, just, and proper.

## DEMAND FOR JURY TRIAL

170.   Plaintiffs hereby demand a jury trial for all claims so triable.


Dated: November 13, 2024                    /s/ Jack Fitzgerald

**FITZGERALD MONROE FLYNN PC**
JACK FITZGERALD

63

1     *jfitzgerald@fmfpc.com*
2     MELANIE R. MONROE
3     *mmonroe@fmfpc.com*
      TREVOR FLYNN
4     *tflynn@fmfpc.com*
      PETER GRAZUL
5     *pgrazul@fmfpc.com*
6     2341 Jefferson Street, Suite 200
      San Diego, California 92110
7     **Counsel for Plaintiffs**

*Azad v. Jenner*, Case No. 2:24-cv-9768
CLASS ACTION COMPLAINT