Jeffrey L. Steinfeld (SBN: 294848)
JLSteinfeld@winston.com
John E. Schreiber (SBN: 261558)
JSchreiber@winston.com
WINSTON & STRAWN LLP
333 S. Grand Avenue, 38th Fl.
Los Angeles, CA 90071-1543
Telephone: (213) 615-1700
Facsimile: (213) 615-1750

George E. Mastoris (*pro hac vice*)
GMastoris@winston.com
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700

*Attorneys for Defendants*
*Caitlyn Jenner and Sophia Hutchins*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAEEM AZAD and MIHAI CALUSERU, on behalf of themselves, all others similarly situated, and the general public,<br><br>        Plaintiffs,<br><br>      v.<br><br>CAITLYN JENNER and SOPHIA HUTCHINS,<br><br>        Defendants. | Case No. 2:24-cv-09768-SB-JC<br><br><u>CLASS ACTION</u><br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT; DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**<br><br>Judge:      Hon. Stanley Blumenfeld, Jr.<br>Date:       May 30, 2025<br>Time:      8:30 a.m.<br>Courtroom: 6C<br>Action Filed: November 13, 2024 |

**TO THE COURT, CLERK, ALL PARTIES AND COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on May 30, 2025, at 8:30 a.m.,[1] or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Stanley Blumenfeld, Jr., located in the United States Courthouse, Courtroom 6C, 350 West 1st Street, Los Angeles, California 90012, Defendants Caitlyn Jenner and Sophia Hutchins will, and hereby do, move to dismiss the First Amended Complaint (the "AC") (ECF No. 22) with prejudice under Federal Rules of Civil Procedure ("Rules") 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

This Motion is based on this Notice of Motion; the attached Memorandum of Points and Authorities;[2] all the pleadings, files, and records in this proceeding; Defendants' forthcoming reply brief; all other matters of which the Court may take judicial notice; and any argument or evidence that may be presented to or considered by the Court prior to its ruling.

Pursuant to Local Rule 7-3 and Section 6(a)(ii) of this Court's Standing Order for Civil Cases, undersigned counsel hereby certifies that the parties met in person on Friday, February 28, 2025, at the 1st Street Courthouse for approximately one hour, thoroughly discussed each and every issue raised in the motion, and attempted in good faith to resolve the motion in whole or in part. During the meet and confer, Plaintiff's counsel indicated that they would take the issues raised under consideration. Thereafter, Plaintiff did not further respond or adjust his claims in any way.

---

[1] The parties have agreed to a briefing schedule pursuant to which Plaintiff's opposition shall be filed on or before April 25, 2025 (35 days after the filing of this Motion, the same amount of time Defendants had to respond to the AC), and Defendants' reply brief shall be filed on or before May 16, 2025 (two weeks before the hearing date). *See* Decl. of Jeff Steinfeld ("Steinfeld Decl."), Ex. D.

[2] All emphasis in the attached Memorandum of Points and Authorities is added, and internal quotations and citations are omitted unless otherwise noted.

DATED: March 21, 2025                Respectfully submitted,

WINSTON & STRAWN LLP

By: /s/ Jeffrey Steinfeld
    Jeffrey L. Steinfeld
    John E. Schreiber
    George Mastoris

    Attorneys for Defendants
    Caitlyn Jenner and Sophia Hutchins

# <u>TABLE OF CONTENTS</u>

Page

I.  INTRODUCTION ....................................................................................... 1

II.  BACKGROUND ........................................................................................ 3

III.  ARGUMENT .............................................................................................. 5

A.  The $JENNER Memecoins Are Not Securities ................................... 5

1.  $JENNER Purchasers Did Not Invest in a "Common
Enterprise" ............................................................................... 6

2.  No Expectation of Profits Solely From Defendants'
Efforts ...................................................................................... 8

3.  Plaintiff Fails to Plead a Domestic Transaction ..................... 10

B.  Plaintiff Fails to Adequately Plead a 10b-5(b) Claim ...................... 11

1.  Plaintiff Fails to Plead a False or Misleading Statement.......... 12

a.  Failure To Plead Falsity ............................................... 15

b.  Non-Actionable Puffery ................................................ 17

c.  Non-Actionable Opinions ............................................. 19

d.  Forward-Looking Statements ........................................ 20

2.  Plaintiff Fails to Adequately Allege Scienter ......................... 22

3.  Plaintiff Fails to Plead Reliance and Loss Causation.............. 24

C.  Plaintiff's Section 12 Claims Fail ..................................................... 26

1.  Plaintiff Lacks Standing to Pursue Section 12 Claims............ 26

2.  Jenner Was Not Plaintiff's Statutory Seller............................. 28

D.  Plaintiff's State Law Causes of Action Fail...................................... 29

1.  Plaintiff's Section 25401 and 25110 Claims Fail.................... 30

2.  The State Common Law Fraud Claim Fails............................. 31

3.    The Quasi-Contract Claim Fails ................................................ 32

E.    Plaintiff's Secondary Liability Claims Against Hutchins Fail .......... 32

IV.    CONCLUSION ............................................................................... 35

DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

5

*Abe v. AFCH, Inc.*,
    2021 WL 2209309 (C.D. Cal. June 1, 2021)......................................................21

6

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012) ................................................................................10

7

8

*AMI – Gov't Emps. Provident Fund Mgmt. Co. v. Alphabet Inc.*,
    2024 WL 4353637 (N.D. Cal. Sept. 3, 2024).....................................................19

9

10

*Apollo Cap. Fund, LLC v. Roth Cap. Partners, LLC*,
    158 Cal. App. 4th 226 (2007).......................................................................30, 34

11

12

*Aramic LLC v. Revance Therapeutics, Inc.*,
    2024 WL 1354503 (N.D. Cal. Apr. 2, 2024) .....................................................15

13

14

*In re Astra Space, Inc. Sec. Litig.*,
    2023 WL 4983156 (N.D. Cal. Aug. 2, 2023)..........................................20, 21, 22

15

16

*Axonic Cap. LLC v. Gateway One Lending & Finance, LLC*,
    2018 WL 11355034 (C.D. Cal. Dec. 18, 2018) .................................................35

17

*In re Bare Escentuals, Inc. Sec. Litig.*,
    745 F. Supp. 2d 1052 (N.D. Cal. 2010).............................................................33

18

19

*Barry v. Colony NorthStar, Inc.*,
    2019 WL 13237710 (C.D. Cal. Jan. 24, 2019)............................................17, 18

20

21

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ..........................................................................................19

22

23

*Baylor v. Honda Motor Co.*,
    2024 WL 650415 (C.D. Cal. Jan. 19, 2024).......................................................11

24

25

*Bowden v. Robinson*,
    67 Cal. App. 3d 705 (1977)...............................................................................31

26

27

*Bridges v. Geringer*,
    2015 WL 2438227 (N.D. Cal. May 21, 2015) ..................................................28

28

*Brodt v. Bache & Co., Inc.*,
    595 F.2d 459 (9th Cir. 1978) ................................................................. 7

*Burnett v. Rowzee*,
    561 F. Supp. 2d 1120 (C.D. Cal. 2008) ............................................... 34

*Butala v. Owlet, Inc.*,
    2024 WL 4560173 (C.D. Cal. Sept. 26, 2024) .................................... 14

*Cahill v. Edalat*,
    2017 WL 2608857 (C.D. Cal. 2017) .................................................... 30

*Cal. Amplifier, Inc. v. RLI Ins. Co.*,
    94 Cal. App. 4th 102 (2001) ................................................................ 31

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994) ............................................................................. 34

*In re Century Aluminum Co. Sec. Litig.*,
    749 F. Supp. 2d 964 (N.D. Cal. 2010) ................................................ 27

*Cesario v. Biocept, Inc.*,
    2025 WL 525120 (S.D. Cal. Feb. 18, 2025) ................................. *passim*

*Cheng Jiangchen v. Rentech, Inc.*,
    2017 WL 10363990 (C.D. Cal. Nov. 20, 2017) ................................... 13

*City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*,
    908 F.3d 872 (3d Cir. 2018) .................................................................. 1

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align
    Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) ............................................................... 19

*Clark v. Am. Honda Motor Co.*,
    528 F. Supp. 3d 1108 (C.D. Cal. 2021) ............................................... 32

*Colman v. Theranos, Inc.*,
    2017 WL 1383717 (N.D. Cal. Apr. 18, 2017) ..................................... 31

*Cress v. Nexo Cap. Inc.*,
    2025 WL 383848 (N.D. Cal. Feb. 4, 2025) ......................................... 10

DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

*Cullen v. RYVYL Inc.*,
  2024 WL 898206 (S.D. Cal. Mar. 1, 2024).......................................................27

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010).................................................................21, 23

*In re CytRx Corp. Sec. Litig.*,
  2015 WL 5031232 (C.D. Cal. July 13, 2015) ...........................................27

*De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*,
  608 F.2d 1297 (9th Cir. 1979) ...................................................................8

*Diamond Multimedia Sys., Inc. v. Superior Ct.*,
  19 Cal. 4th 1036 (1999).............................................................................30

*Diaz v. Intuit, Inc.*,
  2018 WL 2215790 (N.D. Cal. May 15, 2018) ........................................35

*In re Downey Sec. Litig.*,
  2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ........................................23

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) .....................................................................................1

*Espy v. J2 Global, Inc.*,
  99 F.4th 527 (9th Cir. 2024)...............................................................24, 25

*Farhar v. Ontrak, Inc.*,
  714 F. Supp. 3d 1198 (C.D. Cal. 2024)...................................................17

*In re Fastly, Inc. Sec. Litig.*,
  2021 WL 5494249 (N.D. Cal. Nov. 23, 2021).......................................20

*Ferreira v. Funko Inc.*,
  2021 WL 8820650 (C.D. Cal. Oct. 22, 2021) ........................................21

*Fialkov v. Microsoft Corp.*,
  692 F. App'x 491 (9th Cir. 2017)...............................................................2

*In re Finjan Holdings, Inc.*,
  58 F.4th 1048 (9th Cir. 2023)...................................................................22

*Francisco v. Abengoa, S.A.*,
  481 F. Supp. 3d 179 (S.D.N.Y. 2020).....................................................25

vii

*Gorog v. Musk*,
  2024 WL 4329918 (S.D.N.Y. Aug. 29, 2024) ..................................................... 18

*Gru v. Axsome Therapeutics, Inc.*,
  2023 WL 6214581 (S.D.N.Y. Sept. 25, 2023) ................................................... 26

*Gugick v. Melville Cap., LLC*,
  2014 WL 349526 (S.D.N.Y. Jan. 31, 2014) ......................................................... 7

*Guo v. Robl*,
  2023 WL 2683473 (C.D. Cal. Mar. 2, 2023) ................................................. 3, 31

*Gustafson v. Alloyd Co., Inc.*,
  513 U.S. 561 (1995) ......................................................................................... 26

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) ................................................................................... 25, 26

*Harman v. Harper*,
  1990 WL 121073 (9th Cir. Aug. 21, 1990) ......................................................... 8

*Hayes v. Scherer*,
  2023 WL 5507072 (N.D. Cal. July 3, 2023) ..................................................... 31

*Hertzberg v. Dignity Partners, Inc.*,
  191 F.3d 1076 (9th Cir. 1999) .......................................................................... 27

*Hocking v. Dubois*,
  839 F.2d 560 (9th Cir. 1988) ............................................................................. 7

*Hocking v. Dubois*,
  885 F.2d 1449 (9th Cir. 1989) ........................................................................... 7

*In re Impac Mortg. Holdings, Inc. Sec. Litig.*,
  554 F. Supp. 2d 1083 (C.D. Cal. 2008) ............................................................ 17

*In re: CCIV / Lucid Motors Sec. Litig.*, 110 F.4th 1181 (9th Cir. 2024) ................. 14

*In re Infonet Servs. Corp. Sec. Litig.*,
  310 F. Supp. 2d 1080 (C.D. Cal. 2003) ............................................................ 23

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011) ................................................................................. *passim*

DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

*Kahnert v. Kotick*,
  2023 WL 2628609 (C.D. Cal. Jan. 17, 2023)....................................15

*Kairos Inv. Mgmt. Co. v. J. P. Morgan Sec. LLC*,
  2023 WL 9375171 (C.D. Cal. Dec. 11, 2023) ..................................19

*Kamen v. Lindly*,
  94 Cal. App. 4th 197 (2001).............................................................30

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ...............................................................2

*Kniss v. Booth*,
  2010 WL 11506770 (C.D. Cal. June 29, 2010)...............................21

*La. Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer*,
  2011 WL 1152568 (N.D. Cal. Mar. 28, 2011) .................................24

*Lehman Bros. Com. Corp. v. Minmetals Int'l Non-Ferrous Metals
  Trading Co.*,
  179 F. Supp. 2d 159 (S.D.N.Y. 2001) .................................................8

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016)...........................................................25

*Macomb Cnt. Emps. Ret. Sys. v. Align Tech., Inc.*,
  39 F.4th 1092 (9th Cir. 2022).............................................................17

*Macquarie Infrastructure Corp. v. Moab Partners, L.P*,
  601 U.S. 257 (2024) ...........................................................................13

*McIntyre v. Am. Honda Motor Co.*,
  739 F. Supp. 3d 776 (C.D. Cal. 2024)...............................................32

*In re McKinsey & Co., Inc. Nat'l Prescription Opiate Litig.*,
  2024 WL 2261926 (N.D. Cal. May 16, 2024) ..................................33

*Mehedi v. View, Inc.*,
  2023 WL 3592098 (N.D. Cal. May 22, 2023) ............................26, 27

*Melrose Place Holdings v. Socotra Opportunity Fund, LLC*,
  2022 WL 3013226 (C.D. Cal. May 31, 2022).....................................14

DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

*Mendoza v. HF Foods Grp.*,
   2021 WL 3772850 (C.D. Cal. Aug. 25, 2021) .................................................. 13

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ...................................................................... 12, 13

*Mohebbi v. Khazen*,
   50 F. Supp. 3d 1234 (N.D. Cal. 2014) ............................................................... 30

*Morrison v. Nat'l Austl. Bank Ltd.*,
   561 U.S. 247 (2010) ........................................................................... 2, 10, 11

*Namer v. Bank of Am., N.A.*,
   2017 WL 1180193 (S.D. Cal. Mar. 30, 2017) ................................................... 35

*In re Nektar Therapeutics Sec. Litig.*,
   34 F.4th 828 (9th Cir. 2022) ............................................................................ 24

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020) ........................................................................ 1, 2

*Noa v. Key Futures, Inc.*,
   638 F.2d 77 (9th Cir.1980) ............................................................................... 8

*Oaktree Principal Fund V, LP v. Warburg Pincus LLC*,
   2017 WL 3187688 (C.D. Cal. Jan. 17, 2017) ................................................... 20

*Olenicoff v. UBS AG*,
   2010 WL 8530286 (C.D. Cal. Mar. 16, 2010) ................................................. 30

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015) ....................................................................................... 19

*In re Omnivision Techs., Inc.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2008) ........................................................... 25

*Pardi v. Tricida, Inc.*,
   2024 WL 1056013 (N.D. Cal. Mar. 11, 2024) ................................................. 19

*Patel v. Parnes*,
   253 F.R.D. 531 (C.D. Cal. 2008) ............................................................... 12, 13

*Pino v. Cardone Cap., LLC*,
   55 F.4th 1253 (9th Cir. 2022) .......................................................................... 29

*Pinter v. Dahl,*
    486 U.S. 622 (1988) ....................................................................... 27, 28

*Pirani v. Slack Techs., Inc.,*
    127 F.4th 1183 (9th Cir. 2025)...................................................... 26, 28

*In re Pivotal. Sec. Litig.,*
    2020 WL 4193384 (N.D. Cal. July 21, 2020) ..................................... 24

*Plumley v. Sempra Energy,*
    847 F. App'x 426 (9th Cir. 2021)....................................................... 16

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.,*
    759 F.3d 1051 (9th Cir. 2014) ...................................................... 13, 17

*Prodanova v. H.C. Wainwright & Co.,*
    993 F.3d 1097 (9th Cir. 2021) ...................................................... 23, 24

*Purple Mtn. Tr. v. Wells Fargo & Co.,*
    432 F. Supp. 3d 1095 (N.D. Cal. 2020).............................................. 33

*Rabin v. Google LLC,*
    2023 WL 4053804 (N.D. Cal. June 15, 2023) .................................... 32

*In re Regulus Therapeutics Inc. Sec. Litig.,*
    406 F. Supp. 3d 845 (S.D. Cal. 2019) ............................................... 16

*Remmers v. Davis,*
    2023 WL 6376156 (C.D. Cal. July 17, 2023) .................................... 29

*Rensel v. Centra Tech, Inc.,*
    2019 WL 2085839 (S.D. Fla. May 13, 2019) .................................... 28

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v.*
    *Hewlett-Packard Co.,*
    845 F.3d 1268 (9th Cir. 2017)........................................................... 15

*In re Rigel Pharms., Inc. Sec. Litig.,*
    697 F.3d 869 (9th Cir. 2012)....................................................*passim*

*Rubke v. Capitol Bancorp Ltd,*
    551 F.3d 1156 (9th Cir. 2009)........................................................... 29

*Ryan v. FIGS, Inc.*,
 2025 WL 71727 (C.D. Cal. Jan. 10, 2025)................................................26, 28, 29

*Salameh v. Tarsadia Hotel*,
 726 F.3d 1124 (9th Cir. 2013) ....................................................................29, 31

*Saraf v. Ebix, Inc.*,
 2024 WL 1298246 (2d Cir. Mar. 27, 2024) .......................................................23

*SEC v. Mut. Benefits Corp.*,
 408 F.3d 737 (11th Cir. 2005) ............................................................................8

*SEC v. R.G. Reynolds Enters., Inc.*,
 952 F.2d 1125 (9th Cir. 1991) ............................................................................7

*SEC v. Ripple*,
 682 F. Supp. 3d 308 (S.D.N.Y. 2023) ...............................................................10

*SEC v. Schueler*,
 No. 23-cv-05749 (E.D.N.Y. Feb. 28, 2025) .......................................................11

*SEC v. W.J. Howey Co.*,
 328 U.S. 293 (1946) ......................................................................................5, 8

*SIC Metals, Inc. v. Hyundai Steel Co.*,
 2018 WL 6842958 (C.D. Cal. Nov. 14, 2018) ...................................................29

*In re Solarcity Corp. Sec. Litig.*,
 274 F. Supp. 3d 972 (N.D. Cal. 2017)..........................................................17, 18

*In re Sona Nanotech, Inc. Sec. Litig.*,
 562 F. Supp. 3d 715 (C.D. Cal. 2021)................................................................23

*Sonner v. Premier Nutrition Corp.*,
 971 F.3d 834 (9th Cir. 2020)............................................................................32

*Special Situations Fund III QP, L.P. v. Brar*,
 2015 WL 1393539 (N.D. Cal. Mar. 26, 2015)....................................................33

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
 552 U.S. 148 (2008) ........................................................................................12

*Stoyas v. Toshiba Corp.*,
 896 F.3d 933 (9th Cir. 2018)......................................................................10, 11

DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

*Su v. Henry Glob. Consulting Grp.*,
   2022 WL 19392 (C.D. Cal. Jan. 3, 2022)............................................................... 35

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ....................................................................................... 22, 23

*Threshold Enters. Ltd. v. Pressed Juicery, Inc.*,
   445 F. Supp. 3d 139 (N.D. Cal. 2020)................................................................. 22

*TrustLabs, Inc. v. Jaiyong*,
   2024 WL 1354486 (N.D. Cal. Mar. 30, 2024) .................................................. 30

*In re Violin Memory Sec. Litig.*,
   2014 WL 5525946 (N.D. Cal. Oct. 31, 2014) ................................................... 28

*Vogel v. Sands Bros. & Co.*,
   126 F. Supp. 2d 730 (S.D.N.Y. 2001) ............................................................... 24

*In re Volkswagen "Clean Diesel" Mkt., Sales Practices, and Prods.*
   *Liability Litig.*,
   2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ......................................................... 33

*Water Island Event-Driven Fund v. MaxLinear, Inc.*,
   2024 WL 3974758 (S.D. Cal. Aug. 28, 2024) ................................................... 14

*Webb v. SolarCity Corp.*,
   884 F.3d 844 (9th Cir. 2018) .............................................................................. 23

*Welgus v. TriNet Grp.*,
   2017 WL 6466264 (N.D. Cal. Dec. 18, 2017) ............................................ 26, 28

*Wildes v. BitConnect Int'l PLC*,
   25 F.4th 1341 (11th Cir. 2022)........................................................................... 29

*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021)............................................................... 19, 20, 21

*Wong v. Tomaszewski*,
   2018 WL 4628269 (E.D. Cal. Sept. 27, 2018) ................................................. 30

*Woodward v. Terracor*,
   574 F.2d 1023 (10th Cir. 1978)........................................................................... 9

*Yokell v. Draper*,
   2018 WL 3417514 (N.D. Cal. July 13, 2018) ................................................. 26

*Yoon v. Lululemon USA, Inc.*,
   549 F. Supp. 3d 1073 (C.D. Cal. 2021) ............................................................ 22

**Statutes**

15 U.S.C. §77l(a)(2) ........................................................................................ 26

15 U.S.C. §78c(a)(1) ........................................................................................ 10

15 U.S.C. §78u-4(b)(1) ................................................................................ 12, 22

15 U.S.C. §78u-5(c)(1) ..................................................................................... 20

Cal. Corp. Code §25110 ........................................................................... 3, 30, 31

Cal. Corp. Code §25401 ........................................................................... 3, 30, 31

Cal. Corp. Code §25504 ..................................................................................... 34

Exchange Act §10(b) ................................................................................*passim*

Securities Act §5 ............................................................................................... 10

Securities Act §12 .......................................................................3, 26, 27, 28, 30

Securities Act §15 ...................................................................................32, 33, 34

**Other Authorities**

17 C.F.R. §240.10b-5 ....................................................................2, 11, 12, 19, 26

Fed. R. Civ. P. 8................................................................................................ 1, 13

Fed. R. Civ. P. 9(b) ....................................................................................*passim*

Michael Kaufman, *Securities Litigation: Damages* §24:3 (2024) ............................ 1

Sec. & Exch. Comm'n, *Staff Statement on Meme Coins* (Feb. 27,
   2025), https://www.sec.gov/newsroom/speeches-statements/staff-
   statement-meme-coins .................................................................... 5, 6, 8, 9

DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

## I.     INTRODUCTION

Plaintiff Lee Greenfield is a foreign "investor" who purchased two "memecoins" ($JENNER) associated with Defendant Caitlyn Jenner, a "high-profile international celebrity and former Olympic gold-medalist." Am. Compl. ("AC") ¶¶1–2, 11. Despite understanding that the coins had "no utility or functionality," and that their "entire appeal … is based off speculation" (*id.* ¶¶3, 82(j)), Plaintiff opted to purchase each coin—not at the time of their launch—but days later in the aftermarket (*id.* ¶11; AC, Ex. 1). Plaintiff did so despite knowing that memecoins operate as a "casino situation" where those who "buy [] the earliest … have the greatest chance of seeing the largest rise in price" before it rapidly declines as "investors quickly move on to the next opportunity." *Id.* ¶48–49.

Having purchased an inherently worthless digital coin, Plaintiff now seeks to use Defendants and the securities laws as insurance for his speculative trading losses. "But the [securities] statutes make [private securities] actions available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharms. v. Broudo*, 544 U.S. 336, 345 (2005). Contrary to Plaintiff's hopes, private securities actions are not a "downside insurance policy against the vicissitudes of the market." *City of Cambridge v. Altisource*, 908 F.3d 872, 880 (3d Cir. 2018); *see* Michael Kaufman, *Securities Litigation: Damages* §24:3 (2024) (the securities laws "are not meant to remedy against the normal risks that come with investing").

The AC is a hodgepodge of conclusory and conflicting allegations that fails to put forth a coherent, plausible theory of liability. Plaintiff does not specify which of the numerous (and out-of-order) tweets included in the AC he believes are false or misleading, let alone explain why. The AC would fail under Rule 8's standard and comes nowhere close to satisfying the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *See Nguyen v. Endologix*, 962 F.3d 405, 414 (9th Cir. 2020). Rule 9(b) requires that, "[i]n all

1

1  averments of fraud … the circumstances constituting fraud … shall be stated with

2  particularity." This requires a plaintiff to "allege 'the who, what, when, where, and

3  how' of the fraud." *Khoja v. Orexigen*, 899 F.3d 988, 1008 (9th Cir. 2018).

4      The PSLRA, enacted to "curb perceived abuses of the §10(b) private action,"

5  further heightens the pleading standard by requiring the complaint to "specify each

6  statement alleged to have been misleading, the reason or reasons why the statement

7  is misleading, and, if an allegation regarding the statement or omission is made on

8  information and belief, the complaint shall state with particularity all facts on which

9  that belief is formed." *Nguyen*, 962 F.3d at 414. Under the PSLRA, a plaintiff "must

10  also 'state with particularity facts giving rise to a strong inference that the defendant

11  acted with the required state of mind." *Id.* As the Ninth Circuit has observed with

12  respect to securities fraud class actions, "[i]n few other areas are motions to

13  dismiss … so powerful." *Fialkov v. Microsoft*, 692 F. App'x 491, 492 (9th Cir. 2017).

14      Plaintiff fails to meet any of these pleading requirements here. The AC also fails

15  as a matter of law for a number of independent reasons.

16      ***First***, the $JENNER memecoins are not securities. The SEC Staff recently

17  addressed this exact topic, providing that memecoin transactions "do not involve the

18  offer and sale of securities" and "neither meme coin purchasers nor holders are

19  protected by the federal securities laws." The same is true under prevailing case law.

20      ***Second***, the securities laws do not apply extraterritorially. *See Morrison v. Nat'l

21  Austl. Bank*, 561 U.S. 247, 267 (2010). Plaintiff, a U.K. citizen, does not and cannot

22  allege that he acquired title to $JENNER within the United States.

23      ***Third***, the Section 10(b) claim also fails because, inter alia, the AC fails to

24  specify the statements claimed to be false or misleading, let alone the reasons why.

25  It also fails to adequately allege nearly every essential element of a Rule 10b-5 claim,

26  including an actionable misstatement, scienter, reliance, or loss causation.

27

28

*Fourth*, the Section 12 claims fail because (i) Plaintiff lacks standing as he did not purchase in the tokens' initial launch but rather in the secondary market, and (ii) Jenner is not a statutory seller.

*Fifth*, in addition to the reasons stated above, the state law claims fail because Plaintiff does not allege a transaction in California (*see* Cal. Corp. Code. §25401 (requiring transaction "in this state"); *id.* §25110 (same)), or "strict privity" between Plaintiff and Jenner (*Guo v. Robl*, 2023 WL 2683473, at *6 (C.D. Cal. Mar. 2, 2023)).

*Sixth*, the secondary liability claims against Hutchins fail because (i) there is no underlying violation, (ii) Plaintiff does not allege any violation by the "$JENNER Project," the entity Hutchins purportedly controlled, and (iii) the allegations are legally insufficient to state a claim for controller or aiding-and-abetting liability.

These pleading deficiencies are not curable by amendment. Accordingly, the Court should dismiss the AC with prejudice.

## II.    BACKGROUND

**The Parties:** Caitlyn Jenner is a "high-profile international celebrity and former Olympic gold-medalist." AC ¶1. Sophia Hutchins is her manager. *Id.* ¶13.

Plaintiff Lee Greenfield is a "citizen of the United Kingdom." *Id.* ¶11. He purchased two different "memecoins" called $JENNER, first "on the Solana blockchain on May 28" and "then on the Ethereum blockchain starting on May 30, 2024." *Id.* He does not allege to have been in the United States at any time or to have conducted any transactions on domestic exchanges.

**$JENNER:** $JENNER is a "memecoin," which is a "type of cryptocurrency" that "draws its inspiration from memes, characters, trends or … the social media accounts and online presence of celebrities." *Id.* ¶2. $JENNER, like other memecoins, has "little to no utility or functionality" and is not "used [] as a store of value nor a medium of exchange." *Id.* ¶3. Rather, "[i]nvestors purchase memecoins with the hope that the underlying price will increase in the future as the project grows in popularity." *Id.* Memecoins are inherently "volatil[e]" and "experience monumental increases and

decreases in value and price in [] exceptionally short periods of time, so that their underlying values soar and crash based on internet culture and viral moments rather than any tangible fundamentals." *Id.* ¶¶2, 40. Memecoins, including $JENNER, are a "casino" where those who "buy [] the earliest … have the greatest chance of seeing the largest rise in price," especially if the coin goes "viral." *Id.* ¶48.

**Solana:** The first $JENNER token was "minted" on the Solana blockchain on May 26, 2024. *Id.* ¶51. Non-party Sahil Arora "launched the token" using Pump.Fun, a foreign application "controlled by a group of individuals located outside of the United States." *Id.* ¶¶44–45, 51, 61. Pump.Fun "employs a 'Bonding Curve' pricing model in which token prices increase with fundraising progress and decrease as tokens are sold." *Id.* ¶46. After the token "achieves a certain market value, Pump.Fun adds liquidity to a pool on Raydium," a decentralized foreign exchange. *Id.* $JENNER "immediately surpassed the trading threshold on the Pump.Fun Bonding Curve" and began trading on Raydium, as it had "over $250 million in trading volume via more than 300,000 transactions" on its first day. *Id.* ¶54. The next day, Arora sold his $JENNER holdings, which allegedly "sen[t] the market price of $JENNER crashing." *Id.* ¶61. Even so, Plaintiff did not purchase until May 28, two days after the token launched and after Arora sold his holdings. *Id.* ¶11; AC, Ex. 1 at 3.

**ERC:** Following Arora's exit, on May 29, 2024, a distinct $JENNER token went "live" on the Ethereum blockchain (the "ERC" token). AC ¶65. As with the Solana token, the ERC token did not trade domestically but instead traded only on a "few minor foreign" exchanges. *Id.* ¶82(i). Plaintiff asserts that "Jenner and her team instituted a 3% 'tax'" on $JENNER transactions taking place on the Ethereum blockchain. *Id.* ¶69. The "tax" (like all financial transactions) was "record[ed]" on the "public blockchain," which is "immediately available to any member of the public." *Id.* ¶14. The "tax" was also disclosed on Twitter at launch on May 29. *Id.* ¶71. Thereafter, Plaintiff began purchasing the ERC token. *Id.* ¶11; AC, Ex. 1 at 3.

III.    **ARGUMENT**

  A.    **The $JENNER Memecoins Are Not Securities**

The AC depends on the $JENNER memecoin being a "security under controlling federal law." AC ¶¶4, 142, 147. Because that assertion is unsupported by Plaintiff's allegations, the claims fail. In February, the SEC's Division of Corporate Finance published a statement that transactions in memecoins "***do not involve the offer and sale of securities***" and "***neither meme coin purchasers nor holders are protected by the federal securities laws***." Sec. & Exch. Comm'n, *Staff Statement on Meme Coins* (Feb. 27, 2025), https://www.sec.gov/newsroom/speeches-statements/staff-statement-meme-coins (the "Memecoin Statement").

Here, despite the Securities Act of 1933 enumerating roughly thirty types of securities, Plaintiff identifies only ***one***—investment contracts—that purportedly describes $JENNER. The Act does not define what an investment contract is; for that, courts look to the seminal case of *SEC v. W.J. Howey*, which held that an investment contract must involve "a contract, transaction or scheme whereby a person [1] invests his money [2] in a common enterprise and [3] is led to expect profits solely from the efforts of the promoter or a third party." 328 U.S. 293, 298–99 (1946).

Here, even assuming, *arguendo*, that Plaintiff's purchase of $JENNER comprises a "contract, transaction, or scheme"[3] as well as an "investment of money," Plaintiff has not pled—and cannot plead—that the memecoin satisfies the *Howey* test's second or third prongs. Indeed, in the Memecoin Statement, the SEC Staff concluded that memecoins could not meet either the "common enterprise" or "expectation of profits" prongs of *Howey*. The SEC's definition of memecoins is virtually identical to that proffered by the AC and easily encompasses $JENNER.[4]

---

[3]Although Plaintiffs have failed to meet their burden of pleading the *Howey* test's other elements, the lack of any contract between purchasers of $JENNER and Defendants provides an independent reason for dismissal.

[4]*Compare* Memecoin Statement at 1 (a "meme coin" is a digital asset "inspired by internet memes, characters, current events, or trends for which the promoter seeks to
(continued…)

Tellingly, rather than rely on the Memecoin Statement, Plaintiff grounds his arguments that $JENNER is a security in the April 3, 2019 "Framework for 'Investment Contract' Analysis for Digital Assets" (the "Framework"). This is a curious choice, for several reasons. *First*, the Framework, which is now six years old, does not mention memecoins, which barely existed at the time. *Second*, the Framework does not even rise to the level of a staff statement or guidance (let alone rule or regulation); it merely represents the "views" of the SEC's FinHub office at that point in time. And *finally*, as discussed, the SEC has made crystal clear that it is currently re-examining the agency's approach to digital asset taxonomy, including through the Memecoin Statement, rendering the earlier Framework obsolete.

Accordingly, this Court should ignore Plaintiff's repeated invocation of the Framework, which occupies a full *twenty-two* pages of the AC. To the contrary, a straightforward application of *Howey* compels the same conclusion as the SEC's most recent pronouncement: that $JENNER, which is far more akin to a baseball card than a share of stock, simply does not qualify as a security.

**1. $JENNER Purchasers Did Not Invest in a "Common Enterprise"**

Plaintiff fails to adequately plead that $JENNER is a common enterprise. Rather, in a single paragraph, Plaintiff generically asserts that $JENNER investors are "passive participants" whose fates are "intertwined" with an undefined "project." AC ¶80. This is nowhere near enough.

Under Ninth Circuit law, pleading a common enterprise requires either "horizontal" or "strict vertical commonality." *Hocking v. Dubois*, 885 F.2d 1449, 1459 (9th Cir. 1989). Horizontal commonality describes a "relationship shared by two or more investors who pool their investments together and split the net profits

---

attract an enthusiastic online community to purchase the meme coin and engage in its trading," the value of which "is driven primarily by market demand and speculation" and "tend[s] to experience significant market price volatility"), *with* AC ¶2 ("$JENNER is … a 'memecoin.' A memecoin … draws its inspiration from … the social media accounts and online presence of celebrities … [and they] typically experience monumental increases and decreases in value and price in an exceptionally short period[] of time.").

and losses in accordance with their pro rata investments." *Hocking v. Dubois*, 839 F.2d 560, 566 (9th Cir. 1988), *aff'd in relevant part*, 885 F.2d at 1459. Plaintiff does not allege any such "pooling" or "profit/loss splitting." Instead, Plaintiff acknowledges that $JENNER has "no utility or functionality, and [is] used neither as a store of value nor a medium of exchange." AC ¶3.

Plaintiff has also failed to plead "vertical commonality," where the "fortunes of the investors are linked with those of the promoters." *SEC v. R.G. Reynolds*, 952 F.2d 1125, 1130 (9th Cir. 1991). Under this approach, both promoter and investor must be exposed to risk, and their profits must be correlated. *Id.* n.5. If anything, the AC repeatedly asserts the opposite: that Jenner cannibalized her original memecoin, which traded on Solana, by promoting an alternative $BBARK coin (AC ¶55–57), and then launching a competing $JENNER on Ethereum (*id.* ¶64–68); and by charging a 3% "tax" on ERC transactions, which she received regardless of the token's performance, thus "guarantee[ing]" that she would "benefit financially, regardless of its underlying price" (*id.* ¶69–71). *See Brodt v. Bache*, 595 F.2d 459, 461 (9th Cir. 1978) (no vertical commonality "because the success or failure of [defendant] … does not correlate with individual investor profit or loss … [defendant] could reap large commissions for itself … while the individual accounts could be wiped out"); *Gugick v. Melville*, 2014 WL 349526, at *4–5 (S.D.N.Y. Jan. 31, 2014) (vertical commonality absent where defendant "was entitled to a commission … regardless of whether Plaintiff made a profit").

Nodding to the conclusory nature of his "factual" allegations, Plaintiff falls back on the Framework's suggestion that "[i]n evaluating digital assets, we have found that a 'common enterprise' typically exists." AC ¶79. But even if the Framework were entitled to any weight (it is not, as discussed above), this equally conclusory statement wouldn't get Plaintiff anywhere either. The word "typically" does not mean "always"; and the Memecoin Statement, which has rendered the Framework a dead letter, explicitly recognized that "meme coin purchasers are not making an

investment in an enterprise … their funds are not pooled together to be deployed by promoters or other third parties for developing the coin or a related enterprise." Memecoin Statement at 2–3. Put differently, the SEC is saying that investors in memecoins like $JENNER simply cannot meet the tests for horizontal *or* vertical commonality. It follows that Plaintiff has failed to plead a common enterprise.

### 2. No Expectation of Profits Solely from Defendants' Efforts

Plaintiff has also failed to plead a reasonable expectation of profits derived "solely from the efforts" of Defendants. *Howey*, 328 U.S. at 301. ***First***, as Plaintiff concedes, Defendants had no contractual obligation to undertake any efforts that would return a profit to $JENNER owners. Ninth Circuit precedent suggests that, under such circumstances, there can be no reasonable expectation of profits. *See, e.g.*, *De Luz Ranchos v. Coldwell Banker*, 608 F.2d 1297, 1300–01 (9th Cir. 1979) (promotion of a "passive investment" that "would appreciate in value as a result of the [promoter's] development of common facilities" did not create an investment contract where the promoter had no such obligation once title had been transferred).

***Second***, where, as here, "the realization of profits depends significantly on the post-investment operation of market forces," it does "not satisfy *Howey*'s third prong." *SEC v. Mut. Benefits*, 408 F.3d 737, 744 n.5 (11th Cir. 2005); *see Noa v. Key Futures*, 638 F.2d 77, 79 (9th Cir.1980) (*Howey* not met where "the profits to the investor depended upon the fluctuations of the [] market"); *Harman v. Harper*, 1990 WL 121073, at *5 (9th Cir. Aug. 21, 1990) (*Howey* not met because investors "did not expect to reap profits based solely on the managerial efforts of others"); *Lehman Bros. v. Minmetals*, 179 F. Supp. 2d 159, 164 (S.D.N.Y. 2001) (no investment contract where "any gain likely would result in large part from market movements, not from capital appreciation due to Lehman's efforts").

Plaintiff repeatedly admits that $JENNER and other memecoins are exceptionally volatile instruments subject to the vicissitudes of a fickle marketplace. *See, e.g.*, AC ¶2 (attributing the "soar and crash" of memecoin values to "internet

culture and viral moments"), ¶40 (memecoins "appeal to the emotions and humor of the general crypto community" and "benefit from the network effect and the bandwagon effect," which "drives up a memecoin's demand and price"), ¶¶48–49 (describing a "casino situation" where investors profit by buying "early on" before they go "viral"), ¶82(j) ($JENNER's "entire appeal to investors is based off speculation"). Thus, because "the value of [$JENNER] is derived from speculative trading and the collective sentiment of the market," Defendants "are not undertaking … managerial and entrepreneurial efforts from which purchases could reasonably expect a profit." Memecoin Statement at 3.

*Third*, in an environment Plaintiff admits was wildly speculative, the fact that Defendants allegedly promoted $JENNER on social media is insufficient to establish a reasonable expectation of profits. *See, e.g.*, *Woodward v. Terracor*, 574 F.2d 1023, 1025 (10th Cir. 1978) (extra-contractual representations about promotional efforts insufficient to meet *Howey* standard). The Memecoin Statement speaks to this exact situation, providing that where the promoter's efforts are "primarily [] hyping the meme coin on social media … and getting the coin listed on crypto trading platforms…there are not likely to be sufficient indicia to establish that purchasers had a reasonable expectation of profits based on the efforts of the promoters." *Id.* n.9.

*Fourth*, Plaintiff concedes that his purchases of $JENNER were not made directly from Jenner but in a secondary market. AC, Ex. 1 at 3. This distinction makes all the difference. Absent some share in the enterprise (which the $JENNER coin did not convey), a secondary market purchaser could have no reasonable expectation that he would profit as a result of Defendants' efforts, as he had no idea to whom or what his money was going. *See, e.g.*, *SEC v. Ripple*, 682 F.Supp.3d 308, 329 (S.D.N.Y. 2023).

*Finally*, the parallels between $JENNER and a collectible, such as a baseball card, neatly illustrate the point. Simply purchasing a baseball card provides no binding "guarantee" that the company issuing the baseball card—or the baseball

1   player associated with it—will make any efforts to promote it or increase its value,

2   even if they say they will. Nor are such efforts, even if promised and delivered upon,

3   the sole driver of the card's value. That will also depend on a host of market factors,

4   including overall demand for baseball cards; the popularity and/or success of the

5   player, his team, and the sport as a whole; the availability and attractiveness of

6   substitutes; the same sort of "bandwagon" and "network" effects Plaintiff identifies

7   as a factor in memecoins' popularity; and more. Because the AC makes clear that the

8   same is true of $JENNER, Plaintiff has failed to adequately allege that its purchasers

9   had any reasonable expectation of profiting solely from Defendants' efforts.

10      In short, Plaintiff has not pled facts sufficient to show that $JENNER is a

11  security, nor could he, compelling dismissal of Claims 1–6 with prejudice.

12          **3.    Plaintiff Fails to Plead a Domestic Transaction**

13          Plaintiff's claims also must be dismissed because the federal securities laws

14  do not apply extraterritorially. In *Morrison*, the Supreme Court held that Section

15  10(b) applies "only" to (1) "transactions in securities listed on domestic exchanges"

16  and (2) "domestic transactions in other securities." 561 U.S. at 267. These

17  requirements also apply to the Securities Act. *Id.* at 269 (Section 5 liability does not

18  "include sales that occur outside the United States"); *Cress v. Nexo*, 2025 WL

19  383848, at *1 (N.D. Cal. Feb. 4, 2025) (applying *Morrison* and noting that "[the]

20  Securities Act of 1933 does not apply to sales outside the United States"). Here,

21  Plaintiff has not, and cannot, meet either requirement.

22          ***First***, Plaintiff does not plead that $JENNER was listed on a domestic

23  "exchange," as defined by the Exchange Act, 15 U.S.C. §78c(a)(1), because it was

24  never so listed. *Stoyas v. Toshiba*, 896 F.3d 933, 946–47 (9th Cir. 2018).

25          ***Second***, Plaintiff has not pled that his purchases were domestic transactions.

26  With "regard to securities not registered on domestic exchanges, the exclusive focus

27  [is] on ***domestic*** purchases and sales." *Morrison*, 561 U.S. at 268. This requires that

28  the purchaser has incurred irrevocable liability to take and pay for a security, or that

10

title must have passed, ***within the United States***. *Stoyas*, 896 F.3d at 949 ("adopt[ing]
the irrevocable liability test"); *see also Absolute v. Ficeto*, 677 F.3d 60, 67 (2d Cir.
2012) (same). "[F]actual allegations concerning contract formation, placement of
purchase orders, passing of title, and the exchange of money are directly related to
the consummation of a securities transaction." *Stoyas*, 896 F.3d at 949.

Here, Plaintiff has not pled such a domestic transaction. Nor can he. Plaintiff
is a UK citizen residing outside the United States. AC ¶11. He concedes that the
Solana token was issued by Pump.Fun, a foreign entity "controlled by … individuals
***located outside of the United States***" which "adds liquidity to a pool on Raydium,"
a foreign decentralized exchange. *Id.* ¶¶45–46. Plaintiff also admits that the ERC
token traded only on "minor ***foreign***" exchanges. *Id.* ¶82(i). Accordingly, Plaintiff
has failed to allege that *any* of his purchases occurred within the United States.

This alone is dispositive: Absent allegations of a domestic transaction,
Plaintiff's claims must be dismissed. *See Morrison*, 561 U.S. at 273; *Stoyas*, 896 F.3d
at 949 ("Missing from the [complaint] are specific factual allegations regarding
where the parties to the transaction incurred irrevocable liability."); *Baylor v. Honda*,
2024 WL 650415, at *4, 6 (C.D. Cal. Jan. 19, 2024) (dismissing securities claim
because plaintiffs "failed to allege a domestic transaction"); Steinfeld Decl., Ex. C
(*SEC v. Schueler*, No. 23-cv-05749 (E.D.N.Y. Feb. 28, 2025), ECF No. 57
(dismissing digital asset securities action because plaintiff failed to "adequately
allege domestic transactions")).[5]

**B.    Plaintiff Fails to Adequately Plead a 10b-5(b) Claim**

To state a claim under Section 10(b) of the Exchange Act and SEC Rule 10b-
5(b), a plaintiff must plead particularized facts demonstrating (1) a materially false

---

[5] That Defendants are alleged to be in the United States is irrelevant. In *Morrison*,
the Supreme Court held that the securities laws did not apply despite defendants
"engag[ing] in the deceptive conduct" and making "misleading public statements" in
Florida because the "focus of the Exchange Act is not upon the place where the
deception originated, but upon purchases and sales of securities in the United States."
561 U.S. at 266; *see Baylor*, 2024 WL 650415, at *4 (applying same).

or misleading statement by the defendant, (2) scienter, (3) a connection between the challenged statement and the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Stoneridge v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008). Even setting aside the two threshold and dispositive defects discussed above, Plaintiff's 10b-5 claim would still fail because the AC fails to adequately plead, let alone with particularity, at least four other required elements: a materially false or misleading statement, scienter, reliance, and loss causation.

## 1. Plaintiff Fails to Plead a False or Misleading Statement

The heightened pleading requirements of Rule 9(b) and the PSLRA require a securities fraud plaintiff to "[1] specify each statement alleged to have been misleading [and] [2] the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)). This rigid standard "prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating why the defendant's alleged statements or omissions are deceitful." *Metzler v. Corinthian*, 540 F.3d 1049, 1061 (9th Cir. 2008). Courts in the Ninth Circuit routinely require that a securities complaint "be clear and concise in identifying false statements" and "identify some facts suggesting that the statement is false or misleading, … preferably in the same [paragraph] or a paragraph following the statement." *See, e.g.*, *Patel v. Parnes*, 253 F.R.D. 531, 554 (C.D. Cal. 2008). The AC falls woefully short of this standard.

***First***, Plaintiff makes no effort to comply with these strict pleading standards. The AC is a morass of screenshotted tweets spanning nearly 40 pages. Plaintiff does not specify which statements he claims are misleading, let alone the reasons why they are misleading. Indeed, it is not until paragraphs 89–91 (and it is only there) that he purports to advance an omission theory and a misrepresentation theory.

The omission theory is that Jenner failed to disclose information regarding her "personal holdings of $JENNER" or "details surrounding her involvement with Sahil Arora" (AC ¶89), and that she "has never properly disclosed" the "tax" on

"Ethereum-based $JENNER transaction[s]" (*id.* ¶¶69–70). But "[p]ure omissions are not actionable under Rule 10b-5(b)" because the securities laws "do not create an affirmative duty to disclose any and all material information." *Macquarie v. Moab*, 601 U.S. 257, 260, 264 (2024). Rather, Plaintiff must "identify[] affirmative assertions" and specify why they are misleading by omission, which he has not done. *See id.* at 264; *see also Police v. Intuitive*, 759 F.3d 1051, 1061 (9th Cir. 2014) (no "rule of completeness for securities disclosures"). Worse, Plaintiff admits that the allegedly omitted "tax" was in fact disclosed. AC ¶70 ("$jenner on eth collected $235k tax"); ¶84(j) (disclosing "tax revenues" and "use [of] tax proceeds").

Plaintiff's misrepresentation theory—premised on unspecified "false statements" about "the ability of $JENNER to increase continuously and exponentially in value" and that "$JENNER would see increased utility and would be a long term project" (*id.* ¶¶90–91)—fares no better. Plaintiff does not specify the allegedly false statements or explain why each is false, as required. *Metzler*, 540 F.3d at 1071–72 ("far-ranging collection of alleged false statements" that "fail to identify with sufficient specificity how and why the statements were false … fail to comply with the PSLRA"). In fact, Plaintiff has advanced **even less** than the sort of catch-all statements of falsity that courts routinely reject under the PSLRA. *See, e.g.*, *Mendoza v. HF Foods*, 2021 WL 3772850, at *7 (C.D. Cal. Aug. 25, 2021) (dismissing because "allegations fail to answer the question that PSLRA requires them to answer: *why* … the filings were false, or *how* the information in the filing had a tendency to mislead"); *Cheng v. Rentech*, 2017 WL 10363990, at *8 (C.D. Cal. Nov. 20, 2017) (dismissing for "failure to delineate the reasons why statements were false and misleading" and "which are supposed to show scienter"); *Patel*, 253 F.R.D. at 552, 554 (dismissing where "the specific alleged false and misleading statements are not readily identified"

---

DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

and "[t]he allegations regarding falsity do not tie the[] reasons [for falsity] to particular statements"). The Court should dismiss the AC on this basis alone.[6]

**Second**, the flaws in Plaintiff's unspecified shotgun pleading are exacerbated by the fact that he purportedly purchased two distinct "securities" (Solana and ERC tokens) and also relies on statements regarding a third ($BBARK). AC ¶¶55–57. "[T]he Ninth Circuit has set a bright-line rule that the *'security' at issue must be one about which the alleged misrepresentations were made*." *Water Island v. MaxLinear*, 2024 WL 3974758, at *5 (S.D. Cal. Aug. 28, 2024) (citing *In re CCIV*, 110 F.4th 1181, 1185–86 (9th Cir. 2024)); *see also Butala v. Owlet*, 2024 WL 4560173, at *2 (C.D. Cal. Sept. 26, 2024) (same). The "relevant inquiry is not whether Plaintiff purchased a security that was affected by an alleged misrepresentation, but rather whether the purchased security was the subject of the misrepresentation." *Id.* at *3. This rule precludes Plaintiff from relying, say, on a statement about the Solana token to establish 10b-5 liability with respect to the ERC token, or vice-versa. It also forecloses reliance on statements about $BBARK, which Plaintiff did not buy, and independently compels dismissal. *CCIV*, 110 F.4th at 1185–86; *Butala*, 2024 WL 4560173, at *2–3; *Water Island*, 2024 WL 3974758, at *5. Nor can Plaintiff rely on third-party statements—e.g., AC ¶¶61, 84(d)—because Jenner did not "make" those statements. *Janus v. First Derivative*, 564 U.S. 135, 138 (2011) (only the "maker" of the statement is liable under 10b-5).

**Third**, even if Plaintiff had complied with Rule 9(b) and the PSLRA, the types of statements Plaintiff appears to challenge are not actionable, as described below.

---

[6]Plaintiff's "shotgun" pleading also violates Rule 8(a)(2). As courts in this District have explained, "[s]hotgun pleadings are pleadings that overwhelm defendants with an unclear mass of allegations and make it difficult or impossible for defendants to make informed responses to the plaintiff's allegations. They are unacceptable. One … type is where the plaintiff recites a collection of general allegations toward the beginning of the Complaint, and then each count incorporates every antecedent allegation by reference. This shotgun pleading style deprives Defendants of knowing exactly what they are accused of doing wrong." *Melrose v. Socotra*, 2022 WL 3013226, at *4–5 (C.D. Cal. May 31, 2022). This is the AC to a T.

### a.     Failure To Plead Falsity

The AC fails to adequately plead that any statement made by Jenner was false or misleading when made.[7] ***First***, for a statement "[t]o be misleading, [it] must be capable of objective verification." *Retail Wholesale v. Hewlett-Packard*, 845 F.3d 1268, 1275 (9th Cir. 2017). Here, however, the AC focuses primarily on "memes" and other subjective statements that are not falsifiable and, as a result, are not actionable. *E.g.*, AC ¶61 ("we love crypto!" followed by photo of Jenner with Donald Trump), ¶68 (picture of Jenner's Twitter profile, including "It's a marathon, not a sprint"), ¶82(f) ("[i]t's a fun day to be a $Jenner trader" followed by photoshopped picture of Jenner wakeboarding), ¶82(h) ("Meme coin summer! Meme coin year!"). Such statements cannot support a securities claim. *See Kahnert v. Kotick*, 2023 WL 2628609, at *7 (C.D. Cal. Jan. 17, 2023) (statements that company is "attempting to foster a sense of belonging, making diversity and inclusion a strategic priority, and monitoring or following best practices" are nonactionable); *Aramic v. Revance*, 2024 WL 1354503, at *7 (N.D. Cal. Apr. 2, 2024) (defendant's statements regarding securing a "monumental achievement," "enter[ing] a catalyst-rich calendar year of … meaningful [c]ompany milestones," and feeling "very proud of [its] performance" and "very good about [its] prep" nonactionable).

***Second***, the handful of statements that may "be capable of objective verification"—like "I launched a coin" (AC ¶51); "$Jenner over a quarter billion in less than 24 hours wow!" (¶54); "+49,452% in 30mins" (¶82(a)); "Now trading on Raydium" (¶82(b)); "our first CEX (signed by both sides)" (¶82(i)); and "we launched on $ETH" (¶84(f))—are not alleged to be false, nor could they be. Plaintiff concedes these were ***accurate*** statements of fact. *Id.* ¶54 ( "$JENNER "amassed over $250 million in trading volume … its first day"), ¶82(a) ("$JENNER had a secondary market established since it mint"), ¶82(b) ("investor[s] [had] access to secondary trading markets on Pump.fun, [and] various DEXs including Raydium and

[7] Ex. A is Defendants' attempt at identifying the statements challenged in the AC.

Uniswap"), ¶82(i) ($JENNER traded on "foreign CEXs" including "MEXC").

*Third*, Plaintiff does not, as he must, allege that any statements were "false or misleading *at the time they were made*." *See Rigel*, 697 F.3d 869, 876 (9th Cir. 2012). Rather, without specifying what actual statements he is challenging, Plaintiff appears to take issue with the fact that "$JENNER ultimately" lost over 90% of its value, despite Jenner purportedly "tout[ing]" the "ability of $JENNER to increase continuously and exponentially in value." *Id.* ¶91. He also takes issue with efforts to obtain "listings on reputable CEXs, meaningful token buy backs, and political donations" because "*none of [them] manifested.*" *Id.*; *see also id.* ¶82(b) ("listings on a few notable centralized exchanges … never manifested"), ¶84(i) ("reward [to] $JENNER holders in some fashion … did not manifest"). But what "ultimately" happened to the price of $JENNER, or what did not "manifest," says nothing about whether any prior statements were false at the time they were made. To be sure, none of the statements included in the AC speak to certainty or guarantees of future events. *See, e.g.*, AC ¶82(a) ("Bullish as ever!!"), ¶82(c) ("I hope $Jenner on $ETH makes everyone … rich"), ¶84(a) ("we are in talks with market makers and evaluating options"), ¶84(d) ("stay tuned for buybacks!"), ¶84(j) ("when $Jenner on $ETH hits $50m market cap [which it never did,] we will donate to @realDonaldTrump from the tax revenues!"), ¶84(j) ("[a]s market cap and trading volume goes up we *plan* to reduce taxes").

The AC is likewise devoid of any factual allegations demonstrating that Jenner was not in fact optimistic about her tokens or that she was not attempting to get the token listed on centralized exchanges. *See Plumley v. Sempra*, 847 F. App'x 426, 430 (9th Cir. 2021) (plaintiff failed to allege that defendants "w[ere] aware, at the time they were made, that [the alleged misstatements] were false"); *In re Regulus Therapeutics*, 406 F. Supp. 3d 845, 857 (S.D. Cal. 2019) (dismissing because plaintiffs "failed to provide specifics" regarding alleged misstatements and court was

1    "unable to determine whether the complained-of statements differed materially from
2    the actual state of affairs that existed at the time they were made").

3    ### b.    Non-Actionable Puffery

4    The tweets screenshotted in the AC are not actionable because they are nothing
5    more than optimistic—and, at times, hyperbolic—statements that constitute classic
6    puffery. Puffery includes "statements of optimism like 'good,' 'well-regarded,' or
7    other feel good monikers" which "are not actionable because professional investors,
8    and most amateur investors as well, know how to devalue the optimism." *Macomb v.*
9    *Align*, 39 F.4th 1092, 1099 (9th Cir. 2022); *Intuitive*, 759 F.3d at 1060 (same).
10   Statements that are "exaggerated," "vague" or "hyperbole" are also "merely puffing
11   statements" that are "not actionable." *In re Impac,* 554 F. Supp. 2d 1083, 1096–97
12   (C.D. Cal. 2008) ("strong," "better than expected," "well-positioned," "solid," and
13   "improved," when "used to describe demand, results, and growth" were "not
14   actionable"). Further examples of "non-actionable puffery" include statements such
15   as "turbocharg[ing] growth and returns," having "positive momentum," being
16   "highly optimistic about growth," and "extremely bullish for the US markets." *See*
17   *Barry v. Colony*, 2019 WL 13237710, at *13 (C.D. Cal. Jan. 24, 2019); *In re Solarcity*,
18   274 F. Supp. 3d 972, 994–95 (N.D. Cal. 2017).

19   Here, the optimistic statements about $JENNER contained in the AC are all
20   quintessential puffery. *See, e.g.*, AC ¶52 ("I'm all in!"), ¶53 ("We are sending this
21   coin to the moon!!!"), ¶56 ("I'm bullish on crypto") , ¶63 ("It'll do better now"), ¶64
22   ("we are only growing $Jenner from here"), ¶66 ("plenty of cryptocurriencies [sic]
23   to be bullish on"), ¶68 ("It's a marathon, not a sprint"), ¶82(a) ("Let's go to Mars!
24   Forget the moon!"), ¶82(a) ("Bullish as ever!!"), ¶82(d) ("bullish always"), ¶82(g)
25   ("Most viral memcoin ever? … only plans to grow and expand!"), ¶82(h) ("growing
26   $Jenner" … "meme coin summer! Meme coin year! Meme coin decade!" … "onward
27   and upward!"), ¶82(j) ("looks like a great time to buy"), ¶84(b) ("extremely bullish"),
28   ¶84(f) ("$Jenner team is working really hard! Killing it on socials!! … "we always

need more and more growth in the crypto space" … "the marketing has been insane! It's been great!" … "We feel nothing but optimistic").

These are classic "feel good monikers" that courts routinely deem non-actionable. *See Intuitive*, 759 F.3d at 1060 ("optimistic about sales" and "potential for growth" are non-actionable puffery); *Farhar v. Ontrak*, 714 F. Supp. 3d 1198, 1209–10 (C.D. Cal. 2024) (statements of company's "growth" to its "most robust level," "proceed[ing] into new heights," having "surging demand," making "important progress on our growth initiatives" and defendant being "really excited to see the hard work, dedication, passion and grit of every Ontrak teammate" all "constitute puffery" and are "nonactionable under Section 10(b)"); *Barry*, 2019 WL 13237710, at *13 ("turbocharge growth and returns" and having "positive momentum" are puffery); *Solarcity*, 274 F. Supp. 3d at 994–95 (being "highly optimistic" and "extremely bullish" were puffery). In fact, one court found nearly identical statements about digital assets were not actionable. *See Gorog v. Musk*, 2024 WL 4329918, at *1 (S.D.N.Y. Aug. 29, 2024) (dismissing with prejudice because defendant's numerous tweets about sending memecoin "to the moon" and being "his favorite" and "the future of currency" are "aspirational and puffery").

Nor could Jenner's statements be material given Plaintiff's admitted knowledge of the risks associated with memecoin investing. The AC repeatedly acknowledges the inherent risks of investing in memecoins, including the "extreme volatility in price and market capitalization that can occur to memecoins." AC ¶39; *see id.* ¶2 ("Memecoins typically experience monumental increases and decreases in value and price in an exceptionally short period[] of time, so that their underlying values soar and crash based on internet culture and viral moments rather than any tangible fundamentals."), ¶40 ("despite the volatility—or perhaps because of it—interest in memecoins has exploded"), ¶47 (acknowledging that "Pump.Fun is inherently risky" and Memecoins "lack true value or utility"), ¶48 (describing memecoins as "a casino" and conceding that, "[i]nevitably," investors who "buy memecoins the earliest …

have the greatest chance of seeing the largest rise in price," which "results in popular tokens pumping when initial interest is high … and then dumping after the initial interest subsides and investors quickly move on"). In light of these acknowledged and well-known risks, Jenner's optimistic statements about $JENNER could not have been "viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic v. Levinson*, 485 U.S. 224, 231–32 (1988).

### c.    Non-Actionable Opinions

The statements in the AC also fail because, at most, they are non-actionable "statements of opinion," which do not become "actionable merely because the 'belief turned out to be wrong.'" *AMI v. Alphabet*, 2024 WL 4353637, at *3 (N.D. Cal. Sept. 3, 2024) (quoting *Omnicare v. Laborers*, 575 U.S. 175, 186 (2015)). Because Rule 10b-5(b) speaks in terms of false or misleading statements about "material *fact[s]*," it is well established that "statement[s] of opinion" are "generally not actionable." *Wochos v. Tesla*, 985 F.3d 1180, 1196 (9th Cir. 2021). A "statement of opinion expresses a view, not a certainty, and is not determinate [and] verifiable." *Kairos v. J. P. Morgan*, 2023 WL 9375171, at *3 (C.D. Cal. Dec. 11, 2023).

Here, the statements referenced in the AC are textbook statements of opinion. *E.g.*, AC ¶54 ("so proud of the community"), ¶56 ("I'm bullish"), ¶63 ($JENNER "will do better now"), ¶82(b) ("we are very happy"), ¶82(e) ("I wouldn't recommend it"), ¶82(f) ("It's always a good day to be a $Jenner"), ¶82(g) ("[m]ost viral memecoin ever?!"), ¶82(h) ("this is why I love this space"), ¶82(i) ("feeling more and more excited"), ¶82(j) ("it looks like a great time [t]o buy the official $Jenner"); ¶84(f) ("glad we launched on ETH"). Plaintiff has not pled any rationale for converting these opinions into actionable misstatements. *See City of Dearborn v. Align*, 856 F.3d 605, 616 (9th Cir. 2017) (plaintiff "must allege both that the speaker did not hold the belief [they] professed and that the belief is objectively untrue"). Rather, the AC merely alleges that Jenner's statements of belief did not "manifest" as hoped. *Id.* ¶91. But the Supreme Court has been clear that "an investor cannot state

a claim," as here, "by alleging only that an opinion was wrong." *Omnicare*, 575 U.S. at 194. Accordingly, the statements of opinion cannot create liability under the securities laws. *Pardi v. Tricida*, 2024 WL 1056013, at *7 (N.D. Cal. Mar. 11, 2024).

### d.    Forward-Looking Statements

The AC also fails because, as Plaintiff admits, it is based on "forward-looking" statements (AC ¶¶90, 125–26), which are protected by the PSRLA's safe harbor, 15 U.S.C. §78u-5(c)(1). The PSLRA's safe harbor provides that "a defendant will not be liable for a false or misleading statement if it is forward-looking and ***either*** is accompanied by cautionary language ***or*** is made without actual knowledge that it is false or misleading." *Wochos*, 985 F.3d at 1190. Protected "[f]orward-looking language includes statements that a [defendant] 'expects,' 'believes,' or 'is confident' that certain projections will be realized in the future." *Oaktree v. Warburg*, 2017 WL 3187688, at *9 (C.D. Cal. Jan. 17, 2017); *see also In re Fastly*, 2021 WL 5494249, at *13 (N.D. Cal. Nov. 23, 2021) ("statements regarding future operations and economic opportunities are forward-looking"). And even where a "statement includes both forward-looking and non-forward-looking statements, the challenged statements still fall within the safe harbor as forward-looking if, when examined as a whole, the challenged statements relate to future expectations and performance." *In re Astra*, 2023 WL 4983156, at *6 (N.D. Cal. Aug. 2, 2023).

Here, the crux of the AC is that certain future events did not materialize. *See* AC ¶¶90–91 (alleging that Jenner made "forward looking" statements leading Plaintiff to "believe there ***would be*** multiple listings on reputable CEXs, meaningful token buybacks, and political donations, none of which manifested" and that Jenner "suggested" that "$JENNER ***would see*** increased utility and would be a long term project" and would "increase continuously … in value"); ¶¶125–26 (Jenner made "forward-looking statements"). While Plaintiff does not specifically identify these "forward looking" statements, the tweets scattered throughout the AC are prototypical protected statements (*e.g.*, AC ¶52 (we "***expect*** to hit $50m market cap

[i]n the first 24 hours"), ¶81(b) ("We are not ***planning*** on going anywhere but up and taking $Jenner everywhere."), ¶84(j) ("we ***plan*** to reduce taxes ofc!")), and are therefore not actionable as a matter of law. *See Wochos*, 985 F.3d at 1192 ("goal to produce 5,000 vehicles per week is unquestionably a forward-looking statement") *Astra*, 2023 WL 4983156, at *6 (dismissing because "future launch cadence goals," "plan[s] to increase its rocket payload capacity," and projected "addressable market" are "forward-looking [statements] under the PSLRA").

Plaintiff cannot avoid the application of the safe harbor to these statements. As a threshold matter, there are no factual allegations demonstrating that Jenner made these statements with "actual knowledge that [they were] false or misleading," thus compelling dismissal. *Wochos*, 985 F.3d at 1190; *see Ferreira v. Funko*, 2021 WL 8820650, at *20 (C.D. Cal. Oct. 22, 2021) (dismissing "forward-looking statement that was not made with actual knowledge that it was false or misleading"); *Abe v. AFCH*, 2021 WL 2209309, at *5 (C.D. Cal. June 1, 2021) (same); *Kniss v. Booth*, 2010 WL 11506770, at *7 (C.D. Cal. June 29, 2010) (same). Nor can Plaintiff rescue his claims through the sort of conclusory assertion of knowledge found in ¶127. *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010) (allegation that "speaker knew that the particular forward-looking statement was false" was insufficient); *Cesario v. Biocept*, 2025 WL 525120, at *18 (S.D. Cal. Feb. 18, 2025) ("conclusory allegation that … '[defendants] knew the statement was false or misleading' … is not sufficient to thwart the application of the PSLRA's safe harbor").

Further, even if Plaintiff had sufficiently pled that Jenner had "actual knowledge" that her statements were false or misleading (he has not), the statements would still be protected because they were "accompanied by cautionary language." *Wochos*, 985 F.3d at 1190 (PSLRA safe harbor applies to a forward-looking statement so long as it is "***either*** … accompanied by cautionary language ***or*** is made without actual knowledge that it is false or misleading"); *Cutera*, 610 F.3d at 1112 ("[T]he state of mind of the individual making the statement is irrelevant" when there is a

"meaningful cautionary statement[].")." "Cautionary language renders forward-looking statements inactionable … when it discloses risks and thus affects the reasonableness of reliance on the misstatements." *Astra*, 2023 WL 4983156, at *6.

Plaintiff tries to bypass this issue by complaining that Jenner's "forward looking" statements did not "disclos[e] the risks associated with investing in $JENNER." AC ¶¶90–91. Not so. The language on the $JENNER website (of which this Court should take judicial notice because the AC expressly incorporates it by reference (*id.* ¶68)) is crystal-clear:

> Disclaimer: The $JENNER token is a memecoin on the Ethereum blockchain intended solely for entertainment purposes. It is not a security, investment, or any other financial instrument. The project developers and founders make no guarantees or promises regarding the token's value or performance. By acquiring or using $JENNER, you assume all risks associated with digital assets and release the developers and founders from any claims or liabilities. Always conduct your own research and consult with a professional advisor before making financial decisions.

Steinfeld Decl. ¶2, Ex. B; *see Yoon v. Lululemon*, 549 F. Supp. 3d 1073, 1079 (C.D. Cal. 2021) (taking judicial notice of website referenced in complaint); *Threshold v. Pressed*, 445 F. Supp. 3d 139, 146 (N.D. Cal. 2020) ("websites and their contents may be judicially noticed").

Given such cautionary language, it is unreasonable to suggest that investors believed $JENNER would necessarily "increase continuously and exponentially in value" (AC ¶91). *See Astra*, 2023 WL 4983156, at *7–8 (disclaimer that "expected growth … may prove to be incorrect" sufficed for safe harbor).

## 2.    Plaintiff Fails to Adequately Allege Scienter

The 10b-5 claim must be dismissed for the additional reason that the AC fails to allege "with particularity facts giving rise to a strong inference that the defendants acted" with scienter. 15 U.S.C. §78u-4(b)(2)(A). "To qualify as 'strong' … an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."

1    *Tellabs v. Makor*, 551 U.S. 308, 314 (2007). As the Ninth Circuit has explained, the

2    "strong inference" standard "has teeth" and "is an exacting pleading obligation that

3    "presents no small hurdle for the securities fraud plaintiff." *In re Finjan*, 58 F.4th

4    1048, 1058 (9th Cir. 2023); *see Webb v. SolarCity*, 884 F.3d 844, 851, 855 (9th Cir.

5    2018) ("The bar set by *Tellabs* is not easy to satisfy.").

6        Plaintiff's allegations fall well short. As discussed, conclusory allegations that

7    Jenner "knew" her statements were false are insufficient. *Cutera*, 610 F.3d at 1112;

8    *Cesario*, 2025 WL 525120, at *18; *In re Infonet*, 310 F. Supp. 2d 1080, 1104 (C.D.

9    Cal. 2003) ("generic allegations cannot support an inference [of scienter], let alone a

10   strong inference as required by the PSLRA"). To the extent the AC offers anything

11   else, it is merely that Jenner had a "financial interest" in the token. AC ¶¶64, 71; *see*

12   *id.* ¶6 ("Jenner's primary purpose in creating $JENNER was to cross-promote herself

13   and her ventures, and to cultivate a cryptocurrency brand uniquely associated with

14   herself, which she could leverage for financial gain."). But merely having a "financial

15   interest" as a holder of the token does not support scienter. *Rigel*, 697 F.3d at 884 (no

16   scienter where "defendant's compensation" tied to "success[]" of stock offering); *see*

17   *also Saraf v. Ebix*, 2024 WL 1298246, at *2 (2d Cir. Mar. 27, 2024) (scienter not

18   sufficiently alleged where plaintiff did "not point[] to any specific benefit that would

19   inure to [defendant] that would not be either generalized to all corporate directors or

20   beneficial to all shareholders"). And the AC is utterly devoid of factual allegations

21   "demonstrating [Jenner's] 'intent to deceive, manipulate, or defraud.'" *Webb*, 884

22   F.3d at 851. Plaintiff does not even allege that Jenner sold either token at inflated

23   prices or otherwise took advantage of the purported price inflation. Absent such

24   allegations, the complaint must fail. *Prodanova v. H.C.*, 993 F.3d 1097, 1107 (9th

25   Cir. 2021) (absence of "deceptive behavior, such as selling shares before the

26   company discloses negative information," is fatal); *In re Sona*, 562 F. Supp. 3d 715,

27   727 (C.D. Cal. 2021) ("What is missing is … how the executives would benefit"); *In*

28

*re Downey*, 2009 WL 2767670, at *13 (C.D. Cal. Aug. 21, 2009) ("strong inference of scienter is negated when there is an absence of stock sales").

Likewise, the 3% "tax" on transactions cannot establish scienter because "[t]he desire to earn commissions or fees is a common motive … and that motive—without more—is insufficient to give rise to a strong inference of scienter." *La. Pac. v. Money Mkt.*, 2011 WL 1152568, at *8 (N.D. Cal. Mar. 28, 2011); *see Prodanova*, 993 F.3d at 1107 (5% fee on offering proceeds insufficient); *Vogel v. Sands*, 126 F. Supp. 2d 730, 739 (S.D.N.Y. 2001) ("transaction fees … are insufficient to show an improper motive"). In the end, the fact that $JENNER ultimately was unsuccessful does not signal fraudulent intent, as "honest optimism followed by disappointment is not the same as lying or misleading." *In re Pivotal.*, 2020 WL 4193384, at *17 (N.D. Cal. July 21, 2020). The Court should dismiss for lack of scienter.

### 3.    Plaintiff Fails to Plead Reliance and Loss Causation

Plaintiff's 10b-5 claim also fails because he fails to plead the separate elements of reliance and loss causation. A 10b-5 plaintiff must plead reliance upon the misrepresentation and must also plead loss causation—i.e., the "causal connection between the fraud and the loss by tracing the loss back to the very facts about which the defendant lied." *In re Nektar*, 34 F.4th 828, 835, 838 (9th Cir. 2022). Loss causation requires a plaintiff to "allege with particularity facts plausibly suggesting that a corrective disclosure revealed, in whole or in part, the truth concealed by the defendant's misstatements, and that disclosure caused the … stock price to decline." *Espy v. J2*, 99 F.4th 527, 540 (9th Cir. 2024). Here, Plaintiff does not adequately plead either reliance on Jenner's purported misstatements or loss causation.

Notably, Plaintiff does not attempt to plead a classwide presumption of reliance but rather attempts to plead his own actual reliance on purported false or misleading statements by Jenner. This effort fails. With respect to the Solana token, Plaintiff alleges that the "downfall" occurred "when it was revealed" that Arora "assist[ed] in minting $JENNER" and then "dumped his portion of $JENNER … sending the

market price of $JENNER crashing." AC ¶¶58, 61. Critically, however, this "revelation" occurred on or before May 26–27, 2024. *Id.* ¶61 ("early buyers … exited once liquidity hit Rayduim"); ¶63 (Sahil "appears to be fully out" "He scammed us! BIG TIME!" … he "is gone"). But Plaintiff did not buy any $JENNER until May 28, ***after*** these facts were known. AC, Ex. 1 at 5. Accordingly, because Plaintiff "did not buy or sell the [Solana token] … ***before the truth was revealed***, then he could not be said to have acted in reliance on a fraud-tainted price." *Halliburton v. Erica P*, 573 U.S. 258, 278 (2014); *see In re Omnivision*, 559 F. Supp. 2d 1036, 1044–45 (N.D. Cal. 2008) (plaintiff "purchased … stock ***after*** the corrective disclosure and therefore cannot have reasonably relied" on the misstatements); AC ¶95 (conceding Plaintiff relied on "general promotion" of $JENNER, not a specific alleged misstatement).

For the same reason, the AC does not (and cannot) plead loss causation—nor does Plaintiff have standing—because the decline in value of the Solana token was the result of the alleged "pump-and-dump" scheme by Arora that occurred ***before*** Plaintiff made any purchases (*id.* ¶61). *See Lloyd v. CVB*, 811 F.3d 1200, 1209 (9th Cir. 2016) (plaintiff "must demonstrate that an economic loss was caused by the defendant's misrepresentations"); *Omnivision*, 559 F. Supp. 2d at 1044 (because plaintiff purchased after the corrective disclosure he "did not suffer any injury" and "lacks standing"); *Francisco v. Abengoa*, 481 F. Supp. 3d 179, 206–07 (S.D.N.Y. 2020) (plaintiffs lacked standing because they purchased after corrective disclosures). Likewise, Plaintiff cannot rely on the $BBARK statements (which are not actionable in any event) because the post was disclosed as an advertisement (and taken down) prior to Plaintiff's purchase. AC ¶55–57 ("Jenner's promotion of $BBARK [on May 26] coincided with a plateau and drop in the price" occurring before Plaintiff's purchase); AC, Ex. 1 at 5.

As to the ERC token, Plaintiff does not allege any corrective disclosure whatsoever and, accordingly, has not pled loss causation as a matter of law. *Espy*, 99 F.4th at 540 (plaintiff must "allege with particularity facts plausibly suggesting that

a corrective disclosure revealed … the truth concealed by the defendant's misstatements, and that disclosure caused the … stock price to decline"); *Cesario*, 2025 WL 525120, at *25 (plaintiff failed to plead loss causation because he "does not attribute his losses to any ***revelation*** of the alleged fraud"); *Gru v. Axsome*, 2023 WL 6214581, at *5–6 (S.D.N.Y. Sept. 25, 2023) (dismissing for lack of loss causation because price drop "was not caused by any 'realization' of an intentionally hidden fact" and thus "[t]here was no corrective disclosure").[8]

## C.   Plaintiff's Section 12 Claims Fail

Plaintiff's Section 12 claims fail for the threshold reasons previously discussed—namely, lack of a security and/or a domestic transaction.[9] The Section 12 claims, which must meet Rule 9(b)'s exacting pleading standard,[10] further fail because (i) Plaintiff lacks standing and (ii) Jenner is not a statutory seller.

### 1.   Plaintiff Lacks Standing to Pursue Section 12 Claims

Plaintiff lacks Section 12 standing because he did not purchase shares directly "in [the] public offering" at issue, "as opposed to the secondary market." *Welgus v. TriNet*, 2017 WL 6466264, at *26 (N.D. Cal. Dec. 18, 2017); *see Ryan v. FIGS*, 2025 WL 71727, at *11 (C.D. Cal. Jan. 10, 2025) (dismissing because a "suit under Section

---

[8] To the extent Plaintiff's theory is based on the 3% "tax" on Ethereum transactions, this too fails. As Plaintiff himself pleads, all information including "financial transactions" on the blockchain are "immediately available to any member of the public." AC ¶14. Plaintiff further concedes that the "tax" was repeatedly disclosed on twitter at the time of launch (May 29), before Plaintiff's first ERC purchase on May 30 (AC Ex. 1. at 3). AC ¶70 ("ETH - $$Jenner … Taxes 3%" … "3% buy & sell tax"); ¶71 ("token has a 3% tax"). Plaintiff cannot, as a matter of law, satisfy reliance in addition to loss causation. *Halliburton*, 573 U.S. 258 (2014); AC ¶95.

[9] Because the text of Section 12(a)(2) is virtually identical to Rule 10b-5(b), this claim fails for the same reasons discussed above with respect to the AC's failure to plead an actionable misstatement. The Section 12(a)(2) claim further fails because $JENNER was not issued "by means of a prospectus." 15 U.S.C. §77l(a)(2). As the Ninth Circuit recently made clear, "liability under section 12(a)(2) can be based only on the sale of" a security "sold by means of a prospectus" in a "registered … public offering." *Pirani v. Slack*, 127 F.4th 1183, 1192 (9th Cir. 2025). Because $JENNER was not sold "by such means," Plaintiff "has not stated a claim" under Section 12(a)(2). *Id.* at 1191, 1194.

[10] *Rigel*, 697 F.3d at 886 ('33 Act claim "grounded in fraud and Plaintiff must meet Rule 9(b)'s pleading requirements" where it relies on same allegations as fraud); *Yokell v. Draper*, 2018 WL 3417514, at *11–12 (N.D. Cal. July 13, 2018) (same).

---

12 may only be maintained by a person who purchased the stock in the offering"). "A plaintiff establishes standing to sue under Section 12 by showing she purchased its shares in a public offering, as opposed to the secondary market." *Mehedi v. View*, 2023 WL 3592098, at *11 (N.D. Cal. May 22, 2023). Where, as here, "Plaintiff has not alleged that it purchased its shares in a public offering," the Court must "dismiss the Section 12 claim for lack of statutory standing." *Id.*; *see Hertzberg v. Dignity Partners*, 191 F.3d 1076, 1081 (9th Cir. 1999) (plaintiff must allege that he "purchased the security directly from the issuer"); *In re CytRx*, 2015 WL 5031232, at *14 (C.D. Cal. July 13, 2015) ("only plaintiffs who have purchased shares directly in a public offering (versus the aftermarket) can bring a claim under this Section"). Here, it is indisputable that Plaintiff did not purchase either $JENNER token in the initial offering and instead only purchased through secondary market transactions.

As to the Solana token, Plaintiff acknowledges that it was initially offered on May 26, 2024, and surpassed "$250 million in trading volume via more than 300,000 transactions … distributed between approximately 20,000 investors who purchased $Jenner its first day." AC ¶¶51, 54. Yet Plaintiff does not allege that he purchased in the offering, nor could he. Plaintiff's sworn PLSRA certification demonstrates that his first purchase of the Solana token occurred May 28, 2024. AC, Ex. 1 at 5.

The same is true of the ERC token. On May 29, 2024, the "ERC-20 token" went "live" and "was immediately available for trading." AC ¶65. Yet Plaintiff did not purchase in the offering and instead first transacted in the secondary market the following day. *See* AC, Ex. 1 at 3. Accordingly, Plaintiff lacks standing to bring a Section 12 claim for either $JENNER token. The Court must "dismiss the Section 12 claim for lack of statutory standing." *Mehedi*, 2023 WL 3592098, at *11; *CytRx*, 2015 WL 5031232, at *14 (dismissing Section 12 claim for lack of standing where plaintiffs did not "show they actually purchased in the … [o]ffering (versus the aftermarket"); *Cullen v. RYVYL*, 2024 WL 898206, at *9 (S.D. Cal. Mar. 1, 2024) (same); *In re Century Aluminum*, 749 F. Supp. 2d 964, 976 (N.D. Cal. 2010) (same).

## 2.    Jenner Was Not Plaintiff's Statutory Seller

The Section 12 claims also fail because Jenner was not a "statutory seller." In *Pinter v. Dahl*, the Supreme Court held that Section 12 claims may be asserted against only (a) "the buyer's immediate seller" or (b) "the person who successfully solicits the purchase" motivated "by a desire to serve his own financial interests." 486 U.S. 622, 644 n.21, 647 (1988). Defendants "must be alleged to have had some direct role in the solicitation of the plaintiff" (*Welgus*, 2017 WL 6466264, at *28) because Section 12 "contemplates only an action by a buyer against ***his … immediate seller***." *In re Violin*, 2014 WL 5525946, at *18 (N.D. Cal. Oct. 31, 2014) (emphasis original).

Here, Plaintiff does not allege that he purchased from Jenner. Nor could he. It is impossible that Jenner was Plaintiff's "immediate seller" because, for example, Plaintiff concedes that the Solana token was "launched" by Arora and sold by Pump.Fun. AC ¶¶46, 61. Plaintiff also concedes he did not purchase the ERC token on the day of the launch and instead bought through DEXs from unknown sellers.[11]

Plaintiff also does not sufficiently allege that Jenner solicited his purchases. The AC only generically asserts that Jenner "solicited Lead Plaintiff … to purchase $Jenner." AC ¶87. This fails. *Welgus*, 2017 WL 167708, at *31 (general allegations of solicitation were "conclusory and insufficient"); *Bridges v. Geringer*, 2015 WL 2438227, at *4 (N.D. Cal. May 21, 2015) ("conclusory allegation" that defendants "solicit[ed] Plaintiff's investments" "will not suffice"); *Rensel v. Centra*, 2019 WL 2085839, at *3, *6 (S.D. Fla. May 13, 2019) ("conclusory allegations that a defendant solicited the sale of stock and was motivated by financial gain … are insufficient").

Plaintiff also does not identify which statements constituted the purported solicitation, which is unsurprising because none of the tweets rise to the level of

---

[11] The AC's conclusory allegation that Jenner "was responsible for … providing the initial liquidity necessary for trading on the DEX" (AC ¶65) is devoid of factual support and says nothing of Plaintiff's purchases. Even if Jenner provided initial liquidity for the pool, Plaintiff does not allege that he acquired the token ***from Jenner***, nor could he. *See Pirani v. Slack Techs., Inc.*, 127 F.4th 1183, 1189 (9th Cir. 2025) (affirming dismissal of Securities Act claim because it was "impossible" to discern which shares were sold by issuer once shares reached secondary market).

solicitation as a matter of law. The Supreme Court has explained that a solicitation must be used to "persuade[] [plaintiff] to purchase securities" and be "directed at producing the sale." *Pinter*, 486 U.S. at 646–47; *Ryan v. FIGS*, 2025 WL 71727, at *12 (C.D. Cal. Jan. 10, 2025) (defendant must "'urge or persuade' another to buy a particular security"). Being a "substantial factor in causing the transaction to take place" is insufficient to constitute a solicitation. *Pinter*, 486 U.S. at 649. Here, Plaintiff does not identify statements that constitute "solicitation" because there were none. The tweets at issue relate to what Jenner was doing; they do not come close to "urging" Plaintiff to buy $JENNER. Courts require much more. *Cf. Pino v. Cardone*, 55 F.4th 1253 (9th Cir. 2022) (statement that "you're gonna walk away with a 15% annualized return. If I'm in that deal for 10 years, you're gonna earn 150%," "Want to double your money?," and that "an investor could receive $480,000 in cash flow after investing $1,000,000, achieve north of 15% returns after fees, and obtain a '118% return amounting to 19.6% per year'" constituted solicitation); *Wildes v. BitConnect*, 25 F.4th 1341, 1344 (11th Cir. 2022) (defendant "told potential investors that passive income was merely 'a click away,' … instructed investors … about 'how to make huge profits'" and "posted thousands of YouTube videos extolling BitConnect").[12]

### D.    Plaintiff's State Law Causes of Action Fail

Because the federal claims should be dismissed, the Court should decline supplemental jurisdiction over the state law claims and, accordingly, dismiss them. *See Remmers v. Davis*, 2023 WL 6376156, at *4 (C.D. Cal. July 17, 2023).

Plaintiff's state law claims, which are all premised on a "unified course of [purported] fraudulent conduct," must be dismissed because they fail to satisfy Rule 9(b). *See Rubke v. Capitol Bancorp*, 551 F.3d 1156, 1161 (9th Cir. 2009); *Salameh*

---

[12] Plaintiff also fails to satisfy the "financial interest" requirement of solicitation for the Solana token. The AC is devoid of factual allegations that Jenner stood to gain financially from Plaintiff's purchase of Solana. The sole allegation regarding her financial interest in his purchases is that "Jenner and her team instituted a 3% 'tax'" on the ***ERC*** token. AC ¶69. Even if such a fee could constitute a financial interest as to the ERC token (which Jenner disputes), it is irrelevant to the Solana token.

*v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013) (affirming dismissal of common-law fraud claim that "d[id] not satisfy [Rule] 9(b)"); *SIC Metals v. Hyundai Steel*, 2018 WL 6842958, at *4 (C.D. Cal. Nov. 14, 2018) ("[S]ection 25401 claims for fraudulent conduct are subject to Rule 9(b)'s heightened pleading standards."). The claims fail for additional independent reasons.

### 1.    Plaintiff's Section 25401 and 25110 Claims Fail

California Corporations Code §§25401 and 25110 are the state equivalents of Section 10(b) of the Exchange Act and Section 12(a) of the Securities Act, respectively. [13] These claims fall alongside their federal counterparts because "[w]here, as here, California law is modeled on federal laws, federal decisions interpreting substantially identical statutes are unusually strong persuasive precedent on construction of our own laws." *See Kamen v. Lindly*, 94 Cal. App. 4th 197, 203 (2001); *Olenicoff v. UBS*, 2010 WL 8530286, at *24 (C.D. Cal. Mar. 16, 2010) ("California securities law was patterned after federal law and the federal constructions are useful in construing state law."); *Mohebbi v. Khazen*, 50 F. Supp. 3d 1234, 1252 (N.D. Cal. 2014) ("Plaintiff's inability to state a claim for fraud under Section 10b–5 is also fatal to his §25401 claims."). These claims also fail for two additional reasons: Plaintiff does not (and cannot) plead that (i) his purchases occurred in California and (ii) he was in direct privity with Jenner.

**Plaintiff Did Not Purchase in California**. Sections 25401 and 25110 require that Plaintiff purchase securities ***in California***. Cal. Corp. Code. §25401 (requiring transaction "in this state"); *id.* §25110 (same); *Diamond v. Superior Ct*., 19 Cal. 4th 1036, 1053 (1999) (§§25401 and 25110 "expressly limited" to transactions "in this state"). Plaintiff does not allege he purchased in California, which requires dismissal.

---

[13] *Wong v. Tomaszewski*, 2018 WL 4628269, at *5 (E.D. Cal. Sept. 27, 2018) (§25110 is the "corresponding state-law statute" to "Section 12(a)"); *TrustLabs v. Jaiyong*, 2024 WL 1354486, at *17 (N.D. Cal. Mar. 30, 2024) ("Section 10b-5" and "§25401" "require the court to engage in the same factual inquiry"); *Cahill v. Edalat*, 2017 WL 2608857, at *5 (C.D. Cal. Feb. 15, 2017) (similar).

**Plaintiff Was Not in Privity With Jenner**. Sections 25401 and 25110 also require direct privity between plaintiff and defendant as purchaser and seller. *Apollo v. Roth*, 158 Cal. App. 4th 226, 253 (2007) (dismissing with prejudice because liability "attaches only to the actual seller of the securities" and plaintiffs "purchased their securities from [affiliated third party], not [defendant]" and therefore "[defendant] cannot be civilly liable for a violation of section 25401"); *Guo v. Robl*, 2023 WL 2683473, at *6 (C.D. Cal. Mar. 2, 2023) (§25401 "require[s] strict privity between the parties"); *Bowden v. Robinson*, 67 Cal. App. 3d 705, 712 (1977) (§25110 requires privity between plaintiff and "immediate" seller defendant). Here, Plaintiff does not allege that he purchased directly from Jenner, which is dispositive. At most, Plaintiff alleges that Jenner was a facilitator of his purchases, which is insufficient. *See Hayes v. Scherer*, 2023 WL 5507072, at *3 (N.D. Cal. July 3, 2023) (plaintiffs failed to establish §§25110 and 25401 claims where defendant was "not a party to the sale of the security, but rather a facilitator"); *Colman v. Theranos*, 2017 WL 1383717, at *3–4 (N.D. Cal. Apr. 18, 2017) (dismissing §25401 claim with prejudice because plaintiffs "have not alleged privity"). The claims must be dismissed.

## 2.    The State Common Law Fraud Claim Fails

Plaintiff's common law fraud claim must be dismissed for the same reasons as his statutory claims, including failure to satisfy Rule 9(b), lack of false statements, lack of scienter, and lack of privity. *See, e.g.*, *Salameh*, 726 F.3d at 1124 (affirming dismissal of common-law fraud claim that "d[id] not satisfy [Rule] 9(b)"); *Cal. Amplifier v. RLI*, 94 Cal. App. 4th 102, 109 (2001) (statutory securities claims "retain the privity requirement from common law fraud"); *supra* Sections III.B, III.C, III.D.1.

Moreover, the Ninth Circuit has held that where, as here, Plaintiff's common law claims arise from securities transactions allegedly disguised as non-securities, it "necessarily leads to the conclusion" that "Plaintiff['s] claims actually do depend on the sale of a security because that fact is at the heart of Plaintiff['s] theory of misrepresentation," and "[w]ithout the sale of a security, Plaintiff[] ha[s] not pleaded

facts showing that the common-law fraud claims survive a motion to dismiss."
*Salameh*, 726 F.3d at 1132–33. Thus, the common law fraud claim must be dismissed.

### 3.    The Quasi-Contract Claim Fails

In addition to the reasons all the other claims fail, Plaintiff's quasi-contract
claim "must be dismissed because Plaintiff[] ha[s] not alleged that [he] lack[s] an
adequate remedy at law." *Rabin v. Google*, 2023 WL 4053804, at *13 (N.D. Cal.
June 15, 2023). In *Sonner v. Premier Nutrition*, the Ninth Circuit explained that a
plaintiff may not seek equitable relief absent factual allegations demonstrating that it
lacks an adequate remedy at law. 971 F.3d 834, 843–44 (9th Cir. 2020). Thus, "a
plaintiff must allege some ***facts*** suggesting that damages are insufficient to make
them whole when seeking equitable relief." *McIntyre v. Am. Honda*, 739 F. Supp. 3d
776, 804 (C.D. Cal. 2024); *see Rabin*, 2023 WL 4053804, at *13 ("[P]laintiff must …
plead that she lacks adequate remedies at law if she seeks equitable relief."); *Clark v.
Am. Honda*, 528 F. Supp. 3d 1108, 1122 (C.D. Cal. 2021) (similar; collecting cases).
Here, because Plaintiff has "not ***pled facts*** to suggest that [he] lack[s] an adequate
remedy at law," the claim must be dismissed. *Rabin*, 2023 WL 4053804, at *13. In
fact, Plaintiff concedes that he does not lack an adequate legal remedy as he asserts
eight legal causes of action, seeking "compensatory, statutory, and punitive damages."
AC ¶169; *see, e.g.*, *id.* ¶135 (Plaintiff is "entitled to and do[es] seek damages"); ¶155
(same). Accordingly, because "Plaintiff[] do[es] not allege or otherwise explain how
[his] legal claims would not provide [him] an adequate remedy," the quasi-contract
claim must be dismissed. *McIntyre*, 739 F. Supp. 3d at 804.

### E.    Plaintiff's Secondary Liability Claims Against Hutchins Fail

Plaintiff's secondary liability claims against Hutchins for "control" person
liability under Section 15 of the Securities Act and aiding and abetting must be
dismissed. First, because Plaintiff failed to establish a predicate violation of federal
or state law against Jenner, the secondary claims against Hutchins also fail. *See Rigel*,
697 F.3d at 886 (affirming dismissal of §15 claim because it "require[s] underlying

primary violations of the securities laws"); *Cesario*, 2025 WL 525120, at *34 (dismissing aiding-and-abetting claims because the complaint "d[id] not sufficiently allege the underlying tort of fraud"); *In re McKinsey*, 2024 WL 2261926, at *15 (N.D. Cal. May 16, 2024) (same). These claims also fail because Plaintiff failed to sufficiently allege "control" under Section 15 or common-law aiding and abetting.

**Plaintiff Failed to Allege Control**. Plaintiff has not even attempted to allege that Hutchins "controlled" Jenner (an individual and the purported primary violator) within the meaning of Section 15. *See* AC ¶¶137–39 (no allegation Hutchins controlled Jenner). For good reason. Control person liability typically emerges from an individual controlling the operations of a business entity. Indeed, to adequately plead control, Plaintiff must allege that Hutchins exercised a "significant degree of day to day operational control" over ***Jenner***. *In re Bare Escentuals*, 745 F. Supp. 2d 1052, 1081 (N.D. Cal. 2010). The AC is devoid of any such allegations because Jenner is an individual with her own free will (and Plaintiff concedes that Hutchins, as Jenner's manager, acted at Jenner's direction, not vice versa (AC ¶13)).

Rather, the Section 15 claim is based on Hutchins' purported control "over the ***$JENNER project***." *Id.* ¶¶137–39 (Hutchins is "a control person of the $JENNER project"). Plaintiff does not attempt to plead any underlying violation by the "$JENNER project." This is fatal. *Rigel*, 697 F.3d at 886. Even if he had made an attempt, the AC's feeble control allegations—limited to Hutchins' "position as CEO" and a conclusory allegation of "influence and control" (AC ¶138)—are insufficient as a matter of law. Courts routinely dismiss controller claims with far more. *See Purple Mtn. v. Wells Fargo*, 432 F. Supp. 3d 1095, 1106–07 (N.D. Cal. 2020) (dismissing claim that "by virtue of their positions and their power to control public statements," defendants controlled company); *Volkswagen*, 2017 WL 66281, at *19 (N.D. Cal. Jan. 4, 2017) (dismissing claim premised on defendant's board positions and being "involved in the day-to-day operations of, and exercised power and control over," companies, including "directing their public statements"); *Special Situations*

1    *v. Brar*, 2015 WL 1393539, at \*10 (N.D. Cal. Mar. 26, 2015) (similar).

2        **Plaintiff Failed to Allege Aiding and Abetting**. Plaintiff's aiding-and-abetting

3    claim, which unlike the Section 15 claim, appears to be premised on assisting

4    Jenner's purported violations, must also be dismissed for a multitude of reasons.

5        ***First***, in violation of Rule 9(b), Plaintiff fails to plead what underlying violation

6    Hutchins purportedly aided and abetted. This is unsurprising given that "[t]here is no

7    private 'aiding and abetting' or 'conspiracy' liability under the [federal securities

8    laws]." *Burnett v. Rowzee*, 561 F. Supp. 2d 1120, 1125 (C.D. Cal. 2008); *see Cent.*

9    *Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 191 (1994) ("private

10   plaintiff may not maintain an aiding and abetting suit under §10(b)"); *Cesario*, 2025

11   WL 525120, at \*34 n.33 ("to the extent Plaintiff asserts the defendants aided and

12   abetted the commission of securities fraud … no private right of action exists").

13       ***Second,*** California secondary liability in securities transactions is governed by

14   specific causes of action in the Corporations Code, which Plaintiff has not attempted

15   to plead. Specifically, "section 25504.1 imposes liability on any person who

16   materially assists in a violation with intent to deceive or defraud" and "no occasion

17   or justification exists for a court to impose liability" on anyone else "because Corp.

18   Code §§25504, 25504.1, and 25504.2 precisely set forth the extent to which persons

19   other than the vendor may also be liable." *Apollo*, 158 Cal. App. 4th at 253–54. The

20   Code further provides that "except as explicitly provided in this chapter, no civil

21   liability in favor of any private party shall arise against any person by implication

22   from or as a result of the violation of any provision of this law or any rule or order

23   hereunder" which was enacted to "prevent the courts from using other provisions of

24   the statute to create implied causes of action … which may be inconsistent with the

25   expressed legislative intention regarding the conduct necessary to render a defendant

26   liable or the qualifications necessary to permit a plaintiff to recover." *Id.* at 254 n.13.

27       ***Finally***, even assuming (i) some sort of primary liability against Jenner and (ii)

28   that the law allows aiding and abetting of whatever that liability may be, the AC

comes nowhere close to adequately pleading aiding and abetting. "To state a claim for aiding and abetting fraud, Plaintiff[] must demonstrate that [Hutchins] **knew about the fraud** and **provided substantial assistance**." *Su v. Henry Glob.*, 2022 WL 19392, at *4 (C.D. Cal. Jan. 3, 2022). "Aiding and abetting liability necessarily requires a defendant to reach a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act." *Id.* at *5 (cleaned up). Such allegations must be pled with particularity. *Axonic v. Gateway*, 2018 WL 11355034, at *17 (C.D. Cal. Dec. 18, 2018) ("aiding and abetting fraud claim is subject to Rule 9(b)" and "must be pleaded with particularity"). Conclusory allegations will not suffice. *See Cesario*, 2025 WL 525120, at *34 (dismissing because complaint "contains no particularized facts" and "conclusory allegations" that defendants "'knew or should have known' about the alleged fraud fall short"); *Diaz v. Intuit*, 2018 WL 2215790, at *6 (N.D. Cal. May 15, 2018) (allegations that defendant "generally knew" of and "affirmatively assisted" the fraud by "deliberately implement[ing] policies that it knew directly enabled and encouraged the fraud" were insufficient to allege aiding and abetting); *Namer v. Bank of Am.*, 2017 WL 1180193, at *5 (S.D. Cal. Mar. 30, 2017) ("conclusory allegations" that defendant "knew of [principal's] wrongful conduct" and "substantially assisted [principal] in carrying out her scheme" "fail to establish an aiding and abetting claim").

Here, Plaintiff's aiding-and-abetting allegations are mere legal conclusions, devoid of specific factual allegations. *See* AC ¶158 ("Hutchins provided assistance that was a substantial factor"), ¶160 ("Hutchins was aware Jenner was defrauding Lead Plaintiff"), ¶161 ("Hutchins substantial assistance and encouragement in the fraud caused Lead Plaintiff … to purchase"). Thus, even if there was a primary violation (there is not) and aiding and abetting was a possibility, Plaintiff has failed to allege the necessary facts to support any such claim. The Court should dismiss.

## IV.   CONCLUSION

For the foregoing reasons, the Court should dismiss the AC with prejudice.

1    DATED: March 21, 2025        Respectfully submitted,

2                            WINSTON & STRAWN LLP

3

4                            By: */s/ Jeffrey Steinfeld*

5                               Jeffrey L. Steinfeld

6                               John E. Schreiber
George Mastoris

7                               Attorneys for Defendants
Caitlyn Jenner and Sophia Hutchins

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

## **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendants Caitlyn Jenner and Sophia Hutchins, certifies that this memorandum in support of Defendants' motion to dismiss does not exceed 35 pages, which complies with the Court's order allowing an oversized brief (ECF No. 30).


DATED: March 21, 2025          */s/ Jeffrey Steinfeld*_____
                                                    Jeffrey L. Steinfeld

DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT