**FITZGERALD MONROE FLYNN PC**
JACK FITZGERALD (SBN 257370)
*jfitzgerald@fmfpc.com*
MELANIE R. MONROE (SBN 275423)
*mmonroe@fmfpc.com*
TREVOR FLYNN (SBN 253362)
*tflynn@fmfpc.com*
PETER GRAZUL (SBN 342735)
*pgrazul@fmfpc.com*
ALLISON FERRARO (SBN 351455)
*aferraro@fmfpc.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741
***Lead Counsel***

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAEEM AZAD and MIHAI CALUSERU, on behalf of themselves, all others similarly situated, and the general public,<br><br>Plaintiffs,<br><br>v.<br><br>CAITLYN JENNER and SOPHIA HUTCHINS,<br><br>Defendants. | Case No: 2:24-cv-9768-SB-JC<br><br>**OPPOSITION TO MOTION TO DISMISS**<br><br>Judge:    Hon. Stanley Blumenfeld Jr.<br>Hearing:  May 9, 2025, 8:30 a.m.<br>Location: Courtroom 6C |

# TABLE OF CONTENTS

FACTS ................................................................................................................. 1

LEGAL STANDARD .......................................................................................... 5

ARGUMENT ....................................................................................................... 5

    I.    PLAINTIFF ADEQUATELY PLEAD CLAIMS FOR JENNER'S SALE OF UNREGISTERED SECURIITES .......................................... 5

        A.    Under *Howey*, $JENNER and the Manner in Which it was Offered and Sold Constitutes an Investment Contract ...................... 5

            1.    There was Investment of Money ...................................... 5

            2.    There was a Common Enterprise ..................................... 5

                a.    There was Vertical Commonality ......................... 6

                b.    There was Horizontal Commonality ..................... 7

            3.    Investors Had an Expectation of Profit from Defendants' Efforts .. 8

            4.    The SEC Staff Statement on Which Defendants Rely is Non-Binding and Inapposite ............................................... 12

        B.    Jenner was a Statutory Seller ................................................. 14

        C.    Plaintiff Conducted a Domestic Transaction .......................... 16

        D.    Plaintiff Has Standing to Assert Section 12 Claims ............... 18

    II.    PLAINTIFF ADEQUATELY PLEADS CLAIMS FOR JENNER'S SECURITIES FRAUD ........................................................................ 20

        A.    Plaintiff Alleges the Elements of His Securities Fraud Claims .............. 20

            1.    Material Misrepresentations and Omissions ................... 21

i

2.      Jenner's Scienter ................................................................. 23

3.      A Connection Between Jenner's Misrepresentations and
        Omissions, and $JENNER Transactions ........................... 24

4.      Plaintiff's Reliance and Economic Loss .......................... 24

5.      Loss Causation .................................................................. 25

B.    Jenner's Misrepresentations Were Not Puffery ....................... 25

C.    Jenner's Misrepresentations Were Not Mere Opinions ........... 26

D.    Jenner's Misrepresentations Were Not Forward Looking
      Statements .................................................................................. 27

III.   PLAINTIFF ADEQUATLEY PLEADS HIS STATE LAW CLAIMS ............ 28

A.    California Corporations Code Sections 25401 and 25110 ....... 28

B.    Common Law Fraud ................................................................... 28

C.    Quasi Contract ........................................................................... 29

IV.    PLAINTIFF ADEQUATELY PLEADS CLAIMS AGAINST
       HUTCHINS .......................................................................................... 30

A.    Plaintiff Plausibly Alleges Hutchins's Control Person Liability ............. 30

B.    Plaintiff Plausibly Alleges Hutchins's Liability for Aiding and
      Abetting ...................................................................................... 31

CONCLUSION .................................................................................................. 35

*Azad et al. v. Jenner et al.*, Case No. 2:24-cv-9768-SB-JC
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AM. COMPLAINT

**TABLE OF AUTHORITIES**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d. Cir. 2012)...........................................................................16

*Affiliated Ute Citizens v. United States*,
    406 U.S. 128 (1972).................................................................................25

*Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.*,
    F.3d 1017 (9th Cir. 1999) .........................................................................25

*Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*,
    158 Cal. App. 4th 226 (2007) ...................................................................32

*Arthur Children's Trust v. Keim*,
    994 F.2d 1390 (9th Cir. 1993) ...................................................................30

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................5

*Baker v. Twitter*,
    2023 WL 6932568 (C.D. Cal. Aug. 25, 2023)...........................................27

*Barron v. Helis Inc.*,
    2023 WL 5672640 (S.D.N.Y. Sep. 1, 2023)..............................................17

*Basic Inc., v. Levinson*,
    485 U.S. 224 (1988)............................................................................23, 24

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................................5

*Benson v. JPMorgan Chase Bank, N.A.*,
    2010 WL 1526394 (N.D. Cal. Apr. 15, 2010) ..........................................34

*Bhatia v. Silvergate Bank*,
    725 F. Supp. 3d 1079 (S.D. Cal. 2024)................................................33, 34

*Brody v. Transitional Hosps. Corp.*,
    280 F.3d 997 (9th Cir. 2002) ....................................................................23

*Azad et al. v. Jenner et al.*, Case No. 2:24-cv-9768-SB-JC
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AM. COMPLAINT

*Burgess v. Premier Corp.*,
   727 F.2d 826 (9th Cir. 1984) ......................................................................... 30

*Burnett v. Rowzee*,
   561 F. Supp. 2d 1120 (C.D. Cal. 2008) ....................................................... 31

*Camenisch v. Umpqua Bank*,
   2021 WL 9181171 (N.D. Cal. Jan. 28, 2021) ................................................ 34

*Cent. Bank of Denver v. First Interstate Bank of Denver*,
   511 U.S. 164 (1994) .......................................................................... 31, 32, 33

*Cesario v. Biocept, Inc.*,
   2025 WL 525120 (S.D. Cal. Feb. 18, 2025) ................................................. 31

*Chang v. Wells Fargo Bank, N.A.*,
   2020 WL 1694360 (N.D. Cal. Apr. 7, 2020) ........................................... 34, 35

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech.*,
   856 F.3d 605 (9th Cir. 2017) ......................................................................... 21

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
   173 F.3d 725 (9th Cir. 2003) ......................................................................... 25

*Combs v. Safemoon LLC*,
   2024 WL 1347409 (D. Utah Mar. 29, 2024) ................................................ 27

*Davy v. Paragon Coin, Inc.*,
   2021 WL 2940200 (N.D. Cal. Mar. 26, 2021) .............................................. 10

*De Ford v. Koutoulas*,
   2023 WL 2709816 (M.D. Fla. Mar. 30, 2023) .............................................. 10

*De Luz Ranchos Inv., Ltd. v. Coldwell Banker*,
   608 F.2d 1297 (9th Cir. 1979) ......................................................................... 8

*Dufoe v. Draftkings Inc.*,
   2024 WL 3278637 (D. Mass. July 2, 2024) .................................................. 10

*Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co.*,
   353 F.3d 1125 (9th Cir. 2004) ....................................................................... 27

iv

*Fed. Energy Regulatory Comm'n v. Vitol Inc.*,
   2021 WL 6004339 (E.D. Cal. Dec. 20, 2021) ................................................................. 32

*Friel v. Dapper Labs, Inc.*,
   657 F. Supp. 3d 422 (S.D.N.Y. 2023) ............................................................... 7, 12

*Gebhart v. Secs. & Exch. Comm'n*,
   595 F.3d 1034 (9th Cir. 2010) ....................................................................... 23

*Glazer Capital Mgmt., L.P. v. Forescout Technologies, Inc.*,
   63 F.4th 747 (9th Cir. 2023) ......................................................................... 26

*Harman v. Harper*,
   1990 WL 121073 (9th Cir. Aug. 21, 1990) .............................................................. 9

*Harper v. O'Neal*,
   746 F. Supp. 3d 1360 (S.D. Fla. 2024) ......................................................... 8, 15, 16

*Herm v. Stafford*,
   663 F.2d 669 (6th Cir. 1981) ......................................................................... 30

*Hocking v. Dubois*,
   885 F.2d 1449 (9th Cir. 1989) ............................................................... 6, 11, 19

*Hollinger v. Titan Cap. Corp.*,
   914 F.2d 1564 (9th Cir. 1990) ....................................................................... 23

*Houghton v. Leshner*,
   2023 WL 6826814 (N.D. Cal. Sep. 20, 2023) .......................................................... 14, 15

*In re Ethereummax Investor*,
   2023 WL 6787827 (C.D. Cal. June 6, 1999) ..................................................... 25, 26, 28

*In re Genius Brands Int'l, Inc. Secs. Litig.*,
   97 F.4th 1171 (9th Cir. 2024) ....................................................................... 14

*In re Gupta Corp. Secs. Litig.*,
   900 F. Supp. 1217 (N.D. Cal. 1994) .................................................................. 30

*In re Homestore.com, Inc., Secs. Litig.*,
   347 F. Supp. 2d 790 (C.D. Cal. 2004) ................................................................ 30

*Azad et al. v. Jenner et al.*, Case No. 2:24-cv-9768-SB-JC
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AM. COMPLAINT

*In re J&J Inv. Litig.*,
   2023 WL 2572300 (D. Nev. Mar. 18, 2023) ...................................................... 34

*In re NVIDIA Corp. Secs. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ...................................................................... 21

*In re Tezos Secs. Litig.*,
   2018 WL 4293341 (N.D. Cal. Aug. 7, 2018) .......................................... 17, 18

*In re Virtu Fin., Inc. Secs. Litig.*,
   --- F. Supp. 3d ----, ----, 2025 WL 847824 (E.D.N.Y. Mar. 17, 2025) ............................ 27

*In re ZZZZ Best Secs. Litig.*,
   864 F. Supp. 960 (C.D. Cal. 1994) ...................................................... 32, 33

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
   998 F.3d 397 (9th Cir. 2021) ...................................................................... 25

*Kairos v. J.P. Morgan*,
   2023 WL 9375171 (C.D. Cal. Dec. 11, 2023) .......................................... 26

*Khoja v. Orexin Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ...................................................................... 21

*Levine v. Diamanthuset, Inc.*,
   950 F.2d 1478 (9th Cir. 1991) ...................................................................... 31

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
   416 F.3d 940 (9th Cir. 2005) ...................................................................... 21

*Manavazian v. Atec Group*,
   160 F. Supp. 2d 468 (E.D.N.Y. 2001) ...................................................... 27

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ...................................................................... 21

*Mohamed v. Jeppesen Dataplan, Inc.*,
   579 F.3d 943 (9th Cir. 2009) ...................................................................... 5

*Morrison v. Nat'l Australia Bank Ltd.*,
   561 U.S. 247 (2010)...................................................................................... 18

*Azad et al. v. Jenner et al.*, Case No. 2:24-cv-9768-SB-JC
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AM. COMPLAINT

*Nacarino v. Chobani, LLC*,
    668 F. Supp. 3d 881 (N.D. Cal. Feb. 4, 2022) ...................................................29

*Neilson v. Union Bank of Cal., N.A.*,
    290 F. Supp. 2d 1101 (C.D. Cal. 2003) ............................................................33

*Noa v. Key Futures, Inc.*,
    638 F.2d 77 (9th Cir. 1980) ................................................................................9

*Okun v. Morton*,
    203 Cal. App. 3d 805 (1988) ............................................................................28

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015).........................................................................................26

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) ...........................................................................26

*Patterson v. Jump Trading LLC*,
    710 F. Supp. 3d 692 (N.D. Cal. 2024) ...............................................................6

*Pegasus Trucking, LLC v. Asset Redeployment Group, Inc.*,
    2021 WL 1234879 (C.D. Cal. Feb. 16, 2021) ..................................................26

*Pino v. Cardone Capital*,
    55 F.4th 1253 (9th Cir. 2022) ..............................................................10, 14, 20

*Pinter v. Dahl*,
    486 U.S. 622 (1988).............................................................10, 14, 16, 19

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) .........................................................................22

*Powell v. Crypto Traders Mgmt., LLC*,
    2024 WL 1330000 (D. Idaho Mar. 28, 2024).................................................22

*Pritikin v. Comerica Bank*,
    2009 WL 3857455 (N.D. Cal. Nov. 17, 2009) .................................................32

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996) .........................................................................28

*Azad et al. v. Jenner et al.*, Case No. 2:24-cv-9768-SB-JC
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AM. COMPLAINT

*Revak v. SEC Realty Corp.*,
    18 F.3d 81 (2d. Cir. 1994)..................................................................................7

*Roberts v. Peat, Markwick, Mitchell & Co.*,
    857 F.2d 646 (9th Cir. 1988) ...........................................................................31

*Salameh v. Tarsadia Hotel*,
    726 F.3d 1124 (9th Cir. 2013) .........................................................................28

*Samuels v. Lido Dao*,
    2024 WL 4815022 (N.D. Cal. Nov. 18, 2024) ..........................................14, 15

*Schueneman v. Arena Pharm., Inc.*
    840 F.3d 698 (9th Cir. 2016) ...........................................................................21

*Secs. & Exch. Comm'n v. Balina*,
    2024 WL 2332965 (W.D. Tex. May 22, 2024) .................................................18

*Secs. & Exch. Comm'n v. Coinbase, Inc.*,
    726 F. Supp. 3d 260 (S.D.N.Y. 2024) .......................................................17, 30

*Secs. & Exch. Comm'n v. Dalius*,
    2023 WL 3988425 (C.D. Cal. May 24, 2023) ...............................................6, 7

*Secs. & Exch. Comm'n v. Glenn W. Turner Enters., Inc.*,
    474 F.2d 476 (9th Cir. 1973) .............................................................................8

*Secs. & Exch. Comm'n v. Goldfield Deep Mines Co. of Nev.*,
    758 F.2d 459 (9th Cir. 1985) .............................................................................6

*Secs. & Exch. Comm'n v. Grybniak*,
    2024 WL 4287222 (E.D.N.Y. Sep. 24, 2024) ...................................................9

*Secs. & Exch. Comm'n v. Kik Interactive, Inc.*,
    492 F. Supp. 3d 169 (S.D.N.Y. 2020) ............................................................7, 9

*Secs. & Exch. Comm'n v. LBRY, Inc.*,
    639 F. Supp. 3d 211 (D.N.H. 2022)..................................................................26

*Secs. & Exch. Comm'n v. LFS Funding Ltd. P'ship*,
    2023 WL 6373859 (C.D. Cal. Aug. 25, 2023)..................................................23

*Azad et al. v. Jenner et al.*, Case No. 2:24-cv-9768-SB-JC
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AM. COMPLAINT

*Secs. & Exch. Comm'n v. NAC Found., LLC*,
   512 F. Supp. 3d 988 (N.D. Cal. 2021) ................................................................. 6

*Secs. & Exch. Comm'n v. Payward, Inc.*,
   2024 WL 4511499 (N.D. Cal. 2024) .................................................... 8, 11, 19

*Secs. & Exch. Comm'n v. Rana Research*,
   8 F.3d 1358 (9th Cir. 1993) ............................................................................. 24

*Secs. & Exch. Comm'n v. Research Automation Corp.*,
   585 F.2d 31 (2d. Cir. 1978) ............................................................................... 23

*Secs. & Exch. Comm'n v. Ripple Labs, Inc.*,
   2022 WL 762966 (S.D.N.Y. Mar. 11, 2022) .................................................. 18

*Secs. & Exch. Comm'n v. Ripple Labs, Inc.*,
   682 F. Supp. 3d 308 (S.D.N.Y. 2023) ........................................................ 11, 12

*Secs. & Exch. Comm'n v. Skinner*,
   2022 WL 2784811 (C.D. Cal. June 17, 2022) .................................................. 7

*Secs. & Exch. Comm'n v. Telegram Group, Inc.*,
   448 F. Supp. 3d 352 (S.D.N.Y. 2020) ...................................................... 6, 7, 9

*Secs. & Exch. Comm'n v. Terraform Labs Pte. Ltd.*,
   684 F. Supp. 3d 170 (S.D.N.Y. 2023) .............................................................. 7

*Secs. & Exch. Comm'n v. Trabulse*,
   526 F. Supp. 2d 1008 (N.D. Cal. 2007) .......................................................... 24

*Secs. & Exch. Comm'n v. Traffic Monsoon, LLC*,
   245 F. Supp. 3d 1275 (D. Utah 2017) ............................................................. 16

*Secs. & Exch. Comm'n v. W.J. Howey Co.*,
   328 U.S. 293 (1946) ........................................................................................... 5

*Secs. & Exch. Comm'n v. Wahi*,
   2024 WL 896148 (W.D. Wash. Mar. 1, 2024) ....................................... passim

*See In re Nat'l Golf Props., Inc.*,
   2003 WL 23018761 (C.D. Cal. Mar. 19, 2003) .............................................. 16

ix

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009) ........................................................... 5

*Slayton v. Am. Exp. Co.*,
   604 F.3d 758 (2d. Cir. 2010) ........................................................... 27

*Sonner v. Premier Nutrition Corp.*,
   971 F.3d 834 (9th Cir. 2020) ........................................................... 29

*Stoyas v. Toshiba Corp.*,
   896 F.3d 933 (9th Cir. 2018) ........................................................... 16

*Sundrand Corp. v. Sun Chem. Corp.*,
   553 F.2d 1033 (7th Cir. 1977) ........................................................... 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ........................................................... 24

*TSC Indus. v. Northway*,
   426 U.S. 438 (1976) ........................................................... 21

*Warfield v. Alaniz*,
   569 F.3d 1015 (9th Cir. 2009) ........................................................... 8, 10

*Wildes v. BitConnect Int'l PLC*,
   25 F.4th 1341 (11th Cir. 2022) ........................................................... 10, 14

*Williams v. Block one*,
   2022 WL 5294189 (S.D.N.Y. Aug. 15, 2022) ........................................................... 16, 18

*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021) ........................................................... 26

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ........................................................... 24

**Rules**

Fed. R. Civ. P. 8(d)(2) ........................................................... 29

x

**Statutes**

15 U.S.C. § 77b(a)(1) ........................................................................................... 14

15 U.S.C. § 77e(c) ................................................................................................. 18

15 U.S.C. § 77l(a)(1) ............................................................................................. 18

15 U.S.C. § 77l(a)(2) ............................................................................................. 20

15 U.S.C. § 78u-4(b)(1) ......................................................................................... 21

15 U.S.C. § 78u-4(b)(2) ......................................................................................... 24

**Other Authorities**

1 Secs. Practice Guide § 4.06 (2025) .................................................................... 20

Restatement (Second) of Torts § 876(b) ............................................................... 33

Secs. & Exch. Comm'n, *Staff Statement on Meme Coins* (Feb. 27, 2025) ............................ 12

Secs. & Exch. Comm'n, *Response to Staff Statement on Meme Coins: What Does it Meme?* (Feb. 27, 2025) ................................................................ 13

*Azad et al. v. Jenner et al.*, Case No. 2:24-cv-9768-SB-JC
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AM. COMPLAINT

Lead Plaintiff Lee Greenfield and thousands of other investors lost money when they purchased an unregistered security that Defendants promoted with misrepresentations and omissions. The Court should deny their motion to dismiss this case.

## FACTS

Defendant Caitlyn Jenner is "a high-profile international celebrity and former Olympic gold-medalist . . . ." (Dkt. No. 22, First Am. Compl. ("FAC") ¶ 1.) She is also "an internationally recognized media personality" (*id.* ¶ 12), and "her public Twitter account . . . has over 3 million followers" (*id.* ¶ 51). "[A]ided by her business partner and manager," Defendant Sophia Hutchins, Jenner "orchestrated a scheme wherein she offered and sold unregistered securities—the cryptocurrency, $JENNER—and fraudulently solicited financially unsophisticated investors . . . to purchase" $JENNER. (*Id.* ¶ 1 (footnote omitted).)

On May 26, 2024, Jenner minted a token on the Solana blockchain called $JENNER, announced its launch via Twitter, and represented, "[w]e will be solely focused on $Jenner and expect to hit $50m market cap on the first 24 hours." (*Id.* ¶¶ 51-52.) In response to questions about the announcement's legitimacy, Jenner tweeted, "I was not hacked. . . . We are sending this coin to the moon!!!," together with rocket emojis. (*Id.* ¶ 53.)

"As Jenner began touting price and market capitalization targets for the memecoin, $JENNER astonishingly amassed over $250 million in trading volume via more than 300,000 transactions, ultimately leading to a $43 million market capitalization value distributed between the approximately 20,000 investors who purchased $JENNER its first day." (*Id.* ¶ 54.) Beforehand, Jenner had entered into an Agreement with "Sahil Arora, a controversial figure within the cryptocurrency industry" (*id.* ¶ 58), to "'generate maximum revenue for [Jenner] within a timeline of 24 hours from the [initial] tweet from [Jenner]' announcing the project." (*Id.* ¶ 60.) "Hutchins was responsible for introducing Arora to Jenner to create the $JENNER project." (*Id.*)

Shortly after $JENNER's launch, on May 26 "Hutchins appeared in a separate video post on Twitter . . . affirming that $JENNER was real, and stating that she was 'managing the crypto project.'" (*Id.* ¶ 53.) "This initial promotional video enticed Lead Plaintiff and

1

numerous other investors to begin purchasing $JENNER, as it confirmed $JENNER was a legitimate cryptocurrency project." (*Id.*) Plaintiff "first purchased $JENNER on the Solana blockchain on May 28, 2024" (*id.* ¶ 11), acquiring approximately 70,679.8 $JENNER for approximately 7.48 $SOL (the Solana blockchain's native coin), worth approximately $1,275.65 USD (*see* Dkt. No. 22-1, FAC Ex. 1, PSLRA Cert. ["PSLRA Cert."] at 5).

Jenner, Hutchins, and Arora had accumulated their own, significant holdings before the investment opportunity was made public. (*See id.* ¶¶ 53, 60, 87, 89.) The day of the launch, an analytics platform "noticed a cluster of wallets [that] held 25.7% of $jenner at launch," and observed that "[t]hese early buyers on @pumpdotfun exited . . . selling for ~ $500k." (*See id.* ¶ 61.) By the next day, May 27, Arora had "'dumped' his portion of $JENNER . . . sending the market price of $JENNER crashing." (*Id.*) But Jenner "continued to promote the memecoin," and "promised investors all was well . . . despite having just witnessed the token drop over 80% in mere hours." (*Id.* ¶ 63; *see also id.* ¶ 52 (May 27 tweet stating "It's not a scam[.] It's legit and I'm all in!".) That day, Jenner tweeted "Tmmrw gonna be huge!!!," someone asked, "are you launching again?," and she responded, "No I am buying more and more $Jenner." (*Id.*) The next day, Jenner tweeted, "Bought some $Jenner extra SOL lying around in a spare random wallet [rocket emojis] bullish always" (*id.* ¶ 82(d)).

In response to criticism that she was focused on another cryptocurrency project (*see id.* ¶¶ 55-56), on May 27, Jenner reassured investors she was "fully focused on my token $JENNER" (*id.* ¶ 57; *see also id.* ¶ 56 ("my sole focus is $JENNER")). On May 28, Jenner reiterated, it was "a long term project. We are not planning on going anywhere but up and taking $Jenner everywhere. It's been a couple days and we are very happy with the growth on @pumpdotfun in those couple days. This is just the beginning for us." (*Id.* ¶ 82(b).)

Those representations, however, were false: the next day, May 29, Jenner minted a new cryptocurrency on the Ethereum blockchain using the same hashtag, "$JENNER," posted its smart contract address on social media, and provided the initial liquidity necessary for the trading to begin on the U.S.-based decentralized exchange, Uniswap. (*Id.* ¶ 65; *see also id.* ¶ 84(e) ("Jenner was responsible for providing the initial liquidity for both versions of

2

$JENNER").) Shortly later, Jenner tweeted, "+49,452% in 30mins….not bad! Let's go to Mars! Forget the moon!" (*Id.* ¶ 82(a).)

For a few days, Jenner "continued to promote the Solana-based $JENNER . . . still hoping she could profit off the coin." (*Id.* ¶ 84(j).) On May 30, she tweeted, "Stay tuned for buybacks! I pumped . . . that SOL token . . . for the community. I continue to promote it and promote the ETH token, the ecosystem is huge and this is just the beginning for $Jenner." (*Id.* ¶ 84(d).) But her "dual promotion quickly ended," and by May 31 "she began to condemn $JENNER on Solana," saying, "[t]he only official coin of mine is on [Ethereum]" (*id.* ¶ 67).

Defendants "created a separate public social media account on Twitter for the Ethereum-based $JENNER token, which has routinely been used for its promotion, as well as a website," which represented that "$JENNER is a pioneering cryptocurrency . . . inspired by the vision and brand of Caitlyn Jenner," that "aims to revolutionize the digital economy by providing a secure, transparent, and innovative platform for transactions and interactions" and "create a community where *everyone can participate and benefit from the growth of digital assets.*" (*Id.* ¶ 68 (emphasis added).) On June 2, Jenner tweeted, "I hope $Jenner on $ETH makes Everyone [expletive] rich," followed by a "money-mouth face" emoji. (*Id.* ¶ 82(c).) The next day, she tweeted, "[w]e move quietly, quickly, and methodically. Right now you're seeing phase one. Marathon not a sprint," and said she was "working triple time not just on the $ETH coin but on all other aspects for the entire $Jenner community" (*id.* ¶ 82(e)).

For the next several months, Defendants promoted $JENNER via the project's website, on Twitter, and in a Telegram group thy created, in which Plaintiff participated. During this time, "Jenner actively and repeatedly told investors she would obtain listings for the Ethereum-based $JENNER . . . on major [centralized exchanges], so as to increase trading volume and liquidity for investors," and "[t]hese promises were one of the primary reasons Lead Plaintiff and other investors purchased and held $JENNER." (*Id.* ¶ 82(i); *see also id.* ¶ 84(a) (Jenner tweeting, "We are also in talks with market makers and evaluating options. Not just exchanges," followed by three rocket emojis).)

Moreover, "[u]nlike the original $JENNER token, Jenner and her team instituted a 3% 'tax' on every Ethereum-based $JENNER transaction." (*Id.* ¶ 69.) This "has enriched Jenner tremendously, as there have been millions of dollars of transaction volume," but "Jenner has never properly disclosed this information to investors, many of whom have paid this transaction tax unknowingly." (*Id.* ¶ 70.) And while Plaintiff and some investors learned of the tax, Jenner represented "that a portion . . . would be used . . . for marketing purposes, and for donating to the 2024 presidential campaign of Donald Trump upon hitting a $50 million market capitalization" (*id.* ¶ 84(j)). She also represented that "[s]ome [funds] have been used for buybacks," and promised that "[a]s market cap and trading volume goes up we plan to reduce taxes" (*id.*; *see also id.* ¶ 84(d) (tweet to Jenner stating, "please give your hodlers clarity . . . last time you said you were doing buybacks of the Solana $JENNER with the ETH tax")).

"Investors relied upon these promises when deciding whether to invest in $JENNER" (*id.* ¶ 84(j)). But much of this "never happened" (*see id.*), and "[m]uch of the cryptocurrency [Jenner] received as 'taxes' from Class Member investors was" instead "transferred into the centralized exchange, Coinbase," where Defendants "have presumably profited greatly by reinvesting the funds into Bitcoin and other cryptocurrencies that have seen enormous run-ups since the Summer of 2024." (*Id.* ¶ 71; *see also id.* ¶ 87 (third-party tweet stating, "$jenner. USDT and ETH withdrawn from team wallet to coinbase do not come back. Who did the money go to?"). Moreover, Jenner willfully omitted material information from investors including Defendants' and Arora's personal holdings of $JENNER; the public wallet addresses she used to hold and trade $JENNER; the price at which she purchased and accumulated $JENNER; the financial risks associated with $JENNER; details surrounding her involvement with Arora; and detailed and reliable financial forecasts and analyses of the current and future state of the project. (*Id.* ¶ 89.)

By "September 2024, Jenner . . . essentially stopped all marketing efforts directly related to $JENNER . . . . effectively abandon[ing] the project," and "leaving holders with essentially worthless cryptocurrency." (*Id.* ¶ 84(b).) When investors became concerned, with one saying "Where's Caitlyn at?! i put my life savings into his [sic] coin," Jenner panned, "Yooooooo lol

why would you put your life savings into any meme coin?" (*Id.* ¶ 93.) Even then, she falsely promised, "it's all good! We aren't going anywhere." (*Id.*)

## LEGAL STANDARD

A claim should not be dismissed where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). In deciding a motion to dismiss, courts should draw "all reasonable inferences from the complaint in [plaintiff's] favor," *Mohamed v. Jeppesen Dataplan, Inc.*, 579 F.3d 943, 949 (9th Cir. 2009), and "accept the plaintiffs' allegations as true and construe them in the light most favorable to the plaintiff[]." *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1177 (9th Cir. 2009).

## ARGUMENT

## I. PLAINTIFF ADEQUATELY PLEAD CLAIMS FOR JENNER'S SALE OF UNREGISTERED SECURIITES

### A. Under *Howey*, $JENNER and the Manner in Which it was Offered and Sold Constitutes an Investment Contract

Defendants contend Plaintiff's allegation that $JENNER is a "'security under controlling federal law'" is "unsupported," so that his "claims fail." (Mot. at 5 (quoting FAC ¶¶ 4, 142, 147).) That is wrong, as $JENNER satisfies the standard in *Secs. & Exch. Comm'n v. W.J. Howey Co.*, 328 U.S. 293 (1946) ["*Howey*"], which is controlling (*see* Mot. at 5).

#### 1. There was Investment of Money

There can be no reasonable dispute, and Defendants do not dispute (*see id.*), that each Class Member's $JENNER purchase—which was a "transaction" even if not "a contract" (*see id.*)—was "an investment of money." (*See* FAC ¶¶ 77-78.)

#### 2. There was a Common Enterprise

"A common enterprise is a venture in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties." *Secs. & Exch. Comm'n v. Goldfield Deep Mines Co. of Nev.*, 758 F.2d 459, 463 (9th

*Azad et al. v. Jenner et al.*, Case No. 2:24-cv-9768-SB-JC
OPPOSITION TO MOTION TO DISMISS

Cir. 1985) (quotations and citations omitted). This "demand[s] either an enterprise common to the investor and the seller, promoter or some third party (vertical commonality)," or "an enterprise common to a group of investors (horizontal commonality)." *Patterson v. Jump Trading LLC*, 710 F. Supp. 3d 692, 710-11 (N.D. Cal. 2024) (quoting *Hocking v. Dubois*, 885 F.2d 1449, 1455 (9th Cir. 1989)). Both are present here.

### a.   There was Vertical Commonality

Vertical commonality "may be established by showing that the fortunes of the investors are linked with those of the promoters." *Secs. & Exch. Comm'n v. Dalius*, 2023 WL 3988425, at *8 (C.D. Cal. May 24, 2023) ["*Dalius*"] (quotation omitted). That occurs when, for example, "issuers retain[] substantial tokens for their management teams . . . to align the financial fortunes of management and token-holders," *see Secs. & Exch. Comm'n v. Wahi*, 2024 WL 896148, at *5 (W.D. Wash. Mar. 1, 2024) ["*Wahi*"] (internal record citations omitted); where the issuer's "fortunes are directly tied to the fortunes of the [investors], which will rise and fall with the success or failure of the [cryptocurrency project]," *Secs. & Exch. Comm'n v. Telegram Group, Inc.*, 448 F. Supp. 3d 352, 371 (S.D.N.Y. 2020) ["*Telegram*"]; or where investors "exchange[] capital for . . . tokens, which c[an], at the time of the exchange, be put to no use aside from online trading," defendants retain a "healthy share," and proceeds are intended to "fund the development of the" cryptocurrency project, *Secs. & Exch. Comm'n v. NAC Found., LLC*, 512 F. Supp. 3d 988, 996 (N.D. Cal. 2021) ["*NAC Foundation*"].

Vertical commonality thus exists here. Defendants accumulated a substantial amount of $JENNER, hoping its value would increase, while investors could do nothing with $JENNER other than trade it online. The fortunes of $JENNER investors, as measured by the trading value of $JENNER, were therefore linked to the fortunes of Jenner, as measured by the trading value of her $JENNER tokens, *and* by the general success of the enterprise. *See NAC Foundation*, 512 F. Supp. 3d at 996. Furthermore, each investor's "anticipated profits were directly dependent on [Jenner's] success in developing and launching" the underlying cryptocurrency project. *See Telegram*, 448 F. Supp. 3d at 370. As vertical commonality exists, so too does a common enterprise between $JENNER investors and Jenner.

### b.    There was Horizontal Commonality

When a common enterprise is "marked by horizontal commonality, the fortunes of each investor depend upon the profitability of the enterprise as a whole . . . .". *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 n.3 (2d. Cir. 1994). "Courts have generally found that horizontal commonality exists when the use of investor proceeds to develop an [enterprise]—the success or failure of which will impact all investors—ties the financial fortunes of the investors together." *Wahi*, 2024 WL 896148, at *5 (collecting cases). This occurs "when investors' assets are pooled and the fortunes of each investor is tied to the fortunes of other investors as well as to the success of the overall enterprise." *Dalius*, 2023 WL 3988425, at *8 (quoting *Telegram*, 448 F. Supp. 3d at 369); *accord Secs. & Exch. Comm'n v. Skinner*, 2022 WL 2784811, at *4 (C.D. Cal. June 17, 2022) (Blumenfeld, J.) ("There is also horizontal commonality because the investors' funds were pooled together to finance the projects."). "[P]ooling occurs when the funds received by the promoter through an offering are, essentially, reinvested by the promoter into the [enterprise]," and "such reinvestment increases the value of the instrument offered." *Dalius*, 2023 WL 3988425, at *8 (quoting *Friel v. Dapper Labs, Inc.*, 657 F. Supp. 3d 422, 436 (S.D.N.Y. 2023)).

Here, Jenner coded a 3% transaction tax into Ethereum-based $JENNER, so that each time a $JENNER transaction occurred, a portion would be transferred into a digital wallet solely controlled by Jenner. (*See* FAC ¶ 69.) She represented these pooled funds would be reinvested to fund marketing operations, buybacks, and high-profile political donations. (*See id.* ¶ 84(j).) These allegations sufficiently establish horizonal commonality, and thus a common enterprise. *See Secs. & Exch. Comm'n v. Terraform Labs Pte. Ltd*., 684 F. Supp. 3d 170, 196 (S.D.N.Y. 2023) ("[B]y alleging that the defendants 'pooled' the proceeds of [token] purchases together and promised that further investment through these purchase would benefit all [token] purchasers, the SEC has adequately pled that the defendants and the investors were joined in a common, profit-seeking enterprise." (citing *Secs. & Exch. Comm'n v. Kik Interactive, Inc.*, 492 F. Supp. 3d 169, 178 (S.D.N.Y. 2020) ["*Kik*"] (horizontal commonality when digital assets were pooled and used to construct and develop defendant's ecosystem))).

*Azad et al. v. Jenner et al.*, Case No. 2:24-cv-9768-SB-JC
OPPOSITION TO MOTION TO DISMISS

### 3.    Investors Had an Expectation of Profit from Defendants' Efforts

The *Howey* test's third prong asks whether the efforts of persons other than the investor "are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Secs. & Exch. Comm'n v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973). The court's analysis primarily consists of "an objective inquiry into the character of the instrument or transaction offered based on what the purchasers were led to expect." *See Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009) ["*Warfield*"]. This "requires the Court to assess the 'economic inducements held out to the' prospective investors." *Wahi*, 2024 WL 896148, at *6 (quoting *Warfield*, 569 F.3d at 1021). "The Ninth Circuit employs a 'commonsense' definition of 'profits,' including the 'increased value of the investment,' or . . . 'simply financial returns on investments.'" *Id.* (quoting *Warfield*, 569. F. 3d at 1023-24). To satisfy the third *Howey* prong, "investments must be substantively passive and depend on the 'entrepreneurial or managerial efforts of others.'" *Harper v. O'Neal*, 746 F. Supp. 3d 1360, 1375 (S.D. Fla. 2024) (quoting *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975)). That is exactly what happened here: passive investors depended on Jenner's efforts to grow and develop the enterprise, and ultimately the value of their underlying $JENNER holdings. (*See* FAC ¶¶ 82(e), 84(b), 87, 108.)

Defendants nevertheless argue that they "had no contractual obligation to undertake any efforts that would return a profit to $JENNER owners," and that a 45-year old case "suggests that, under such circumstances, there can be no reasonable expectation of profits." (Mot. at 8 (citing *De Luz Ranchos Inv., Ltd. v. Coldwell Banker*, 608 F.2d 1297, 1300-1301 (9th Cir. 1979)).) But that decision "does not say that the third *Howey* prong requires a per se obligation to improve the subject of the would-be investment contract"; instead, the court "merely noted the absence of such a contractual obligation, along with other factors, when determining that the promotional statements . . . were insufficient to confer . . . a reasonable expectation of profits from the efforts of others." *Secs. & Exch. Comm'n v. Payward, Inc.*, 2024 WL 4511499, at *10, *17 (N.D. Cal. 2024) ["*Payward*"] (distinguishing *De Luz Ranchos Inv., Ltd.* and noting "the Ninth Circuit . . . and numerous courts . . . have made clear that contractual

formalities are not required for something to qualify as an investment contract").

Defendants alternatively argue that investors' profits depended on market forces, rather than Jenner's managerial and entrepreneurial efforts, based primarily on Plaintiff's general allegations about the volatile nature of some memecoins. (*See* Mot. at 8-9.) But they ignore Plaintiff's allegations that for $JENNER, Defendants repeatedly touted Jenner's experience, dedication, and network as integral to the success of the venture. (*See* FAC ¶ 82(c) (Telegram listing 10 reasons Jenner's celebrity will drive adoption); *id.* ¶ 82(e) (Jenner tweeting, "Never give up on a $Jenner . . . I've been doing this for 50 years – I've got nothing but stamina!," and "I am working triple time not just on the $ETH coin but on all other aspects for the entire $Jenner community."); *id.* ¶ 82(g) ("Most viral memecoin ever?!"); *id.* ¶ 84(f).)

Moreover, Plaintiff and others invested in $JENNER—not because they believed market fluctuations would increase its value—but because they believed *Jenner's efforts* would, for example, by getting $JENNER listed on new exchanges, making buybacks and high-profile political donations, and leveraging her celebrity brand and network. (*See id.* ¶¶ 82(g), 82(i), 84(d), 84(i), 84(j).) *Cf. Secs. & Exch. Comm'n v. Grybniak*, 2024 WL 4287222, at *11 (E.D.N.Y. Sep. 24, 2024) (Statements "regarding the possibility of 'resale in the secondary market' are 'crucial to the investor' with respect to the expectation of 'realizing profits from capital appreciation.'" (citation omitted)). As one investor tweeted after Jenner had shuttered the project, "many people see crypto as an investment not a gamble, especially when the devs are doxed high profile ppl with global names. . . . I invested it in your project. I lost it all . . . ." (FAC ¶ 94.)

Defendants' "insistence in [their] brief[] that 'market forces' would drive the value of [$JENNER] ignores the essential role of [Jenner] in establishing the market," *see Kik*, 492 F. Supp. 3d at 180. Plaintiff has plausibly alleged that the "profits of [$JENNER investors]" did not depend "upon the fluctuations of [cryptocurrency] market," *see Noa v. Key Futures, Inc.*, 638 F.2d 77, 79 (9th Cir. 1980), and that investors expected to "reap profits based solely on the managerial efforts of [Jenner]," *see Harman v. Harper*, 1990 WL 121073, at *5 (9th Cir. Aug. 21, 1990); *see also Telegram*, 448 F. Supp. 3d at 375 (finding expectation of profits

*Azad et al. v. Jenner et al.*, Case No. 2:24-cv-9768-SB-JC
OPPOSITION TO MOTION TO DISMISS

plausibly alleged from defendant's promise to "develop, launch, and support [a cryptocurrency venture]," because if defendant "ceased all further efforts to support [the cryptocurrency venture] . . . [it] and [its cryptocurrency] would exist in some form but would likely lack the mass adoption, vibrancy, and utility that would enable [investors] to earn their expected huge profits."); *cf. Dufoe v. Draftkings Inc.*, 2024 WL 3278637, at *10 (D. Mass. July 2, 2024) ("[T]he primary forces behind the market price of [a cryptocurrency is] a factual question that is not suited for resolution on a motion to dismiss.").

Defendants next argue Jenner's use of social media to promote $JENNER precludes Plaintiff and other investors from having a reasonable expectation of profits from Jenner's efforts. (*See* Mot. at 9.) But "courts have frequently examined the promotional materials associated with an instrument or transaction in determining whether an investment contract is present." *Warfield*, 569 F.3d at 1021-22 (collecting cases). Moreover, a solicitation need not be "direct or personal to a particular purchaser," or akin to "contractual privity." *Pino v. Cardone Capital*, 55 F.4th 1253, 1258-69 (9th Cir. 2022). In *Pino*, the Ninth Circuit held that "Defendants' indirect, mass communications to potential investors through social media posts and online videos counts as 'engaging in solicitation' under *Pinter*," rendering them statutory sellers. *See id.* at 1258-59 (citing *Pinter v. Dahl*, 486 U.S. 622 (1988)); *accord Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341, 1346 (11th Cir. 2022) (plaintiffs stated a Section 12 claim where "promoters urged people to buy [a cryptocurrency] in online videos").

Here, Jenner was the public face of the project, was involved in "every aspect of the design and content of [the] . . . promotional materials and strategies and actively solicited investments in [$JENNER] from her twitter account," even "communicat[ing] directly with actual [$JENNER] investors" via multiple online platforms. *See Davy v. Paragon Coin, Inc.*, 2021 WL 2940200, at *8 (N.D. Cal. Mar. 26, 2021) (finding plaintiffs sufficiently alleged defendants were sellers for purposes of stating Section 12 claims); *cf. De Ford v. Koutoulas*, 2023 WL 2709816, at *15 (M.D. Fla. Mar. 30, 2023) (A defendant's "extensively documented alleged promotion of [a cryptocurrency] in-person or online in videos, on social media, and on podcasts" were "enough to make him a seller under Section 12(1)." (internal record

*Azad et al. v. Jenner et al.*, Case No. 2:24-cv-9768-SB-JC
OPPOSITION TO MOTION TO DISMISS

citations omitted)).

Next, Defendants argue that because Plaintiff purchased $JENNER on a secondary market, rather than Jenner directly, he "could have no reasonable expectation that he would profit as a result of Defendants' efforts, as he had no idea to whom or what his money was going." (Mot. at 9, 16.) But "whether an instrument purchased in a resale market is an investment contract depends on the 'economic reality of each transaction' and a determination of 'what investment package was actually offered.'" *Wahi*, 2024 WL 896148, at *6 (quoting *Hocking*, 885 F.2d at 1463). In *Wahi*, the court found cryptocurrencies at issue were investment contracts because "the promotional statements and managerial promises . . . apply equally to tokens that investors . . . bought from the issuer directly or . . . on a crypto asset trading platform." *Id*. Moreover, the defendants' representations "regarding the profitability of [the] tokens" were being made "as the tokens were traded on secondary markets." *Id*. (internal record citations omitted).

Here, "[t]he promotional statements and managerial promises set forth [by Jenner] apply equally to [$JENNER] that an investor may have bought from [Jenner] directly or from another investor, including on a crypto asset trading platform." *Wahi*, 2024 WL 896148, at *6. This is because the "determinative factor" involves not "the nature of the platform upon which the asset is transacted, but rather the reasonable expectations of the individual initiating the transaction." *Payward*, 2024 WL 4511499, at *7. Jenner enticed investors to use secondary markets like Uniswap to purchase $JENNER, and marketed the tokens' potential for profitability while they were traded there. (*See* FAC ¶¶ 68, 82(a), 82(f).) Plaintiff attempted to realize gains from capital appreciation on the secondary market established by Jenner since the genesis of the project. (*See id.* ¶ 82(a).) And Plaintiff knew "to whom or what his money was going" (*see* Mot. at 9), as the tax he incurred on every $JENNER transaction, collected by Jenner herself, was supposed to be reinvested into the project. (FAC ¶ 84(j).)

Defendants' reliance on *Secs. & Exch. Comm'n v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308 (S.D.N.Y. 2023) ["*Ripple Labs*"], is misplaced. (*See* Mot. at 9.) There, the court did "not address whether secondary market sales of [a cryptocurrency] constitute offers and sales of

*Azad et al. v. Jenner et al.*, Case No. 2:24-cv-9768-SB-JC
OPPOSITION TO MOTION TO DISMISS

investment contracts," which was "not properly before the Court," but explained that determining whether a secondary market sale "constitutes an offer or sale of an investment contract would depend on the totality of circumstances," as well as the "economic reality of that specific contract, transaction, or scheme." *See Ripple Labs*, 682 F. Supp. 3d at 329 n.16. (collecting cases).

Finally, Defendants argue the hundreds of millions of individual $JENNER tokens minted on Solana and Ethereum are non-fungible collectibles, akin to baseball cards. (Mot. at 9-10.) But even non-fungible tokens expressly sold as collectibles have been held to plausibly constitute securities. *Friel*, 657 F. Supp. 3d at 429-30, 444-46. In *Friel*, the court found the defendant's "focus on the instrument being offered" was "askew" and instead "the aim must be on the totality of the scheme and the economic realities that encompass it." *Id.* at 439. It noted that, should the company behind the project go "out of business and shut down the [the project's infrastructure], the value of the [NFT] would drop to zero. . . ." *Id.* The defendant's "public statements and marketing materials objectively led purchasers to expect profits . . . includ[ing] Tweets . . . . [using] "the 'rocket ship' [and other] emoji[s]" that "objectively mean one thing: a financial return on investment." *Id.* at 443.

Here, the economic reality is that Jenner was not promoting a collectible, but a financial product marketed to *investors*—including with rocket ship and money-mouth emojis—as one that would increase in value and make "Everyone [expletive] rich." (FAC ¶ 82(c).) The value of $JENNER was entirely dependent on her ability to continuously hype the project and keep trading volume high. When she was unable to do that, and shut down infrastructure, like the public website and Telegram group, and $JENNER's value dropped to essentially zero.

### 4.    The SEC Staff Statement on Which Defendants Rely is Non-Binding and Inapposite

Attempting to capitalize on some regulatory and policy ambiguity currently surrounding digital assets, Defendants overemphasize a recent statement by the SEC's Division of Corporate Finance Staff, while omitting a contradictory response issued the same day. (*See* Mot. at 5-6 (citing Secs. & Exch. Comm'n, *Staff Statement on Meme Coins* (Feb. 27, 2025)

["Statement"].) The Statement makes clear it "represents the views of the staff . . . . is not a rule, regulation, guidance, or a statement of the U.S. Securities and Exchange Commission," which has "neither approved nor disapproved of its content"; "has no legal force or effect"; and "does not alter or amend applicable law," nor "creates . . . new or additional obligations for any person." (Statement n.1.) With that caveat, that Statement posits that *certain* memecoins, *and the manner in which they are offered and sold*, are not investment contracts, because "purchasers['] . . . funds are not pooled together to be deployed by promoters . . . for developing the coin or related enterprise," and "promoters . . . are not undertaking . . . managerial and entrepreneurial efforts from which purchasers could reasonably expect profit." (Statement.) But the Statement "does not extend to the offer and sale of meme coins that are inconsistent" with that description, and in such instances "the Division will evaluate the economic realities of the particular transaction." (*Id.*) Thus, the Statement merely begs the question, and hardly "render[s]" "obsolete" "the earlier Framework" on which Plaintiff relied in his Complaint (*compare* Mot. at 6 *with* FAC ¶¶ 73-75).

Moreover, SEC Commissioner Caroline Crenshaw relied on the Framework to lambast the Statement, accusing it of "advanc[ing] an incomplete, unsupported view of the law to suggest that an entire product category is outside the bounds of SEC jurisdiction." *See* Secs. & Exch. Comm'n, *Response to Staff Statement on Meme Coins: What Does it Meme?* (the "Response") (Feb. 27, 2025), *at* https://www.sec.gov/newsroom/speeches-statements/crenshaw-response-staff-statement-meme-coins-022725. As Crenshaw stated, "[t]he reality is that meme coins, like any financial product, are issued to make money." *Id.* She opines that the Statement's "guidance is not a reasoned interpretation of existing law," and wrongly "suggests promoters can get around *Howey* with disclaimers or other window dressing designed to downplay the significance of managerial efforts." *Id.* Although Crenshaw's Response was released the same day, Defendants "tellingly" fail to disclose it.[1]

---

[1] Defendants argue, "[t]ellingly, rather than rely on the . . . Statement, Plaintiff grounds his arguments that $JENNER is a security in . . . [the Framework]" (Mot. at 6). The FAC, however, was filed 13 days before the Statement and Response were released.

Absent Congressional legislation, the nearly 80-year-old *Howey* test is still binding when analyzing whether something is an investment contract, and hence a security, *see* 15 U.S.C. § 77b(a)(1) ("The term "security" means [*inter alia*] . . . [an] investment contract"). The Court should thus disregard Defendants' misplaced reliance on the Statement.

## B.    Jenner was a Statutory Seller

Section 12 liability "is not limited to persons who pass title" in an unregistered security, but also extends to "the person who successfully solicits the purchase" of such security, "motivated in part by a desire to serve his own financial interests or those of the security owner." *Pinter*, 486 U.S. at 643-47. "Solicitation is broadly construed in the Ninth Circuit." *Houghton v. Leshner*, 2023 WL 6826814, at *3 (N.D. Cal. Sep. 20, 2023). "A person 'solicits' the purchase of a security 'where she petitions, entices, lures, or urges another to purchase a security." *Samuels v. Lido Dao*, 2024 WL 4815022, at *11 (N.D. Cal. Nov. 18, 2024) (quoting *In re Genius Brands Int'l, Inc. Secs. Litig.*, 97 F.4th 1171, 1182 (9th Cir. 2024)). Thus, a plaintiff adequately pleads solicitation where he alleges the defendant has been "comprehensive[ly] involve[d] with the design, operation and monetization of a cryptocurrency enterprise." *Houghton*, 2023 WL 6826814, at *3 (citation omitted). Solicitation need not be "direct or personal to a particular purchaser," or akin to "contractual privity." *Pino*, 55 F.4th at 1259-60; *see also Wildes*, 25 F.4th at 1345-46 (solicitation can occur by "promoting a security in mass communication," and if it attempts to "urge or persuade" investors to buy a security, the "efforts at persuasion [need not] be personal or individualized"). To state a Section 12 claim, Plaintiff need not allege "he specifically relied on any alleged misstatements identified" in the FAC. *See Pino*, 55 F.4th at 1260.

In *Samuels*, the court decided a case that raised "questions about the ability of people in the crypto world to inoculate themselves from liability . . . [when] profit[ing] from exotic financial instruments." *See* 2024 WL 4815022, at *1. It centered around "whether four large institutional investors" could be liable for a decentralized autonomous organization's "failure to register its crypto tokens as securities," *see id.* Plaintiffs alleged the DAO "was comprehensively involved in the creation and issuance of [a cryptocurrency] and in efforts to

get people to purchase it," "worked to get crypto exchanges to list [its cryptocurrency]," "promoted the listings and increases in [its cryptocurrency's] price through posts on social media," and "encouraged people to participate" in the governance of the enterprise, which "require[d] them to purchase [the cryptocurrency]." *Id.*, at *11. The court found these allegations "nearly identical to those held sufficient for solicitation in *Houghton* . . . ." *Id.*

Another recent decision involving similar allegations against a cryptocurrency venture that was the "brainchild" of a celebrity promoter, is also on point. *See Harper*, 746 F. Supp. 3d 1360. In *Harper*, plaintiffs claimed basketball star Shaquille O'Neal appeared "in a video," "claimed that the . . . team would not stop until the price of [his cryptocurrency] reached thirty $SOL," and "urged investors to hop on the wave before it's [sic] too late." *Id.* at 1369 (alterations and internal citations omitted). O'Neal "personally invited [investors] to a [project-focused social media] channel" and "interacted directly with [investors on a daily basis, reassuring investors that the project would grow." *Id.* (internal record citations omitted). And he was "one of the founders of the [cryptocurrency project]" and "personally developed" the project. *Id.* (internal record citations omitted). Based on these allegations, the court held "Plaintiff have met the definition of a seller and thus alleged enough to state a Section 12 claim against Defendants." *Id.*

Contrary to Defendants' assertion in their 12th footnote (*see* Mot. at 29), Plaintiff has adequately pleaded the "financial interest" requirement for $JENNER tokens on both blockchains, as evidenced by Jenner's signed agreement with Arora, prior to launching the Solana-based $JENNER, to "generate maximum revenue for [Jenner] within a timeline of 24 hours from the [initial] tweet from [Jenner]" announcing the project (FAC ¶ 60), and her retention of at least $500,000 in tax revenue from the Ethereum version (*see id.* ¶¶ 71, 82(d)). And Jenner accumulated substantial holdings of both tokens, so she had skin in the game.

Finally, Jenner had "comprehensive involvement with the design, operation and monetization" of project, *see Houghton*, 2023 WL 6826814, at *3. Not only did she create and launch $JENNER, but the cryptocurrency literally bears her name. She used social media extensively in her efforts to get investors to purchase the asset, touting higher price targets and

*Azad et al. v. Jenner et al.*, Case No. 2:24-cv-9768-SB-JC
OPPOSITION TO MOTION TO DISMISS

market capitalization goals. (*See*, *e.g.*, FAC ¶¶ 82(f), 82(h).) She created the initial liquidity pool for the tokens, and marketed potential listings on decentralized and centralized secondary markets as a major selling point. (*Id.* ¶ 82(i).) She interacted with investors regularly on multiple platforms she created for the project, always hyping the project and community, her long-term commitment to it, and its ability to sustain and grow value. She even had her manager and business partner, Hutchins, join as the "CEO" and "manager" of the project. *See Harper*, 746 F. Supp. 3d at 1369 ("[T]he Astrals Project was [O'Neal's] brainchild that he personally developed, and his son was named head of 'Investor Relations.'").

In sum, Jenner's "active solicitation coupled with [her] motivation, at least in part, to benefit [her] own financial interests . . . satisfy the statutory requirement [of Section 12]." *See In re Nat'l Golf Props., Inc.*, 2003 WL 23018761, at *3 (C.D. Cal. Mar. 19, 2003) (citing *Pinter*, 486 U.S. at 649).

### C.    Plaintiff Conducted a Domestic Transaction

Defendants argue that "Plaintiff's claims also must be dismissed because the federal securities laws do not apply extraterritorially," asserting "Plaintiff has not pled that his purchases were domestic transactions." (Mot. at 10.) That is wrong.

Courts "have articulated an 'irrevocable lability' test to determine when a securities transaction is domestic." *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 947 (9th Cir. 2018). Under this test, "a plaintiff must plausibly allege 'that the purchaser incurred irrevocable liability within the United States to take and pay for a security, ***or*** that the seller incurred irrevocable liability within the United States to deliver a security.'" *Id.* at 948 (emphasis added) (quoting *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d. Cir. 2012)). "Which blockchain transactions are domestic and which are not remains a relatively novel question." *Williams v. Block one*, 2022 WL 5294189, at *5 (S.D.N.Y. Aug. 15, 2022).

Relevant here, one court has held that where, as here, non-exchange listed securities are offered and sold over the internet, the sale takes place in both the location of the seller and buyer. *See Secs. & Exch. Comm'n v. Traffic Monsoon, LLC*, 245 F. Supp. 3d 1275, 1296 (D. Utah 2017). Another court has concluded that all transactions on Ethereum are domestic

because each "bec[o]me[s] irrevocable only after it [i]s validated by a network of global nodes clustered more densely in the United States than in any other country." *See In re Tezos Secs. Litig.*, 2018 WL 4293341, at *8 (N.D. Cal. Aug. 7, 2018) ["*Tezos*"]. That court noted the plaintiff used an interactive website that "was: (a) hosted on a server in [the U.S.] and; (b) run primarily by [defendant] in California," and that plaintiff "presumably learned about the [investment opportunity] and participated in response to marketing that almost exclusively targeted United States residents." *Id.* "While no single one of these factors is dispositive to the analysis," it held, "together they support an inference that . . . [the] purchase occurred inside the United States." *Id.* (citation omitted).

In *Barron v. Helis Inc.*, the court found transactions were domestic because digital wallets that generated assets were controlled by a U.S. resident and operated out of the U.S., and defendants were in the U.S. when they sold their own crypto to the public. 2023 WL 5672640, at *6 (S.D.N.Y. Sep. 1, 2023) (internal record citations omitted). While "allegations that [the cryptocurrency] was marketed in the United Sates" were not sufficient alone, the court held they "support the necessary inference that the claims are not predominately foreign as to be impermissibly extraterritorial." *Id.* at *7 (quotations and citations omitted).

Here, several factors demonstrate sales of $JENNER, including to Plaintiff, plausibly constituted domestic transactions. First, both blockchains on which $JENNER was launched have significant U.S. ties. More than half of the node validation network for Ethereum is hosted within the U.S., which is also home to the largest concentration of Solana network validators of any country. (*See* Pl. Request for Judicial Notice.) Solana Labs, responsible for the infrastructure and technology behind the Solana blockchain, is based in San Francisco. *See Secs. & Exch. Comm'n v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 275 (S.D.N.Y. 2024) ["*Coinbase*"]. And Uniswap is a U.S. software company headquartered in New York City.[2]

Thus here, as in *Tezos*, Plaintiff's $JENNER transactions "became irrevocable only after [they] were validated by a network of global nodes clustered [most] densely in the United

---

[2] *See* https://www.linkedin.com/company/uniswaporg (accessed April 09, 2025).

States . . . ." *See* 2018 WL 4293341, at *8. Once these transactions were validated, they were irrevocable and permanently available on the blockchain. *See Williams*, 2022 WL 5294189, at *7 ("In general, irrevocable liability is incurred when the transaction has been verified by at least one individual node of the blockchain." (internal quotations omitted)).

Moreover, Jenner, a California resident (FAC ¶ 12), created the smart contract for the Ethereum-based $JENNER, and provided its initial liquidity, within the U.S. Similarly, the smart contract behind the token, the code and functionality Jenner maintained control over, was operated out of California by Jenner. She also marketed $JENNER within the U.S., and was physically present in the U.S. when she sold her own $JENNER holdings to the public. That Jenner used these "United States social media platforms," is also relevant. *See Secs. & Exch. Comm'n v. Balina*, 2024 WL 2332965, at *7 (W.D. Tex. May 22, 2024). Together these facts make it plausible that Plaintiff's transactions occurred within the U.S.

Defendants' reliance on the "NOT FOR PUBLICATION" decision in *Secs. & Exch. Comm'n v. Schueler*, No. 23-cv-05749 (E.D.N.Y. Feb. 28, 2025), ECF No. 57, is misplaced, as the defendant in that case was a resident of Finland during the offer period, and the case involved the development of a failed blockchain that—unlike Ethereum—did not have its node network concentrated in the U.S. (*See* Mot. at 11; Dkt. No. 31-4, Steinfeld Decl. Ex. C at 28-29.) *Cf. Secs. & Exch. Comm'n v. Ripple Labs, Inc.*, 2022 WL 762966, at *11 (S.D.N.Y. Mar. 11, 2022) (explaining *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010) governs the domesticity of sales, but not offers, applying different tests for both, and holding offers were domestic where defendants resided in the U.S. when they made offers of cryptocurrency). Here, Defendants are residents of California, and thus a domestic offering to sell securities was made under Section 5(c) of the Securities Act. *See* 15 U.S.C. § 77e(c).

### D.    Plaintiff Has Standing to Assert Section 12 Claims

Defendants argue "Plaintiff lacks Section 12 standing because he did not purchase shares directly" from Jenner (Mot. at 26). But Section 12(a)(1) of the Securities Act provides that any person who offers or sells a security in violation of Section 5 "shall be liable . . . to the person purchasing such a security from him." 15 U.S.C. § 77l(a)(1). The Supreme Court

has clarified that a "seller" under Section 12(a)(1) includes not only the immediate seller who passes title, but *any* person who "solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *See Pinter*, 486 U.S. at 647. Thus, "[t]he *Howey* test applies wherever a court seeks to determine whether a transaction involves an investment contract, regardless of whether that transaction is on a primary or secondary market." *Payward*, 2024 WL 4511499, at *10.

Moreover, the Ninth Circuit "in *Hocking* . . . provide[d] general guidance on how to determine whether a secondary market transaction is an investment contract." *Id.* (citing 885 F.2d at 1455-56). "In the context of . . . resales, each case requires an analysis of how the [security] was promoted to the investor, including any representations made to the investor . . . ." *Hocking*, 885 F.2d at 1462. Accordingly, "binding authority requires the court to evaluate whether an investment contract is formed in a secondary market to consider the features of that secondary market transaction," and "[w]hat matters [is] the reasonable expectations of the investor. That a transaction does not involve the asset's primary issuer does not foreclose the possibility that the primary issuer's representations follow the asset through to the secondary market." *Payward*, 2024 WL 4511499, at *11; *see also id.*, at *12 ("[T]he fact that the transactions in question occurred on a secondary market does not by itself prevent those transactions from involving investment contracts it simply means that the *Howey* test must be applied to the transactions as they occurred on the secondary market.").

Here, Jenner created the liquidity pools for $JENNER (FAC ¶ 84(e)), and actively made representations "regarding the profitability of [$JENNER] tokens . . . as [$JENNER] tokens were traded on secondary markets." *Wahi*, 2024 WL 896148, at *6. As already discussed, transactions in $JENNER, including on secondary markets, involved investment contracts. Hence, Jenner is a statutory seller and liable to Plaintiff and the Class under Section 12(a)(1).

The cases Defendants cite—*Welgus*, *Ryan*, *Mehedi*, *Hertzberg*, *In re CytRx*, *Cullen*, and *In re Century Aluminum* (Mot. at 26-27)—are inapposite because all involve Section 12(a)(2). In their ninth footnote, and only in their ninth footnote, Defendants argue Plaintiff's Section 12(a)(2) claim fails because "$JENNER was not issued 'by means of a prospectus.'" (Mot. at

19

26 n.9.) That is wrong.

Section 12(a)(2) imposes liability on a person who "offers or sells a security . . . by means of a prospectus *or oral communication* . . . ." 15 U.S.C. § 77l(a)(2) (emphasis added).[3] Defendants' argument fails because Jenner's solicitations qualify as "oral communications" under the statute. *See* 1 Secs. Practice Guide § 4.06 (2025) ("All electronic communications (*other than . . . live, in real-time communications to a live audience*) are . . . written communications for purposes of the Securities Act . . . ."); *Pino*, 55 F.4th at 1260 (Explaining that Instagram posts and YouTube videos "are the types of potentially injurious solicitations that are intended to command attention and persuade potential purchaser to invest," and finding Section 12(a)(2) liability plausibly alleged.).

Here, Plaintiff was introduced to $JENNER via a video in which Hutchins appeared live on behalf of Jenner, in a "Twitter Space" titled "$JENNER COMMUNITY SPACE: Cryptocurrencies - NFTs - *Investing*," and "answered all questions to the participants" about how "[w]e are sending this coin to the moon!!! [3 rocket emojis]" (FAC ¶¶ 53 (emphasis added), 95). In this video, the $JENNER team represented the Solana-based $JENNER was "a legitimate cryptocurrency project" (*id.* ¶ 53), but this was a misrepresentation, as only five days later, Jenner renounced the Solana token. (*Id.* ¶ 67.) Thus, Jenner is plausibly liable under Section 12(a)(2), as well as 12(a)(1).

## II.    PLAINTIFF ADEQUATELY PLEADS CLAIMS FOR JENNER'S SECURITIES FRAUD

### A.    Plaintiff Alleges the Elements of His Securities Fraud Claims

To state a claim under Rule 10b-5(b), a plaintiff "must allege: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *City of Dearborn*

---

[3] Defendants erroneously insert a period after "prospectus" and omit the emphasized language. (Mot. at 26 n.9).

*Heights Act 345 Police & Fire Ret. Sys. v. Align Tech.*, 856 F.3d 605, 613 (9th Cir. 2017) (quotation omitted). Plaintiff has done so here.

### 1.    Material Misrepresentations and Omissions

A fact is material "if there is a substantial likelihood that a reasonable [investor] would consider it important" in making an investment decision, or if it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *See TSC Indus. v. Northway*, 426 U.S. 438, 449 (1976) (footnote omitted). Thus, a "misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." *Khoja v. Orexin Therapeutics, Inc.*, 899 F.3d 988, 1009 (9th Cir. 2018) (quoting *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005)). "[O]nce defendants [choose] to tout positive information to the market," they are "bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.* 840 F.3d 698, 705-706 (9th Cir. 2016) (quotation omitted).

To plead falsity, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading," and if made on information and belief, "state with particularity all facts on which that belief is formed." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008) (quoting 15 U.S.C. § 78u-4(b)(1)). "Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time." *Khoja*, 899 F.3d at 1008 (citation omitted). "Even if a statement is not false, it may be misleading if it omits material information." *Id.* at 1008-1009 (citing *In re NVIDIA Corp. Secs. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014)). Here, Plaintiff adequately pleads material misrepresentations and omissions.

*First*, between May and August 2024, Jenner regularly represented she was dedicated to the "long term" development of $JENNER, that the project was a "marathon not a sprint," and that she would be involved personally until it was successful. (*See*, *e.g.*, FAC ¶¶ 52, 68,

82(e), 82(f), 84(b).) Similarly, she suggested her personality, online celebrity status, and network could support and propel the project indefinitely. (*See, e.g., id.* ¶¶ 128-29.)

These statements were false and misleading, and omitted material information, when spoken. For example, on May 27, Jenner tweeted that she was "No[t]" "launching [$JENNER] again," but instead "buying more and more" (*id.* ¶ 63), whereas in reality, she launched the Ethereum-based $JENNER token two days later, on May 29 (*id.* ¶ 65). But despite her promises, by September 2024, a little more than three months after its launch, Jenner abandoned the project, stopping promotion on social media, and shutting down the public Telegram group and website investors relied on to interact with Defendants and discuss $JENNER, even while maintaining she was "fully committed and extremely bullish on how we are moving this project forward." (*See id.* ¶ 84(b).) Via these false and misleading public statements, Jenner knowingly or recklessly lent $JENNER a false character, as having a potential to increase in value, and falsely suggested her personality and online celebrity status could support and propel the project indefinitely, thereby artificially inflating the price of $JENNER. (*Id.* ¶ 128.) In sum, Jenner's statements "would give a reasonable investor the impression that [$JENNER's] growth was different than it was in reality." *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014).

*Second*, Jenner made a series of false representations regarding the allocation of the tax revenue harvested from investors, including that it would be used for marketing, buybacks, high-profile political donations and networking, and listings on secondary exchanges. (*See* FAC ¶¶ 82(i), 84(j).) Instead, Jenner deposited over $500,000 into her personal Coinbase account. (*Id.* ¶¶ 71, 165.) Moreover, when Jenner abruptly abandoned $JENNER, she retained the entirety of the tax revenue that was held out to investors as a mechanism for funding the project's growth. (*See id.* ¶¶ 71, 82(d).) Jenner's statements that she "intended to use investor money" to develop the $JENNER project "were false and misleading because . . . [s]he misappropriated [the] funds . . . ." *See Powell v. Crypto Traders Mgmt., LLC*, 2024 WL 1330000, at *11 (D. Idaho Mar. 28, 2024).

*Third*, for an omission to be actionable, "it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (citation omitted). Here, Jenner omitted the public wallet addresses she used to hold and trade $JENNER; the prices at which she obtained $JENNER; the financial risks associated with investing in memecoins generally, and her project specifically; that promised exchange listings for $JENNER would not manifest; details surrounding her involvement with Sahil Arora; and detailed and reliable financial forecasts and analyses of the current and future state of the project. (*See* FAC ¶¶ 82(i), 89, 91.)

"Reasonable investor[s]" would place a "[high] significance . . . on the withheld or misrepresented information." *Basic Inc., v. Levinson*, 485 U.S. 224, 240 (1988) (footnote omitted). For example, once it became obvious Jenner had abandoned the project (*see* FAC ¶ 84(b)), Plaintiff was forced to sell his holdings to recoup what little value was left (*see id.* ¶ 95). "Courts have repeatedly found materiality in similar misrepresentations concerning commissions and use of investment funds." *Secs. & Exch. Comm'n v. LFS Funding Ltd. P'ship*, 2023 WL 6373859 (C.D. Cal. Aug. 25, 2023) (citing, *inter alia*, *Secs. & Exch. Comm'n v. Research Automation Corp.*, 585 F.2d 31, 35-36 (2d. Cir. 1978) (misleading statements and omissions about the use of investor funds were material as a matter of law)).

### 2.    Jenner's Scienter

Scienter may be established through showing either actual knowledge or recklessness. *Gebhart v. Secs. & Exch. Comm'n*, 595 F.3d 1034, 1040-42 (9th Cir. 2010). Recklessness is a "highly unreasonable omission," which involves "an extreme departure from the standards or ordinary care," and which "presents a danger of misleading buyers and sellers that is either known to the defendant or is so obvious that [defendant] must have been aware of it." *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977)). "To adequately plead scienter, [plaintiff] must . . . 'state with particularity facts giving rise to a strong inference . . . defendant acted with the required state of mind.'" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d

981, 991 (9th Cir. 2009) (quoting 15 U.S.C. § 78u-4(b)(2)). Here, the required state of mind "embrac[es] intent to deceive, manipulate, or defraud." *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (citation omitted). A complaint should survive a motion to dismiss "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

Here, Jenner—who, before launching the project, entered into an Agreement with the express purpose of "generat[ing] maximum revenue for" Jenner (FAC ¶ 60), was "surely aware of the [project's] financial status," yet she "misstated the value of [$JENNER] and the performance of the [project]." *See Secs. & Exch. Comm'n v. Trabulse*, 526 F. Supp. 2d 1008, 1014 (N.D. Cal. 2007). "The obvious reason that [she] would have exaggerated the value of [$JENNER] w[as] to serve as cover for large withdrawals for [her]self," as well as "to attract new investors, to increase the buy-in price, and to induce existing investors to contribute more funds and to stay with the [project]." *Id.* (footnote omitted).

### 3.    A Connection Between Jenner's Misrepresentations and Omissions, and $JENNER Transactions

"The Ninth Circuit has said that the in connection with requirement is met if the fraud alleged somehow touched upon or has some nexus with any securities transaction." *Id.* (quotations and citations omitted). If the fraud alleged involves "public dissemination in a document . . . *on which an investor would presumably rely*, the 'in connection with' requirement is generally met by proof of the means of dissemination and the materiality of the misrepresentation or omission." *Id.* (quoting *Secs. & Exch. Comm'n v. Rana Research*, 8 F.3d 1358, 1362 (9th Cir. 1993)). Here, the Complaint details Jenner's many statements made in connection with $JENNER transactions, satisfying the requirement.

### 4.    Plaintiff's Reliance and Economic Loss

Reliance "provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." *Basic*, 485 U.S. at 243 (citations omitted). Here, had it not been for Jenner's false and misleading statements and omissions, Plaintiff would not have invested in, nor held $JENNER. (FAC ¶¶ 53, 82(a), 82(b), 82(e), 82(h), 82(i), 84(d),

84(g), 95; *see also* Dkt. No. 16-2, Joint Decl. ¶ 18.) He alleges significant economic losses as a result of the fraud. (FAC ¶ 11 & Ex. 1.)

### 5. Loss Causation

"To prove loss causation, [Plaintiff] must demonstrate a causal connection between the deceptive acts that for the basis of the claim . . . and the injury suffered . . . ." *Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.*, F.3d 1017, 1027 (9th Cir. 1999). Where a duty to disclose material information is breached, there is a sufficient nexus between the plaintiffs' injury and the defendant's wrongful conduct. *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972). With regard to misrepresentations, "to establish loss causation, a plaintiff must show that the defendants' alleged misstatements artificially inflated the price of [a security]," and "once the market learned of the deception, the value of the [security] declined." *See Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 407 (9th Cir. 2021). Here, Plaintiff was forced to sell his holdings at a loss, when it became apparent $JENNER would never recover after Jenner's misrepresentations and omissions came to light when she abruptly abandoned the project. (*See* FAC ¶ 95.) Thus, Plaintiff has adequately alleged loss causation.

### B. Jenner's Misrepresentations Were Not Puffery

Puffery includes "statement[s] of fact [in]capable of being proved false," statements not "specific and measurable," and statements not otherwise "reasonably interpreted as a statement of objective fact." *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 2003).

Recently, a court in this district held that statements regarding a promoter-defendant's commitment to a cryptocurrency for the "long haul" were not "vague opinion[s] about the sustainability of the [cryptocurrency]." *See In re Ethereummax Investor*, 2023 WL 6787827, at *32 (C.D. Cal. June 6, 1999) ["*Ethereummax*"]. In *Ethereummax*, a defendant argued the statement that "he was invested in [the cryptocurrency] for the 'long haul'" was non-actionable puffery, but the court found it was "an affirmative representation of [defendant's] personal investment position," and held the fact that his "trading activity lasted a total of 16 days . . . could suggest falsity." *Id.* Moreover, "[b]y retaining [substantial $JENNER tokens] for

[her]self, [Jenner] also signaled that [she] was motivated to work tirelessly to improve the value of [the token] for [her]self and any [$JENNER] purchasers." *See Secs. & Exch. Comm'n v. LBRY, Inc.*, 639 F. Supp. 3d 211, 220 (D.N.H. 2022) ["*LBRY*"].

Jenner made numerous statements about her accumulation of $JENNER and long-term commitment to the project. (*See, e.g.,* FAC ¶¶ 63, 82(b), 82(d), 82(e), 84(b), 84(g).) "It is plausible that [Plaintiff] will at least be able to prove that objective reasonable consumers" would interpret "the term 'long haul' as conveying a sense of permanency longer than a few [months]." *See Ethereummax*, 2023 WL 6787827, at *32. And Jenner's statements regarding the planned allocation of the tax revenue to benefit the project were "specific promises on which [an investor] could reasonably rely," *see Pegasus Trucking, LLC v. Asset Redeployment Group, Inc.*, 2021 WL 1234879, at *6 (C.D. Cal. Feb. 16, 2021), not mere puffery.

## C.   Jenner's Misrepresentations Were Not Mere Opinions

"A statement of opinion . . . qualifies as an 'untrue statement of . . . fact' if *that fact* is untrue—*i.e.*, if the opinion expressed was not sincerely held." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 176 (2015) (emphasis in original). In addition, "[a] statement of opinion, even if literally accurate, may be rendered misleading by the omission of a material fact." *Glazer Capital Mgmt., L.P. v. Forescout Technologies, Inc.*, 63 F.4th 747, 764 (9th Cir. 2023) (citing *Omnicare,* 575 U.S. at 186-87). Because "a statement of opinion may nonetheless involve a representation of material fact, if that representation is false or misleading, [the statement] could be actionable." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1189 (9th Cir. 2021). Here, Jenner's statements did not "express a [mere] view, [but rather] . . . certaint[ies]," which are "determinate [and] verifiable." *Kairos v. J.P. Morgan*, 2023 WL 9375171, at *3 (C.D. Cal. Dec. 11, 2023) (quotation and footnote omitted). In particular, her statements regarding the long-term sustainability of her efforts to develop the project, and the allocation of the tax revenues, can be judged "true or false on an objective standard." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014).

### D.    Jenner's Misrepresentations Were Not Forward Looking Statements

Where "defendants knowingly misrepresent[ ] present material facts as part of forward-looking statements . . . defendants are not immunized by the safe harbor provision" of the PSLRA. *In re Virtu Fin., Inc. Secs. Litig.*, --- F. Supp. 3d ----, ----, 2025 WL 847824, at *16 (E.D.N.Y. Mar. 17, 2025) (quoting *Manavazian v. Atec Group*, 160 F. Supp. 2d 468, 481-82 (E.D.N.Y. 2001)). According to the "bespeaks caution" doctrine, forward looking statements "may be considered immaterial" when "the defendant has provided the investing public with sufficiently specific risk disclosures or other cautionary statements concerning the subject matter of the statements at issue" to "nullify any potentially misleading effect." *Combs v. Safemoon LLC*, 2024 WL 1347409, at *12 (D. Utah Mar. 29, 2024) (quotations and citation omitted). Therefore, "[t]o avail [herself] of safe harbor protection," Jenner must "demonstrate that [her] cautionary language was not boilerplate and conveyed substantive information." *Baker v. Twitter*, 2023 WL 6932568, at *6 (C.D. Cal. Aug. 25, 2023) (quoting *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 772 (2d. Cir. 2010). This requires "that the cautionary language mention 'important factors that could cause actual results to differ materially from those in the forward-looking statement.'" *Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1133 (9th Cir. 2004) (citations omitted).

Here, Jenner made false statements, some of which were forward looking, which she knew to be false or made with a reckless disregard for their truth, hoping her public persona and online antics could make them become true eventually. (FAC ¶¶ 90, 127.) Jenner knew the vast majority of memecoins lose 90% of their value (*id.* ¶ 91), but made no cautionary statements when touting her dedication to the sustain the project for the long term, nor when representing how tax revenue would be used to grow the enterprise.

Jenner's reliance on the general disclaimer posted on the project's now defunct website (*see* Mot. at 22)—which is not pleaded in the Complaint, and is not properly contextualized in the Steinfeld Declaration, which does not state when the disclosure was first placed on the website—is misplaced, since "[b]lanket warnings that securities involve a high degree of risk [are] insufficient to ward against a federal securities fraud claim." *Provenz v. Miller*, 102 F.3d

1478, 1493 (9th Cir. 1996). Moreover, Defendants omit that the disclaimer was not prominently displayed on the website throughout the relevant time period, and that Jenner did not first post a version of the disclaimer on any of her social media accounts, where she extensively promoted the cryptocurrency, until February of 2025 (following the collapse of the $JENNER project and the initiation of this case).

## III.   PLAINTIFF ADEQUATLEY PLEADS HIS STATE LAW CLAIMS

### A.    California Corporations Code Sections 25401 and 25110

Defendants argue Plaintiff's state law claims fail because he does not allege a transaction in California, nor have privity with Jenner. (Mot. at 30-31.) For the same reasons described in Section I(B) above, however, irrevocable liability attached in California where Jenner resides and sold $JENNER. Moreover, if Jenner's privity "theory were accepted, no plaintiff could ever allege privity based on the purchase of a security on Uniswap," or by extension, other decentralized platforms like Raydium. *See Ethereummax*, 2023 WL 6787827, at *8. This would allow "violators of the securities laws . . . [to] escape liability merely because advanced technology has eliminated the need to deal directly with a counterparty." *Id.* at *10. But "[$JENNER] did not just miraculously appear in the [decentralized exchanges'] liquidity pool[s]"; instead the liquidity "was provided by [Jenner herself]." *Id.* at * 11. (*See* FAC ¶¶ 65, 82(a), 84(e).) Therefore, privity existed between Plaintiff and Jenner.

### B.    Common Law Fraud

The elements of common-law fraud include misrepresentation, knowledge of falsity, intent to induce reliance, justifiable reliance, and resulting damages. *Okun v. Morton*, 203 Cal. App. 3d 805, 828 (1988) (citations omitted). As demonstrated above, Plaintiff has pleaded these elements with particularity under Rule 9(b). Defendants' reliance on *Salameh v. Tarsadia Hotel*, 726 F.3d 1124 (9th Cir. 2013), is misplaced. (*See* Mot. at 31-32.) There, the plaintiffs "allege[d] that Defendants fraudulently offered a security disguised as a real-estate transaction," and the court's "holding that Plaintiffs have not alleged the sale of a security necessarily le[d] to the conclusion that the Plaintiffs could not have been fraudulently sold a security for purposes of their theory of common-law fraud." *Salameh*, 726 F.3d at 1133. Here,

28

Plaintiff does not allege he was fraudulently sold a security disguised as something else, but that Defendants defrauded him into purchasing $JENNER based on false promises and material omissions about the project itself.

### C.    Quasi Contract

For his Quasi Contract claim, Plaintiff alleges he "and other Class Members conferred direct monetary benefits on Jenner in the form of fees paid for transaction taxes on the Ethereum-based $JENNER," and that "[w]ith their money, Jenner unjustly enriched herself." (FAC ¶¶ 164-65; *see also id.* ¶ 71 ("Jenner was likely able to reap over $500,000 by this mechanism alone."[4]).) Jenner argues the claim should be dismissed under *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020), for failure to plead lack of an adequate legal remedy. (*See* Mot. at 32.) The claim, however, is narrowly tailored to Jenner's conversion of Ethereum-based $JENNER transaction tax, and expressly subject to that condition: "*To the extent that Lead Plaintiff and other Class Members have no other adequate remedy at law*, Lead Plaintiff seeks restitution of all funds and assets that Jenner has unjustly received as a result of her wrongful charge, use, and conversion of transaction taxes on Ethereum-based $JENNER." (FAC ¶ 168 (emphasis added).) Plaintiff brought this narrow claim in case money investors lost to this transaction tax are not recoverable pursuant to legal claims asserted under the Securities Act, Securities Exchange Act, and California Corporation Code. He is entitled to plead in the alternative, Fed. R. Civ. P. 8(d)(2), and at this stage, his allegations are adequate. *See Nacarino v. Chobani, LLC*, 668 F. Supp. 3d 881, 895-97 (N.D. Cal. Feb. 4, 2022). If the Court believes otherwise, Plaintiff requests leave to allege with more specificity why his legal claims may be inadequate to obtain the remedy this cause of action seeks.

---

[4] *Cf.* Dkt. No. 25, Joint Rule 26(f) Report at 4-5 ("Lead Plaintiff also requests disgorgement of the 3% transaction tax Defendants imposed on Ethereum $JENNER. (*See*, *e.g.*, First Am. Compl. ¶ 168.) Based on an analysis of the relevant transaction volume, Lead Plaintiff presently estimates this amount to be approximately $2.55 million.").

*Azad et al. v. Jenner et al.*, Case No. 2:24-cv-9768-SB-JC
OPPOSITION TO MOTION TO DISMISS

## IV.    PLAINTIFF ADEQUATELY PLEADS CLAIMS AGAINST HUTCHINS

### A.    Plaintiff Plausibly Alleges Hutchins's Control Person Liability

"Control" has been defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person" via "ownership of voting securities, by contract, or otherwise." *In re Gupta Corp. Secs. Litig.*, 900 F. Supp. 1217, 1242 (N.D. Cal. 1994). To establish control person liability, a plaintiff must show "primary violation by the controlled person," and "control of the primary violator by the defendant, and that the controlling person was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Coinbase*, 726 F. Supp. 3d at 281 (citations omitted). To show control, "[t]here must be some showing of actual participation in the [enterprise's] operation or some influence . . . ." *Burgess v. Premier Corp.*, 727 F.2d 826, 832 (9th Cir. 1984) (citing *Herm v. Stafford*, 663 F.2d 669, 684 (6th Cir. 1981)). "[A]lthough a person's being an officer or director does not create any *presumption* of control, it is a sort of red light." *Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1397 (9th Cir. 1993) (quotation omitted).

Here, Jenner is the primary violator, but Hutchins, as CEO of the $JENNER project, was held out as integral and vital component of the management team. (*See* FAC ¶¶ 13, 53, 84(a), 84(c), 84(f).) Hutchins was responsible for operations of the public Telegram account, which included her frequently communicating with investors, as well as for making business-related decisions for the project. (*Id.* ¶¶ 53, 84(a).) She also initiated the project. (*See id.* ¶¶ 60, 160.) In sum, Hutchins "did influence and control . . . decision making relating to $JENNER, including the decision to engage in the fraudulent offer and sale of securities." (*Id.* ¶ 138.) Her control over the "day-to-day affairs of the [enterprise]" and "control over management and policies" is persuasive, if not dispositive. *See In re Homestore.com, Inc., Secs. Litig.*, 347 F. Supp. 2d 790, 810 (C.D. Cal. 2004). Plaintiff has adequately alleged Hutchins "demonstrate[d] 'actual power or influence over' [the $JENNER project]," *see In re Gupta Corp.*, 900 F. Supp. at 1217, and his control person claim against her should proceed.

**B.      Plaintiff Plausibly Alleges Hutchins's Liability for Aiding and Abetting**

Hutchins argues Plaintiff's Eighth Cause of Action, for "Aiding and Abetting Fraud," "fails to plead what underlying violation Hutchings purportedly aided and abetted." (Mot. at 34.) That is wrong. Plaintiff alleges that, "[w]ithout Hutchins's assistance, Jenner would have been unable to use the misleading marketing strategy she devised to fraudulently market $JENNER, and would not have been able to commit the violations of federal [and] state securities laws identified herein." (FAC ¶ 159.) "Moreover, by introducing Jenner to Arora for purposes of minting $JENNER, Hutchins gave substantial encouragement to Jenner to commit the fraud from the outset." (*Id.* ¶ 160.) "Hutchins substantial assistance and encouragement in the fraud caused Lead Plaintiff and other Class Members to purchase and hold $JENNER when they otherwise would not have done so." (*Id.* ¶ 161.) "As a direct and proximate result of Hutchings aiding and abetting Jenner's fraud, Lead Plaintiff and the Class suffered losses . . . ." (*Id.* ¶ 162.) Thus, Plaintiff clearly alleges Hutchings aided and abetted Jenner's commission of Securities Fraud and Common Law Fraud, *i.e.*, his Second, Third, Fifth, Sixth, and Seventh Causes of Action.

Hutchins's reliance on *Cesario v. Biocept, Inc.*, 2025 WL 525120 (S.D. Cal. Feb. 18, 2025), *Burnett v. Rowzee*, 561 F. Supp. 2d 1120 (C.D. Cal. 2008), and *Cent. Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994) ["*Central Bank*"], is misplaced. (*See* Mot. at 34.) In each of those cases, the plaintiff asserted the defendant was liable *under § 10(b)*, for aiding and abetting securities fraud, whereas here, Plaintiff asserts his aiding and abetting claim under *California law*, which—unlike the Securities Act itself—*does* impose liability for violating the Securities Act. *See Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1483 (9th Cir. 1991) ("To state a claim of aiding and abetting securities fraud, one must plead (1) the existence of an independent primary wrong, (2)) actual knowledge or reckless disregard by the alleged aider and abettor of the wrong and of his or her role in furthering it, and (3) substantial assistance in the wrong." (quoting *Roberts v. Peat, Markwick, Mitchell & Co.*, 857 F.2d 646, 652 (9th Cir. 1988)).

*Central Bank* stands for the proposition that "aiding and abetting claims . . . may not be

maintained ***under the PSLRA itself***." *Pritikin v. Comerica Bank*, 2009 WL 3857455, at *3 (N.D. Cal. Nov. 17, 2009) (emphasis added) (citing 511 U.S. at 191); *see also Fed. Energy Regulatory Comm'n v. Vitol Inc.*, 2021 WL 6004339, at *22 (E.D. Cal. Dec. 20, 2021) (A party's argument "draws on case law interpreting section 10(b) and Rule 10b-5. The Supreme Court has held ***these provisions*** do not impose liability on those who aid and abet securities fraud . . . ." (emphasis added) (citing *Central Bank*, 511 U.S. at 177)); *cf. In re ZZZZ Best Secs. Litig.*, 864 F. Supp. 960, 967 (C.D. Cal. 1994) ["*ZZZZ Best*"] (Where "Plaintiffs . . . base ***their Section 10(b)/Rule 10b-5 claim***, in part, on an aider and abettor theory," the defendant is entitled to "summary adjudication as to this issue." (emphasis added)).

Here, Plaintiff seeks to hold Hutchins liable, not under 10b-5, but under California law, as she is a resident of this state, subject to that law. (*See* FAC ¶¶ 13, 157.) Defendants provide no authority, however, that the bar on private actions under 10b-5 for aiding and abetting securities fraud preempts California law permitting recovery for Hutchins's aiding and abetting Jenner's securities fraud. If Hutchins were right that Plaintiff's state law claims for aiding and abetting *federal* securities fraud are not actionable, however, that would not affect her liability for aiding and abetting Jenner's violations of the California Corporations Code, or Jenner's Common Law Fraud, and would likely make Hutchins subject to securities fraud claims directly.

Hutchins concedes California's Corporations Code provides a cause of action for aiding and abetting violations. (*See* Mot. at 34.) "[S]ection 25504 imposes liability on a broker-dealer or agent who materially aids in the act or transaction, and section 25504.1 imposes liability on any person who materially assists in a violation with intent to deceive or defraud." *Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*, 158 Cal. App. 4th 226, 253 (2007). Hutchins argues "Plaintiff has not attempted to plead" these violations, but their elements are pleaded. (*See* FAC ¶ 158 (Hutchins materially aided the acts and transactions at issue and "made similar misrepresentations and omissions" as Jenner "concerning $JENNER . . . breach[ing] a duty she owed . . . to tell the full truth when soliciting the[] purchase of securities."); *id.* ¶ 159 ("Without Hutchins's assistance, Jenner would have been unable to . .

. commit the violations of . . . state securities laws identified herein."); *id.* ¶ 160 ("While giving Jenner assistance, Hutchings was aware Jenner was defrauding Lead Plaintiff and other Class Members," and "gave substantial encouragement to Jenner to commit the fraud from the outset.").)

Moreover, as the *Central Bank* Court explained, "[t]he absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity . . . who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5 . . . ." 511 U.S. at 191; *accord ZZZ Best*, 864 F. Supp. at 967 (Bar on aider and abettor liability under Section 10(b)/Rule 10b-5 "does not necessarily mean that Defendant . . . is free from liability under the Securities Acts for its involvement in the . . . fraudulent scheme."). If the Court holds Plaintiff may not assert an aiding and abetting claim against Hutchins for federal securities fraud, it should permit the claim to go forward with respect to aiding and abetting Jenner's violations of the California Corporations Code and Jenner's Common Law Fraud, and give Plaintiff leave to amend to assert securities fraud claims against Hutchins directly.

Hutchins is also wrong that Plaintiff inadequately pleads the elements of this claim. (*See* Mot. at 35.) Under California law, "[l]iability may . . . be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act ***or*** (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach to the third person." *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1118 (C.D. Cal. 2003) (emphasis added; citations omitted); *see also* Restatement (Second) of Torts § 876(b) (same). "Under the Federal Rules of Civil Procedure, 'substantial assistance of the underlying fraud must be pleaded with particularity, while actual knowledge of the fraud may be averred generally.'" *Bhatia v. Silvergate Bank*, 725 F. Supp. 3d 1079, 1113 (S.D. Cal. 2024) (internal quotation marks and citations omitted); *see also In re J&J Inv. Litig.*, 2023 WL 2572300, at *4 (D. Nev. Mar. 18,

33

2023) (rejecting assertion that plaintiffs must "allege actual knowledge with particularity in accordance with Rule 9"). Here, Plaintiff adequately pleads Hutchins's actual knowledge, own breach of duty, and substantial assistance.

First, Plaintiff alleges "Hutchins was aware Jenner was defrauding Lead Plaintiff and other Class Members . . . ." (FAC ¶ 160.) "If a plaintiff directly alleges actual knowledge, the next question is whether the complaint pleads sufficient facts to make that allegation plausible as required by *Twombly*." *Chang v. Wells Fargo Bank, N.A.*, 2020 WL 1694360, at *4 (N.D. Cal. Apr. 7, 2020). That occurs when the sum of its allegations, and the reasonable inferences arising from them, plausibly establish a defendant's actual knowledge. *Benson v. JPMorgan Chase Bank, N.A.*, 2010 WL 1526394, at *6 (N.D. Cal. Apr. 15, 2010). That is the case here, where Plaintiff alleges Hutchins is Jenner's "business partner and manager" (FAC ¶ 1), and that they "have both close business and personal relationships" (*id.* ¶ 160.) Hutchins was "CEO of the $JENNER project and acted as a promoter, manager, and control person for the enterprise, as well as for $JENNER itself." (*Id.* ¶ 13.) She was an "insider[]" and had "personal holdings of $JENNER" before the project went public. (*See id.* ¶ 89.) Together with Jenner, she alone was "responsible for all business-related decisions related to CEXs and market makers . . . which were essentially bringing liquidity to the project." (*Id.* ¶ 84(a); *see also id.* ¶ 84(c) ("There is . . . only Jenner and Hutchins, who are responsible for all essential business managerial, and entrepreneurial decisions related to the project."); *id.* ¶ 84(f) ("Jenner, with Hutchins' assistance, is responsible for all managerial judgments or decisions that have any meaningful impact on the success of $JENNER," including "business decisions surrounding CEX listings, promotional and marketing budgeting and activities, and timing of mints.").) Thus, Plaintiff has "adequately pled actual knowledge, which may be averred generally in federal court." *See Bhatia*, 725 F. Supp. 3d at 1114; *see also Camenisch v. Umpqua Bank*, 2021 WL 9181171, at *3 (N.D. Cal. Jan. 28, 2021) ("Although the question may be somewhat close . . . the allegations give sufficient plausibility to plaintiffs' assertion that Umpqua had actual knowledge of Casey's fraud to survive a motion to dismiss.").

Plaintiff also alleges Hutchins provided Jenner substantial assistance, which "requires

34

a significant and active, as well as a knowing participation in the wrong," and "alleg[ations] that the defendant's conduct was a substantial factor in bringing about the injury allegedly suffered by the plaintiff." *Chang*, 2020 WL 1694360, at *6 (citations omitted). Here, Plaintiff alleges Defendants "solicited Sahil Arora, a controversial figure within the cryptocurrency industry, to assist in minting $JENNER" (*id.* ¶ 58), and that "Hutchins was responsible for introducing Arora to Jenner to create the $JENNER project" (*id.* ¶ 60). Shortly after Jenner's tweet first making the project public, "Hutchins appeared in a separate video post on Twitter (*i.e.*, on Twitter 'Spaces') affirming that $JENNER was real, and stating that she was 'managing the crypto project.'" (*Id.* ¶ 53.) Moreover, "[b]oth Jenner and Hutchins made clear to investors that they are leading the $JENNER project and will be performing or overseeing tasks necessary to facilitate an increase in value for $JENNER." (*Id.* ¶ 84(a).) "Hutchins [further] assisted Jenner by frequently posting in the public Telegram account and by conducting multiple Twitter Spaces sessions where she answered investors' questions." (*Id.*; *see also id.* ¶ 84(f) ("Hutchins assisted Jenner with running the various social media accounts and websites used to promote $JENNER.").) Thus, Hutchins regularly "assisted" Jenner in making "false and misleading statements and omissions . . . ." (*Id.* ¶ 95.) "Hutchins substantial assistance and encouragement in the fraud caused Lead Plaintiff and other Class Members to purchase and hold $JENNER when they otherwise would not have done so." (*Id.* ¶ 161.) "Without Hutchins's assistance, Jenner would have been unable to use the misleading marketing strategy she devised to fraudulently market $JENNER . . . ." (*Id.* ¶ 159.) "As a direct and proximate result of Hutchins aiding and abetting Jenner's fraud, Lead Plaintiff and the Class suffered losses . . . ." (*Id.* ¶ 162.)

Finally, "because Hutchins made similar misrepresentations and omissions concerning $JENNER, her conduct breached a duty she owed to Lead Plaintiff and other Class Members, to tell the truth when soliciting their purchase of" $JENNER. (*Id.* ¶ 158.)

## CONCLUSION

The Court should deny Defendants' motion. If the Court is inclined to grant the motion in any respect, Plaintiff requests leave to amend if it would not be futile to do so.

35

Dated: April 9, 2025

Respectfully Submitted,

/s/ Jack Fitzgerald

**FITZGERALD MONROE FLYNN PC**
JACK FITZGERALD
*jfitzgerald@fmfpc.com*
MELANIE R. MONROE
*mmonroe@fmfpc.com*
TREVOR FLYNN
*tflynn@fmfpc.com*
PETER GRAZUL
*pgrazul@fmfpc.com*
ALLISON FERRARO
*aferraro@fmfpc.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110

***Lead Counsel***

*Azad et al. v. Jenner et al.*, Case No. 2:24-cv-9768-SB-JC
OPPOSITION TO MOTION TO DISMISS