SUNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAEEM AZAD et al., <br><br> Plaintiffs, <br><br> v. <br><br> CAITLYN JENNER et al., <br><br> Defendants. | Case No. 2:24-cv-09768-SB-JC <br><br> ORDER GRANTING MOTION TO DISMISS [DKT. NO. 31] |

Defendant Caitlyn Jenner, with the assistance of Defendant Sophia Hutchins, developed and promoted $JENNER cryptocurrency tokens on the Solana and Ethereum blockchains. Lead Plaintiff Lee Greenfield, a U.K. citizen who lost more than $40,000 investing in $JENNER, brings this putative class action alleging that Defendants defrauded investors when marketing the $JENNER tokens in violation of federal and California securities laws. Defendants move to dismiss the First Amended Complaint (FAC) for failure to state a claim. The Court held a hearing on May 9, 2025. Because Greenfield has failed to adequately plead any of his claims, the motion is granted.

I.

Understanding the allegations requires some knowledge about how cryptocurrency tokens function. The Court begins with a brief overview of the relevant technology, as set forth in the FAC, before addressing the asserted claims.

A.

Cryptocurrency refers to digital tokens that are secured using cryptography, often through a system called a blockchain—a public, decentralized ledger maintained by a network of users. Dkt. No. 22 at 1 n.1 (FAC). New transactions can only be added to the blockchain when they are verified by a network of users. *Id*. ¶¶ 14–16, 22. To verify transactions, users must use significant computing power and in return are rewarded with the blockchain's native cryptocurrency. *Id*. ¶¶ 16–18. Two blockchains are at issue in this case, and each has its own unique cryptocurrency (or "native protocol asset"): the Ethereum blockchain uses Ether

1

(cashtag $ETH), while the Solana blockchain uses Solana (cashtag $SOL). *Id.* ¶¶ 22, 25, 29. A cashtag is a feature on the social media platform X (formerly Twitter) that allows users to click on a cryptocurrency's ticker symbol to view related posts—functioning much like a stock ticker for a publicly traded company. *Id.* at 5 n.4.

A blockchain can also run "smart contracts"—self-executing computer programs stored on a blockchain that automatically carry out trades when specified conditions are met. *Id.* ¶¶ 20–22. Decentralized Exchanges (DEXs) operate entirely through smart contracts, allowing users to trade cryptocurrency tokens in a secure and transparent environment. *Id.* ¶ 23. To enable trading on a DEX, a third party supplies liquidity by depositing crypto assets into a "liquidity pool" for a specific token, which other users can then trade against—exchanging another crypto asset for the designated token (e.g., contributing $SOL and receiving $JENNER). *Id.* Tokens can also be bought and sold on Centralized Exchanges (CEXs), which—unlike DEXs—require a third-party intermediary to facilitate transactions. *Id.*

Smart contracts also allow individuals to create (or "mint") new cryptocurrency tokens that can be traded on DEXs and CEXs. The Ethereum and Solana blockchains—two widely used blockchain platforms—each provide standardized technical protocols for creating such tokens. *Id.* ¶¶ 26, 30–31. Each blockchain also hosts DEXs that facilitate trading in these tokens. A leading DEX on Ethereum is Uniswap, and a leading DEX on Solana is Raydium. *Id.* ¶¶ 27, 32.

Taken together, these features have made it easy for even technically unsophisticated individuals to create new cryptocurrency tokens, resulting in an explosion of so-called "memecoins." *Id.* ¶¶ 33, 40–43, 47–48. Memecoins are tokens inspired by internet memes, fictional characters, pop culture, current events, or particular celebrities. *Id.* ¶¶ 33–36, 42, 49. Millions of memecoins have been created, and some have drawn interest from investors. *Id.* ¶¶ 41–42, 48. These tokens are typically volatile, with prices and market capitalizations fluctuating significantly based on the level of public interest. *Id.* ¶¶ 37–38.

B.

Jenner is a former Olympic athlete and media personality. *Id.* ¶ 12. Hutchins, Jenner's manager and business partner, is alleged to be the "CEO of the $JENNER project [who] acted as a promoter, manager, and control person," and

who introduced Jenner to Sahil Arora—a controversial figure involved in multiple celebrity-backed cryptocurrency projects. *Id.* ¶¶ 13, 58–60.

On May 26, 2024, Jenner, assisted by Arora, launched her $JENNER token on the Solana blockchain (the Solana Token). *Id.* ¶¶ 51, 58, 61. Jenner created the token using an application called Pump.Fun, which enables users to create tokens and raise funds on its platform. *Id.* ¶¶ 45–46, 54. Once a token reaches a certain value, Pump.Fun establishes a liquidity pool on Raydium (a DEX on Solana), allowing the token to be traded more broadly. *Id.* ¶ 46. Jenner promoted the Solana Token on X, posting a link to Pump.Fun, where followers could purchase the token during its fundraising phase. *Id.* ¶ 51. Hutchins assisted in marketing the token on X and stated she was managing Jenner's cryptocurrency "project." *Id.* ¶ 53. Approximately 20,000 individuals purchased the Solana Token on the first day, driving its market capitalization to $43 million. *Id.* ¶ 54. The following day, however, the token's value declined after Jenner promoted a different token, apparently named after her and Hutchins's dogs ($BBARK), despite previously assuring followers that she was "fully focused on my token $JENNER." *Id.* ¶¶ 55–57. That same day, the price of the Solana Token fell sharply following the public revelation of Arora's involvement and his subsequent dumping of his Solana Tokens. *Id.* ¶¶ 58, 61–62. Nevertheless, Jenner continued to promote the Solana Token on X. *Id.* ¶ 63.

Two days later, on May 29, Jenner launched a new token with the same identifier, $JENNER, on the Ethereum blockchain (the Ethereum Token) and supplied the liquidity necessary for it to be traded on Uniswap, a DEX. *Id.* ¶ 65. Unlike the Solana Token, Jenner received a 3% fee (or "tax") on the total amount traded for each purchase and sale of the Ethereum Token. *Id.* ¶ 69. Initially, she promoted both tokens, pledging support for each. *Id.* ¶ 66. But by May 31, she began distancing herself from the Solana Token, referring to it as "the Sahil scam SOL coin," and called the Ethereum Token her "only official coin." *Id.* ¶¶ 67, 82(g), 84(d). Jenner then focused her efforts on promoting the Ethereum Token, launching an X account and dedicated website for it, and promising to secure listings on major CEXs. *Id.* ¶¶ 68, 82(e), 82(g)–(i), 84(a). Since September 2024, however, Jenner has ceased actively promoting either token. *Id.* ¶¶ 84(b), 92–93. Both tokens have lost 99 percent of their peak value, and trading activity has come to a crawl. *Id.* ¶¶ 92–94.

Lead Plaintiff, Lee Greenfield, a citizen of the United Kingdom, purchased both $JENNER tokens in exchange for $SOL and $ETH. *Id.* ¶¶ 11, 95; Dkt. No. 22-1. He acquired Solana Tokens in late May 2024, and sold them shortly

3

thereafter at a loss. Dkt. No. 22 ¶ 11; Dkt. No. 22-1 at 5. He also purchased Ethereum Tokens between May and July 2024, holding them until September and October 2024, when he sold them at a loss of almost $40,000, "when it became apparent that $JENNER had become virtually worthless and unlikely ever to recover its value." Dkt. No. 22 ¶¶ 11, 95; Dkt. No. 22-1 at 3–4.

In November 2024, Plaintiffs Naeem Azad and Mihai Caluseru filed this putative class action, alleging securities violations and fraud. After publishing notice of this action, a group of purchasers of the tokens—including Azad, Caluseru, and Greenfield—sought appointment as lead plaintiff. The Court granted the motion's alternative request to appoint Greenfield, the investor with the largest losses, as lead plaintiff.

Greenfield's FAC asserts nine claims: (1) violations of §§ 5 and 12(a)(1) of the Securities Act (15 U.S.C. §§ 77e(a), 77*l*(a)(1)); (2) misleading statements and omissions in the sale of a security in violation of § 12(a)(2) of the Securities Act (15 U.S.C. § 77*l*(a)(2)); (3) securities fraud in violation of § 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b)); (4) controlling person liability under § 15(a) of the Securities Act (15 U.S.C. § 77*o*(a)); (5) securities fraud in violation of California law (Cal. Corp. Code § 25401); (6) sale of unregistered securities in violation of California law (Cal. Corp. Code § 25110); (7) common-law fraud; (8) aiding and abetting fraud; and (9) quasi-contract. Counts 4 and 8 are alleged against Hutchins; the others are alleged against Jenner. Defendants now move to dismiss the FAC for failure to state a claim. Dkt. No. 31.

II.

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility" if the plaintiff pleads facts that "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In resolving a Rule 12(b)(6) motion, a court must accept all well-pleaded factual allegations as true, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (quoting *Twombly*, 550 U.S. at 555). Assuming the veracity of well-pleaded factual allegations, a court must "determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. There is no plausibility "where the

4

well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id.*

In addition to these pleading standards, a plaintiff alleging fraud must meet the heightened pleading requirements imposed by Federal Rule of Civil Procedure 9(b), which also applies to claims under the Securities Act that are "grounded in fraud." *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996). Claims of securities fraud under the Securities Exchange Act must also satisfy the heightened pleading requirements imposed by Private Securities Litigation Reform Act of 1995 (PSLRA), which "present no small hurdle." *In re Verifone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Similarly, the PSLRA requires that a securities plaintiff plead both falsity and scienter with particularity. 15 U.S.C. §§ 78u–4(b)(1), (b)(2)(A).

### III.

Defendants raise a host of challenges to Greenfield's claims without always being precise about which claims are subject to which arguments. The Court addresses the following arguments, which are sufficient to conclude that all nine causes of action are deficient as alleged: (1) Greenfield fails to allege a domestic transaction; (2) Greenfield's § 12(a)(2) claim fails because Greenfield has not identified any false statements in connection with a prospectus; (3) Greenfield has not adequately alleged controlling-person liability against Hutchins; (4) Greenfield's California securities claims fail for lack of direct privity; (5) Greenfield's fraud-based claims fail to satisfy Rule 9(b) or the PSLRA's particularity requirements; (6) the aiding-and-abetting claim against Hutchins fails for lack of a primary violation; and (7) Greenfield's quasi-contract claim does not adequately allege the unavailability of legal remedies.[1]

---

[1] The parties dispute whether the $JENNER tokens constitute securities. Because Greenfield's securities claims fail on other grounds, and because the determination of whether the tokens are securities is fact-dependent and may be affected by an amended pleading, the Court declines to resolve that issue at this stage and instead assumes without deciding that the tokens are securities subject to the federal securities laws.

A.

Defendants contend that Greenfield's federal claims in Counts 1–3 fail because the securities laws apply only to domestic transactions, and Greenfield—a U.K. citizen—has not alleged that any of his transactions occurred within the United States.

In *Morrison v. National Australia Bank Ltd.*, the Supreme Court applied the presumption against extraterritoriality to § 10(b) of the Securities Exchange Act, holding that the provision applies only to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities." 561 U.S. 247, 267 (2010). Although *Morrison* did not analyze the Securities Act in the same depth, it emphasized that the "same focus on domestic transaction is evident" in that statute and that the Securities and Exchange Commission has interpreted § 5 of the Act to exclude foreign transactions. *Id.* at 268–69 (citing 17 C.F.R. § 230.901). Courts have since recognized that *Morrison*'s extraterritoriality analysis extends to the Securities Act as well. *See Stoyas v. Toshiba Corp.*, 896 F.3d 933, 948 (9th Cir. 2018); *Williams v. Binance*, 96 F.4th 129, 136 (2d Cir. 2024).

Greenfield does not dispute that his federal securities claims require a domestic transaction. The dispute instead focuses on whether he has pleaded a domestic transaction. In determining whether a transaction is domestic, the Ninth Circuit has adopted an "irrevocable liability test." *Stoyas*, 896 F.3d at 949. Under the test, a plaintiff must plausibly allege "that the purchaser incurred irrevocable liability within the United States to take and pay for a security, or that the seller incurred irrevocable liability within the United States to deliver a security." *Id.* at 948 (cleaned up).[2]

The FAC does not allege where Greenfield purchased the tokens or adequately demonstrate where he, or Jenner, incurred irrevocable liability. The FAC provides scant details about Greenfield's purchases, alleging only that: he "accumulated" the tokens; he paid for them using $SOL and $ETH; and the tokens could be purchased on Pump.Fun (as to the Solana Token), DEXs, and certain "minor foreign CEXs." Dkt. No. 22 ¶¶ 65, 68, 82(b), 82(i), 95; Dkt. No. 22-1. Moreover, although the FAC describes how transactions in cryptocurrency assets

---

[2] Alternatively, a plaintiff can allege "that title to the [securities] was transferred within the U.S.," but Greenfield does not invoke this basis for a domestic transaction. *Stoyas*, 896 F.3d at 948.

6

occur (e.g., through network validation) and explains the operation of DEXs, it fails to allege facts establishing how the transactions in this case have a sufficient nexus to the United States to support the application of U.S. securities laws. *See Barron v. Helbiz Inc.*, No. 20-CV-0470, 2023 WL 5672640, at *6 (S.D.N.Y. Sept. 1, 2023) (finding insufficient to show irrevocable liability in the U.S. allegations that tokens were "transferred via the Ethereum blockchain, which is centralized in the United States"). Not only does the FAC fail to clarify whether any of the potential methods for purchasing the tokens would have subjected Greenfield to irrevocable liability within the United States, it is also fails to specify which method Greenfield actually used. Thus, the FAC provides no basis to conclude that any of the transactions were domestic. *Cf. Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 70 (2d Cir. 2012) (domestic transaction inadequately alleged "[a]bsent factual allegations suggesting that the Funds became irrevocably bound within the United States . . . , including, but not limited to, facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money").

As for whether any of Jenner's sales were domestic, Greenfield alleges that Jenner is a California resident and that she "was responsible for . . . providing the initial liquidity" for trading the Ethereum Token on Uniswap, a DEX. Dkt. No. 22 ¶¶ 12, 65. But he alleges no facts regarding where or how Jenner provided this liquidity that would allow the Court to reasonably infer that she incurred irrevocable liability within the United States "to deliver a security." *Stoyas*, 896 F.3d at 948; *cf. Baylor v. Honda Motor Co.*, No. 2:23-CV-00794-WLH, 2024 WL 650415, at *4 (C.D. Cal. Jan. 19, 2024) (collecting cases rejecting "the argument that a transaction qualifies as a 'domestic transaction' under *Morrison* whenever the purchaser or seller resides in the United States, even if the transaction itself takes place entirely over a foreign exchange").[3]

In his opposition, Greenfield improperly relies on facts not alleged in the FAC in an attempt to cure its pleading deficiencies. He asks the Court to take

---

[3] Greenfield briefly suggests that, because Jenner is a California resident, she made a domestic offer to sell securities under § 5(c) of the Securities Act. This undeveloped argument is insufficient to rescue his § 12(a)(1) claim. *See John-Charles v. California*, 646 F.3d 1243, 1247 n.4 (9th Cir. 2011) (argument waived where party "failed to develop [it]"). Greenfield's counsel conceded at the hearing that this argument was inadequately developed but requested leave to bolster the relevant allegations in an amended pleading, which the Court will allow.

7

judicial notice of two websites stating that many validators for the Ethereum and Solana blockchains are located in the United States. Dkt. No. 34. Based on these statements, he argues that his token transactions were domestic because they were validated by individuals in the United States. But while the Court may take judicial notice of the existence of these websites, it may not take notice of their contents and accept them as true. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018). Similarly, Greenfield's reliance on factual findings in other cases is improper. *See California ex rel. RoNo, LLC v. Altus Fin. S.A.*, 344 F.3d 920, 931 n.8 (9th Cir. 2003) (a court may take judicial notice of another court's opinion but "not for the truth of the facts recited therein") (cleaned up). To the extent Greenfield has an adequate basis to assert the new facts raised in his opposition, they may be relevant to whether amendment is futile, but they have no bearing on the adequacy of the FAC as currently pleaded. *See Okla. Firefighters Pension & Ret. Sys. v. IXIA*, 50 F. Supp. 3d 1328, 1350 (C.D. Cal. 2014) (declining request for judicial notice for purposes of "utiliz[ing] the documents to amend the complaint and defeat defendants' motions to dismiss").

Because Greenfield has failed to plead a domestic securities transaction, his federal securities claims in Counts 1–3 are dismissed for failure to state a claim.[4]

B.

Greenfield's § 12(a)(2) claim in Count 2 fails for an additional reason. That provision imposes liability on a person who "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact" or misleading omission. 15 U.S.C. § 77*l*(a)(2). Greenfield admits that the $JENNER tokens were not sold through a prospectus, but he argues that an offer or sale through an "oral communication" is sufficient under the statute. Under Ninth Circuit law, however, "the phrase 'oral communication' is restricted to oral communications that relate to a prospectus." *Pirani v. Slack Techs., Inc.*, 127 F.4th 1183, 1192 (9th Cir. 2025) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 567–69 (1995)). Because it is undisputed that there is no relevant prospectus, the § 12(a)(2) claim fails and cannot be cured by amendment, as Greenfield effectively conceded at the hearing.

---

[4] Because his § 12 claims are otherwise subject to dismissal, the Court declines to reach whether Greenfield has statutory standing to bring a such claims or whether Jenner is a statutory seller under § 12.

C.

Greenfield's claim in Count 4, seeking to hold Hutchins liable as a controlling person under § 15(a) of the Securities Act, fails both derivatively and independently.

Section 15(a) provides that "[e]very person who by or through stock ownership, agency, or otherwise . . . controls any person liable under [§§ 11 and 12 of the Securities Act], shall also be liable jointly and severally with and to the same extent as such controlled person."  15 U.S.C. § 77*o*(a).  Because liability under § 15(a) requires a primary violation of the Securities Act, and Greenfield has failed to plead a § 12 violation, he has also failed to state a § 15(a) claim.  *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012).

Even if Greenfield could establish a primary violation by Jenner, his allegations do not suffice to show that Hutchins was a controlling person under § 15(a).  To be liable, a defendant must have "exercised actual power or control over the primary violator."  *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000) (addressing controlling-person liability under § 20(a) of the Securities Act); *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1578 (9th Cir. 1990) ("Although § 15 is not identical to § 20(a), the controlling person analysis is the same."); *see also* 17 C.F.R. § 230.405 (defining control as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person . . . .").  Whether a defendant is a controlling person is a factual question that requires scrutiny of the defendant's involvement in the day-to-day affairs and decisions of the primary violator and her power to control the violator's actions.  *SEC v. Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011).

Greenfield concedes that Jenner is the primary violator.  Yet there are no nonconclusory allegations in the FAC that Hutchins exercised control over Jenner—only that Hutchins assisted Jenner in managing the "$JENNER project." *Compare* Dkt. No. 22 ¶¶ 13, 53, 138 (alleging that Hutchins was managing the project as its CEO and "[b]y virtue of her position as CEO of, and participation in the $JENNER project's operations, Hutchins had the power to influence and control, and did influence and control, directly and indirectly, decision making relating to $JENNER"), *with id.* ¶¶ 82(a), 84(f) (alleging Jenner and Hutchins formed a "team" and that "Jenner, with Hutchins' assistance, is responsible for all managerial judgments or decisions that have any meaningful impact on the success of $JENNER").  In fact, the FAC acknowledges that the "$JENNER project" consists solely of "Jenner and Hutchins, who are responsible for all essential

9

business, managerial, and entrepreneurial decisions related to the project." *Id.* ¶ 84(c). The allegations of Hutchins's involvement—introducing Jenner to Arora, posting on Telegram, and responding to investor's questions on X—are sufficient to demonstrate a business relationship between the two but are insufficient to show that Hutchins controlled Jenner. *Id.* ¶¶ 58, 60, 84(a), 84(c), 84(f). *See In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 790, 810 (C.D. Cal. 2004) (finding insufficient to show control allegations that an accounting firm provided "extensive" services, important advice, and generally significant assistance to the primary violator). Accordingly, the FAC does not plausibly allege that Hutchins controlled Jenner.

### D.

Counts 5 and 6 allege securities claims against Jenner under California Corporations Code §§ 25401 and 25110. Section 25401 prohibits the offer or sale of a security by means of untrue statements or omissions of material facts; section 25110 prohibits the offer or sale of unqualified securities that are not exempted. Neither section, however, provides a cause of action. Rather, the private causes of action for §§ 25401 and 25110 are found in California Corporations Code §§ 25501 and 25503, respectively.

To recover under either statutory provision, a plaintiff must allege privity—i.e., that he purchased securities directly from the defendant. Liability under California law is narrower than under federal law; it does not extend to a defendant who "actively solicits the sale of the securities with a motive of benefiting himself financially" but does not directly sell the securities to the plaintiff. *Apollo Cap. Fund, LLC v. Roth Cap. Partners, LLC*, 158 Cal. App. 4th 226, 253 (2007) (no liability under § 25501 where plaintiffs purchased from defendant's agent); *see also Steinmann v. Settlement Grp., Inc.*, No. D075550, 2020 WL 1481921, at *10 (Cal. Ct. App. Mar. 27, 2020) (unpublished) (requiring privity for § 25110-based claims); *Zakinov v. Ripple Labs, Inc.*, No. 18-CV-06753, 2020 WL 922815, at *16 (N.D. Cal. Feb. 26, 2020) (same).

Greenfield does not allege that he purchased tokens from Jenner. As noted, the FAC does not identify where Greenfield purchased his tokens—only that he did so using $SOL and $ETH. Dkt. No. 22 ¶ 95; Dkt. No. 22-1. Greenfield conclusorily asserts in his opposition that there is privity because Jenner provided the initial liquidity to allow for the tokens to be traded on the Uniswap and Raydium DEXs. Dkt. No. 22 ¶¶ 65, 82(a), 84(e). But it is not clear that Greenfield purchased tokens through those DEXs, or any DEX, rather than through a CEX.

10

*See id.* ¶¶ 82(b), 82(i) (alleging Jenner facilitated "investor access to secondary trading markets on . . . various DEXs" and secured listings on minor foreign CEXs). Moreover, even if Greenfield had alleged that he purchased tokens on those DEXs, the FAC contains no plausible allegations that he acquired those tokens from Jenner's liquidity contribution. While the law on privity in DEX transactions is sparse, the few courts that have addressed the issue have required more factual allegations than Greenfield provides here. *See Zakinov*, 2020 WL 922815, at *16 (allegation that plaintiff purchased 129,000 tokens in a quarter and defendants sold 0.095 percent of the tokens that quarter supported inference that plaintiff purchased approximately 122 tokens from defendants); *In re Ethereummax Inv.*, No. 22-CV-00163-MWF, 2023 WL 6787827, at *11 (C.D. Cal. June 6, 2023) (relying on *Zakinov* and finding it plausible that defendants provided "many" of the tokens in the liquidity pool where they created the pool with substantial liquidity and engaged in fake purchases and sales to increase the tokens' price). Thus, even assuming that Greenfield purchased tokens on the relevant DEXs, the FAC does not adequately allege privity. Accordingly, his claims under §§ 24501 and 25110 are dismissed.

E.

Greenfield's common-law fraud cause of action against Jenner in Count 7 is subject to Rule 9(b)'s heightened pleading standard. "To properly plead fraud with particularity under Rule 9(b), a pleading must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 964 (9th Cir. 2018) (cleaned up). In particular, the complaint must explain why the statements were false at the time they were made, without relying on hindsight. *In re Cloudera, Inc.*, 121 F.4th 1180, 1187 (9th Cir. 2024).

The FAC fails to satisfy this standard. It includes allegations of omitted information and screenshots of numerous posts by Jenner on X, stating that she would continue to support the tokens—e.g., by securing listings on major CEXs and conducting buybacks. Dkt. No. 22 ¶¶ 82(b), 82(i), 84(d), 84(j), 89–91. However, Count 7 does not identify which of these statements gives rise to Greenfield's fraud claim, let alone plead with particularity how any such statement was false or misleading when made. The "bare fact of a broken promise" does not show that a statement was false when made. *See Hampton v. Pac. Inv. Mgmt. Co. LLC*, 705 F. App'x 558, 561 (9th Cir. 2017). And although the standard is "somewhat relaxed" for fraud-by-omission claims, a plaintiff must still specify

11

"where the omitted information should or could have been revealed"—a requirement the FAC fails to meet. *Carroll v. Nissan N. Am., Inc.*, No. 2:22-CV-05783-SB, 2023 WL 3433590, at *2 (C.D. Cal. Feb. 27, 2023) (cleaned up).

In short, the FAC provides inadequate notice of the challenged statement(s) and otherwise fails to satisfy Rule 9(b)'s heightened pleading standard. Accordingly, Count 7 is dismissed.[5]

F.

Count 8 alleges that Hutchins aided and abetted Jenner's fraudulent conduct. This claim appears to encompass not only the common-law fraud claim but also the claims alleging violations of federal and state securities law. To the extent that Count 8 seeks to impose aiding-and-abetting liability for the securities claims, it is foreclosed as a matter of law. *See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008) (§ 10(b) liability does "not extend to aiders and abettors"); *Apollo*, 158 Cal. App. 4th at 253–54 & n.13 (explaining that California law "defines the liability of various participants in a transaction in separate sections of the [securities] statute" and does not permit liability against other actors based on a participation theory).[6] Furthermore, because the FAC does not adequately allege any viable fraud claim, Greenfield's aiding and abetting claim necessarily fails. *See Richard B. LeVine, Inc. v. Higashi*, 32 Cal. Rptr. 3d 244, 249

---

[5] The securities-fraud allegations in Counts 2, 3, and 5 fail for similar reasons. Count 3, moreover, is subject to the more demanding PSLRA standard. *See* 15 U.S.C. § 78u-4(b)(1) (requiring plaintiff to "specify each statement alleged to have been misleading [and] the reason or reason why the statement is misleading"); *id.* § 78u-4(b)(2)(A) (requiring plaintiff to, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind").

[6] In his opposition, Greenfield contends that he can maintain a claim against Hutchins for violations of §§ 25401 and 25110 because she has conceded the availability of aiding-and-abetting liability under California securities law. But Count 8 does not invoke the statutory aiding and abetting provisions; instead, it attempts to impose liability under common-law theories for violations of those statutes. That approach is impermissible: "common law theories of liability may not be used to expand liability for securities violations (at least under California law)." *Ethereummax*, 2023 WL 6787827, at *41. In any event, the FAC does not plausibly allege a primary violation of either state or federal securities law.

(2005) ("[A]iding and abetting . . . liability depends upon the actual commission of a tort."). Count 8 is dismissed.

### G.

Finally, Defendants argue that the quasi-contract claim against Jenner in Count 9 must be dismissed because it seeks equitable relief (i.e., restitution of the tax proceeds from the Ethereum Token transactions), and Greenfield has failed to plead that he lacks an adequate remedy at law. *See Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020) ("Sonner must establish that she lacks an adequate remedy at law before securing equitable restitution for past harm under [California's consumer protection laws]."). Greenfield responds that this claim is pleaded in the alternative and is conditioned on lacking an adequate remedy at law—namely, if his legal claims do not permit recovery of the money Jenner received from the tax on Ethereum Token transactions. He also "requests leave to allege with more specificity why his legal claims may be inadequate to obtain the remedy this cause of action seeks." Dkt. No. 33 at 29. Because the FAC contains no factual allegations as to why any relief on Greenfield's legal claims may be inadequate, the quasi-contract claim is subject to dismissal. *See, e.g.*, *Tobin v. Procter & Gamble Co.*, No. 23-CV-05061, 2024 WL 1560050, at *8 (N.D. Cal. Apr. 9, 2024) (dismissing quasi-contract claim where plaintiff pleaded no facts showing a lack of an adequate legal remedy); *Swetala v. Quten Rsch. Inst., LLC*, No. 1:24-CV-00620, 2025 WL 950627, at *7 (E.D. Cal. Mar. 28, 2025) (same). However, the Court will allow him an opportunity to cure this deficiency, as he requests.

### IV.

Greenfield requests leave to amend if the Court grants the motion and amendment would not be futile. Dkt. No. 33 at 35. "The court should freely grant leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Adherence to Rule 15's presumption in favor of leave to amend "is especially important in the context of the PSLRA" because "[i]n this technical and demanding corner of the law, the drafting of a cognizable complaint can be a matter of trial and error." *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). Leave may be denied, however, for reasons such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue

13

of allowance of the amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

This is Greenfield's first request for leave to amend in response to a pleading challenge, and Defendants have not argued any grounds for denying leave to amend other than futility and the fact that Greenfield could have amended his complaint earlier. Although it would have better served judicial economy and conserved party resources for Greenfield to amend his pleading after Defendants identified the defects in the FAC in their meet and confer *before* the motion to dismiss was fully briefed and decided, the Court will not deny leave to amend on that basis. As for futility, Greenfield conceded at the hearing that leave to amend Counts 2 and 4 would be futile given the absence of a prospectus or any facts suggesting that Hutchins controlled Jenner. Amendment is therefore denied as to those claims. Leave to amend the other claims in the FAC (Counts 1, 3, and 5 through 9) is granted because the pleading defects in those claims are not clearly incurable on this record. Defendants' arguments to the contrary at the hearing were overstated and in any event were not adequately developed in time to allow Greenfield a fair opportunity to respond.

At the hearing, Greenfield also requested leave to add claims alleging direct liability against Hutchins, as well as state-law consumer protection and conversion claims in the event the $JENNER tokens are determined not to be securities. The Court is reluctant to expand the scope of this litigation, which has already required significant party and judicial resources to narrow. Nevertheless, Defendants have not shown on this record that the proposed claims necessarily would be futile, particularly given their position that $JENNER is not a security. Moreover, Greenfield's counsel stated at the hearing that he sought "only one more shot" and that "if we can't make a case next time, [it will] be dismissed." He also represented that the amendment would narrow the allegations to focus on the statements alleged to be false.[7] Accordingly, the Court will not preclude Greenfield from alleging the additional claims he seeks leave to add, although he is ordered to thoroughly meet and confer with Defendants about the viability of such claims before amendment to avoid further unnecessary motions practice. The

---

[7] Although the Court does not reach Defendants' arguments about reliance and loss causation, Greenfield should consider those arguments when amending his complaint to ensure that he has adequately alleged all elements of the claims he wishes to pursue.

14

Court expects the Second Amended Complaint (SAC) to be more focused and judiciously pleaded than the 68-page FAC.

Finally, Greenfield briefly raised the possibility of amending to add a U.S.-based plaintiff in case Greenfield's transactions fail to meet the domesticity test. Counsel's suggestion that Greenfield may be unable to state a claim but that other class members could raises the possibility that Greenfield may not be a lead plaintiff who can adequately represent the class—assuming class treatment is even appropriate. The Court declines to allow the addition or substitution of a new lead plaintiff based on counsel's oral request at the hearing. If Greenfield no longer believes that he is the most adequate lead plaintiff, he shall promptly meet and confer with Defendants to attempt to reach agreement on how best to proceed, and the parties shall file a joint status report no later than May 16, 2025, including their positions (supported by legal authority) and any requests for appropriate relief. The Court will construe the absence of a timely filed joint report as a representation that Greenfield wishes to continue as the lead plaintiff.

V.

Defendants' motion is granted, and all claims in the FAC are dismissed for failure to state a claim. Greenfield's request for leave to amend is granted in part, and Greenfield shall file his SAC, limited as described above, no later than May 23, 2025. Defendants shall answer or otherwise respond to the SAC by June 6, 2025.[8] Greenfield is cautioned that if Defendants move to dismiss the SAC for failure to state a claim, the Court does not expect to allow Greenfield to again amend his pleading to add allegations that could have been included in the SAC. If Greenfield fails to file his SAC by May 23, 2025, his failure will be deemed an admission that amendment would be futile, and his claims will all be dismissed with prejudice.

Date: May 8, 2025

Stanley Blumenfeld, Jr.
United States District Judge

---

[8] The parties should not expect an extended word or page limit for briefing on any further motion to dismiss.