**FITZGERALD MONROE FLYNN PC**
JACK FITZGERALD (SBN 257370)
*jfitzgerald@fmfpc.com*
MELANIE R. MONROE (SBN 275423)
*mmonroe@fmfpc.com*
TREVOR FLYNN (SBN 253362)
*tflynn@fmfpc.com*
PETER GRAZUL (SBN 342735)
*pgrazul@fmfpc.com*
ALLISON FERRARO (SBN 351455)
aferraro@fmfpc.com
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741
***Lead Counsel***

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAEEM AZAD and MIHAI CALUSERU, on behalf of themselves, all others similarly situated, and the general public,<br><br>Plaintiffs,<br><br>v.<br><br>CAITLYN JENNER and SOPHIA HUTCHINS,<br><br>Defendants. | Case No: 2:24-cv-09768-SB-JC<br><br><u>CLASS ACTION</u><br><br>**SECOND AMENDED COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

INTRODUCTION.................................................................................................1

JURISDICTION AND VENUE .........................................................................2

PARTIES.............................................................................................................2

BACKGROUND AND RELEVANT FACTS ....................................................3

    I.    Blockchain Technology.................................................................3

        A.    Smart Contracts.............................................................4

        B.    Decentralized Finance (DeFi) ......................................5

        C.    Decentralized Exchanges (DEXs).................................6

    II.    The Ethereum Blockchain, Ecosystem, and Network.......................7

        A.    Background....................................................................7

        B.    The ERC-20 Standard ...................................................7

        C.    The Uniswap Protocol...................................................8

    III.    The Solana Blockchain and Ecosystem............................................12

    IV.    The Jenner Project ...........................................................................12

        A.    Jenner Launches a Solana-Based Token.....................12

        B.    Jenner Focuses on $BBARK, Causing $JENNER to Plummet 75%.................................................................21

        C.    Defendants Reveal that $JENNER Has Been Rug-Pulled.....................22

        D.    Jenner Launches an Ethereum-Based Token .........................34

i

E.     Jenner Quickly Stops Promoting the Solana-Based Token ...................41

F.     Defendants Continuously Promote the Jenner Project as Long-Term, and Promise to Reinvest Transaction Taxes Into the Project........................................................................................................44

       1.     In the $JENNER Coin (ETH) Telegram Group ..........................47

       2.     Over X................................................................................................49

       3.     On the Jennercoineth.com Website .............................................68

       4.     With the "Reward" of Fractionalized Olympic Medal Tokens.................................................................................................72

G.     Defendants Break Their Promises to Reinvest the Substantial Tax Revenues from the Sale of the ERC-20 $JENNER Tokens Into the Jenner Project................................................................................75

H.     On August 20, Jenner Transfers Substantial Funds Out of the Project's Treasury Account, and Abruptly Shuts the Project Down .....................................................................................................77

V.     Lead Plaintiff's Experience with the Jenner Project and Tokens ....................81

A.     The Solana-Based $JENNER Token .......................................................81

B.     The ERC-20 $JENNER Token .................................................................82

VI.    Lead Plaintiff Obtained the ERC-20 $JENNER Tokens in a Domestic Transaction .....................................................................................................83

A.     Jenner Passed Title to the ERC-20 $JENNER Tokens in the United States ...........................................................................................83

B.     Jenner's Obligation to Sell, and Lead Plaintiff's Obligation to Buy at Least Some ERC-20 $JENNER Tokens Became Irrevocable in the United States .................................................................86

VII.   The ERC-20 $JENNER Token and the Manner in Which it was
       Offered and Sold was an Investment Contract Under *Howey* ...........................88

       A.   There was an Investment of Money ........................................................88

       B.   There was a Common Enterprise ............................................................88

            1.   Vertical Commonality ....................................................................88

            2.   Horizonal Commonality ...............................................................89

       C.   Lead Plaintiff and Other Investors had a Reasonable
            Expectation of Profits from Defendants' Efforts ....................................89

CLASS ALLEGATIONS .........................................................................................91

CAUSES OF ACTION ............................................................................................93

   FIRST CAUSE OF ACTION ..............................................................................93

      Sale of Unregistered Securities .......................................................................93

   SECOND CAUSE OF ACTION .........................................................................96

      Common Law Fraud ........................................................................................96

   THIRD CAUSE OF ACTION .............................................................................97

      Quasi Contract ................................................................................................97

PRAYER FOR RELIEF ...........................................................................................98

DEMAND FOR JURY TRIAL ................................................................................98

*Azad v. Jenner*, Case No. 2:24-cv-09768-SB-JC
SECOND AMENDED COMPLAINT

Lead Plaintiff LEE GREENFIELD, individually, and on behalf of all others similarly situated, brings this action against Defendants CAITLYN JENNER and SOPHIA HUTCHINS, and alleges the following upon his own knowledge, or where he lacks personal knowledge, upon information and belief, including the investigation of his counsel.

## **INTRODUCTION**

1.      This case involves a scheme conceived by Defendant Caitlyn Jenner and her manager, Defendant Sophia Hutchins, to leverage Jenner's celebrity brand and network to obtain investors' money on the promise of profits through the sale of "$JENNER" cryptocurrency. Defendants frequently referred to the scheme as a "project," and Jenner sometimes as a "startup" or "company." Defendants also referred to token holders as "investors" and "shareholders," made market capitalization projections, and promised investors they would get rich with Jenner.

2.      In advancement of this scheme, beginning in May 2024, Jenner created, promoted, and sold two tokens—one on the Solana blockchain, and another on the Ethereum blockchain—representing to current and potential investors that she was "solely" focused on the project, to which she was dedicated and had a vision for the "long-term." Jenner also promised investors that a 3% transaction tax, collected from each investor at the time of purchase and sale of the Ethereum token, would be reinvested into the project.

3.      Lead Plaintiff Lee Greenfield and other investors, believing Jenner's promises, bought into the Jenner project by purchasing the tokens, hoping to profit from Defendants' efforts to market the project and thereby bring in new investors. But when on August 20, 2024, Jenner withdrew to personal Coinbase accounts large portions of the project's treasury funds, collected from token holders via the Ethereum token transaction tax, and abruptly shuttered the Telegram Group Chat through which Defendants had been communicating with investors, the value of $JENNER dropped significantly, effectively now to zero, causing Lead Plaintiff and other Class Members to experience substantial losses.

4.      Lead Plaintiff now brings claims on behalf of the Class under the Securities Act in relation to the Ethereum $JENNER token (asserting a claim for quasi contract in the

alternative for the restitution of transaction taxes on those tokens); and a claim for common law fraud in relation to the Solana $JENNER token.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1391 and 1367(a), because Lead Plaintiff's claims under the Securities Act and Securities Exchange Act raise federal questions; and the Court has supplemental jurisdiction over Lead Plaintiff's claims under California state law.

6.     This Court has personal jurisdiction over Defendants because Defendants reside in this District and have substantial contacts with this District.

7.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) because Defendants are subject to the Court's personal jurisdiction here, and because the acts giving rise to Lead Plaintiff's claims occurred, among other places, in this District.

## PARTIES

8.     Lead Plaintiff Lee Greenfield is a citizen of the United Kingdom. As set forth in the accompanying Certification attached as Exhibit 1, Mr. Greenfield first purchased $JENNER on the Solana blockchain on May 28, 2024, and then on the Ethereum blockchain on May 30, 2024, and lost approximately $40,308.34 between both tokens.

9.     Defendant Caitlyn Jenner is an internationally-recognized media personality and former Olympic gold medal-winning decathlete. Jenner is a resident and citizen of California, residing in Malibu. As the owner and primary promoter of the Jenner project, Jenner entered into one or more contracts on behalf of the project, in which the contracting parties agreed to jurisdiction in Los Angeles County Superior Court, West District (in Malibu).

10.     Defendant Sophia Hutchins is a businesswoman, television personality, and Jenner's manager and business partner. Hutchins is a resident and citizen of California, residing in Malibu.

///
///
///

*Azad v. Jenner*, Case No. 2:24-cv-09768-SB-JC
SECOND AMENDED COMPLAINT

## BACKGROUND AND RELEVANT FACTS

### I.    Blockchain Technology

11.    A public blockchain is a digital ledger containing information (such as records of financial transactions) immediately available to any member of the public.[1] Unlike traditional ledgers, which are managed and validated by a centralized authority, public blockchains are distributed and decentralized. This structure offers greater transparency as to ownership by being based on consensus as to the accuracy of the transactions consummated on the network. To reach consensus, embedded in each blockchain platform is a software protocol, or consensus mechanism, which provides governance standards over how information is added to the blockchain.

12.    Blockchain-based transactions are considered more secure and trustworthy than ledgers controlled by centralized authorities, like banks, because adding, changing, or removing information from the blockchain is made purposefully difficult, so that it is harder to falsify a transaction or hack into the ledger itself.[2]

13.    Unlike a bank that exercises complete control over validating any transaction on its ledgers, transactions on decentralized blockchains must be validated by a network of users. To encourage validation of the transactions on a blockchain, validators (sometimes referred to as "nodes") are provided incentives, usually in the form of cryptocurrency. Blockchain

---

[1] *See* Jonathan Rohr & Aaron Wright, *Blockchain-based Token Sales, Initial Coin Offerings, and the Democratization of Public Capital Markets,* 70 HASTINGS L.J. 463, 469 (2019) ("At their core, blockchains are decentralized databases maintained by a network of computers. Using public-private key cryptography and strict code-based rules—known as consensus mechanisms—blockchains store tamper-resistant, resilient, and authenticated data, enabling users to engage in pseudonymous transactions.").

[2] *Id*. at 471 ("[B]lockchain-based consensus mechanisms make adding information to a blockchain purposefully difficult and even harder to remove once saved, creating data that is hard to alter once stored. Blockchain-based protocols group sets of transactions into blocks, which are linked together to form a sequentially ordered chain. Before a block can be added to a blockchain, the protocol requires that a valid cryptographic hash for a block (an encrypted representation of the underlying transactional data) is generated.").

3

transactions are typically validated through either "Proof of Work" or "Proof of Stake" methods.

14.     For example, Bitcoin, whose "cashtag"[3] is $BTC, operates on a Proof of Work blockchain. To generate a new "hash" (or ledger entry) for a block of transactions on the Bitcoin blockchain, validators engage in a mathematical (*i.e.*, cryptographic) guessing game requiring their computers to, through brute-force computing, guess the answer to an algorithm. The validator who wins the guessing game broadcasts the new hash to the network and, once confirmed by the other validators, is rewarded with $BTC for their efforts.

15.     Proof of Stake blockchains require much less energy than Proof of Work blockchains, making them desirable for projects and protocols looking to scale quickly. Proof of Stake requires validators to "stake," or lock up, cryptocurrency they already own. Validators staking more cryptocurrency for longer periods of time have the greatest chance of being selected by an algorithm to validate new transactions, much like a lottery. Once new transactions are validated, the validator earns the blockchain's native cryptocurrency as a reward.

16.     Since Bitcoin's introduction in 2009, blockchain technology and use cases have grown exponentially via the creation of various cryptocurrencies, smart contract protocols, decentralized finance ("DeFi"), decentralized applications ("DApps"), and decentralized exchanges ("DEXs").

### A.     Smart Contracts

17.     Many blockchains have emerged to provide smart contract functionality. Smart contracts are small applications stored on a blockchain and executed in parallel by a large set of validators. In the context of public blockchains, the network is designed so that each participant can be involved in and verify the correct execution of any operation. Smart

---

[3] A cashtag is a feature on the social media platform, X (formerly known as Twitter) that allows users to click on ticker symbols to search specific cryptocurrencies and digital projects. The feature allows social media users to easily search for posts related to the cryptocurrency, similar to a ticker for a publicly-traded company.

*Azad v. Jenner*, Case No. 2:24-cv-09768-SB-JC
SECOND AMENDED COMPLAINT

contracts will always be executed as specified, and allow anyone to independently verify the resulting state changes to the blockchain. One major use for smart contracts is to mint new tokens. Once written and uploaded to the blockchain, smart contracts are immutable and exist in perpetuity. Moreover, like cryptocurrencies themselves, smart contracts can be owned and controlled by a person or entity, and can be transferred and burned (*i.e.*, stored in a wallet where they become inaccessible and, thus, effectively unusable, though still in existence).

## B.   Decentralized Finance (DeFi)

18.   Smart contracts have allowed for the genesis of a blockchain-based financial infrastructure, known as decentralized finance, or DeFi. DeFi generally refers to an open, permissionless, and highly interoperable protocol stack built on public smart contract platforms. DeFi does not rely on intermediaries and centralized institutions, but rather on open protocols and decentralized applications, or DApps.

19.   DeFi uses a multi-layered architecture. To conceptualize:

a.   The *settlement layer* (Layer 1) consists of the blockchain and its native protocol asset (*i.e.* $ETH (Ether) on the Ethereum blockchain). It allows the network to store ownership information securely and ensures that any state changes adhere to its ruleset. The blockchain can be seen as the foundation for trustless execution and serves as a settlement and dispute resolution layer.

b.   The *asset layer* (Layer 2) consists of all assets that are issued on top of the settlement layer. This includes the native protocol asset as well as any additional assets that are issued on this blockchain (often referred to colloquially as tokens).

c.   The *protocol layer* (Layer 3) provides standards for specific use cases such as DEXs, debt markets, derivatives, and on-chain asset management. These standards are usually implemented as a set of smart contracts and can be accessed by any user. As such, these protocols are highly interoperable.

d.   The *application layer* (Layer 4) creates user-oriented applications that connect to individual protocols. The smart contract interaction is usually abstracted by a web browser-based front end, making the protocols easier to use.

e.      The *aggregation layer* (Layer 5) is an extension of the application layer. Aggregators create user-centric platforms that connect to several applications and protocols. They usually provide tools to compare and rate services, allow users to perform otherwise complex tasks by connecting to several protocols simultaneously, and combine relevant information in a clear and concise manner.

*The DeFi Stack*



## C.      Decentralized Exchanges (DEXs)

20.      Integral to DeFi are decentralized exchanges, or DEXs, which exist as a set of persistent, non-upgradable smart contracts, *i.e.*, no single entity controls the codebase. So long as the underlying blockchain on which it operates is functional, a DEX will continue to run as coded. DeFi participants use DEXs for two main reasons:

a.      *Providing Liquidity*. Liquidity refers to how much of an asset is available to trade. DEXs rely on third parties to supply liquidity. The liquidity providers ("LPs") are users who deposit crypto assets into a "liquidity pool" to provide liquidity for a particular token pair that "swappers" can trade with. In return for providing liquidity, LPs earn trading fees generated by that pool.

b.      *Swapping*. Unlike traditional centralized cryptocurrency exchanges (or CEXs), DEXs are unique because they allow users to "swap" tokens without third parties facilitating the transaction or taking control of funds. Essentially, users send tokens they own to the relevant liquidity pool, and receive the equal value of the other paired token in return, with the value of the tokens at the time of the swap algorithmically determined according to the terms of the DEX's smart contract.

6

## II.    The Ethereum Blockchain, Ecosystem, and Network

### A.    Background

21.    The Ethereum blockchain and its greater ecosystem were first conceived in 2013. Beginning as a Proof of Work ledger, in September 2022 Ethereum successfully transitioned into a Proof of Stake ledger, in part due to the increased activity on its network, which made scaling a priority for developers. Ethereum's architecture is designed to facilitate the implementation of smart contracts and Dapps, and to support a wide range of DeFi platforms and protocols, such as DEXs. The Native Protocol Asset of the Ethereum blockchain is Ether, whose cashtag is $ETH.

22.    Ethereum has a feature called the Ethereum Name Service (ENS), which allows users to register "0x" alpha-numeric addresses in an easy-to-read format, much like an email address is an easy-to-read formatting of an IP address. Addresses so registered end in ".eth."

### B.    The ERC-20 Standard

23.    The technical standard for fungible tokens on Ethereum is ERC-20, which allows developers to create smart-contract-enabled tokens that can be used with other products and services. Essentially, ERC-20 guides the creation of new tokens on the Ethereum blockchain so that they are interchangeable with other smart contract tokens.

24.    ERC-20 tokens are a representation of an asset, right, ownership, access, cryptocurrency, or anything that is not unique, but can be transferred.

25.    The Ethereum network uses the programming language, Solidity, to write its ERC-20 smart contracts. ERC-20 includes the following key functions:

a.    *Token Creation* allows developers to create new tokens with custom specifications, such as the amount of supply and number of decimals in price.

b.    *Token Management* allows developers to mint and burn tokens,[4] and to increase or decrease transaction taxes.

---

[4]    "Minting" refers to creating new tokens. "Burning" refers to sending tokens to a special "burn" address on the blockchain, where they are no longer accessible, and thus effectively destroyed. Because burning takes tokens out of circulation, lowering the outstanding supply,

7

      c.   *Token Transfers* allow developers to securely and efficiently transfer tokens between accounts.

26.    To create an ERC-20 token, a developer must first have an Ethereum address to act as the deployment wallet. Then, using Solidity, the developer must write the smart contract for the ERC-20 token, implementing such basic features as the token name, symbol, and supply; and more advanced features, if desired, such as a transaction tax. Once the smart contract is customized, the developer must compile it,[5] ensure their Ethereum deployment wallet is set to the selected contract to be deployed, then finally deploy the contract, at which time it will become live, and its functions carried out.[6]

## C.   The Uniswap Protocol

27.    The Uniswap protocol is a smart contract running on the Ethereum blockchain that was first launched in November 2018. It was built by Uniswap Labs, a New York company with approximately 200 employees. Uniswap Labs built and now services the means and methods by which users take advantage of the protocol, including the Uniswap Interface (at app.uniswap.org), Uniswap Wallet, Uniswap Mobile App, Uniswap Extension, and an API for the Uniswap protocol. Uniswap Labs also provides support to protocol users.

28.    The Uniswap protocol is a noncustodial automated market maker implemented for the Ethereum Virtual Machine, providing an interface for the seamless exchange of ERC-20 tokens on Ethereum. It the largest onchain marketplace, with billions of dollars in weekly volume across thousands of tokens on Ethereum and at least 12 other blockchains.

---

it theoretically causes the value of remaining "unburned" tokens to increase due to scarcity principles of economics. Thus, token holders generally view favorably a token developer's decision to burn tokens.

[5] This involves translating the human-readable code language of Solidity into bytecode that can be read and executed by a blockchain's virtual machine.

[66] Many ERC-20 token developers use OpenZeppelin's ERC-20 token standard which provides community-audited library of reusable smart contracts. In that case, the user need not write the entire ERC-20 interface, but instead, can import the library contract and use its functions. This allows relatively unsophisticated developers to create ERC-20 tokens.

29.    The Uniswap protocol enables crypto trades without the reliance on a centralized intermediary. The protocol achieves this through *decentralization*, *liquidity pools*, and an *automated market maker*.

a.    *Decentralization*: Uniswap is an open source, peer-to-peer, decentralized protocol defined by immutable, persistent, non-upgradable smart contracts on the Ethereum blockchain. Uniswap functions as a public good. No special treatment is given to early investors, adopters, or developers. The protocol's services are open for public use; no one has the ability to restrict who can or cannot use them. Token listing is open and free. All smart contract functions are public and all upgrades—the Uniswap protocol is now on its fourth iteration—are opt-in.

b.    *Liquidity Pools*: Liquidity pools are token pairs stored in a Uniswap pool contract. They allow users to swap against the tokens within a pool. These pools rely on users for funding. Users create initial market liquidity by providing token pairs to commence a pool. To incentivize pooling liquidity, there is compensation for liquidity providers, which differs depending on the version of the Uniswap protocol used.

c.    *Automated Market Maker*: The Uniswap protocol's smart contract allows for automated and permissionless token swaps through an automated market maker ("AMM"). AMMs are agents that pool liquidity and make it available to traders according to an algorithm. Uniswap belongs to a particular class of AMM, called a Constant Function Market Maker. An AMM analyzes a token pairs' supply and demand within a liquidity pool, determining the real-time value of a token, providing efficient token prices for each swap, replacing the traditional order book used by centralized exchanges. The Uniswap AMM works by implementing a constant using the function, $x * y = k$, where x is token0, y is token1, and k is a constant.

30.    The below graphic represents the mechanics of a pair swap on Uniswap.



31.     There are different types of LPs on the Uniswap protocol, among them Passive LPs and Token Projects. Passive LPs are token holders who wish to provide their assets to accumulate trading fees, which can generate passive income. Token Projects include token creators who choose to become LPs to create a liquid market for their token, creating a simple way for others to buy and sell their tokens. The two are not mutually exclusive.

32.     To create a trading pair on Uniswap, someone must create an initial liquidity pool with two tokens. Because ERC-20 tokens cannot be exchanged for $ETH directly, LPs must use "wrapped Ether" ($WETH)—a smart contract that allows users to deposit any amount of $ETH into the contract and receive the same amount of $WETH in return—or some other ERC-20 token, such as the stablecoin, $USDT. $WETH, in turn, can easily and freely be swapped back into $ETH at any time. As a result, trading pairs on Uniswap often involve the swapping of $WETH with the ERC-20 token of interest.

33.     To create the initial liquidity for a trading pair, a token owner who wishes to sell their tokens must go to the Uniswap Interface at app.uniswap.org; click on "Pool"; connect their deployment address and allow Uniswap permission to access it; ensure they have a sufficient amount of both tokens in the deployment wallet; select the token pair; then transfer in the necessary amount of each token. Once completed, the liquidity pool will be live and swapping can begin immediately.

34.     Uniswap protocol transactions involving the swapping of ERC-20 tokens occur on the Ethereum blockchain. These transactions must thus be executed by a validator that propagates the resulting state change to the rest of the node network, as depicted in the

infographic below, and require the payment of "gas" fees, paid to validators to compensate them for the computing power necessary to effect the transaction.



35.    The Ethereum network consists of thousands of validator nodes throughout the world. However, the United States has always had the largest number of validator nodes, by far, consistently averaging more about 40% of global nodes, while the next-closest country, Germany, averages only about 10% of global nodes.

36.    For example, as shown below, as of the filing of this Amended Complaint on May 23, 2025, etherscan.io/nodetracker reported 41.64% of nodes in the United States.



11

### III.    The Solana Blockchain and Ecosystem

37.    Solana is a hybrid "Proof of Stake" open-source distributed ledger, aimed at significantly enhancing the scalability of blockchain technology. Its architecture is designed to facilitate the creation of smart contracts and DApps, and it supports a wide range of DeFi platforms and protocols.

38.    The Native Protocol Asset behind the Solana blockchain is Solana, whose cashtag is $SOL. Users can create tokens on the Solana blockchain via the Solana Primary Library (SPL) Token Program, which—much like the ERC-20 standard for Ethereum—defines how smart contract tokens on the Solana blockchain operate.

39.    A number of DEXs operate on the Solana blockchain, including but not limited to Raydium. These DEXs reside on the *protocol layer* of the DeFi stack and allow for SPL tokens established via the SPL Token Program to be traded by investors.

40.    An application exists on the Solana blockchain called Pump.Fun, which allows anyone to create a token instantaneously and at very little cost. Pump.Fun works by interacting on a user's behalf with the SPL Token Program to allow the user to mint a new SPL token via a prebuilt smart contract.

41.    Pump.Fun employs a "bonding curve" pricing model in which token prices increase with fundraising progress and decrease as tokens are sold. Once the fundraising achieves a certain market value, Pump.Fun—through its pre-built smart contract functionality—transfers liquidity to a pool on Raydium on behalf of the token (taking a small portion for itself as a fee), at which point the token can be traded within the larger Solana ecosystem.

42.    While millions of tokens have been created on Pump.Fun, the vast majority do not get purchased, much less experience any significant success.

### IV.    The Jenner Project

####     A.    Jenner Launches a Solana Token

43.    Jenner maintains an account on the social media platform, X, @Caitlyn_Jenner, which has over 3 million followers and identifies her location as "California, USA."

12

44.    On May 26, 2024, Jenner entered into a "Non-Binding Term Sheet for Promotional Activity Agreement" with Sahil Arora, a resident of Dubai, United Arab Emirates. The Agreement deemed Jenner the "Talent" and Arora the "Talent Co-ordinate."

45.    A section of the Agreement titled, "Scope" stated, "It is come to a mutual agreement that the Talent agrees to make a joint effort to post a tweet and split revenues with the Talent Co-Ordinate."

46.    A section of the Agreement titled, "Fees" stated, "The Talent Co-Ordinate will split 80% of all generated revenues (at a minimum guarantee of $50,000 paid upfront) to the Talent paid instantly within 24 hours from the first tweet by the Talent via bank transfer or crypto." Upon information and belief, this fee was paid by Arora to Jenner's Charles Schwab account at Chase Bank.

47.    A section of the Agreement titled, "Talent Obligations" stated, "1 tweet required which will be shared with the Talent for review prior to posting."

48.    A section of the Agreement titled, "Talent Co-Ordinate Obligations" stated, "The Talent Co-Ordinate will work in best effort to generate maximum revenue for the Talent within a timeline of 24 hours from the tweet from the Talent," and "The Talent Co-Ordinate will drive traffic and buying power to earn best possible money for the Talent."

13

**Sahil**
@sahilbuilds

Follow

**Non-Binding Term Sheet for Promotional Activity Agreement**

Sahil (Talent Co-ordinate) and Caitlyn Jenner ('Talent') desire to enter into a service cooperation dated 26/05/2024 to carry out promotional endorsement from the influencer decided mutually. The following are non- binding terms for discussion. This Term Sheet is for discussion purposes only. There is no obligation to conclude a transaction and the terms and conditions herein shall not be deemed to be binding unless and until definitive transaction documents are signed by all parties.

| | |
|---|---|
| Scope: | It is come to a mutual agreement that the Talent agrees to make a joint effort to post a tweet and split revenues with the Talent Co-Ordinate. |
| Fees | The Talent Co-Ordinate will split 80% of all generated revenues (at a minimum guarantee of $50,000 paid upfront) to the Talent paid instantly within 24 hours from the first tweet by the Talent via bank transfer or crypto. |
| Talent Obligations: | - 1 tweet required which will be shared with the Talent for review prior to posting. |
| Talent Co-Ordinate Obligations: | - The Talent Co-Ordinate will work in best effort to generate maximum revenue for the Talent within a timeline of 24 hours from the tweet from the Talent.<br>- The Talent Co-Ordinate will drive traffic and buying power to earn best possible money for the Talent. |
| Confidentiality: | Neither party may disclose this discussion or terms of any future partnership agreements without advance written approval of the other party. |

Non-Binding Agreement in Principle:

*Sahil Arora*

Contracted: Sahil Arora

███████████████████    Dubai, UAE

*Cmd—Jun*

The Talent: Caitlyn Jenner

49.    Although the Term Sheet was nominally "Non-Binding," that same day, May 26, Jenner authorized the creation of approximately 1 billion $JENNER tokens on the Solana blockchain, using Pump.Fun.[7]

50.    Jenner then tweeted a link to Pump.Fun, where investors could immediately purchase the token. The tweet, pictured below, has amassed nearly 2 million views.

---

[7] Contract address 4GJ3TCt5mTgQT5BRKb14AkjddpFQqKVfphxzS3t4foZ9.

14



51.     Due to Jenner's status as an internationally-recognized celebrity, $JENNER almost immediately surpassed the trading threshold on Pump.Fun's bonding curve, so that it was quickly available to be traded on Raydium and other DEXs within the Solana ecosystem. In fact, $JENNER was named "King of the Hill" on Pump.Fun, meaning it was the most popular cryptocurrency on the site for a period of time, and thus prominently displayed to investors for purchase on its front page.

52.     Nevertheless, the Twittersphere's extensive reaction to Jenner's tweet was skeptical, with many theorizing her account had been hacked in an attempt by persons unconnected with Jenner to perpetrate some kind of scam.

53.     A particular red flag was that "a cluster of wallets held 25.7% of $jenner at launch," and "These early buyers on @pumpdotfun exited once liquidity hit Raydium, selling for ~$500k[.]"



54.    To discuss the situation, an X user named Books hosted an X "Spaces" session titled, "$JENNER COMMUNITY SPACE," subtitled "Cryptocurrencies • NFTs • Investing."

55.    At the time this was happening on May 26, Jenner was golfing. To combat the online skepticism, Hutchins joined the Spaces, participating in a live question-and-answer session, which was recorded and available for replay on X. During the session, Hutchins made a number of representations about the project, the sum and substance of which were relayed and repeated extensively thereafter on X.



*Azad v. Jenner*, Case No. 2:24-cv-09768-SB-JC
SECOND AMENDED COMPLAINT

56.    Hutchins told the group, "not only am I [Jenner's] manager for seven years, but [I am] specifically managing this crypto project." She said Jenner "has not been hacked. This is real. And it's something that Caitlyn, myself, and our partners, have—in the project—have been working on for quite some time. And this was the time to launch it."

57.    In fact, prior to launching the token on Pump.Fun, Defendants or someone on their behalf had already discussed with several CEXs the possibility for the not-yet-minted token to become listed; and indeed, the token was quickly listed on at least eight foreign CEXs starting shortly (within days) after the launch, including, as relevant here, MEXC, XT, and HTX.

58.    During the May 26 Spaces session,  Hutchins said:[8]

This is the first time Caitlyn has taken a step into, really a step at this level in crypto. Caitlyn has obviously been a vocal supporter of President Trump and former President Trump and feels extraordinarily strongly about crypto in general. And when the opportunity came and the pieces came together for Caitlyn to launch her own, her own version of it, we're delighted with the response right now.

I'm just looking. We've hit a market cap in less than two hours, uh, $15.3 million and a volume of $45.6 million. So we hope we can keep the momentum going.

Obviously this is not just a short-term play. This is something that Caitlyn feels strongly on at a macro level.

Really the precipice or the deciding factor for today is the day was President Trump's speech, former President Trump's speech at the Libertarian Convention last night, where he doubled and tripled down on crypto.

And also Caitlyn, Caitlyn follows policy, as do I. And the rejection of the Federal Reserve's centrally controlled digital currency was huge this week.

Mike Lee and Caitlyn, Senator Mike Lee from Utah and Caitlyn are very close, as am I, with his office. And so we just really are bullish on crypto in general and Caitlyn being bullish on it and having these contacts that we really see the future leaning into crypto. She felt this was the time, no better time than now to jump in.

And so obviously really appreciate everybody buying and, and look, taking a serious look at, you know, the coin she's offering.

---

[8] For clarity, transcription cleaned up to remove "you know" and "um" interjections.

59.    Responding to a question about the involvement of Jenner's daughter, Kim Kardashian, in the promotion of a different cryptocurrency, Ethereummax, Hutchins said Jenner "has had no communication with Kim on that," and stated, "obviously this is a deeper, deeper commitment to crypto than . . . whatever it was Kim did."

60.    Jenner subsequently re-tweeted a link to the Spaces, reiterating that she was "not hacked," stating, "We are sending this coin to the moon!!! 🚀🚀🚀," and including a link to where it could be traded.



61.    Because some confusion over whether Jenner had been hacked was the result of her failure to tag Pump.Fun in her original tweet, a short while later, Jenner again tweeted a tagged link to Pump.Fun where investors could purchase the token, stating, "We will be solely focused on $Jenner and expect to hit $50m market cap on the first 24 hours."



62.    Jenner separately tweeted, "Not getting involved with other coins."



63.    After "g[etting] back from the golf course" on May 26, Jenner tweeted, "At every new 10m added to $JENNER marketcap, I'll support your communities and do buy-backs!" The tweet contained a short video, apparently recorded in her home, which stated:

> Hey everyone, Caitlyn Jenner here. I just got back from the golf course, so I kind of look like this. But, uh, a lot's been going on today. And, yes, this crypto is, um—my account is real. Sophia, my CEO of the company, has done an absolutely phenomenal job, and I couldn't be more proud of her. And so, if you want to get in on this, get in in a hurry, okay? Get in right now.[9]



64.    Early the morning of May 27, Jenner tweeted, "It's not a scam 😂 its legit and I'm all in! $Jenner."



---

[9] Though the video is no longer available on X, it was captured by a crypto-focused YouTube user. *See* https://www.youtube.com/watch?v=Bnq3wJ-GUkk, at 0:36-1:03.

65.    A few hours later, Jenner, in a tweet touting "$113.5M volume in just over 4 hours," posted another video where, in a robe from her home, she said:

> Hi everybody. This is Caitlyn Jenner here. I know. Actually, I'm just—I've been running around all day playing golf and Sophia, my CEO, uh, has been doing a wonderful job with my new crypto coin. Yes, this is for real. Get involved. It's going to be very good. So, I'm very excited about it. And I'm looking forward to the future for the next couple of hours. So, keep the sales going. This is exciting.[10]



66.    Within the first 24 hours of trading, $JENNER amassed over $250 million in trading volume via more than 300,000 transactions, ultimately leading to a $43 million market capitalization value distributed between the approximately 20,000 investors who purchased $JENNER its first day. By May 27, the coin's value had grown 24,838% since its creation.

67.    In response to this, Jenner tweeted, "$Jenner over a quarter billion in less than 24 hours wow! 🚀🚀🚀 I'm all in! Stay tuned :) so proud of the community we are building together and the journey we are embarking on!"

---

[10] Video available at https://www.youtube.com/watch?v=Bnq3wJ-GUkk, at 1:16-1:47.



**B.      Jenner Focuses on $BBARK, Causing $JENNER to Plummet 75%**

68.      Despite her representations on May 26 that she was "solely focused on $Jenner," and "Not getting involved with other coins," on May 27 Jenner issued a tweet promoting a different cryptocurrency, $BBARK. The tweet stated, "Double the trouble, double the fun! Bertha and Baxter"—Jenner's dogs—"are now in the crypto game!" It contained a link to the token on Pump.Fun and stated "Coin name[:] $BBARK | BBARK (Early investor)[.]"

69.      This simultaneous promotion of a different cryptocurrency greatly affected the price of $JENNER, as investors, questioning Jenner's true dedication to the project, rapidly sold off their tokens, causing a 75% loss market capitalization from its peak.

21

70.     Attempting to do damage control, Jenner took to X, responding to criticism by stating, "I am entirely focused on $Jenner this is a one off where the founding team approached me as a great fit for the token!" Jenner elsewhere stated, "Why? I'm bullish on crypto. I love dogs. And when I was approached to invest in this token meme I was all in!" And she stated repeatedly, "It's just an ad not my token or coin. I'm completely focused on $jenner," reiterating, "My sole focus is $Jenner."



71.     Later that day, Jenner tweeted, "That ad for a third party token was taken down! As I have said from the beginning the only focus I have is $Jenner and the ad I posted confused too many people, and was not worth it. Like I have said time and time again I'm fully focused on my token $Jenner."



## C.    Defendants Reveal that $JENNER Has Been Rug-Pulled

72.     On May 27, a journalist with the cryptocurrency-focused online magazine, *Decrypt*, tweeted Jenner asking whether she could "confirm if Sahil Arora is behind your JENNER token?," as "I am writing a story . . . on his involvement."

22

73.     Jenner responded that Arora "scammed us! BIG TIME!," and later added, "That doesn't mean I won't be investing and continuing to promote $Jenner – but Sahil appears to be fully out, at the moment[.]"





74.     That day, *Decrypt* published an article titled, "Meet the Crypto Promoter Who Says He Launched Caitlyn Jenner's Solana Meme Coin."[11] According to the article, "Jenner appears to have launched a Pump.fun token, which sent Crypto Twitter into a meltdown" and that "led *Decrypt* down a rabbit hole to find the person who claims to have deployed the JENNER token on Pump.fun": Sahil Arora.

---

[11] Ryan S. Gladwin, "Meet the Crypto Promoter Who Says He Launched Caitlyn Jenner's Solana Meme Coin: After Caitlyn Jenner's Twitter account posted a Pump.fun link, someone has claimed to have deployed the token," *Decrypt* (May 27, 2024), *at* https://decrypt.co/232565/crypto-promoter-who-launched-caitlyn-jenner-solana-meme-coin.



The man who claims to be behind Caitlyn Jenner's Pump.fun token. Image: Sahil Arora

75.    Arora is a controversial figure in the cryptocurrency industry and has been accused of orchestrating multiple scams. According to the article, Arora claimed to be "in contact with multiple celebrities," and said, "Sometimes I go to them, most of the time they come and I pick[.]" Arora further stated, "It's the only way to make crypto more mainstream and benefit from the attention economy, it's the meta they didn't know they needed."

76.    It quickly became apparent Arora had orchestrated a rug-pull with the Solana $JENNER token, launching it on behalf of Jenner, having her promote it, "sniping" a large portion of the supply shortly after its launch with his inside information, then dumping his $JENNER on the liquidity pool in Raydium, sending the token's price crashing.

77.    That evening, Jenner tweeted, "$Jenner isn't going anywhere. It'll do better now that, that clown is gone[.]"



*Azad v. Jenner*, Case No. 2:24-cv-09768-SB-JC
SECOND AMENDED COMPLAINT

78.    That same day, May 27, Jenner had responded to a tweet by musician Iggy Azalea, who had also launched a cryptocurrency, writing, "My girl @IGGYAZALEA and I are celebrating Solana Summer!!! Tmmrw gonna be huge!!! 🚀🚀🚀 and hey! You'll get to actually keep your $ by not working with [Arora]."

79.    Responding, an X user asked Jenner, "What do you mean, are you launching again?" Jenner responded, "No I am buying more and more $Jenner."



80.    The following day, May 28, the same X user posted a chart of $JENNER, predicting "price action will be determined on the next Fundamental news announcement from the Jenner Team, as to whether the project will be continued as a long term project. Until then will be bouncing between support . . . and the trend line resistance . . . ."

81.    Jenner responded, "Of course $Jenner is a long term project. We are not planning on going anywhere but up and taking $Jenner everywhere. It's been a couple days and we are very happy with the growth on @pumpdontfun in those couple days. This is just the beginning for us. Now trading on Raydium."



82.    On May 28, Jenner also tweeted, "Bought some $Jenner with some extra SOL lying around in a spare random wallet 🚀🚀🚀 bullish always[.]" This purchase, in fact, amounted to only about $25 worth of $JENNER, and was the first $JENNER tokens Jenner claims she purchased.



83.    On May 28, an X user tweeted, "I stand with $JENNER," because the "Community is active and engaged," and "Caitlyn [is] working hard for the community..." Jenner responded, "We are just getting started! 🚀And to think… $Jenner is just shy of 48 hours into this token's launch. We have no plans of slowing down only plans to grow and expand!"

26

84.    Still hoping to exercise damage control over Arora's rug-pull, on May 28, Jenner and Hutchins hosted an X Spaces session, with thousands tuning in (and later relaying via X the sum and substance of the discussion). Jenner said, "I love being involved with really well done good projects and this is probably one of the best launches I've seen so far," and "I love that I have my own coin the Jenner coin."

85.    Some other relevant statement Defendants made during the approximately 40-minute Spaces presentation are excerpted below:

<u>Jenner</u>

"This is kind of a hedge against government-backed currency and the dollar. So I wanted to get involved. I started looking at what are our opportunities? Sophia, who's much smarter than me and an economics and finance major. I take her advice very seriously. We started looking into this. And so I want crypto to make it. I want crypto to be mainstream. I want to see if we all get together and work together as a team, we can make a big difference. It's not all about just me. I can be a front person. That's what I've been my whole life. And bring credibility to it. But we all need to work very hard to make sure this makes it."

<u>Hutchins</u>

"To be honest with you, don't think we also want to address some of the Twitter stuff because obviously we're relying heavily on X to communicate. I want to make very clear on the record for all of you. Obviously there were no deep fake videos. They were all videos posted by us. . . . They were Caitlyn. Yes."

--

"So, so I want to address Twitter/X. That is an extremely huge community of crypto traders, crypto analysts, crypto media personalities, influencers, whatever you want to call them, that we have gotten extraordinarily familiar with, but also

see a massive learning curve in who we should be interacting with and who we shouldn't be interacting with. Our goal and our vision of using X continually to communicate with you is simply the transparency and is simply to not just be transparent on trading, but what the message is by Jenner the brand and where Jenner the coin is going and what's going on with it."

--

"We revel in the successes of those that have traded the coin, that have bought the coin, that have held the coin, that have sold the coin, whatever it may be. But the philosophy is coming from the top down, from Caitlyn. All tweets are controlled by Caitlyn, myself, one other person on the team that has access to a Twitter, if Caitlyn were to dictate a tweet-this-for-me.

I won't go through the whole Twitter protocol with you, but they are coming directly from one of us, from Caitlyn. Only two devices connected to the account, two phones. And I think that's something we really wanted to clear up. And so that's kind of philosophy from top down for Caitlyn. This is not at all what it has been portrayed to be by some in the media. We understand the concern and the hesitancy, which is why we wanted to get on here.

Frankly, we probably should have come on the day of launch. We didn't realize how integral Spaces were. I think we thought just posting videos and tweets would suffice, but I think we're going to be doing a lot more of these Spaces with the crypto community. Not just about this coin, but really attempting to engage that community on X, which obviously this Space is the first up."

--

I can't tell you how many emails, DMs, everything. Hey, I own, you know, a hundred thousand, and I really recommend you do this. And I'm passing it along to the team, hey, is this worthwhile? Is this something that we should change or whatever? So do know that when you email or DM or tweet at us . . . we are listening."

--

"The philosophy is obviously Caitlyn supports Trump. There's no secret there. I think the answer is crypto is something that Trump has and the Republicans have generally been more protective of. We saw that last week in the House and the Senate passing bills to add some protections to crypto and to reject digital, digitally controlled government currencies. So I think we're not really looking at this purely through a political lens, but we're not, you know, neither of us are one

28

issue voters either. We're not just voting for crypto and we wouldn't expect you to be just voting for crypto. This is not a political coin. This is a way for people to play the market, obviously, hopefully make money. And, you know, we, we just happen to believe that the Republicans are the ones to protect crypto and, know, are extremely bullish on it as a result of that."

--

"Like I said, this token or this coin launch has really been the launch pad of entering the market space or the marketplace with this token. And again, it's going to go everywhere eventually."

--

"Just having it exist, number one, and having such a prominent voice in the celebrity world speaking on it and backing it, when there literally is no financial incentive for her to be doing it because she doesn't have any coin until she bought some today at 20 million market cap, which it's still hovering around. So anyways, point being, we're having conversations internally on givebacks, as the coin grows, to certain organizations. And those conversations have already started. I don't want to get too specific on which organizations have been floated around until we make a definitive answer, but it's something we'll definitely take the pulse on the community on X from as we narrow those down."

86.     During the May 28 Spaces session, at times, Hutchins and Jenner engaged in a question-and-answer presentation. Some relevant excerpts from those interactions are below:

Hutchins:     Caitlyn, I was at an event for—everybody that knows Caitlyn lives out in LA and is also a political commentator on Fox News, more conservative leaning. But I was at an event at Mar-a-Lago recently and had a lot of conversations with a lot of very excited young people about crypto, people my age. And I think there's this generational divide that you're able to bridge with people that have no idea what crypto is. And there's a learning curve. And certainly for me, there's been a learning curve, but I imagine for older folks that invest and buy crypto there is as well. Maybe you could talk a little bit about that and that event after I went to Mar-a-Lago with President Trump, fully backing crypto and your thoughts on that.

Jenner:     Yeah, no, he's a big supporter of crypto. I think it's really important from my standpoint and the things that I do, like just we've only been out for 48 hours now, is stay connected with the community. I

think these things are, be open. I love how the transparency of crypto is just, I think, absolutely incredible, where we certainly don't get transparency with the federal government, do we? And so all of those things for me are the reason I got involved in something like this. I think crypto can—I mean, you know, you hear a lot of the things, can go to the moon and all that kind of stuff. No, we're going to Mars. I'm on Elon Musk's side. We're going to, we're going to, you know, the Jenner coin is going to, is going to Mars. We're going all the way out there. We're looking we're thinking real big. We're going to stay behind this.

It's really important to me, you know—to tell you a little bit about me, I've had, you know, been around the business world for a long time and I, I'm always more worried, not about what my success is with that business. I've always done well. But if I have other people that are involved, honestly, I am more motivated and work harder to make sure that their investment is better than mine. And I've just always been that way with everything that I do. I want it to be a success for everybody, not just me.

Hutchins:    And when it comes to that, Caitlyn, and everyone, I think it's really critical to point out that we all know that this launch was a little, had a shady component to it. And we're going to limit what we speak about that shady little son of a bitch on because of an ongoing federal investigation and civil charges being pressed against this individual. So we're going to limit what we say there. However, I want to make very clear to all of you that neither Caitlyn, nor myself, on behalf of Caitlyn, have sold one Jenner meme coin. Not when it launched, and not now that it's trading on Raydium. Not when it launched on Pump.Fun and not now. Not one coin has been sold by us.

All the coins that have been traded, sold, were by that shady son of a bitch, and looking back in hindsight, launching it the way we did with the shady son of a bitch, could we redo that and make a lot more money? Had we had those coins in our wallet and not his multiple wallets? Yes. But what we plan to do moving forward is what we've been grappling with for the past 48 hours and not just how we plan to move forward with this token on these exchanges, but other exchanges and where we plan to take this token beyond, you know, Raydium and—beyond Pump.Fun and the Raydium.

30

This is not a one off. That's critical. The team that we've assembled over the past couple of weeks, post-launch, especially on Pump.Fun, just over 48 hours ago, has a deep understanding and breadth of experience in launching coins and compliance. And, you know, we've launched our coin. Now it's a question of how are we going to do that to maximize all of the return?

You know, for Caitlyn to continue to promote this coin when she doesn't own—well actually today she bought some—but for her to continue to promote a coin that she totally could have just tapped out on, both of us, we could have tapped out and said we're done. But there were too many people involved, there are too many shareholders. And that's the core of what we're doing here is protecting the market cap, growing this. Not just on the exchanges that it's on now, but growing it further and further. We see this past 48 hours really as a launch pad.

Jenner:     Well, we look at it as a great start, but we are in this for the long run, okay? In athletics, Decathlon was 10 events you had to do, and I always was in everything for the long run. Needless to say, we're not going anywhere. We are actually very, very excited about this. We will work out some of the little hiccups along the way. And of course, every company and every startup company has that. But right now we have the best people that we've been able to assemble and put together to make sure that our community is very strong. And that's why we have all of you on this phone today just to talk to you about the community and our commitment to that.

87.    During the May 28 Spaces session, Defendants also fielded questions from participants. Some relevant excerpts from those interactions are below:

"Bark":     I know there's been a lot of questions in regards to what happened for the launch. Again, I know you're probably still dealing with some things. You probably can't discuss everything that's going on. You said you're out of tokens. So were you never in custody of the tokens from the launch to begin with?

Jenner:      I want to be really careful here because I've been dealing with the authorities, along with our team today, quite extensively. And want to be really careful with not saying too much about what Sahil—I think that's what his name is— Saleel, Sahil did. But all of the tokens that we launched with

31

| | |
|---|---|
| | were in his custody, and they were to be transferred over, and they were never transferred over. To this day, to this moment, not one token has been transferred over. |
| Hutchins: | Why we did it that way was, I'll own it, very stupid on our part. We had done work with Sahil in the past that was random promo shit and he never scammed, so to speak.  So we were not expecting that at all. But in hindsight, should we have let him have custody of those tokens? No, but the fact remains he pretty much dumped all of them that day. We have none except the ones that we bought today, Caitlyn bought today. |
| "Bark": | Understood. Yeah, thank you. And I appreciate the answer there and we'll definitely make sure the community is educated on that. |
| | -- |
| "Bark": | Hey, are we going to get Trump to talk about Jenner? I think that's the big question. |
| Hutchins: | Well, let's just hold those cards to the vest. |
| Jenner: | Let's just put it this way. I have, yeah, a good relationship with him. Sophia certainly does. We don't know what the future holds, but we're optimistic. |
| | -- |
| "Caleb": | So you say you hold zero tokens and obviously you're still pumping the token. Do you have any plans to like make revenue from another token or what is the thought process behind that? |
| Hutchins: | Just real quick, today, Caitlyn bought some tokens. Okay. So she doesn't have none, but the ones that were launched and dumped by the little son of a bitch, we do not have any possession of. So just to be really clear, she did buy some today. |
| "Caleb": | Okay. So probably around like 20 million market cap? So do you— |

*Azad v. Jenner*, Case No. 2:24-cv-09768-SB-JC
SECOND AMENDED COMPLAINT

Hutchins:              Yes, that's correct. 20 million, it was this morning. Right.

"Caleb":               That makes sense. And then the reason I can ask is I saw
                       yesterday you guys did that kind of first [$BBARK] ad on
                       your page. Do you plan on doing more of that?

Hutchins:              So that ad was totally misrepresented to me on what they
                       would be doing with their coin.

"Caleb":               That's 99% of peoples in this space. I wouldn't' do that for
                       anybody.

Hutchins:              Yeah. Thank you. But the answer is, we're giving quotes for
                       ads that are astronomical and we don't plan to focus on any
                       efforts on ads for other coins. The full focus is on this token
                       or this coin and then expanding it to the other platforms,
                       which we tested out after we took that ad down immediately
                       and refunded the buyer immediately."

                                              --

"Ant":                 You've stepped into the crypto space. Being here every day,
                       we don't have people like you willing to step into this space.
                       And just the fact that you fore-fronted this, really the crypto
                       freaking army, is very motivating for the rest of us and just
                       beyond bullish and excited for this coin. I really see this thing
                       going ham and can't wait to see Mr. President Trump, talking
                       about it, it's going to go nuts and I'm just glad to be here.

88.    An example of how information Defendants conveyed in Twitter Spaces
sessions was inevitably spread throughout the Twittersphere shortly thereafter appears below,
in relation to comments Defendants made during a May 31 Twitter Spaces addressing
Jenner's launch of an Ethereum token, during which time she "promised to do $sol $jenner
buyback [sic] with $eth $jenner Tax proceeding regardless of marketcap of $eth token
(donation to @realDonaltdTrump happens when it hits 50mc)."




**D.  Jenner Launches an Ethereum Token**

89.    Early the morning of May 29, Jenner addressed the public criticism over Arora's apparent rug-pull, tweeting, "We were never going to pull a rug. But yes you are right [Arora] did. Nonetheless, the market cap and volume remains extremely strong and we are only growing $Jenner from here. Stay tuned today."

90.    Despite Jenner representing on May 27 that she was "No[t]" going to "launch[] again," and despite Hutchins representing in the May 28 Spaces, "we don't plan to focus any efforts on ads for other coins," and "the full focus is this token or this coin," at approximately 4:54 p.m. PST on May 29, 2024, Jenner launched a new token for the project, this time an ERC-20 $JENNER token on the Ethereum blockchain.

91.    Approximately 24 minutes later, she tweeted, "$Jenner on $ETH" posting the "Official contract address[.]"[12] The tweet included a short video of Jenner saying, "$JENNER

---

[12] 0x482702745260Ffd69FC19943f70cFFE2caCd70e9.

is now live on Ethereum. Let the trading begin," and represented that there were "NO team tokens. NO Dev tokens. NO founder tokens."

92.    Within 2 minutes after the launch—well before Jenner had announced it on X or otherwise informed the investing public—a single Ethereum address, Req.eth,[13] purchased approximately 42% of the supply.



93.    Approximately 30 minutes after the launch of the ERC-20 $JENNER token, linking users to the Uniswap liquidity pool, Jenner tweeted, "+49,452% in 30mins….not bad! Let's go to Mars! Forget the moon! 🌙😛"

_____

[13] Ethereum address 0x3C7E7e5D95a154764E209e6BCac1F0653fEE75AC.

94.     When an X user asked in response, "What happens to $JENNER on Sol now?,"
she responded, "I like the idea of buybacks. :)"



95.     Responding to a different X user, borovik.sol, a short while later, Jenner said "I
still have my SOL token," and asked investors to "imagine all the buybacks I can make,"
without revealing she possessed only about $25 worth, acquired the previous day.



96.    Shortly thereafter, the evening of May 29, Jenner participated in a now-deleted Twitter Spaces chat with investors and potential investors. During this event, Jenner represented that (a) the ERC-20 token was now the Jenner team's main focus; (b) there were no development team or insider allocations; (c) there was a 3% transaction tax on the token, which would be used (i) to donate to the presidential campaign of Donald Trump, (ii) for buybacks, and (ii) for marketing efforts, such as getting $JENNER listed on prominent U.S.-based CEXs, especially Coinbase. Jenner also stated that Arora was under federal investigation for his role in the Solana token's rug-pull.

97.    Responding again to X user, borovik.sol, who, after the Spaces session tweeted, "Caitlyn Jenner just announced she plans to have $JENNER listed on coinbase in the future," Jenner wrote, "like I keep saying, the Jenner brand is going to be everywhere in the crypto space. This is not your fly-by-night celebrity BS pump and dump. It's a movement. So blessed for the amazing community."

37



98.    Approximately an hour after launching, Jenner also tweeted that "[w]hen
$Jenner hits $50m market cap we will donate to @realDonalTrump from the tax revenues!
We have to protect crypto! It's ULTRA MAGA!"

99.    Jenner's association of the project with President Trump's campaign and politics
was a prominent feature of her promotion of the project and ERC-20 $JENNER token, and a
substantial reason for many investors' interest in the project and token, including Mr.
Greenfield who, as a Trump supporter and U.K. citizen, believed this was a way he could
contribute to President Trump's campaign, even if he could not vote.

100.    On May 30, for example, Jenner tweeted, "IT'S NOW MORE IMPORTANT
THAN EVER! TO GIVE BACK TO TRUMP! Which is why I launched $Jenner on $ETH."



101.   The morning of May 31, Jenner tweeted, "It's all about the long game for
$Jenner."

Caitlyn Jenner ✓
@Caitlyn_Jenner

It's all about the long game for $Jenner

10:03 AM · May 31, 2024 · 5,615 Views

102.   The afternoon of  May 31, while "recommend[ing]" holders of the Solana
$JENNER token "swap it for ETH $Jenner"—in response to a complaint about the transaction
tax on the ERC-20 token—Jenner wrote, "taxes are part of the value prop[osition] here"
because they "support causes important to our $Jenner community and when we hit MC of
50m I'll make our first distribution to MAGA," since it is "ULTRA MAGA TO PROTECT
CRYPTO!"

1
2
3
4
5
6
7
8
9
10
11



12    103.   To assist in bringing new investors into the project, on May 31, Jenner tweeted
13 a "Screen recording step by step tutorial to trade $Jenner on $ETH."

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## E.    Jenner Quickly Stops Promoting the Solana Token

2      104.   As indicated by Defendants' comments in Twitter Spaces presentations and

3  Jenner's early-morning tweet on May 29—issued about 11 hours before announcing the ERC-

4  20 $JENNER token—Jenner viewed the ERC-20 coin as a second iteration of the same

5  underlying project through which she hoped to enrich herself by leveraging her particular

6  celebrity brand and network to bring new investors into the project.



11      105.   Nevertheless, Jenner's launch of the new token caused the price of the Solana

12  $JENNER token to plummet 58% over the first 2 hours following the announcement, and

13  66% within 24 hours after.

14      106.   Defending herself, on May 29, Jenner tweeted, "I have zero control over the

15  SOL token and continue to promote it. There are plenty of cryptocurrencies to be bullish on.

16  SOL and ETH[.]"



20      107.   The next day, May 30, Jenner tweeted, "Stay tuned for buybacks! I pumped the

21  shit out of that SOL token despite the fact I had none of it - bc of dumb Sahil scam- for the

22  community. I continue to promote it and promote the ETH token, the ecosystem is huge and

23  this is just the beginning for $Jenner."



108.    But despite these initial promises to support both tokens, Jenner quickly began to disavow the Solana token. On May 31, for example, responding to a tweet, she said, "You mean the Sahil scam SOL coin? That he never transferred funds for. The only official coin of mine is on ETH (pinned on my X profile)."



109.    By early June, Defendants were actively trying to have the Solana token delisted on the eight foreign CEXs. They hired an attorney, Paul Mariano, whose Telegram handle at times was 0xattorney,[14] and in a private Telegram chat, Hutchins listed the project's "Priorities" as "1.Delist SOL JENNER as much as possible from exchanges[;] 2. Delist / remove affiliation with anything on SOL coin official 'Jenner' on platforms (Dexscreener done ✓) like social media links, TG links, photos, etc.[;] 3. LIST and own all platforms Jenner ETH is on (gecko ✓)." She further stated that while "We are working on listing – [we] don't need help right there now[;] can happen after above priorities met as our team [is] actively working on this with our dev, quant, and MM) etc."



---

[14] "0x" is the first two digits of any Ethereum address. Thus, Mr. Mariano's handle suggests he specialized in legal matters relating to Ethereum, or at least crypto.

110.   In attempting to get the Solana token delisted from one foreign CEX, HTX, exchange representatives said that "because many users bought $JENNER after seeing Jenner's tweets and other publicity, we suggest that some compensation or rewards be given to the $JENNER holders who held positions at the time of the delisting, so that there will be incentives for these users to support the ETH_JENNER project, and I believe the community will continue to pay attention to the development to the ETH_JENNER, and the Jenner program can have a better reputation . . . ."

111.   Hutchins responded, "We have a great reputation. I'm sorry that you guys did not conduct due diligence prior to listing. We are not committing to anything in order for you to de-list."



112.   For the next several months, Defendants continued to promote the project and ERC-20 $JENNER token (but no longer the Solana token) online, often providing links to

relevant social media accounts, the Telegram Group Chat, and the Uniswap liquidity pool. Examples of such promotional material appears below.




F.    **Defendants Continuously Promote the Jenner Project as Long-Term, and Promise to Reinvest Transaction Taxes Into the Project**

113.    Understanding that the value of $JENNER depended upon Defendants' ability to leverage Jenner's particular brand of celebrity and network to bring new investors into the project over the long-term, they began aggressively promoting the ERC-20 $JENNER token, Jenner's dedication to it and the project that it backed, and the potential for purchasers of the token to become "rich" alongside Jenner.

114.    On May 31, an X user tweeted, "Team need to have long term vision, projects have recovered from worse dip. I still believe that $jenner is 100Mill plus project 🚀[.]"

115.    Jenner responded, "We have long term vision. Nothing but long term vision. Sure there was tons of hype and pump on launches (as there normally is with high profile launches) but this is just the beginning. This is there for the long term. All hands on deck for team $Jenner."

44



116.   Also on May 31, Jenner reiterated, "We use tax proceeds as giveaways (like MAGA when we hit 50m mc) and [liquidity providing]. Giveaways are for causes I and our $Jenner $ETH community truly believe in." Indicating her control over the smart contract for the ERC-20 token, Jenner further stated, "As market cap and trading volume goes up we plan to reduce taxes ofc! We hear you :)[.]"

117.   On May 31, Jenner also addressed Arora's rug-pull of the Solana token. Attaching a chart showing the token recovering somewhat, she stated, "This is what happens when you are transparent with your community. We soar together. We have shared the update on the scammer (Sahil) controlled SOL token. Will share the charges and documentation in comments. I am putting all focus to $Jenner $ETH - fully controlled by me."

118.   Jenner then commented on the tweet, attaching a photo of a Los Angeles County Sheriff's Department pamphlet titled "Report Information and Victims' Bill of Rights," with handwritten information about the case including the "Classification of Incident" as "Fraud." Alongside the picture, Jenner commented, "$Jenner fam…WE WERE ALL TAKEN! I didn't get one penny from SOL. CRIMINAL FRAUD PROCEEDINGS HAVE COMMENCED

45

AGAINST SCAMMER SAHIL- FIRST LOCALLY – AND NOW THE FEDS INVOVLED AND COOPERATING WITHIN HIS JURISDICTION – FOR THE SOL COIN. THE $Jenner $ETH coin is fully under my control."



46

### 1.    In the $JENNER Coin (ETH) Telegram Group

119.   On or around June 1, 2024, Defendants created a public Telegram group, named "$JENNER Coin (ETH)," where they could interact with investors and potential investors. Until it was shuttered on August 20, 2024, hundreds of investors—including Lead Plaintiff Lee Greenfield—regularly communicated about the project with Defendants and other investors.

120.   In this Telegram group, Jenner and Hutchins directly interacted with Mr. Greenfield and other investors by posting voice and video messages; responding directly to investor questions; and providing mechanisms for investor input on project-related issues, such as Google Forms that investors could submit so that Defendants could receive their suggestions "in an organized way for the team to act upon."



*Azad v. Jenner*, Case No. 2:24-cv-09768-SB-JC
SECOND AMENDED COMPLAINT

121.    Defendants also continuously hyped and promoted the $JENNER project in this Telegram group chat, including providing updates to the group such as, "We are back and marketing marketing marketing / working very hard," and "The marketing has been insane! It's been great! :)"

122.    In one Telegram communication, apparently frustrated with some investor criticism, Hutchins—referring to Jenner as the project's "dev[eloper]"—touted Jenner's ability to bring attention and investors into the project, saying:

Our dev has an ESPY

Our dev has been on TV for 50 years - viewed by billions of people – literally

Our dev is a household name since he [sic] was 27 years old

Our dev has been Time Magazine person of the year twice

Our dev has been on countless magazines covers like sports illustrated (twice), Playgirl, Glamour, People Magazine, Forbes, Vanity Fair, New York Times, Wall Street Journal, the list goes on

Our dev had the longest running reality tv show in the world

Our dev has raised the most famous family / parent to the most famous family in the world

Our dev has raised 3 billionaire daughters

Our dev is connected to the most powerful people in the world

The list goes on and on

And so many of you guys complain non stop, every day, about her not being active in a [Telegram] channel, or doing voice chats with y'all. And Not updating you on things that aren't finalized yet.

You guys have got to get a reality check here.

If you're not bullish on this dev - you clearly don't know who you're dealing with and shouldn't be here in the first place and should sell (no shame in selling and this is not financial advice) because you just simply don't get it.

Zoom out!

### 2.    Over X

123.    Defendants also extensively promoted the project and token—as an investment—on social media, both via Jenner's personal account, and via a new account Defendants created for the project shortly after launching the ERC-20 $JENNER token, @jennercoineth, which Jenner and Hutchins jointly controlled from their mobile phones, with both using the account at different times to send tweets.

124.    Pictured below, the X profile included the tag line for the project—apropos for a former Olympic champion—that "It's a marathon, not a sprint."



125.    On June 1, an X user asked Jenner, "When are you listing on exchanges!?" This would be important information to investors or potential investors because the potential for the token to be listed on centralized exchanges—especially if U.S.-based or prominent, like Coinbase—would inevitably bring more investors into the project, increasing the demand and trading volume for the ERC-20 $JENNER tokens, and thereby their price.

126.    Jenner responded, "We are in talks with a few exchanges! Evaluating best options for our $Jenner community."

127.    In a comment responding to that tweet, an X user said, "With your family's strong financial resources, we can definitely go to the moon, and I think you are the best[.]" Jenner responded, "Only on my official coin on $ETH."



128.    Later that day, another X user suggested, "You should also look into market makers[.]" Jenner responded, "We are also in talks with market makers and evaluating options. Not just exchanges :) Thank you for your feedback! 🚀🚀🚀"



50

129.   On June 2, Jenner tweeted, "I hope $Jenner on $ETH makes Everyone [expletive] rich 🤢[.]"



130.   The also tweeted, "I told you…it's a marathon not a sprint. Stick with me and $Jenner fam. We are gonna do our best to make it to mars! Only on $ETH"



131.   On June 3, in response to an X user predicting, "this should hit 20M soon," Jenner tweeted, "Never give up on a $Jenner hahaha I've been doing this for 50 years – I've got nothing but stamina! Let's go fam! 🥇[.]"



51

132.  On June 3—after suggesting she had gotten Arora, whose X handle was @Habibi_Comm, banned from the platform—Jenner also tweeted, "We move quietly, quickly, and methodically. Right now you're seeing phase one. Marathon not a sprint."



133.  On June 3, Jenner also tweeted, "Just wanted to provide update I am working triple time not just on the $ETH coin but on all other aspects for the entire $Jenner community :)[.]"



134.  Defendants also suggested future utility for the ERC-20 $JENNER token. For example, on June 3, Jenner responded to an X user asking, "When would we be able to buy

kylie cosmetics[15] with $JENNER on ETH?," Jenner responded suggestively, "We love utility! Only official $Jenner is on $ETH." Of course, any such utility could dramatically increase the trading volume and value of the token by bringing new interest and investors into the project.



135.   On June 4, Jenner tweeted the below message regarding "explosive growth," featuring an AI-generated image of a latte with a dollar sign ($) and "Jenner" sketched in the foam.



---

[15] Referring to a line of cosmetics sold by Jenner's daughter, Kylie Jenner.

136.   On June 4, Jenner also tweeted, "Any guesses on which exchange $Jenner on $ETH launches on first? Boy is our team -and esp our MM's -hustling! Guesses in the comments!" When a user "guess[ed] Binance," Jenner responded, "I like that guess! We are working on all, but the first one will be critical :)[.]"



137.   On June 5, Jenner tweeted an AI-generated image of Jenner in a "JENNER ETH" T-shirt, carrying an American flag through a crowd in which one member holds up a sign reading, "LETS MAKE EVERYONE RICH!"



54

138.   On June 5, Jenner tweeted, "we didn't own the smart contract to migrate or bridge" the Solana token "over to ETH… Trust me I get the issue hahaha but we are here to stay with the actual coin we launched and hold the smart contract of on ETH[.]"



139.   On June 5, Jenner also said "we are working extremely hard with a lot of people in the space to get this right. We don't plan on going anywhere, but up. For us this is truly a marathon, not a sprint."



140.   On June 11, Defendants' @jennercoineth account tweeted a screenshot of "Ongoing convos" on Telegram "with @HTX-Global on de-listing FRAUD coin and listing $ETH," noting, "We will not list with anyone that has the fraud listing up."



141.    That same day, the X account posted an announcement from BitMart and tweeted, "@BitMartExchange Delisted Fraudulent SOL Jenner Meme Coin – stay tuned for our future work with the exchange!"



142.    On June 12, Defendants tweeted an AI-generated image of Jenner and President Trump sitting behind a pile of money, with a comment titling the image, "Crypto King @realDonaldTrump & $ETH KWEEN @Caitlyn_Jenner." Jenner re-tweeted the image, saying, "We are making more and more great progress $Jenner only on $ETH stay tuned for our first CEX listing!!!! But for now, trade [on Uniswap.]"



143.    A few days later, on June 16, the account tweeted, "Bye bye. More delistings. Can you guess where your first CEX listing will be? I can tell you we have signed some so far!"

144.    Jenner retweeted the message, adding, "With our first CEX (signed by both sides) announcement incoming & on a CEX that never listing the fraud SOL token- we are feeling more and more excited to share the news with you. This will be a major week for our community! WE are $Jenner / $ETH strong!"



145.    On June 17, Defendants gave an interview to crypto influencer, Mika (@mikadontlouz), which she posted on June 20, titled "The Future Of $Jenner Coin." In the interview, Jenner said, "I've gotten involved with a lot of different projects. The Jenner name, I like to think of it as a winning name. I like to win. Anything I get involved with, I would like people to do well with. And I will take nothing to make sure that everybody else has a profit. I mean, it's important to me if you invest in a project that I'm involved with."



146.    On June 19, Jenner tweeted, "Cannot build properly without a solid foundation. That groundwork for building has all been going on in the background simultaneously. Thank you for your support and patience."



147.    On June 24, Defendants tweeted, "JennerTreasury.eth (second largest wallet) will match the biggest buy in the next 6 hours!" A little while later, the account stated, "We are going to extent this match period to 24 hours . . . for the matching from JennerTreasury wallet – in order to take our entire worldwide community into account!"[16]

---

[16] The JennerTreasury.eth wallet resolves to a Gnosis safe wallet, which is an open-source, non-custodial, multi-signature wallet for managing digital assets, requiring a minimum number of Ethereum addresses to approve a transaction before execution. The use of a Gnosis

148.   An X user responded to this, "Use half of the taxes for buybacks. The community doesn't like to just fund Trump. It would be fair to do half and half." Jenner responded, "Not all taxes going for Trump. The first distribution would be made when we hit 50m MC. And never said it would be ALL of them. Some have been used for buybacks, marketing, etc."



149.   On June 27, Defendants tweeted, "If you're not in our [Telegram] Chat see our morning update here[.]" Copying from the Telegram chat, the tweet continued:

By way of updates:

- Sophia says golfing [with major CEX CEO yesterday] went very well' [sic] follow up meeting being scheduled there FYA :)

- Still signed with 2 CEX's about to sign with a 3rd

- Rollout dates are still being considered and juggled as to not do it all at once – and do what makes the most sense w/ markets and the CEX's themselves and our project.

[Market Making] will start right then and there with first CEX launch.

_____

safe by a crypto project is viewed favorably because it effectively acts as a transparent escrow account, where anyone can see the balance at any time; and because no one person is supposed to control the wallet. If only insiders hold the keys to the Gnosis safe, however, it's protections become illusory.

- Olympic campaigns from you all [in TG chat] being integrated and looking forward to deploying in the next 29 days leading up tot Paris 2024 opening ceremony

- Merch collab with external partner (other active web 3 group) coming out soon."



150.   On June 28, Defendants tweeted an excerpt of the Mika interview, describing the clip as "Our CEO on her simultaneous venture in bringing Web 2 Talent into Web 3 – like she did with our project! Responsibly and ethically! And a lot of our very own team is the founding team! Will keep all posted. But ofc don't worry - my sole focus (and the team we have) is $Jenner."



151.   On June 28, Defendants also tweeted content pasted from a "[Telegram Group Chat] Update Today." Seemingly coming from Jenner, it stated, "Wrapping up CEX listing process for the first one we will roll out with. Will not roll out over the weekend – FYA. Cool marketing web3 collab coming next week- after we are listed on CEX. MM will commence

upon listing. I have an interview with Forbes in about one hour. We will keep doing PR / high profile crypto collabs for the project esp as we begin CEX listing (s) rollout (s)[.]"



152.   Also on June 28, cryptocurrency exchange BitMart tweeted, "Which coin are you watching today? 👀" Jenner responded "Of course… $Jenner[.]" An X user responded to that, "If you tell us to buy $JENNER right now, we will 👀" Jenner responded, "Now is the time. We just got our first CEX listing date…the best part…It's right around the corner."



153.    That same day, Defendants tweeted, "🚨🚨🚨 We just got our first CEX listing date! Stay tuned! It's right around the corner! These prices won't last at this level! May wanna stock up[.]" The tweet contained a link to the Uniswap liquidity pool.

154.    Jenner retweeted the message, adding, "This's gonna be huge! Cannot wait for us to hit $50m market cap for our first giveback to re-elect Trump!" The tweet featured an AI-generated image of Jenner and President Trump standing in a sea of gold coins.



155.    Defendants were referring to a listing they had obtained on the foreign CEX, MEXC.

156.    On June 30, Jenner tweeted an image of the ERC-20 $JENNER token experiencing a 5.52% increase in price over the course of a few hours, saying, "told ya it's a marathon, not a sprint!"



157.   That same day, Defendants and Jenner promoted the upcoming MEXC listing
of the ERC-20, with Jenner linking to Uniswap and urging, "Buy now or cry later!"

158.  On July 5, an X user posted "@Caitlyn_Jenner is slowly becoming the leader Crypto needs $JENNER," to which Defendants replied, "We are working around the clock on this project and are all inspired by our founder's work ethic, commitment, and devotion to everything Jenner does!"

159.  On July 8, Defendants posted on X a link to the jennercoineth.com website (discussed further below), the Uniswap liquidity pool (which they later corrected), and official contract address.



160.  On July 23, Jenner tweeted, "Glad to see the team working really hard these past few days esp! What a great time to be bullish!! And the Olympics! My fav time of year! Trade here: jennercoineth.com."



161.    On July 26, Defendants tweeted, "We noticed a certain new follower on Caitlyn's X profile, I wonder what that could mean…👀👀[.]" They were referring to Jenner being newly-followed by KuCoin, a top-10 global cryptocurrency exchange in daily trading volume. Thus, Defendants were suggesting the ERC-20 $JENNER token would be listed there imminently.



162.   On August 3, however, responding to a KuCoin tweet, Jenner revealed, "they
don't want us" because "[t]hey don't want celebrity tokens' LOL! As if I'm just a celebrity
token. . . . That's ok. We have much larger CEX's in the pipeline; and much larger things to
focus on than @kucoincom."



163.   On August 8, Defendants tweeted a still shot of a runner with the message, "The
$JENNER community on their way to buy the dip 🏃‍♂️💨[.]" Jenner responded, "🤦🏿‍♀️ common
sense...I know we are doing a lot of that with our [Market Makers]'s."



164.  On August 10, Defendants tweeted, "Don't be sidelined, be a $JENNER holder... 🤣🚀," featuring a fanciful image of Jenner dishing out bills while sitting on stacks of money.



165.   On August 20, Defendants tweeted, "Don't mess with the vision 🥊🤣[.]" Jenner re-tweeted, "🎉 🎉 🎉 let's gooooooo $Jenner," even though that day—as described further below—Defendants would end up shuttering the project.



### 3.   On the Jennercoineth.com Website

166.   In June 2024, Defendants created a website for the token, jennercoineth.com, registering the URL with Arizona-based domain registrar, GoDaddy.com, containing a link to the Uniswap pool where it could be traded, as well as to related social media accounts and a chart of the token's price action.

167.   According to the website, "$JENNER is a pioneering cryptocurrency on the Ethereum blockchain, inspired by the vision and brand of Caitlyn Jenner. Designed to empower the community and offer unique value, $JENNER aims to revolutionize the digital economy by providing a secure, transparent, and innovative platform for transactions and interactions."

168.   The website further stated that "$JENNER is more than just a token; it's a movement. Embracing the values of inclusivity, empowerment, and progress, $JENNER aims to create a community where everyone can participate and benefit from the growth of digital assets." It encouraged the public to "Join us in this exciting journey and be part of a transformative experience in the world of cryptocurrencies."

169.   Finally, the website stated people could "Get Involved" by "Buy[ing] $JENNER" on "major cryptocurrency exchanges," "Particpat[ing] in Events," "Stay[ing] tuned for updates on exclusive events and opportunities," and "Engag[ing] with the Community" by "Follow[ing] us on social media and join[ing] the conversation."



170.   In late June, Defendants posted a revamped website. This one included the tag line, "It's a marathon, not a sprint," on the front page.



171.   The revamped website contained the same description of the Jenner Project and token, and also featured the AI-generated image with "RICH!" sign that Jenner had tweeted.



172.    Eventually, Defendants revamped the website again, though the copy and messaging remained the same.



173.    Defendants added to the website the following, "Disclaimer" in small-print, typically at the bottom of the relevant page:

> The $JENNER token is a memecoin on the Ethereum blockchain intended solely for entertainment purposes. It is not a security, investment, or any other financial instrument. The project developers and founders make no guarantees or promises regarding the token's value or performance. By acquiring or using $JENNER, you assume all risks associated with digital assets and release the developers and founders form any claims or liabilities. Always conduct your own research and consult with a professional advisor before making financial decisions.

174.    Despite this statement's purported attempt to "disclaim" that the ERC-20 $JENNER token was an investment, its contradictory suggestion to "consult with a professional advisor before making financial decisions" reveals the economic reality of the situation.

175.    As shown above, the revamped website also stated, "We will make our first donation to re-elect President Trump when we reach a market cap of 50 million. Taxes are for this purpose and set out below." The website then stated that the 3% taxes would be divided as follows: 0.5% to Liquidity, 0.3% to Development, and 2.2% to marketing (dividing the tax 16.7% to liquidity, 10% to development, and 73.3% to marketing). Thus, Defendants represented all taxes would be effectively re-invested into the project.

176.    Later, on August 20, a Telegram user would ask Jenner, "So, you feel that tax money belongs to you?," with Jenner responding, "Absolutely not[.]"



177.    As described more fully below, however, that same day Jenner had transferred into personal Coinbase accounts about half the taxes collected, then abruptly shuttered the project without ever returning those funds to token holders.

#### 4. With the "Reward" of Fractionalized Olympic Medal Tokens

178. In early August 2024, Jenner devised a plan to fractionalize ownership of her Olympic gold medal, and reward holders of the ERC-20 $JENNER tokens with shares.

179. On August 20, Defendants teased the plan via X, tweeting "Tomorrow . . . a snapshot of all $JENNER holders will take place. This will allow us to distribute the planned surprise to our loyal holder base.



180. As Jenner explained to the $JENNER Coin (ETH) Telegram Group shortly thereafter:

> Hey all: Lots of Questions regarding how this Fractionalized NFT - backed by RWA- then tokenized – and how it will reward $Jenner holders. First and foremost, whenever I engage in any activity within Web3 or within the Crypto space, I have a criteria that is very clear: how can I contribute and work to benefit and provide something positive to the Industry, Project(s), and then of course, the Holders. $JENNER is a separate token and we still have a very active team on $JENNER and that is the team's primary focus here. It has been and will remain the primary focus here. We have a very specific answer and plan there that has been in the works alongside this project's development for quite some time – for about 2 months since we finalized. This is set to be implemented / executed as we launch the other project on Thursday. All $Jenner holders will be rewarded and we look forward to sharing that reward with all $Jenner holders, Thursday.

181. On August 5, Jenner published a screenshot of this discussion on X.

182. On August 6, Jenner released an article titled, "Broken History or Breaking History? 1976 Olympic Gold Medal auctioned off in 100 Million Pieces." It explained

72

Jenner's "medal will be divided into 100 million pieces" in a process that "involves the minting of a 1-to-1 ERC-721 token that represents the ownership of the medal," with the pieces expected to be "auctioned from August 8th to August 15th, 2024, using a custom-developed platform." The article also explained that "$JENNER holders" would be "Airdrop[ped]" "1%" as a "reward." One X user responded, "generous," and Jenner wrote back, "Very! We are beyond proud to add this to our ongoing fully commitment [sic] to @jennercoineth 😊[.]"




183.   On August 8, to promote the auction, Jenner gave an interview and Defendants re-tweeted Jenner's related thank-you, saying, "Our founder is everywhere. We are $Jenner strong and bullish and committed as ever."



184.   On August 9, in response to an X user asking, "What happened with Jenner on Eth?," and suggesting "you need more marketing and developments for that!," rather than focusing on the fractionalized medal, Jenner responded, "@jennercoineth is full steam ahead- as we have said many many times."



**G.     Defendants Break Their Promises to Reinvest the Substantial Tax Revenues from the Sale of the ERC-20 $JENNER Tokens Into the Jenner Project**

185.    Defendants did not keep their promises to reinvest all tax proceeds from ERC-20 $JENNER tokens back into the project, and were frequently unwilling to spend the tax proceeds on the basic things necessary to keep the project operational.

186.    For example, while Defendants hired attorney Paul Mariano in early June, his association with the project did not last very long, with his retainer terminated by July following an apparent dispute.

187.    Similarly, Defendants at times refused to pay listing fees to obtain listings of the ERC-20 $JENNER token on CEXs. One exchange, XT, was essentially ready to list the token, but on July 2, Hutchins told XT the Jenner project would not pay the exchange's listing fee. XT noted it had "received your listing announcement on MEXC, which was paid," and urged Hutchins to "Please review the agreement within the next 24 hours. If we do not hear from you, we will proceed to relist the previous SOL contract as previously discussed."



188.    Mr. Mariano responded to XT, "To relist SOL would be to violate Caitlyn's intellectual property rights. I would suggest heavily that you not threaten illegal activity in response to our current position." Mr. Mariano claimed, "we have acquired all of the $Jenner tokens we have on the open market in the millions of market cap," so that "our project is

different than other projects who snipe the majority of supply or otherwise airdrop themselves." Mr. Mariano continued, "We are a long term project with 30/90/180 day plans. We cannot blow our budget on listing without a revenue source and expect to survive."

189.  Attempting to persuade XT to list the ERC-20 token for free, Mr. Marino argued, "XT will get a massive promotion through Caitlyn's nearly 20M social media followers and we can agree to some extra promotion by the same in lieue [sic] of massive payments[.] We will be publicized in major news outlets over the coming weeks that No [sic] other projects have access to[.] We are in partnership discussions with key industry players as well[.] In most of these, our CEX partners will be mentioned by default as platforms from which Jenner [sic] may be purchased. This is why we are scrutinizing our deals and relationships heavily. We provide value to our partners that very few meme projects can offer[.]"

190.  XT, however, was not persuaded and—because Defendants refused to use transaction taxes from ERC-20 $JENNER tokens to pay its listing fees—never listed the token.

191.  By late August, token holders were observing that Defendants and their team did not seem to be doing much. In an August 19 tweet, an X user expressed his frustration that "we have no idea bout the plans [for] $Jenner[.] when marketing? when mm?"



*Azad v. Jenner*, Case No. 2:24-cv-09768-SB-JC
SECOND AMENDED COMPLAINT

192.    During an August 20 Telegram group chat, one user said, "you say that the team is working very hard, but we have not seen any work for 2 months. I kindly ask the team to work hard." Jenner responded, "Sorry you feel that way[.]"



**H.    On August 20, Jenner Transfers Substantial Funds Out of the Project's Treasury Account, and Abruptly Shuts the Project Down**

193.    Since launching the ERC-20 $JENNER token, the 3% transaction tax has accounted for approximately $942,242.38[17] in taxes extracted from transactions as of the time of this filing. Although Defendants presumably used some money on the project, substantial amounts were never reinvested, as promised, nor used as promised.

194.    On August 20, Jenner or someone on her behalf transferred approximately $432,950.49 from the project's Marketing and Treasury wallets, into three Coinbase wallets. Moreover, Defendants' transmission of $385,415.35 from the project's JennerTreasury.eth wallet—the Gnosis safe wallet—in the form of approximately $201,000 in $ETH and $183,000 in WBTC (wrapped Bitcoin), suggests their intent to trade the funds on Coinbase, as WBTC is not commonly used for other applications that would be relevant to the Jenner project, and indeed, the project was thereafter shuttered that same day, and thus those transferred funds *could not have* been used for the project.

---

[17] The smart contact specifies that the transaction tax is collected in $JENNER and, after the accumulated token balance reaches a threshold set in the contract's code, automatically converted to $ETH, then sent in $ETH to various wallets. Dollar figures in this section are estimated as of the time of the transactions.

195.   The smart contract for the ERC-20 $JENNER token[18] created three wallet addresses, controlled by Jenner, into which proceeds from the 3% transaction tax would flow: a Deployer wallet,[19] a Liquidity wallet,[20] and a Marketing wallet.[21]

196.   Between May 29 and May 30, the ERC-20 $JENNER token's smart contract sent approximately $47,777.78 in transaction tax revenue to the Deployer wallet.

197.   On May 30, the Deployer wallet sent that revenue to two separate Coinbase deposit addresses: $8,278.50 to Coinbase deposit address 0x1dd5; and $38,883.36 to Coinbase deposit address 0xed89. This is the Deployer wallet's only lifetime activity.

198.   Since May 30, 2024, the ERC-20 $JENNER token's smart contract has sent $59,034.50 to the Liquidity wallet.

199.   Since May 29, 2024, the ERC-20 $JENNER token's smart contract has sent $835,430.10 to the Marketing wallet (jennercoin.eth).

200.   Between May 30 and September 26, 2024, the Jenner Liquidity wallet transferred $46,162.27 to the Marketing wallet; and between July 31 and August 20, 2024, it transferred $28,602.48 to the project's Gnosis safe Treasury wallet (JennerTreasury.eth).

201.   Between May 30 and September 26, 2024, the Marketing wallet sent $84,251.10 to the Liquidity wallet, for net outflows of $38,088.83 from the Marketing wallet to the Liquidity wallet.

202.   On July 1, 2024, the Marketing wallet sent $421,167.79 to the project's Gnosis safe Treasury wallet (JennerTreasury.eth). A substantial portion of this was in the form of 3.0290404 $WBTC, worth approximately $196,138.32 at the time of transfer.

203.   On August 2, 2024, the Marketing wallet transferred $15,013.24 to Coinbase account 0x680a. On August 20, 2024, it transferred $16,289.99 to Coinbase account 0x43a7.

---

[18] 0x482702745260Ffd69FC19943f70cFFE2caCd70e9 (sometimes, the "ox4827 wallet").

[19] 0xB41aF5Ce8C1b86e0204a0Bc6625041376c70Ba81 (sometimes, the "0xB41a wallet").

[20] 0xedc3D54605d6d25cF405f214B56d63b7bCD80d1f (sometimes, the "0xedc3 wallet").

[21] 0xC152A863312F4AB4C5B6a52447abe8bFDD741aa2; the ENS, "jennercoin.eth," resolves to this address.

204. On August 20, 2024, the Gnosis safe Treasury wallet (JennerTreasury.eth) transferred $384,415.35 to the same Coinbase account, 0x43a7. This included approximately $201,000 in $ETH, and $183,000 in $WBTC.

205. These transactions are captured in the below flow chart. A larger version—and one that includes layers for the various forms of payment at issue (USD, $ETH, $JENNER, $USDT, and $WBTC)—is attached hereto as Exhibit 2.



206. In sum, of the approximately $942,000 in taxes generated from the sale of ERC-20 $JENNER tokens, approximately $445,000 (about 47%) was transferred into Coinbase wallets. Even if some of these transfers were legitimately for the project's use, about $433,000 of the $445,000 (97%, or 46% of the total) was transferred on August 20, the same day Defendants shuttered the Telegram group and, effectively, the project. And of that $433,000 transferred on August 20, approximately $183,000 (42%) was in $WBTC, suggesting Defendants intended to use those funds for trading, once on Coinbase.

79

207.    Investors noticed these large outflows on August 20 and became upset,
demanding answers in the Telegram Group Chat.

208.    Defendants, rather than responding, abruptly "muted" the Telegram Group,
effectively shutting it, and the project, down: Although Defendants would, for a couple weeks
thereafter, pay lip service to continuing with the project, nothing more ever came of it, and
ERC-20 $JENNER tokens became effectively worthless.

 

209.    As a result of Defendants' actions, Lead Plaintiff and other investors have
experienced substantial losses. When one noted she had "put [her] life savings into [Jenner's]
coin," Jenner mocked her, responding, "Yoooooo lol why would you put your life savings
into any meme coin?," even while claiming on September 3, "We aren't going anywhere."

///
///
///
///
///
///

*Azad v. Jenner*, Case No. 2:24-cv-09768-SB-JC
SECOND AMENDED COMPLAINT

## V.    Lead Plaintiff's Experience with the Jenner Project and Tokens

### A.    The Solana Token

210.    At the time Defendants commenced the scheme described herein, Lead Plaintiff Lee Greenfield was interested in cryptocurrency investments. He recalls first becoming aware of the Jenner project when the May 27 video of Jenner promoting the project and Solana token in her robe (described above in paragraph 65), appeared in his X feed. Following the story, Mr. Greenfield was quickly exposed to the significant buzz online, especially in the Twittersphere, including Arora's rug-pull, which had by then come to light.

211.    Mr. Greenfield was following Jenner's tweets that day and recalls her making many statements affirming her dedication to the project and token notwithstanding. He recalls seeing statements, either from Jenner directly or those relaying her statements on May 27, that she did not intend to launch another token.

212.    The following day, May 28, Mr. Greenfield made three purchases of the Solana $JENNER token, for a total of 70,679 tokens, for the equivalent of $1,275.65 in $SOL. Mr.

Greenfield recalls making these purchases on Pump.Fun, but believes the token may have already been in the Raydium liquidity pool, accessed through the Pump.Fun website.

213.   As described in paragraphs 89-91 and 105, on May 29, contrary to her representations, Jenner launched a new token, the ERC-20 $JENNER token. This caused the price of the Solana token to drop dramatically.

214.   As a result, and having been exposed to Jenner's suggestions that Solana $JENNER token holders sell and buy into the ERC-20 token instead, Mr. Greenfield sold his 70,679 $JENNER tokens for the equivalent of $476.92 in SOL, a loss of more than 62% of his initial purchase. As Jenner had suggested, Mr. Greenfield began purchasing the ERC-20 $JENNER token that same day.

### B.   The ERC-20 $JENNER Token

215.   Beginning on May 27, primarily through X, Mr. Greenfield was exposed to Defendants' numerous representations regarding the Jenner project discussed herein. Based on these representations, on May 30—within approximately 90 minutes of Jenner launching the ERC-20 $JENNER token—Mr. Greenfield made his first purchase on the DEX, Uniswap, using the Uniswap Interface.

216.   In particular, Mr. Greenfield was exposed to and, in purchasing the ERC-20 $JENNER token, relied on Jenner's representations that all of the transactions taxes would be reinvested into the project, which Jenner repeatedly described as "long-term," and a "marathon, not a sprint."

217.   Based on these representations, the promotion by Jenner and Hutchins of the token as an investment with high growth potential, and the potential he saw for growth in the value of the ERC-20 $JENNER token based on Jenner's ability to bring attention and investors to the project with her unique celebrity brand, between May 30 and July 26, Mr. Greenfield purchased the tokens 35 times, accumulating more than 12.7 million. Each of these purchases was made on Uniswap, using either the Uniswap Interface or Uniswap Mobile App via either Mr. Greenfield's desktop or mobile phone.

218.    Following Defendants' shuttering of the Telegram Group, and effectively the project on August 20, Mr. Greenfield waited to see whether Defendants would rectify the situation. However, when after several weeks no acceptable explanation or plan was forthcoming, and Defendants ceased promoting the project, Mr. Greenfield decided to sell his ERC-20 $JENNER tokens at a substantial loss. Between September 8 and October 3, he sold his tokens over 6 transactions, realizing a loss of $39,497.50 on his original purchase.

## VI.    Lead Plaintiff Obtained the ERC-20 $JENNER Tokens in a Domestic Transaction

219.    "Either a domestic purchaser or a domestic seller of a security may bring a transaction within the purview of" the U.S. securities laws, *aff'd sub nom.*, *Secs. & Exch. Comm'n v. Scoville*, 913 F.3d 1204 (10th Cir. 2019).

### A.    Jenner Passed Title to the ERC-20 $JENNER Tokens in the United States

220.    Jenner provided 100% of the initial liquidity for the ERC-20 $JENNER tokens on Uniswap. Moreover, as the deployer and owner of the smart contract behind the ERC-20 $JENNER token, Jenner retained control over certain features of the contract, including the ability to increase or decrease the 3% transaction tax.

221.    Mechanically, on May 29, 2024, Jenner, from California, funded or directed an agent to fund the Ethereum address, 0xB41aF5Ce8C1b86e0204a0Bc6625041376c70Ba81 (the "Jenner (ETH) Deployer Wallet"), with Ethereum transferred from a Coinbase account, 0x95A9bd206aE52C4BA8EecFc93d18EACDd41C88CC. Coinbase is a United States company, publicly traded on the NASDAQ, with its corporate address as 1209 Orange Street, Wilmington, Delaware 19801.

222.    The Jenner (ETH) Deployer Wallet then minted 1,000,000,000 $JENNER as an ERC-20, which were issued to the Jenner (ETH) Deployer Wallet by an Assert Minter and Burner address known as a "null wallet."

223.    The Jenner (ETH) Deployer Wallet then transferred ownership of the 1,000,000,000 $JENNER tokens to the token's smart contract,[22] which—instituting its 3%

---

[22] 0xcb951bcbdfa4a854f55592b88b1e0e6e97e4bb01.

1  transaction tax—sent 30,000,000 $JENNER tokens into a $JENNER token contract address

2  (0x4827); and sent the remaining 970,000,000 $JENNER, together with 1 $WETH, to create

3  a Uniswap liquidity pool for the trading pair.[23] Once that occurred at 11:54:35 p.m. UTC,

4  trading was immediately available using Uniswap's AMM function.

5      224.  These steps are represented in the below flow chart. For legibility, a full-size

6  version is attached hereto as <u>Exhibit 3</u>.



17      225.  In sum, the initial ERC-20 $JENNER tokens were owned by Jenner and placed

18  by her into Uniswap's liquidity pool, where they were immediately available to be swapped,

19  *i.e.*, purchased by members of the investing public. Thus, for some time after the token's

20  launch, there was a high probability purchasers were purchasing $JENNER tokens directly

21  from Jenner, *i.e.*, purchasing tokens that had never yet been purchased by a third party and

22  re-sold back into the liquidity pool.

23      226.  Using the Uniswap Interface created and maintained by Uniswap Labs in New

24  York, Lead Plaintiff Lee Greenfield made his first purchase of ERC-20 $JENNER tokens on

25  Uniswap at 1:28:23 a.m. UTC—about 90 minutes after Jenner launched the token—

26  purchasing approximately 20,552 $JENNER for 0.02 ETH (then worth about $30.68). Mr.

27

28  [23] 0x8588F0c49849C011d5b5e3318bb0D1fB8534266b.

Greenfield made his second purchase approximately 8 minutes later, at 1:36:11 a.m. UTC, this time purchasing approximately 588,573 $JENNER for 0.35 ETH (then worth about $1,311.44).

227.  In fact, as reflected in the table below, over the first three days of trading, between May 30 and June 1, Mr. Greenfield purchased approximately 5,561,500 ERC-20 $JENNER tokens, spending 3.58 ETH, then worth about $14,605.54.

| Date | Time (UTC) | Amount of ERC-20 $JENNER Tokens Purchased (to 1 decimal) | Purchase Price (ETH) | Purchase Price (USD) |
|---|---|---|---|---|
| May 30 | 1:28:13 a.m. | 20,552.6 | 0.02 ETH | $30.68 |
| May 30 | 1:36:11 a.m. | 588,572.9 | 0.35 ETH | $1,311.44 |
| May 30 | 2:23:47 a.m. | 145,116.7 | 0.1 ETH | $374.70 |
| May 30 | 2:51:59 a.m. | 362,495.9 | 0.3 ETH | $1,124.09 |
| May 30 | 10:29:23 a.m. | 607,497.6 | 0.45 ETH | $1,686.14 |
| May 30 | 12:40:47 p.m. | 43,066.5 | 0.025 ETH | $93.67 |
| May 30 | 2:49:11 p.m. | 1,365,641.4 | 0.55 ETH | $2,047.29 |
| May 31 | 4:15:47 p.m. | 93,527.6 | 0.04 ETH | $150.35 |
| May 31 | 7:26:35 p.m. | 530,209.9 | 0.185 ETH | $695.35 |
| June 1 | 7:43:11 p.m. | 554,940.2 | 0.6 ETH | $2,287.69 |
| June 1 | 8:23:23 p.m. | 59,757.5 | 0.06 ETH | $228.77 |
| June 1 | 8:26:35 p.m. | 1,079,481.6 | 1.1 ETH | $4,194.09 |
| June 1 | 9:12:23 p.m. | 110,639.5 | 0.1 ETH | $381.28 |
| **Totals:** | | **5,561,499.8** | **3.58 ETH** | **$14,605.54** |

228.  Accordingly, it is likely Mr. Greenfield purchased some ERC-20 $JENNER tokens directly from Jenner, with title never having passed from Jenner to any other person prior to his purchase. This is all the more so if the Req.eth wallet that purchased a significant supply early, which it resold into the liquidity pool in several transactions through June 5, represented tokens owned by Defendants or the project.

229.  Since Jenner was in the United States when she passed title of at least some ERC-20 $JENNER tokens to Mr. Greenfield, Lead Plaintiff obtained at least some of his tokens in a domestic transaction. *See Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 156 (2d Cir. 2017) (A transaction can occur in "more than one location," for example, "if the buyer 'incur[s] irrevocable liability … to take and pay

for a security' in New York and the 'seller incur[s] irrevocable liability ... to deliver a security' in New Jersey, the transaction occurs in both New York and New Jersey." (quoting *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012))); *cf. Stoyas v. Toshiba Corp.*, 896 F.3d 933, 948-49 (9th Cir. 2018) (adopting the *Absolute Activist* domestic transaction analysis).

**B.    Jenner's Obligation to Sell, and Lead Plaintiff's Obligation to Buy at Least Some ERC-20 $JENNER Tokens Became Irrevocable in the United States**

230.   Even if Mr. Greenfield had not purchased some ERC-20 $JENNER tokens directly from Jenner, he nevertheless acquired at least some tokens in a domestic transaction because, as a technical matter, Jenner's obligation to sell, and Mr. Greenfield's obligation to purchase some tokens became irrevocable in the United States.

231.   As described above in paragraphs 220-225, on May 29, Jenner provided 100% of the initial liquidity to the Uniswap liquidity pool. On May 30, she tweeted, "Liquidity locked 🔒✓ $Jenner on $ETH." That tweet included a transaction hash, showing a transaction in which the liquidity locked on May 30 at 4:37:59 p.m. UTC.



*Azad v. Jenner*, Case No. 2:24-cv-09768-SB-JC
SECOND AMENDED COMPLAINT

232.    A review of the smart contract shows Jenner had, in a transaction initiated by or at Jenner's direction from California, locked liquidity through November 1, 2025. This meant that until then—when Jenner would regain the ability to remove liquidity from the Uniswap liquidity pool—any investor could use the liquidity pool to purchase ERC-20 $JENNER tokens without fear that the market for it would be shuttered.

233.    As a result, once she locked the liquidity, Jenner's obligation to sell any tokens she had placed in the pool, which any other person wished to purchase, became irrevocable. As shown above in the table in paragraph 227, that meant Jenner was irrevocably obligated to sell Mr. Greenfield every ERC-20 $JENNER token he purchased after May 30.

234.    As described above in paragraph 32, swaps effected through a Uniswap liquidity pool become final and non-reversible—that is, written to the blockchain—when the assigned node validates the transaction and creates a new block, then broadcasts that block to all validator nodes on the consensus layer to confirm the information before the block is immutably added to the blockchain.

235.    As described above in paragraph 35, because every transaction on the Ethereum blockchain becomes irrevocable only after it is validated by a network of global nodes clustered far more densely in the United States than in any other country, every transaction on the Ethereum blockchain is a domestic transaction. That includes Jenner's transaction locking liquidity; therefore, her obligation to sell Mr. Greenfield every ERC-20 $JENNER token that he purchased after May 30 occurred in the United States.

236.    Given Mr. Greenfield's purchase of approximately 12,757,459.6 ERC-20 $JENNER tokens between May 30 and July 26, 2024, it is statistically likely that nodes located in the United States validated the transaction—making Mr. Greenfield's obligation to purchase irrevocable—with respect to approximately 5.1 million ERC-20 $JENNER tokens (representing about 40%) that Mr. Greenfield purchased. *See Williams v. Binance*, 96 F.4th 129, 137 (2d Cir. 2024) (finding plausible inference of domestic transaction where plaintiffs alleged "the transactions at issue were matched, and therefore became irrevocable, on servers located in the United States.").

237.    The sovereignty and comity concerns that at least partially motivate the careful policing of the line between foreign and domestic transactions in cases like *Morriosn v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010), and its progeny are non-existent or at least very weak here, since there is no foreign jurisdiction that more clearly has jurisdiction over Jenner's promotion and sale, from California, of an investment contract primarily marketed to and aimed at United States investors (who, for example—notwithstanding Lead Plaintiff—are far more likely to be interested in the project's connection to Donald Trump and to Jenner's celebrity brand and network).

## VII.    The ERC-20 $JENNER Token and the Manner in Which it was Offered and Sold was an Investment Contract Under *Howey*

238.    An investment contract exists because Defendants' scheme constituted an investment of money in a common enterprise with the reasonable expectation of profit to be derived from the efforts of others. *See SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ["*Howey*"].

### A.    There was an Investment of Money

239.    Here, investors purchasing ERC-20 $JENNER tokens, including Lead Plaintiff, made an investment of money or other valuable consideration (in most cases, $ETH, but also in the form of other cryptocurrencies, including but not limited to, $USDT), satisfying the first prong of the *Howey* test.

### B.    There was a Common Enterprise

240.    To satisfy the "common enterprise" requirement of *Howey*, there must be either "horizonal commonality" or "vertical commonality." *See Revak v. SEC Realty Corp.*, 18 F.3d. 81, 87-88 (2d Cir. 1994).

#### 1.    Vertical Commonality

241.    Vertical commonality "may be established by showing that the fortunes of the investors are linked with those of the promoters." *Secs. & Exch. Comm'n v. Dalius*, 2023 WL 3988425, at *8 (C.D. Cal. May 24, 2023) (citations omitted).

242.   As alleged in, *inter alia*, paragraphs 148, 188, 223, Defendants and the Jenner project had a financial interest in the value of the ERC-20 $JENNER token, because they had substantial holdings of Jenner's own coin.

243.   In fact, as of the filing of this Amended Complaint, the project's Treasury wallet (JennerTreasury.eth) held over 20 million ERC-20 $JENNER tokens.

244.   As a result, investors' fortunes were tied to the fortunes of the project and its promoters, *i.e.*, Defendants.

### 2.    Horizonal Commonality

245.   Horizontal commonality exists where investor assets are pooled and the fortunes of each investor is tied to the fortune of other investors, as well as to the success of the overall enterprise. That is the case here.

246.   By their very nature, cryptocurrencies like the ERC-20 $JENNER token, which lack utility other than as a store and transfer of value, represent proportional shares of the token's market capitalization at any given moment, so that all holders' fortunes are necessarily tied together in a one-to-one manner (*i.e.*, every holder experiences the same percent gain or loss over the same period of time).

247.   As alleged in, *inter alia*, paragraphs 96, 98, 102, 116, 148, 175, 179, a 3% tax was imposed on every transaction of the ERC-20  $JENNER token. Defendants promised these assets would be pooled and reinvested into the project. In fact, in early August, Defendants planned to make a pro-rata distribution to all token holders in the form of "airdropped" NFTs representing a fractionalized ownership interests in Jenner's Olympic gold medal.

### C.    Lead Plaintiff and Other Investors had a Reasonable Expectation of Profits from Defendants' Efforts

248.   The Securities and Exchange Commission has explained that "the main issue in analyzing a digital asset under the *Howey* test is whether a purchaser has a reasonable

expectation of profits (or other financial returns) derived from the efforts of others."[24] This requires an assessment of the "economic reality"[25] of the transaction and "what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect."[26]

249.    As set forth at length herein, Defendants' own statements, including on social media, led investors to expect profit, especially inasmuch as they touted market capitalization goals, used rocket ship, moon, and other emojis to indicate profit, and promised to make investors "rich."

250.    As alleged extensively herein, Defendants emphasized the potential appreciation in the value of the project and ERC-20 $JENNER token in particular, in marketing and other promotional materials. Furthermore, these social media communications, which were disseminated to the investing public often contained language, emojis, and memes, implying an increase in return on investment.

251.    The record demonstrates Defendants' ongoing managerial and entrepreneurial efforts were essential to building the Jenner project, which they well understood. Defendants made numerous representations, via U.S.-based social media, to potential investors concerning their plans to develop the project in ways that would imbue the ERC-20 $JENNER token with value. Investors were led to believe Defendants would perform or oversee tasks contemporaneously and in the future that were necessary for $JENNER to achieve or retain its intended purpose, which was to grow in value. And indeed, Defendants did exercise significant, ongoing control over the project.

---

[24] U.S. Secs. & Exch. Comm'n, "Framework for 'Investment Contract' Analysis of Digital Assets (last updated Jul. 5, 2024), *at* https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.

[25] *Howey*, 328 U.S. at 298; *see also Tcherepnin v. Knight*, 389 U.S. 332, 336 ("[I]n searching for the meaning and scope of the word 'security' in the [Acts], form should be disregarded for substance and the emphasis should be on economic reality." (citation omitted)).

[26] *Sec. & Exch. Comm'n v. C.M. Joiner Leasing Group*, 320 U.S 344, 352-53 (1943).

252.   As set forth at length herein, some examples of Defendants' managerial and entrepreneurial efforts include:

a.   Building the team behind the project, including legal representation and technical specialists;

b.   Creating and maintaining the project's website and social media accounts;

c.   Creating, owning, maintaining and controlling the ERC-20 $JENNER token's smart contract;

d.   Creating the initial liquidity pool on Uniswap and facilitating investors' use of the liquidity pool to trade;

e.   Communicating with investors and touting their long-term vision for and dedication to the project and to ERC-20 $JENNER token investors;

f.   Determining the amount and use of the transaction tax;

g.   Determining if and when to engage in behaviors including mints, buybacks, burns, and airdrops;

h.   Getting the ERC-20 $JENNER token listed on exchanges;

i.   Getting the Solana token delisted from exchanges; and

j.   Generally leveraging Defendants' celebrity and network to bring attention and value to the project.

253.   As illustrated by what actually occurred, because the value of the token and investors' expectation of profits was so strongly tied to Defendants' managerial and entrepreneurial efforts, if Defendants ceased working on the project, the value of the ERC-20 $JENNER would plumet.

## **CLASS ALLEGATIONS**

254.   While reserving the right to redefine or amend the class definition prior to or as part of a motion seeking class certification, pursuant to Federal Rule of Civil Procedure 23, Lead Plaintiff seeks to represent a Class comprised of the following two subclasses:

a.   **The Solana Subclass:** All persons who, between May 27 and May 29, 2024 (the "Solana Class Period"), purchased Solana $JENNER tokens.

91

b.    **The Ethereum Subclass:** All persons who, between the time it was first offered for sale, and the time a Class is notified of certification (the "Ethereum Class Period") purchased Ethereum (ERC-20) $JENNER tokens.

255.    Excluded from the Class are Defendants, any $JENNER insider, and any entity in which Defendants have or had a controlling interest.

256.    The members of the Class are so numerous that joinder of all members is impracticable. As of the filing of this lawsuit, there were thousands of public digital wallets either previously transacting in, or currently still holding $JENNER on both blockchains, including more than 1,000 wallets still holding on Ethereum, and more than 6,000 still holding on Solana. Therefore, while the exact number of Class Members is unknown, there are likely thousands of Members of the proposed Class.

257.    Lead Plaintiff's claims are typical of the claims of other Class Members, as all Class Members were similarly affected by Defendants' wrongful conduct in violation of the laws, as complained of herein.

258.    Lead Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action litigation.

259.    Common questions of law and fact exist as to all Members of the Class and predominate over any questions solely affecting individual Members of the Class, among them:

a.    Whether the ERC-20 $JENNER token and the manner in which it was offered and sold, constitute an "investment contract" under federal law;

b.    Whether Jenner's promotion, sale or solicitation of purchases of ERC-20 $JENNER tokens violated the Securities Act;

c.    Whether Hutchins' promotion, sale, or solicitation of purchases of ERC-20 $JENNER tokens violated the Securities Act;

d.    Whether Jenner knowingly or recklessly made a material misrepresentation about the Solana $JENNER token;

e.      Whether Jenner intended to deceive and induce Lead Plaintiff's and other Solana Subclass Members' reliance on the misrepresentation;

f.      Whether Lead Plaintiff and other Solana Subclass Members reasonably relied on the misrepresentation, and whether they suffered losses as a result;

g.      Whether Lead Plaintiff and other Ethereum Subclass Members have an adequate legal remedy to recover the transaction taxes Jenner converted for her own personal use;

h.      Whether Lead Plaintiff and other Ethereum Subclass Members conferred a benefit on Jenner, and whether, under principles of equity, the Class is entitled to restitution;

i.      To what extent Lead Plaintiff and other Class Members have sustained damages, and their proper measure; and

j.      The propriety of any other remedy or request for relief.

260.   A class action is superior to all other methods of fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class Members may be relativity small, the expense and burden of individual litigation make it impossible for Class Members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Sale of Unregistered Securities

### In Violation of Sections 5(a) and 12(a)(1) of the Securities Act of 1933,

### 15 U.S.C. §§ 77e(a) & 77*l*(a)(1)

### (Against Defendants, Regarding the ERC-20 $JENNER Token)

261.   Lead Plaintiff realleges and incorporates the allegations elsewhere in this Complaint as if set forth fully herein.

262.   "The primary purpose of the Securities Act is to protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings of securities in interstate commerce." *Pinter v. Dahl*, 486 U.S. 622, 638 (1988) (citations omitted). "The registration requirements are the heart of the Act," which "imposes strict liability for violating those requirements." *Id.*

263.   Section 5(a) of the Securities Act provides that:

> Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

15 U.S.C. § 77e(a). "The term 'sale' or 'sell' . . . include[s] every contract of sale or disposition of a security or interest in a security, for value." *Id.* § 77b(a)(3).

264.   Jenner is a seller of the ERC-20 $JENNER tokens to Lead Plaintiff and other Ethereum Subclass Members within the meaning of the Securities Act because, as alleged in paragraphs 220-229, she passed title of the ERC-20 $JENNER tokens to Lead Plaintiff and other Ethereum Subclass Members by creating the initial liquidity pool for the tokens, and by maintaining the liquidity pool for the tokens, including through the use of a portion of the 3% transaction tax.

265.   Jenner is also a seller of the ERC-20 $JENNER tokens to Lead Plaintiff and other Ethereum Subclass Members within the meaning of the Securities Act because, as alleged at length herein, she solicited Lead Plaintiff and other Ethereum Subclass Members to invest in $JENNER, in furtherance of her own financial interests. *See Pinter*, 486 U.S. at 647 ("The language and purpose of § 12(1) suggest that liability extends . . . to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner.").

266.   Jenner made use of means or instruments of transportation or communication in interstate commerce or of the mails in connection with the sale of the ERC-20 $JENNER

token because, as alleged herein, she solicited investors' purchases via online communications, posted links to where the token could be sold on her social media accounts and websites, and provided potential investors with instructions on how to use Uniswap to purchase the ERC-20 $JENNER token from her.

267. Hutchins is a seller of the ERC-20 $JENNER tokens to Lead Plaintiff and other Ethereum Subclass Members within the meaning of the Securities Act because, as alleged at length herein, she solicited Lead Plaintiff and other Ethereum Subclass Members to invest in $JENNER, in furtherance of Jenner's and the project's financial interests.

268. Hutchins made use of means or instruments of transportation or communication in interstate commerce or of the mails in connection with the sale of the ERC-20 $JENNER token because, as alleged herein, she solicited investors' purchases via online communications.

269. The ERC-20 $JENNER token is a "security" within the meaning of the Securities Act, *see* 15 U.S.C. § 77b(a)(1), because, as alleged in paragraphs 238-253, it constitutes an "investment contract" pursuant to *Howey*.

270. No registration statements for the ERC-20 $JENNER token have ever been filed with the Securities and Exchange Commission.

271. The sale of the ERC-20 $JENNER token was not exempt from the registration requirements of the Securities Act.

272. As a result of the foregoing, Defendants have violated § 5(a) of the Securities Act.

273. Section 12(a)(1) of the Securities Act provides that any person who sells a security in violation of § 5:

> Shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover consideration for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security. *Id.* § 77*l*(a)(2).

274. Pursuant to Section 12(a)(1), for her sale of unregistered securities, Jenner is liable to Lead Plaintiff and the Ethereum Subclass for the consideration they paid for their ERC-20 $JENNER tokens, with interest thereon, less any income received thereon; or their damages, if sold at a loss; together with pre- and post-judgment interest, reasonable attorneys' fees, and costs of the suit.

## SECOND CAUSE OF ACTION

### Common Law Fraud

### (Against Jenner Regarding the Solana $JENNER Token)

275. Lead Plaintiff realleges and incorporates the allegations elsewhere in this Complaint as if set forth fully herein.

276. Jenner made a misrepresentation of material fact concerning the Solana $JENNER token. As alleged in paragraph 79, on May 27, 2024, Jenner represented that, in the wake of the Arora rug-pull, she was not re-launching again.

277. At the time Jenner made this statement, she knew she had no control over the Solana token, held only about $25 worth, and could not substantially profit from it. But she had already put substantial resources and efforts into developing the project and also knew she needed to keep attention on the project and not alienate Solana token holders until a contingency plan—transferring the project to an ERC-20 token Jenner controlled—could be enacted. Jenner's statement was thus either knowingly false or recklessly made.

278. As alleged in paragraph 212, in reliance on Jenner's representation, on May 28, Lead Plaintiff purchased 70,679 Solana $JENNER tokens, for the equivalent of $1,275.65 in $SOL.

279. On May 29, however, contrary to Jenner's representation two days earlier, she re-launched on Ethereum, causing the price of the Solana token to plummet, as alleged in paragraph 105. As a result, as alleged in paragraph 214, Lead Plaintiff sold the entirely of his 70,679 tokens, for the equivalent of $476.92 in SOL, a loss of more than 62% of his purchase.

280. Because Lead Plaintiff and other Members of the Solana Subclass suffered losses due to Jenner's fraud, they seek and are entitled to their actual damages.

### THIRD CAUSE OF ACTION

**Quasi Contract**

**(Against Jenner)**

281.   Lead Plaintiff realleges and incorporates the allegations elsewhere in this Complaint as if set forth fully herein.

282.   As alleged in herein, Lead Plaintiff and other Ethereum Subclass Members conferred direct monetary benefits on Jenner in the form of transaction taxes on the ERC-20 $JENNER token, that Jenner falsely represented would be wholly and appropriately reinvested in the project.

283.   As alleged in paragraphs 176 and 206 above, with Lead Plaintiff and other Ethereum Subclass Members' money—which Jenner acknowledged did not belong to her— Jenner unjustly enriched herself.

284.   Under principles of equity and good conscience, Jenner should not be permitted to retain the funds and assets she received as a result of her inequitable conduct.

285.   If the ERC-20 $JENNER token is not a security, or if Lead Plaintiff does not have standing to assert claims under the securities laws, Plaintiff's legal remedies will be inadequate to compensate him and other similarly-situated Ethereum Subclass Members for Jenner's misuse of the transaction taxes she charged on the ERC-20 $JENNER token.

286.   Lead Plaintiff's legal remedies are inadequate. Although Jenner promised Lead Plaintiff and other Ethereum Subclass Members she would use all of the transaction taxes for the betterment of the project they bought into by purchasing the tokens, this promise was not expressed in a written instrument over which Lead Plaintiff or other Ethereum Subclass Members could assert breach of contract claims. Moreover, Lead Plaintiff likely cannot state a claim for conversion because he cannot show a legal ownership or right to possession of the taxes at the time of the conversion, since Jenner had promised (but failed) to use them for the betterment of the project in a manner that, in at least some cases, as with marketing or trying to obtain exchange listings, did not necessarily contemplate returning those taxes to investors on a one-to-one basis. Furthermore, Lead Plaintiff likely cannot state a claim under

California's Consumers Legal Remedies Act because it does not cover intangible goods, like cryptocurrencies. Lead Plaintiff is not aware of any other legal claim through which he might obtain restitution of the transaction taxes Jenner inequitably converted for her own use.

287. Lead Plaintiff seeks restitution of all funds and assets that Jenner has unjustly received as a result of her wrongful charge, use, and conversion of transaction taxes on the ERC-20 $JENNER token.

## **PRAYER FOR RELIEF**

288. WHEREFORE, Lead Plaintiff, individually, and on behalf of all others similarly situated, prays for judgment against Defendants as to each and every cause of action, and an Order:

a.    Declaring this action to be a proper class action, appointing Lead Plaintiff as Class Representative, and appointing Lead Counsel as Class Counsel;

b.    Requiring Defendants to bear the cost of Class Notice;

c.    Requiring Defendants to pay compensatory, statutory, and punitive damages permitted by law;

d.    Requiring Defendants to disgorge all monies, revenues, and profits obtained by means of any unlawful or inequitable act or practice;

e.    Awarding pre- and post-judgment interest on any monetary judgment;

f.    Granting appropriate injunctive and declaratory relief;

g.    Awarding reasonable attorneys' fees and costs; and

h.    Granting such further relief that the Court deems necessary, just, and proper.

## **DEMAND FOR JURY TRIAL**

289. Lead Plaintiff hereby demands a jury trial for all claims so triable.


Dated: May 23, 2025              /s/ Jack Fitzgerald

                                 **FITZGERALD MONROE FLYNN PC**
                                 JACK FITZGERALD

*jfitzgerald@fmfpc.com*
MELANIE R. MONROE
*mmonroe@fmfpc.com*
TREVOR FLYNN
*tflynn@fmfpc.com*
PETER GRAZUL
*pgrazul@fmfpc.com*
ALLISON FERRARO
*aferraro@fmfpc.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
***Lead Counsel***

*Azad v. Jenner*, Case No. 2:24-cv-09768-SB-JC
SECOND AMENDED COMPLAINT