BLANK ROME LLP
Cheryl S. Chang (SBN 237098)
cheryl.chang@blankrome.com
Jamison T. Gilmore (SBN 322100)
jamison.gilmore@blankrome.com
2029 Century Park East | 6th Floor
Los Angeles, CA 90067
Telephone:   424.239.3400
Facsimile:   424.239.3434

Jennifer L. Achilles (*pro hac vice*)
jennifer.achilles@blankrome.com
Michael E. Donohue (*pro hac vice*)
michael.donohue@blankrome.com
1271 Avenue of the Americas
New York, NY 10020
Telephone:   212.885.5000
Facsimile:   212.885.5001

Attorneys for Defendants
CAITLYN JENNER and
SOPHIA HUTCHINS

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAEEM AZAD and MIHAI CALUSERU, on behalf of themselves, all other similarly situated, and the general public<br><br>Plaintiffs,<br><br>vs.<br><br>CAITLYN JENNER and SOPHIA HUTCHINS,<br><br>Defendants. | Case No. 2:24-cv-09768-SB-JC<br><br>CLASS ACTION<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**<br><br>Judge:    Hon. Stanley Blumenfeld, Jr.<br>Date:     August 1, 2025<br>Time:     8:30 a.m.<br>Courtroom:   6C<br>Action Filed:  November 13, 2024 |

**TO THE COURT, CLERK, ALL PARTIES AND COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on August 1, 2025, at 8:30 a.m., or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Stanley Blumenfeld, Jr., located in the United States Courthouse, Courtroom 6C, 350 West 1st Street, Los Angeles, California 90012, Defendants Caitlyn Jenner and Sophia Hutchins (collectively, "Defendants") will, and hereby do, move to dismiss the Second Amended Complaint (Dkt. No. 44) with prejudice under Rules 9(b), 12(b)(1), and 12(b)(6) of the Federal Rules of Civil Procedure.

This Motion is based on this Notice of Motion; the attached Memorandum of Points and Authorities; the simultaneously filed Request for Judicial Notice and exhibits thereto; all the pleadings, files, and records in this proceeding; Defendants' forthcoming reply brief; all other matters of which the Court may take judicial notice; and any argument or evidence that may be presented to or considered by the Court prior to its ruling.

Pursuant to Local Rule 7-3 and Section 6(a)(ii) of this Court's Standing Order for Civil Cases, undersigned counsel hereby certifies that the parties met via videoconference on June 12, 2025 for approximately forty minutes, thoroughly discussed each and every issue raised in the motion, and attempted in good faith to resolve the motion in whole or in part. During the meet and confer, counsel for Lead Plaintiff indicated that they would take the issues raised under consideration. Thereafter, on June 17, 2025, undersigned counsel followed up with counsel for Lead Plaintiff by email to determine if their consideration had resulted in any change in Lead Plaintiff's position on the Second Amended Complaint. Lead Plaintiff's counsel indicated that they had taken a second look and reviewed the case

law cited by Defendants, but that Lead Plaintiff's position had not changed. *See* Declaration of Cheryl S. Chang ("Chang Decl.") ¶ 5.

DATED: June 20, 2025                    Respectfully submitted,

                                       **BLANK ROME LLP**

                                       By:  */s/ Cheryl S. Chang*

                                       Cheryl S. Chang
                                       Jennifer L. Achilles (*pro hac vice*)
                                       Jamison T. Gilmore
                                       Michael E. Donohue (*pro hac vice*)

                                       *Attorneys for Defendants*
                                       *Caitlyn Jenner and Sophia Hutchins*

# TABLE OF CONTENTS

I.    Preliminary Statement ................................................................1

II.   Background.................................................................................2

    A.    The Ethereum Blockchain and Uniswap ...........................2

    B.    The $JENNER Token on Solana ........................................3

    C.    The $JENNER Token on Ethereum.....................................3

III.  Argument ...................................................................................4

    A.    The Securities Act claims should be dismissed. ................4

        1.    Greenfield's transactions in $JENNER were not domestic...5

            a.    Irrevocable liability for neither seller nor buyer was incurred in the United States. ..............................6

            b.    Title to $JENNER was not transferred in the United States...............................................9

        2.    $JENNER is not a security...................................10

            a.    $JENNER on Ethereum was not a common enterprise. ...................................11

            b.    Token holders did not expect profits solely from the efforts of another. ...........................13

        3.    Hutchins was not a statutory seller to Greenfield. ..............14

    B.    The common-law fraud claim should be dismissed. ......................15

    C.    The quasi-contract claim should be dismissed. ..............................17

        1.    The contract allowing access to the liquidity pool defining the rights of the parties precludes the quasi-contract claim.......................................18

        2.    Greenfield has failed to plead an actionable misstatement. ................................................19

IV.   Conclusion..................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012) ...................................................................5

*Airs Aromatics, LLC v. Victoria's Secret Stores Brand Mgmt. Inc.*,
  744 F.3d 595 (9th Cir. 2014) ...............................................................20

*Am. Motorists Ins. Co. v. IDEC Corp.*, No. C-01-20821,
  2004 WL 2095699 (N.D. Cal. Sept. 20, 2004)......................................9

*In re Arris Cable Modem Consumer Litig.*, No. 17-CV-01834,
  2018 WL 288085 (N.D. Cal. Jan. 4, 2018)...........................................17

*Baylor v. Honda Motor Co.*, No. 223CV00794,
  2024 WL 650415 (C.D. Cal. Jan. 19, 2024)..........................................10

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)...............................................................................7

*Best Carpet Values, Inc. v. Google, LLC*,
  90 F.4th 962 (9th Cir. 2024) .................................................................20

*Bridges v. Geringer*, No. 13-CV-01290,
  2015 WL 2438227 (N.D. Cal. May 21, 2015)........................................15

*Brodt v. Bache & Co.*,
  595 F.2d 459 (9th Cir. 1978) .................................................................12

*Cal. Amplifier v. RLI*,
  113 Cal. Rptr. 2d 915 (Ct. App. 2001) ..................................................17

*In re Century Aluminum Co. Securities Litigation*,
  729 F.3d 1104 (9th Cir. 2013) .........................................................7, 8, 9

*De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*,
  608 F.2d 1297 (9th Cir. 1979) ...............................................................13

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
  97 F.4th 1171 (9th Cir. 2024) ................................................................14

*Gugick v. Melville Cap., LLC*, No. 11-CV-6294,
2014 WL 349526 (S.D.N.Y. Jan. 31, 2014) ........................................................12

*Hampton v. Pac. Inv. Mgmt. Co. LLC*,
705 F. App'x 558 (9th Cir. 2017) .....................................................................15

*Hocking v. Dubois*,
885 F.2d 1449 (9th Cir. 1989) ..........................................................................11

*Jones v. AIG Risk Mgmt., Inc.*,
726 F. Supp. 2d 1049 (N.D. Cal. 2010).........................................................16, 20

*Legal Additions LLC v. Kowalski*, No. C-08-2754,
2010 WL 335789 (N.D. Cal. Jan. 22, 2010).........................................................16

*Letizia v. Facebook, Inc.*,
267 F. Supp. 3d 1235 (N.D. Cal. 2017)................................................................19

*Loper Bright v. Raimondo*,
603 U.S. 369 (2024)..........................................................................................11

*Marques v. Fed. Home Loan Mortg. Corp.*, No. 12CV1873,
2013 WL 1932920 (S.D. Cal. May 8, 2013) ........................................................19

*McSweeney v. City of Bell*, No. CV087006,
2009 WL 10700299 (C.D. Cal. Mar. 13, 2009) ...................................................14

*Morrison v. Nat'l Australia Bank Ltd.*,
561 U.S. 247 (2010).............................................................................................5

*Noa v. Key Futures, Inc.*,
638 F.2d 77 (9th Cir. 1980) ...............................................................................13

*PAE Government Services, Inc. v. MPRI, Inc.*,
514 F.3d 856 (9th Cir. 2007) .............................................................................21

*Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*,
96 F.3d 1151 (9th Cir. 1996) .........................................................................18, 19

*Pinter v. Dahl*,
486 U.S. 622 (1988)........................................................................................5, 14

*Pirani v. Slack Techs., Inc.*,
127 F.4th 1183 (9th Cir. 2025) ...................................................................*passim*

*SEC v. R.G. Reynolds Enters., Inc.*,
   952 F.2d 1125 (9th Cir. 1991) ........................................................ 12

*SEC v. Terraform Labs Pte. Ltd.*,
   684 F. Supp. 3d 170 (S.D.N.Y. 2023) ...................................... 11, 12

*SEC v. Traffic Monsoon, LLC*,
   245 F. Supp. 3d 1275 (D. Utah 2017),
   *aff'd sub nom. SEC v. Scoville*, 913 F.3d 1204 (10th Cir. 2019) ...................... 10

*SEC v. W.J. Howey*,
   328 U.S. 293 (1946).............................................................. 5, 10

*Service by Medallion v. Clorox Co.*,
   52 Cal. Rptr. 2d 650 (Ct. App. 1996) ........................................... 15

*Smolen v. Deloitte, Haskins & Sells*,
   921 F.2d 959 (9th Cir. 1990) ...................................................... 14

*Sonner v. Premier NutritionCorp.*,
   971 F.3d 834 (9th Cir. 2024) ...................................................... 19

*Stoyas v. Toshiba Corp.*,
   896 F.3d 933 (9th Cir. 2018) ................................................. 5, 6, 10

*Travelers Indem. Co. v. New Orleans Louisiana Saints, L.L.C.*,
   650 F. App'x 416 (9th Cir. 2016) ................................................. 21

*Vierneisel v. Rhode Island Ins. Co.*,
   175 P.2d 63 (Cal. Dist. Ct. App. 1946) ........................................... 9

*Vizcarra v. Michaels Stores, Inc.*,
   710 F. Supp. 3d 718 (N.D. Cal. 2024) ........................................... 18

*West v. Rheem Manuf. Comp.*,
   765 F. Supp. 3d 976 (C.D. Cal. 2025) ........................................... 15

*Williams v. Binance*,
   96 F.4th 129 (2d Cir. 2024) ................................................. 6, 8, 9

**Statutes**

15 U.S.C. § 77b(a)(1) ................................................................ 10

15 U.S.C. § 77e ....................................................................... 5

vi

15 U.S.C. § 77*l*(a)(1) ................................................................................5

**Other Authorities**

Fed. Rule Civ. Proc. 9(b)............................................................16, 18, 19

Div. of Corp. Fin., Secs. & Exch. Comm'n,
    *Staff Statement on Meme Coins* (Feb. 27, 2025),
    https://www.sec.gov/newsroom/speeches-statements/staff-statement-meme-coins
    ...........................................................................................11, 13

I.    **PRELIMINARY STATEMENT**

Lead Plaintiff Lee Greenfield has re-pleaded himself out of a case. After the Court dismissed his First Amended Complaint ("FAC," Dkt. No. 22) against Defendants Caitlyn Jenner and Sophia Hutchins (Dkt. No. 38), Greenfield took advantage of the Court's leave to amend by adding hundreds of paragraphs of new factual allegations to a Second Amended Complaint ("SAC," Dkt. No. 44) that still does not state a claim. His three new causes of action must be dismissed with prejudice.

*First*, Greenfield amends his claim under Section 12(a)(1) of the Securities Act by narrowing it to concern only $JENNER tokens traded on the Ethereum blockchain—thereby excluding activity on the Solana platform—and by explaining the inner workings of the token's trading. Far from addressing the deficiencies pointed out by the Court, Greenfield's amendments only serve to highlight that he cannot plead that his U.K. trades in $JENNER were domestic transactions. Although he attempts to salvage his claim by alleging it is "likely" that his trades were validated on a U.S. computer, Ninth Circuit law precludes him from relying on such statistical techniques, and Greenfield in any event concedes most transactions on Ethereum are validated outside the United States. Greenfield's Section 12(a)(1) claim also fails because he does not properly allege that $JENNER is a security or that Hutchins is a statutory seller. This claim must be dismissed.

*Second*, Greenfield amends his common-law fraud cause of action to focus on a single post on X by Jenner indicating she did not plan to re-launch the $JENNER token. But this trimmed claim, which proceeds against Jenner alone, fails to allege with particularly that this promise was false when made or that Greenfield actually and reasonably relied upon it. The fraud claim too must be dismissed.

*Third*, Greenfield does not allege a viable quasi-contract claim. He admits he entered into a valid smart contract on the Ethereum blockchain agreeing to allegedly pay Jenner a 3% transaction "tax" for the ability to trade $JENNER, precluding any

equitable cause of action. Greenfield's claim—against only Jenner—also fails to properly and plausibly plead any misrepresentations. Moreover, the factual allegations that underpin it are contradicted by his previous pleadings. His quasi-contract claim must therefore be dismissed.

## II.    BACKGROUND

Given this Court's familiarity with this matter, we describe only those allegations in the SAC that pertain to this motion, which we accept as true for purposes of this motion only. *See Pirani v. Slack Techs., Inc.*, 127 F.4th 1183, 1188 (9th Cir. 2025).

### A.    The Ethereum Blockchain and Uniswap

Ethereum is a blockchain, a "digital ledger containing information (such as records of financial transactions)." SAC ¶¶ 11, 21. Users of Ethereum can do far more than simply transfer the blockchain's native asset, Ether; they can also create "smart contracts," which allow for complex transactions and a variety of financial applications. *See* SAC ¶ 21.

Uniswap, an application on the Ethereum platform, allows for anyone to set up and distribute a token on the Ethereum blockchain. SAC ¶¶ 27–29. Tokens created through Uniswap, such as $JENNER, are created and then placed into a liquidity pool on the blockchain. SAC ¶ 30. After the liquidity pool is created, persons interested in the token can purchase it by "swapping" in a different token, usually less volatile "wrapped Ether" or "stablecoins." SAC ¶ 32. Buyers and sellers are matched through another smart contract called an "Automated Market Maker," which also runs on the blockchain. SAC ¶ 29(c).

Critically, none of these transactions is executed by a computer owned by the purchaser, the seller, or even Uniswap. Rather, each of these transactions is executed by a random "validator that propagates the resulting state change to the rest of the node network." SAC ¶ 34. There are "thousands" of validators (also called "nodes"), and less than half are based in the United States. *See* SAC ¶ 35. Greenfield concedes

2

that when a validator executes the transaction, the transaction becomes "final and non-reversible," *i.e.*, "irrevocable." SAC ¶¶ 234–35. The SAC does not indicate that there is any way to determine which node validated any particular transaction.

### B.    The $JENNER Token on Solana

According to the SAC, the $JENNER token was first launched on the blockchain Solana on the afternoon of May 26, 2024. Over the next day and a half, both Jenner and Hutchins promoted the new token through posts on X and statements made in X Spaces, with Jenner discussing her commitment to the token in several posts. *See* SAC ¶¶ 50–71, 73, 77–79. At 8:24 p.m. PDT on May 27 (which was 4:24 a.m. on May 28 in the United Kingdom), Jenner tagged musician Iggy Azalea in a post on X, noting both were celebrating "Solana Summer," and one minute later, Jenner replied to the question, "[A]re you launching again?" by writing "No I am buying more and more $JENNER[.]" SAC ¶ 79; Request for Judicial Notice Exs. 1, 2. Greenfield, a U.K. citizen, SAC ¶ 8, alleges that he bought Solana on May 28 in reliance on this promise, although he does not allege the precise time that he did so. SAC ¶ 212; *id.* Ex. 1, at 5.

### C.    The $JENNER Token on Ethereum

On May 29, Jenner launched $JENNER on Ethereum. SAC ¶ 90. As mentioned above, this token was built on the Uniswap platform, functioning by filling a liquidity pool that then allowed purchasers and sellers to be matched via an Automated Market Maker. Purchasers seeking to access the liquidity pool to buy and sell $JENNER were charged a 3% transaction "tax" that went to cryptocurrency wallets allegedly controlled by Jenner. SAC ¶¶ 193, 195. Despite Greenfield's claim that the launch of the Ethereum token had a negative impact on the price of the Solana token, SAC ¶ 105, Greenfield purchased more of the Solana token two days later, on May 31, SAC Ex. 1, at 5.

Jenner promoted the Ethereum token through June, July, and August. *See generally* SAC ¶¶ 89–184. Hutchins is not alleged to have made any statements

3

herself discussing $JENNER on the Ethereum blockchain aside from one set of messages in a private Telegram chat in which she encouraged investors to hold the token. *See* SAC ¶ 122. The SAC attributes a number of promotional statements to "Defendants," because Jenner and Hutchins both allegedly had access and posted to an X account for the Ethereum token, SAC ¶ 123, but the SAC contains no allegations concerning who made any one post on that account, *see, e.g.*, SAC ¶ 147.

The SAC describes several statements by Jenner concerning the transaction tax. On the evening of May 29, Jenner indicated in an X Spaces conversation that the tax would be used to donate to Donald Trump's political campaign, for buybacks, and for marketing. SAC ¶ 96. She repeated that taxes would be given to Trump in several more posts on X, indicating that taxes would be sent when the market capitalization of the token hit $50 million. SAC ¶¶ 98, 100, 102, 116, 148, 154, 175. Jenner also stated that the transaction taxes would be used for "giveaways," SAC ¶ 116, and to "support causes important to our $Jenner community," SAC ¶¶ 102, 116. The SAC does not allege that $JENNER on Ethereum ever hit a market capitalization of $50 million, and although it alleges that about $430,000 in taxes were transferred shortly before the project was allegedly shuttered, it does not indicate the use of more than half of the collected taxes. SAC ¶¶ 193, 194, 206.

In August, Jenner announced a plan to give fractionalized ownership interests in her Olympic gold medal to holders of $JENNER, SAC ¶ 178, but the SAC does not allege that any such interests were ever distributed. As alleged, on August 20 funds collected from transaction taxes were transferred out of the $JENNER project and a Telegram channel related to the group was allegedly closed. SAC ¶¶ 206.

## III. ARGUMENT

### A. The Securities Act claims should be dismissed.

Section 12(a)(1) of the Securities Act makes "[a]ny person who offers or sells

a security" without properly registering it with the Securities and Exchange Commission pursuant to Section 5 of the Exchange Act, 15 U.S.C. § 77e, "liable … to the person purchasing such security from him … ." 15 U.S.C. § 77*l*(a)(1). The SAC fails to state a claim for relief under Section 12(a)(1) because Greenfield, a U.K. citizen, offers only the probability that the transactions in question were domestic and thus the type of transaction Congress sought to regulate with the Securities Act. *See Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 267 (2010); *Pirani v. Slack Techs., Inc.*, 127 F.4th 1183, 1190 (9th Cir. 2025). In addition, Greenfield has failed to allege that $JENNER is a security at all. *See SEC v. W.J. Howey*, 328 U.S. 293, 298–99 (1946). Finally, the SAC fails to state a claim against Hutchins for the additional reason that it does not allege that she sold $JENNER to Greenfield or solicited his purchase of $JENNER. *See Pinter v. Dahl*, 486 U.S. 622, 644 n.21, 647 (1988).

### 1.    Greenfield's transactions in $JENNER were not domestic.

The Securities Act applies only to domestic transactions. *See Morrison*, 561 U.S. at 269. In the Ninth Circuit, the timing of a transaction, and thus its location, is determined "when the parties incur irrevocable liability." *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 948 (9th Cir. 2018) (quoting *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012)). Accordingly, "a plaintiff must plausibly allege 'that the purchaser incurred irrevocable liability within the United States to take and pay for a security, or that the seller incurred irrevocable liability within the United States to deliver a security.'" *Id.* (quoting *Absolute Activist*, 677 F.3d at 68). A plaintiff may also allege that title was transferred in the United States. *See id.* Courts consider "factual allegations concerning contract formation, placement of purchase orders, passing of title, and the exchange of money" in this analysis. *Id.* at 949.

### a.   Irrevocable liability for neither seller nor buyer was incurred in the United States.

In this case, all transactions in $JENNER became irrevocable at the time the Automated Market Maker matched a buyer and a seller and that match was validated by a node. *See Williams v. Binance*, 96 F.4th 129, 137–38 (2d Cir. 2024). In *Binance*, the Second Circuit considered claims against Binance, a cryptocurrency exchange. *Id.* at 133. Plaintiffs alleged that they transacted in tokens through Binance, and that "their trade orders were matched on, and their account data was stored on, servers hosting the Binance platform—the vast majority of which were located in the United States." *Id.* at 135. Given that Binance itself had no location, the Second Circuit used the place where buyers and sellers were matched as the place where irrevocable liability was incurred. *See id.* at 137–38. This was so because the "meeting of the minds," and thus the imposition of liability, traditionally occurred on the exchange floor, before any transactions cleared; the electronic matching of parties involves the same dynamics. *See id.* at 137; *accord Stoyas*, 896 F.3d at 949 (looking to place of "contract formation," *inter alia*, to determine place of transaction).

To allege a domestic transaction based on irrevocable liability, Greenfield must therefore allege that his U.K. trades were matched in the United States. But he cannot. As Greenfield alleges, transactions in $JENNER were matched via Uniswap's Automated Market Maker, which functioned on the blockchain. *See* SAC ¶ 29. The validators that executed the matching algorithm, akin to the servers in *Binance*, were randomly assigned and mostly located outside the United States. SAC ¶¶ 34–35. Greenfield thus cannot, and does not, allege that any validator in the United States matched his purchases of $JENNER.

Undaunted, Greenfield argues that it is "statistically likely" that a U.S. node validated at least some of the relevant transactions. SAC ¶ 236. But this "statistical tracing" is a legally impermissible pleading tactic. *See Slack*, 127 F.4th at 1190. In

6

*Slack*, a plaintiff alleging claims under Section 11 of the Securities Act was required to trace his purchases of securities back to a registered offering, but he conceded that he was unable to do so. *Id.* at 1189. As an alternative, he asserted that 42% of the shares on the exchange he patronized were registered and therefore the chance that none of his shares could be traced to an offering was "infinitesimally small." *Id.* at 1190. The Ninth Circuit flatly rejected this tactic, relying on *In re Century Aluminum Co. Securities Litigation*, 729 F.3d 1104 (9th Cir. 2013). *Id.* In *Century Aluminum*, the Ninth Circuit reasoned that plaintiffs that rely on statistics to allege something is likely to be true must do something to exclude the alternative explanation; without more, a plaintiff's allegations are stuck in "neutral territory" and do not cross into plausibility. *See* 729 F.3d at 1108 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

*Slack* and *Century Aluminum* compel the dismissal of Greenfield's Section 12(a)(1) claim. Just like in *Slack*, Greenfield alleges that only about 40% of validators were U.S. based, and some of his transactions thus must be domestic and actionable. SAC ¶ 236. But, just like in *Century Aluminum*, Greenfield offers no allegations to rule out the alternative explanation: that foreign validators executed the transactions at issue. To the contrary, there are more validators outside the United States than within it, and Greenfield's theory assumes without support that each transaction is individually processed, rather than batched to correspond to the thirteen purchases of $JENNER on Ethereum that he made, SAC ¶ 227. *Cf. Slack*, 127 F.4th at 1190.

Alternatively, Greenfield theorizes that Jenner incurred irrevocable liability in the United States when she or an agent allegedly set up the liquidity pool and committed to providing liquidity until November 2025. SAC ¶¶ 232–33. By Greenfield's own concessions, however, a transaction on the Ethereum blockchain becomes "irrevocable *only* after it is validated" on the blockchain. SAC ¶ 235 (emphasis added). And, as discussed *supra*, Greenfield has failed to allege that

transactions confirmed on the blockchain occurred in the United States. In any event, Greenfield locates the critical event too early. It is when the buyers and sellers to the transaction are matched on a node, and not before, that liability becomes irrevocable. *See Binance*, 96 F.4th at 137–38.

Greenfield may attempt to rely on *Binance* itself, where the Second Circuit ultimately held that the transactions in question were domestic, to argue his allegations are sufficient. But *Binance's* facts are inapposite. There, the matching occurred on servers owned by Binance, the "vast majority of which were located in the United States," and which the plaintiffs alleged were more likely to receive U.S.-originated transactions. 96 F.4th at 135. Here, most nodes were located *outside* the United States, SAC ¶ 35, and the assignment of nodes was *completely* random, SAC ¶ 34. In any event, reliance on the concentration of nodes in the United States would conflict with *Slack* and *Century Aluminum*, controlling authority in the Ninth Circuit. The alternative holding in *Binance*, that irrevocable liability attached when the plaintiffs agreed to Binance's terms of use, placed orders, and sent payments in the United States on Binance's servers, 96 F.4th at 139–40, is inapplicable. Greenfield is a U.K. citizen, SAC ¶ 8, and does not allege that he made his trades in the United States. There are no allegations that anyone accepted any binding terms anywhere, much less on a U.S. server; again, Greenfield concedes that transactions did not become irrevocable until a random node validated them, SAC ¶ 235.

Nor do the policy concerns in *Binance* compel victory for Greenfield. *First*, those policy concerns merely counsel in favor of looking to the location of matching to determine irrevocable liability; they do not compel an automatic finding that the transactions were domestic. *See* 96 F.4th at 139. And *second*, Defendants have not "notoriously deni[ed] the applicability of any other country's securities regulation regime." *See id.* They merely point out that, under *Morrison*, the Securities Act does not reach the extraterritorial transactions that form the basis for Greenfield's claims, given their specific factual context.

**b.      Title to $JENNER was not transferred in the United States**

Greenfield has conceded that token swaps occurred at nodes on the blockchain, just as the matching of transactions did. *See* SAC ¶ 234 ("[S]waps effected through a Uniswap liquidity pool become final and non-reversible—that is, written to the blockchain—when the assigned node validates the transaction … ."). As discussed *supra*, Greenfield therefore cannot properly allege that the blockchain transactions passing title occurred in the United States.

In the alternative, Greenfield argues that Jenner passed title in the United States when she or an agent allegedly added tokens to the liquidity pool. SAC ¶ 225. But this puts the title-passing cart before the transaction-matching horse. Even assuming he could properly plead that Jenner sold him any tokens (though he cannot without resorting to impermissible statistical tracing, *see* discussion regarding *Slack* and *Century Aluminum*, *supra*), title did not pass when Jenner allegedly added tokens to the liquidity pool; it passed after the matching algorithm did its work and found a buyer for the tokens Jenner allegedly owned. *See Binance*, 96 F.4th at 137 (explaining that traders first match transactions on the exchange floor *before* submitting trade to clearinghouse for execution).

It is legally nonsense that Jenner "transferred ownership of the … tokens to the token's smart contract," SAC ¶ 223. The smart contract is not alleged to be an entity that could hold title to the tokens, and even if it could be considered something like an escrow account (which would normally only come into play after the parties contracted), title still would not be considered transferred until the buyer took possession of the token, since "merely depositing the deed with the escrow holder does not pass title to the grantee." *See Am. Motorists Ins. Co. v. IDEC Corp.*, No. C-01-20821, 2004 WL 2095699, at *3 (N.D. Cal. Sept. 20, 2004) (quoting *Vierneisel v. Rhode Island Ins. Co.*, 175 P.2d 63, 64 (Cal. Dist. Ct. App. 1946)).

In essence, Greenfield argues that the transaction was domestic merely

9

because Jenner may have been in California at the time. But her location alone is legally irrelevant. *See Stoyas*, 896 F.3d at 949 (holding complaint did not allege a domestic transaction when it relied solely on location of seller); *Baylor v. Honda Motor Co.*, No. 223CV00794, 2024 WL 650415, at *4 (C.D. Cal. Jan. 19, 2024) (observing that alleging that purchaser or seller is located in the United States is insufficient to allege domestic transaction).

*SEC v. Traffic Monsoon, LLC*, 245 F. Supp. 3d 1275, 1295 (D. Utah 2017) ("Either a domestic purchaser or a domestic seller of a security may bring a transaction within the purview of Section 10(b)."), *aff'd sub nom. SEC v. Scoville*, 913 F.3d 1204 (10th Cir. 2019), quoted by Greenfield, SAC ¶ 219, does not suggest otherwise. Besides being out-of-circuit, the case does not provide authority for Greenfield's broad claim. In addition to considering the domestic location of the seller, the case involved domestic purchasers, and the trial court relied on the location where liability became irrevocable. *Id.* Here, Greenfield was not located in the United States, and liability became irrevocable and title passed on an Ethereum node, which Greenfield cannot allege was located in the United States.

### 2. $JENNER is not a security.

In the SAC, Greenfield asserts that $JENNER is governed by the Securities Act because it is an investment contract. *See* 15 U.S.C. § 77b(a)(1). "[A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party … ." *SEC v. W.J. Howey*, 328 U.S. 293, 298–99 (1946). The Division of Corporate Finance at the Securities and Exchange Commission recently analyzed whether meme coins like $JENNER are investment contracts, and ultimately determined they generally are not.[1] *See Staff Statement on Meme Coins* (Feb. 27, 2025),

---

[1] Although not binding on this Court, the latest thinking of the SEC staff on this cutting-edge intersection of the law and technology is "especially informative"

https://www.sec.gov/newsroom/speeches-statements/staff-statement-meme-coins.

Because $JENNER on Ethereum was not a common enterprise and investors did not reasonably expect profits solely from the efforts of any third party, $JENNER is not a security, and the Section 12(a)(1) claim must be dismissed.

### a.    $JENNER on Ethereum was not a common enterprise.

To establish a common enterprise, a plaintiff must show there was either horizontal or vertical commonality. *See Hocking v. Dubois*, 885 F.2d 1449, 1459 (9th Cir. 1989).

i.    An investment exhibits horizontal commonality when "participants pool their assets; give up any claim to profits or losses attributable to their particular investments in return for a pro rata share of the profits of the enterprise; and they make their collective fortunes dependent on the success of a single common enterprise." *See Hocking*, 885 F.2d at 1459. But the individuals that transacted in $JENNER on Ethereum did not pool their investments or agree to split the profits and losses. They separately bought and sold digital tokens, the only function of which was to be a tradeable asset. Unlike certain tokens that have been considered investment contracts, $JENNER did not involve any larger ecosystem or profit beyond the coin itself. *See Staff Statement*, *supra* (Meme coin "funds are not pooled together to be deployed by promoters or other third parties for developing the coin or a related enterprise."). In *SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 183 (S.D.N.Y. 2023), for example, the promoters of the token in question advertised that owning the "yield-bearing" tokens could result in returns of up to 20%, and that tokens entitled the holder to direct profits from a larger cryptocurrency ecosystem created by the issuer. The court held that there was horizontal commonality because (1) profits were generated *and then* redistributed to investors and (2) other funds

---

because "it rests on factual premises within [the agency's] expertise." *See Loper Bright v. Raimondo*, 603 U.S. 369, 402 (2024) (citation omitted).

were invested into the larger blockchain project on which the tokens lived. *Id.* at 195. None of those facts is present here: $JENNER itself was not "yield-bearing" and there was no larger ecosystem at play—owning $JENNER did not entitle token holders to gain control over or acquire a stake in direct profits from a blockchain application that Jenner had created.

Neither the alleged fractionalization of Jenner's Olympic medal nor the transaction taxes establish horizontal commonality. Greenfield does not allege that the fractionalization was ever executed. *See* SAC ¶ 178–184. And the transaction taxes were not alleged to have been invested in any broader ecosystem or project— just promotion of the token itself. Without more, Greenfield cannot characterize these tokens as an investment contract based on horizontal commonality. *Cf. Terraform*, 684 F. Supp. 3d at 195.

**ii.**    "Vertical commonality may be established by showing 'that the fortunes of the investors are linked with those of the promoters.'" *SEC v. R.G. Reynolds Enters., Inc.*, 952 F.2d 1125, 1130 (9th Cir. 1991) (citation omitted). The "success or failure" of the promoter must "correlate with individual investor profit *or loss*." *Brodt v. Bache & Co.*, 595 F.2d 459, 461 (9th Cir. 1978) (emphasis added). Greenfield's allegations make clear that this was not the case. As alleged, Jenner collected almost $1 million in transaction taxes and paid little to nothing for $JENNER herself. *See* SAC ¶ 223. She accordingly did not bear the same risk as investors, and—as alleged—she had a separate revenue stream that was disconnected from the price of $JENNER. These facts foreclose a finding that there was vertical commonality. *See, e.g., Gugick v. Melville Cap., LLC*, No. 11-CV-6294, 2014 WL 349526, at *5 (S.D.N.Y. Jan. 31, 2014) (holding no vertical commonality when defendant "was entitled to a commission … regardless of whether Plaintiff made a profit").

**b.    Token holders did not expect profits solely from the efforts of another.**

An investor may reasonably expect to receive profits from the effort of another when "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*, 608 F.2d 1297, 1300 (9th Cir. 1979) (citation omitted). Greenfield has failed to allege that this was the case.

As alleged, the only work conducted by Jenner was promotion of $JENNER in the form of making statements online, arranging for new exchanges to trade, and winding down the Solana token. SAC ¶ 252. These allegations do not establish that Jenner's efforts were "undeniably significant" when compared to the market forces that truly determined $JENNER's price. *See Noa v. Key Futures, Inc.*, 638 F.2d 77, 79 (9th Cir. 1980) (holding no investment contract where "profits to the investor depended upon the fluctuations of the [] market"). Indeed, the overriding power of the markets is shown through, for example, Jenner's encouragement that individuals "buy the dip." SAC ¶ 163. *See also Staff Statement*, *supra* ("[T]he value of meme coins is derived from speculative trading and the collective sentiment of the market, like a collectible.").

Additionally, the work Jenner is alleged to have conducted is insufficient to establish $JENNER as a security under binding Ninth Circuit law. In *De Luz Ranchos*, the Ninth Circuit determined that a contract was not an investment contract where it was (1) "promoted … as a passive investment" and (2) it would "appreciate in value as a result of [the defendant's] development of common facilities." 608 F.2d at 1300. Here, too, the investment is passive, with profit coming from the appreciation of the token and Jenner's interactions with other exchanges akin to the development of common facilities. *See also Staff Statement*, *supra* ("[P]romoters of meme coins are not undertaking (or indicating an intention to

13

undertake) managerial and entrepreneurial efforts from which purchasers could reasonably expect profit.").

### 3.    Hutchins was not a statutory seller to Greenfield.

Even if Greenfield had properly alleged that he had purchased $JENNER in a domestic transaction or that $JENNER on Ethereum were a security, his SAC would still have to be dismissed against Hutchins for failure to plead that she was either Greenfield's "immediate seller" or "the person who successfully solicit[ed] the purchase" he made, "motivated at least in part by a desire to serve [her] own financial interests." *See Pinter v. Dahl*, 486 U.S. 622, 644 n.21, 647 (1988). Hutchins is not alleged to have owned $JENNER, and so she could not have sold any to Greenfield. He must therefore allege that Hutchins solicited his purchase of $JENNER to state a claim.

Greenfield has failed to do so. *First*, he has not plausibly alleged that statements made by Hutchins in a Telegram group, SAC ¶ 122, solicited him to make a purchase. *See Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 965 (9th Cir. 1990) (observing "some causal connection required" between solicitation and purchase). To begin, Greenfield has not properly alleged that Hutchins made these statements before his purchase of the Ethereum token; there is in fact no date associated with this Telegram thread at all. And those statements do not "urge or persuade another to buy a particular security," *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1182 (9th Cir. 2024) (citation modified). Rather, they are aimed at encouraging existing token holders to hold, rather than soliciting new buyers.

*Second*, the SAC is devoid of any other statement by Hutchins prior to Greenfield's purchases of the Ethereum token. He cannot rely on any of the posts sent by "Defendants," for this purpose, *e.g.*, SAC ¶ 142, as those allegations constitute group pleading and do not make his claim plausible. *See McSweeney v. City of Bell,* No. CV087006, 2009 WL 10700299, at *2 (C.D. Cal. Mar. 13, 2009)

14

(dismissing claim because plaintiff relied solely on group pleading and defendant's position).

*Third*, the SAC is devoid of allegations indicating that Hutchins would financially benefit from the sale of $JENNER on Ethereum. Allegations concerning how *Jenner* may have benefited are insufficient. *See, e.g.*, *Bridges v. Geringer*, No. 13-CV-01290, 2015 WL 2438227, at *6 (N.D. Cal. May 21, 2015) (dismissing claim for failure to allege financial benefit because defendants were "not similarly-situated").

### B.    The common-law fraud claim should be dismissed.

To plead a common-law fraud claim under California law, a plaintiff must allege: "(a) misrepresentation …; (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, *i.e.*, to induce reliance; (d) justifiable reliance; and (e) resulting damage." *West v. Rheem Manuf. Comp.*, 765 F. Supp. 3d 976, 991 (C.D. Cal. 2025) (citation omitted). When the allegedly fraudulent statement is a promise, the plaintiff must show the promise was made "without any intention of performing it." *Service by Medallion v. Clorox Co.*, 52 Cal. Rptr. 2d 650, 655 (Ct. App. 1996).

In sharp contrast to his former "shotgun" pleading, Greenfield now hangs his hat on a single post on X to support his purported claim for common-law fraud. Greenfield pleads that, "As alleged in paragraph 79, on May 27, 2024, Jenner represented that, in the wake of the Arora rug-pull, she was not re-launching again." SAC ¶ 276. In paragraph 79, an X user asked Jenner, "are you launching again?", and Jenner wrote, "No I am buying more and more $Jenner." SAC ¶ 79. There are at least five fatal issues with Greenfield's focus on this post.

*First*, Greenfield must allege more than "[t]he 'bare fact of a broken promise' [to show Jenner's] statement was false when made." *See* Dkt. No. 38, at 11 (quoting *Hampton v. Pac. Inv. Mgmt. Co. LLC*, 705 F. App'x 558, 561 (9th Cir. 2017)). But he alleges only that Jenner "needed to keep attention on the project and not alienate Solana token holders until a contingency plan—transferring the project to an

Ethereum-based token Jenner controlled—could be enacted." SAC ¶ 277. This conclusory allegation does not provide any facts to support that Jenner had a plan to launch an Ethereum token at the time of the post. *See Jones v. AIG Risk Mgmt., Inc.*, 726 F. Supp. 2d 1049, 1058 (N.D. Cal. 2010) (requiring more than "failure to perform" to allow promissory fraud claim). Without more, the need to keep Solana token holders committed to the project does not support an inference that she had no intention of honoring her promise when she made it. *See Legal Additions LLC v. Kowalski*, No. C-08-2754, 2010 WL 335789, at *5 (N.D. Cal. Jan. 22, 2010) (holding allegation that victims would not have done work if they had known of broken promise not sufficient to support falsity of promise).

*Second*, Greenfield has not pleaded that Jenner thought listing via Ethereum was inconsistent with her promise not to launch again. To the contrary, the SAC alleges that "Jenner viewed the ERC-20 coin as *a second iteration* of the same underlying project." SAC ¶ 104 (emphasis added). The SAC also notes that Jenner posted, "we didn't own the smart contract to migrate or bridge over to ETH … Trust me I get the issue hahaha but *we are here to stay with the actual coin we launched* and hold the smart contract [] on ETH[.]" SAC ¶ 138 (emphasis added). These allegations further belie any plausible inference that Jenner either knew her statement was false or intended to defraud anyone when she said she would not launch another token.

*Third*, Greenfield has not pleaded actual reliance on this post. Indeed, he has not made even a conclusory claim that he *saw* the post on which he bases his fraud claim. Instead, he alleges generally that he "recalls seeing statements, either from Jenner directly or those relaying her statements on May 27, that she did not intend to launch another token." SAC ¶ 211. But there are at least six posts on May 27 where Jenner expresses her commitment to the Solana token, and any one of them could have been the one Greenfield recalls. SAC ¶¶ 70, 71, 73, 77, 78, 79. Without more, especially in light of the strict requirements of Rule 9(b), Greenfield's claims of

16

reliance fall short. *See In re Arris Cable Modem Consumer Litig.*, No. 17-CV-01834, 2018 WL 288085, at *8–9 (N.D. Cal. Jan. 4, 2018) (dismissing fraud claim because plaintiffs failed to specify "which statements any of them saw or relied on").[2]

*Fourth*, Greenfield contradicts his own allegations of reliance by conceding that he purchased the Solana token again on May 31, up to two days after the launch of the Ethereum token. SAC Ex. 1, at 5. If he had indeed premised his investment strategy on Solana being the only platform on which $JENNER would trade, he never would have purchased more after it became clear there was a second platform that $JENNER was focusing more on over time.

*Fifth*, Greenfield cannot allege the requisite privity between himself and Jenner in relation to the Solana token. *See Cal. Amplifier v. RLI*, 113 Cal. Rptr. 2d 915, 921 (Ct. App. 2001) (observing that statutory securities claims "retain the privity requirement from common law fraud"). He makes no allegations that he purchased any Solana $JENNER from Jenner herself.

## C. The quasi-contract claim should be dismissed.

Greenfield maintains that Jenner should not be permitted to retain the 3% transaction taxes on the Ethereum token sales because Jenner "falsely represented" the taxes would be "wholly and appropriately reinvested in the project." SAC ¶¶ 193, 282. This purported quasi-contract claim fails for at least two reasons. *First*, Greenfield is barred from seeking equitable relief because there was an enforceable,

---

[2] Additionally, the alleged misstatement from Jenner was posted on May 27 at 8:24 p.m. PDT, which was May 28 at 4:24 a.m. BST/3:24 a.m. UTC in the United Kingdom, where Greenfield resides. *See* Request for Judicial Notice Ex. 2. Thus, the earliest Greenfield could have seen the post was on the same day he began purchasing $JENNER on Solana. *See* SAC Ex. 1, at 5. During the parties' meet and confer call, counsel for Greenfield would not disclose the time stamps of Greenfield's May 28 purchases, Chang Decl. ¶ 4, further casting doubt on Greenfield's purported reliance on the alleged misrepresentation. *See also* SAC ¶ 227 (showing Greenfield executing multiple Ethereum token trades before 3:00 a.m. UTC).

binding agreement defining the rights of the parties: the smart contract through which Greenfield paid a 3% transaction tax to Jenner in return for the ability to access the Uniswap liquidity pool to trade $JENNER. *See Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996). *Second*, Greenfield does not identify the false statements on which he bases his claim in violation of Rule 9(b), and they are otherwise insufficiently pleaded and contradict the FAC.

### 1. The contract allowing access to the liquidity pool defining the rights of the parties precludes the quasi-contract claim.

A plaintiff may not assert a quasi-contract claim when a valid contract defines the respective rights of the parties. *Paracor*, 96 F.3d at 1167. At the pleading stage, this means that "a plaintiff may not plead the existence of an enforceable contract and simultaneously maintain a quasi-contract claim unless the plaintiff also pleads facts suggesting that the contract may be unenforceable or invalid." *Vizcarra v. Michaels Stores, Inc.*, 710 F. Supp. 3d 718, 732 (N.D. Cal. 2024) (citation omitted).

Here, Greenfield pleads the existence of an enforceable contract that governed his purchases of $JENNER on Ethereum, whereby Greenfield paid a 3% transaction tax to Jenner each time Greenfield sought to purchase or sell the token.[3] SAC ¶¶ 138, 193 & n.17, 195. Both parties performed their part of the contract, and there are no indications that the contract was unenforceable. The contract thus governs Greenfield's 3% tax payments to Jenner, and he may not allege a quasi-contract cause of action.

Greenfield nevertheless alleges that he has no adequate remedy at law for breach of contract because Jenner's promise to "use all of the transaction taxes for

---

[3] The smart contract that administers this agreement, executed via validator each time anyone sought to access the liquidity pool, is between Jenner and any putative seller or purchaser of $JENNER. It is different from the Automated Market Maker and other applications that enable trading between buyers and sellers of $JENNER. *See* SAC ¶ 223 (describing different steps for transaction tax and matching).

the betterment of the project," was not "expressed in a written instrument." SAC ¶ 286. But the absence of a separate contract allowing Greenfield to dictate how Jenner used the transaction taxes does not mean that the contract does not govern Jenner's right to the taxes. *See Letizia v. Facebook, Inc.*, 267 F. Supp. 3d 1235, 1253 (N.D. Cal. 2017). In *Letizia*, the plaintiffs were marketing professionals who sued Facebook for deficiencies in their video advertising services that were not explicitly covered by the parties' contracts. 267 F. Supp. 3d at 1253. In dismissing the claim, the district court held, "The mere fact that Facebook's contracts do not expressly mention the two advertising metrics at issue here does not mean the contract does not govern the subject matter at issue here—*i.e.*, Facebook's advertising services." *Id. Letizia* leads to the same result here. Even if the use of the transaction tax is not nominally covered by the contract between the parties, the contract still covers the subject matter of the quasi-contract claim. Although Greenfield criticizes how Jenner allegedly used the transaction taxes, Greenfield should not be permitted to use the courts to recover in excess of what he bargained for. *See Paracor*, 96 F.3d at 1167.

### 2. Greenfield has failed to plead an actionable misstatement.

Being premised on allegedly fraudulent misrepresentations concerning the use of the transaction tax, Greenfield's quasi-contract claim is virtually indistinguishable from a common-law fraud claim. Accordingly, because Greenfield has pleaded no facts that suggest that he "lacks an adequate remedy at law," here through tort, his equitable claim should be dismissed. *See Sonner v. Premier NutritionCorp.*, 971 F.3d 834, 844 (9th Cir. 2024).

In any event, because Greenfield's "quasi contract claim is premised on fraudulent conduct by Defendants, Plaintiffs must meet the heightened pleading standards of Federal Rule of Civil Procedure 9(b)." *Marques v. Fed. Home Loan Mortg. Corp.*, No. 12CV1873, 2013 WL 1932920, at *5 (S.D. Cal. May 8, 2013). By that metric, Greenfield fails to properly plead his quasi-contract claim because

(1) he fails to identify which statements concerning the use of the transaction tax are false; (2) he does not otherwise allege any actionable misstatements; and (3) his latest complaint impermissibly contradicts the FAC and exceeds his leave to amend.

*First,* although Greenfield alleges that "Jenner falsely represented [that transaction taxes] would be wholly and appropriately reinvested in the project," SAC ¶ 282, he never identifies the specific statements that he alleges to be false or why they were false at the time. To be sure, there are a number of statements by Jenner in the SAC discussing what taxes would be used for. *See supra* Part II.C. But Greenfield "does not identify which of these statements gives rise to [the quasi-contract] claim, let alone plead with particularly how any such statement was false or misleading when made." *See* Dkt. No. 38, at 11. Absent more specific allegations, which Greenfield has now twice failed to provide, his claim must be dismissed.

*Second*, the statements on which Greenfield bases his claim are all promises to use transaction taxes in a specific way, namely on marketing, liquidity, or donating to the Trump campaign. *See, e.g.*, SAC ¶ 175. He accordingly must allege facts that show the Jenner had no intention of following through on those promises when they were made, *see Jones v. AIG Risk Mgmt., Inc.*, 726 F. Supp. 2d 1049, 1058 (N.D. Cal. 2010), a task made more difficult given his failure to identify *which* statements of Jenner's were false at the time they were made. He has failed to do so: the paragraphs describing his quasi-contract claim contain no relevant allegations, SAC ¶¶ 281–287, and there are none anywhere else in the SAC.

*Third*, Greenfield has violated basic rules of pleading in formulating his new quasi-contract claim. "A party cannot amend pleadings to 'directly contradic[t] an earlier assertion made in the same proceeding.'" *Airs Aromatics, LLC v. Victoria's Secret Stores Brand Mgmt. Inc.*, 744 F.3d 595, 600 (9th Cir. 2014) (citation omitted).[4] Greenfield now alleges he "was exposed to" and "relied on Jenner's

---

[4] The Ninth Circuit has applied this principle as recently as last year. *See Best Carpet Values, Inc. v. Google, LLC*, 90 F.4th 962, 968 (9th Cir. 2024). Accordingly,

20

representations that all of the transactions taxes would be reinvested into the project … ." SAC ¶ 216. In sharp contrast, the FAC alleged that "Jenner has never properly disclosed this information to investors, many of whom have paid this transaction tax unknowingly" and that it was a "hidden transaction tax." FAC ¶¶ 70, 84(d). This turnabout to establish reliance should be rejected. *See, e.g.*, *Travelers Indem. Co. v. New Orleans Louisiana Saints, L.L.C.*, 650 F. App'x 416, 418 (9th Cir. 2016) (denying leave to amend when party attempted to change key fact in pleadings).

## IV.   CONCLUSION

For the foregoing reasons, Greenfield's Second Amended Complaint should be dismissed with prejudice.

DATED: June 20, 2025               Respectfully submitted,

**BLANK ROME LLP**

By:  */s/ Cheryl S. Chang*  
Cheryl S. Chang  
Jennifer L. Achilles (*pro hac vice*)  
Jamison T. Gilmore  
Michael E. Donohue (*pro hac vice*)

*Attorneys for Defendants*  
*Caitlyn Jenner and Sophia Hutchins*

---

older cases that may appear to be inconsistent, such as *PAE Government Services, Inc. v. MPRI, Inc.*, 514 F.3d 856, 858–60 (9th Cir. 2007), are best read to limit this pleading rule to forbidding only those inconsistencies that are truly contradictory.

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendants Caitlyn Jenner and Sophia Hutchins, certifies that this memorandum in support of Defendants' motion to dismiss does not exceed 7000 words.

DATED: June 20, 2025                    */s/ Cheryl S. Chang*
                                         Cheryl S. Chang

**LR 7-3 CERTIFICATION**

I certify that the parties met by videoconference, thoroughly discussed each and every issue raised in the motion, and attempted in good faith to resolve the motion in whole or in part.


DATED: June 20, 2025                    */s/ Cheryl S. Chang*
                                        Cheryl S. Chang

23