**FITZGERALD MONROE FLYNN PC**
JACK FITZGERALD (SBN 257370)
*jfitzgerald@fmfpc.com*
MELANIE R. MONROE (SBN 275423)
*mmonroe@fmfpc.com*
TREVOR FLYNN (SBN 253362)
*tflynn@fmfpc.com*
PETER GRAZUL (SBN 342735)
*pgrazul@fmfpc.com*
ALLISON FERRARO (SBN 351455)
*aferraro@fmfpc.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741

*Lead Counsel*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

NAEEM AZAD and MIHAI CALUSERU,
on behalf of themselves, all others similarly
situated, and the general public,

               Plaintiffs,

      v.

CAITLYN JENNER and SOPHIA
HUTCHINS,

             Defendants.

Case No: 2:24-cv-9768-SB-JC

**OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS SECOND
AMENDED COMPLAINT (DKT. NO. 63)**

Judge:     Hon. Stanley Blumenfeld Jr.
Hearing:   August 1, 8:30 a.m.
Location:  Courtroom 6C

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 1

I.    PLAINTIFF STATES A SECTION 12(A)(1) CLAIM ........................... 1

    A.    Applying the Securities Act to Defendants' Conduct Does Not Implicate an Extraterritorial Application of the Act ................................. 1

        1.    The Parties Incurred Irrevocable Liability in the U.S. ................... 3

            a.    Contract Formation ................................................... 4

                i.    Upon Plaintiff's Acceptance of Jenner's Offer ........... 4

                ii.    Upon Jenner Locking Liquidity ................................. 6

            b.    Passing of Title ....................................................... 7

            c.    Exchange of Money ................................................. 8

            d.    Placement of Purchase Orders .................................. 9

        2.    Jenner *Offered* Unregistered Securities From the U.S. ................... 9

        3.    Jenner Caused Unregistered Securities to be Carried in Interstate Commerce ................................................................. 10

    B.    $JENNER is a Security ................................................................. 11

        1.    There was a Common Enterprise .................................................. 11

            a.    Horizontal Commonality ......................................... 12

            b.    Vertical Commonality ............................................ 13

        2.    Investors Expected Profits from Defendants' Efforts .................... 13

i

        C.    Hutchins Was a Statutory Seller ............................................... 14

    II.    PLAINTIFF STATES A COMMON LAW FRAUD CLAIM ......................... 15

    III.    PLAINTIFF STATES A QUASI CONTRACT CLAIM................................. 17

CONCLUSION ........................................................................................................ 19

CERTIFICATE OF COMPLIANCE ....................................................................... 20

ii

# TABLE OF AUTHORITIES

## Cases

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012)....................................................................................... 1, 3

*Balestra v. ATBCOIN LLC*,
    380 F. Supp. 3d 340 (S.D.N.Y. 2019) ........................................................................ 12

*Banco Safra S.A.-Cayman Islands Branch v. Smamarco Mineracao S.A.*,
    849 Fed. App'x 289 (2d Cir. 2021)................................................................................ 4

*Barron v. Helbiz Inc.*,
    2023 WL 5672640 (S.D.N.Y. Sept. 1, 2023)................................................................. 5

*Butler v. United States*,
    992 F. Supp. 2d 165 (E.D.N.Y. 2014) ........................................................................... 2

*Cheng v. Liu*,
    2021 WL 12313014 (D. S.C. May 20, 2021) ................................................................. 8

*Choi v. Tower Research Cap. LLC*,
    890 F.3d 60 (2d Cir. 2018)................................................................................. 2, 5, 6, 9

*Combs v. Safemoon LLC*,
    2024 WL 1347409 (D. Utah Mar. 29, 2024) ................................................................. 2

*Davy v. Paragon Coin Inc.*,
    2021 WL 2940200 (N.D. Cal. Mar. 26, 2021)............................................................. 14

*De Ford v. Koutoulas*,
    2023 WL 2709816 (M.D. Fla. Mar. 30, 2023) ............................................................ 11

*De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*,
    608 F.2d 1297 (9th Cir. 1979) .................................................................................... 14

*Fed. Hous. Fin. Agency for Fed Nat'l Morg. Ass'n v. Nomura Holding Am., Inc.*,
    873 F.3d 85 (2d Cir. 2017)............................................................................................ 2

*Friel v. Dapper Labs, Inc.*,
    657 F. Supp. 3d 422 (S.D.N.Y. 2023) ................................................................... 12, 14

iii

*Azad et al. v. Jenner et al.*, Case No. 2:24-cv-9768-SB-JC
OPPOSITION TO MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

*Gelow v. Cent. Pac. Mortg. Corp.*,
   656 F. Supp. 2d 1217 (E.D. Cal. 2009) ........................................................................ 16

*Giunta v. Dingman*,
   893 F.3d 73 (2d Cir. 2018) .................................................................................... 2, 4, 7

*Hardin v. TRON Found.*,
   2024 WL 4555629 (S.D.N.Y. Oct. 23, 2024) ............................................................ 1

*Harper v. O'Neal*,
   746 F. Supp. 3d 1360 (S.D. Fla. 2024) ...................................................................... 13

*Hocking v. Dubois*,
   885 F.2d 1449 (9th Cir. 1989) .................................................................................. 11

*Houghton v. Leshner*,
   2023 WL 6826814 (N.D. Cal. Sep. 20, 2023) ...................................................... 14, 15

*In re Century Aluminum Co. Secs. Litig.*,
   729 F.3d 1104 (9th Cir. 2013) .................................................................................... 9

*In re Elec. Data Sys. Corp. "ERISA" Litig.*,
   224 F.R.D. 613 (E.D. Tex. 2004) .............................................................................. 11

*In re Ethereummax Investor Litig.*,
   2023 WL 6787827 (C.D. Cal. Jun. 6, 2023) ............................................................ 18

*In re Ethereummax Investor Litig.*,
   2023 WL 6787458 (C.D. Cal. Oct. 3, 2023) ............................................................ 17

*In re Petrobas Secs. Litig.*,
   150 F. Supp. 3d 337 (S.D.N.Y. 2015) ........................................................................ 2

*In re Sanofi-Aventis Secs. Litig.*,
   293 F.R.D. 449 (S.D.N.Y. 2013) ................................................................................ 7

*In re Tezos Secs. Litig.*,
   2018 WL 4293341 (N.D. Cal. Aug. 7, 2018) ............................................................ 9

*Lemus v. Rite Aid Corp.*,
   613 F. Supp. 3d 1269 (C.D. Cal. 2022) .................................................................... 16

iv

*Letizia v. Facebook Inc.*,
    267 F. Supp. 3d 1235 (N.D. Cal. 2017) .................................................................. 18

*Marques v. Fed. Home Loan Morg. Corp.*,
    2013 WL 1932920 (S.D. Cal. May 8, 2023) ............................................................ 18

*Messieh v. HDR Global Trading Ltd.*,
    2024 WL 1436755 (S.D.N.Y. Apr. 3, 2024) ............................................................ 2

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010) ................................................................................................ 1

*Patterson v. Jump Trading LLC*,
    710 F. Supp. 3d 692 (N.D. Cal. 2024) .................................................................... 11

*Pino v. Cardone Capital, LLC*,
    55 F.4th 1253 (9th Cir. 2022) ................................................................................ 14

*Pinter v. Dahl*,
    486 U.S. 622 (1988) ................................................................................................ 14

*Pirani v. Slack Techs., Inc.*,
    127 F.4th 1183 (9th Cir. 2025) .............................................................................. 9

*Radiation Dynamics, Inc. v. Goldmuntz*,
    464 F.2d 876 (2d Cir. 1972) ................................................................................... 1

*Rensel v. Centra Tech., Inc.*,
    2018 WL 4410110 (S.D. Fla. June 14, 2018) ........................................................ 4

*Revak v. SEC Realty Corp.*,
    18 F.3d 81 (2d. Cir. 1994) ....................................................................................... 12

*Risley v. Universal Navigation Inc.*,
    2025 WL 615185 (2d Cir. 2025) ............................................................................. 4

*Risley v. Universal Navigation Inc.*,
    690 F. Supp. 3d 195 (S.D.N.Y. 2023) ................................................................ 3, 4, 7

*Samuels v. Lido Dao*,
    757 F. Supp. 3d 951 (N.D. Cal. 2024) ............................................................. 14, 15

v

*SEC v. Ahmed*,
    308 F. Supp. 3d 628 (D. Conn. 2018)................................................................................2

*SEC v. Bio Defense Corp.*,
    2019 WL 7578525 (D. Mass. Sep. 6, 2019) ........................................................6

*SEC v. Blockvest, LLC*,
    2019 WL 625163 (S.D. Cal. Feb. 14, 2019) ........................................................9

*SEC v. Dalius*,
    2023 WL 3988425 (C.D. Cal. May 24, 2023) ............................................. 12, 13

*SEC v. Goldfield Deep Mines Co. of Nev.*,
    758 F.2d 459 (9th Cir. 1985)................................................................................11

*SEC v. Goldman Sachs & Co.*,
    790 F. Supp. 2d 147 (S.D.N.Y. 2011) ................................................................10

*SEC v. Kik Interactive, Inc.*,
    492 F. Supp. 3d 169 (S.D.N.Y. 2020) ......................................................... 12, 14

*SEC v. Levine*,
    462 Fed. App'x 717 (9th Cir. 2011) ......................................................................8

*SEC v. Liu*,
    549 F. Supp. 3d 1087 (C.D. Cal. 2021) ................................................................8

*SEC v. Payward, Inc.*,
    2024 WL 4511499 (N.D. Cal. Aug. 23, 2024) ....................................................14

*SEC v. Ripple Labs*,
    682 F. Supp. 3d 308 (S.D.N.Y. 2023) ................................................................12

*SEC v. Ripple Labs, Inc.*,
    2022 WL 762966 (S.D.N.Y. Mar. 11, 2022) ...................................................9, 10

*SEC v. Scoville*,
    913 F.3d 1204 (10th Cir. 2019) ........................................................................5, 6

*SEC v. Telegram Group, Inc.*,
    448 F. Supp. 3d 352 (S.D.N.Y. 2020) ......................................................... 12, 13

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946) .......................................................................................... 11

*SEC v. Wahi*,
   2024 WL 896148 (W.D. Wash. Mar. 1, 2024) ........................................... 12, 13

*SEC v. World Capital Mkt., Inc.*,
   864 F.3d 996 (9th Cir. 2017) ............................................................................. 6

*Sonner v. Premier Nutrition Corp.*,
   971 F.3d 834 (9th Cir. 2024) ........................................................................... 18

*Stoyas v. Toshiba Corp.*,
   896 F.3d 933 (9th Cir. 2018) .................................................................... 1, 3, 5

*Underwood v. Coinbase Global, Inc.*,
   654 F. Supp. 3d 224 (S.D.N.Y. 2023) ............................................................... 7

*United States v. Georgiou*,
   777 F.3d 125 (3d Cir. 2015) .............................................................................. 2

*United States v. Vilar*,
   729 F.3d 62 (2d Cir. 2013) ......................................................................... 2, 4, 5

*Van Loon v. Dep't of Treasury*,
   122 F.4th 549 (5th Cir. 2024) ................................................................... 5, 6, 17

*Wildes v. BitConnect Int. PLC*,
   25 F.4th 1341 (11th Cir. 2022) ........................................................................ 15

*Williams v. Binance*,
   96 F.4th 129 (2d Cir. 2024) ....................................................................... 2, 5, 6

*Williams v. Block one*,
   2022 WL 5294189 (S.D.N.Y. Aug. 15, 2022) ................................................ 10

*Zalazar v. Capital Force LLC*,
   2023 WL 4186397 (S.D. Fla. June 26, 2023) .................................................... 5

**Rules**

Fed. R. Civ. P. 9(b) ................................................................................................ 16

**Statutes**

15 U.S.C. § 77e(a)(2) ...................................................................................... 10, 11

15 U.S.C. § 77e(c) ..................................................................................................... 9

15 U.S.C. § 77k .......................................................................................................... 9

15 U.S.C. § 77*l* ......................................................................................................... 9

15 U.S.C. § 77*l*(a)(1) ............................................................................................... 9

**Other Authorities**

Max Raskin, "The Law and Legality of Smart Contracts," 1 Geo. L. Tech. Rev. 305
    (2017) ................................................................................................................... 7

## INTRODUCTION

"This case involves a scheme . . . to leverage Jenner's celebrity brand and network to obtain investors' money on the promise of profits through the sale of '$JENNER' cryptocurrency." (Dkt. No. 44, Second Am. Compl. ("SAC") ¶ 1.) Because Plaintiff states claims for violation of the Securities Act, common law fraud, and quasi-contract, the Court should deny Defendants' Motion ("Mot.").

## ARGUMENT

## I. PLAINTIFF STATES A SECTION 12(A)(1) CLAIM

### A. Applying the Securities Act to Defendants' Conduct Does Not Implicate an Extraterritorial Application of the Act

The Securities Act applies "to 'purchases and sales of securities in the United States.'" *Hardin v. TRON Found.*, 2024 WL 4555629, at *14 (S.D.N.Y. Oct. 23, 2024) (quoting *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 266 (2010)). "[T]ransactions involving securities that are not traded on a domestic exchange are domestic if irrevocable liability is incurred or title passes within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012) ["*Ficeto*"]; *accord Stoyas v. Toshiba Corp.*, 896 F.3d 933, 948-49 (9th Cir. 2018).

Irrevocable liability occurs "when the parties become bound to effectuate the transaction." *Ficeto*, 677 F.3d at 67. It is "the point at which, in the classical contractual sense, there was a meeting of the minds," and "marks the point at which the parties obligated themselves to perform . . . even if the formal performance of their agreement is to be after a lapse of time." *Id.* at 68 (quoting *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876 (2d Cir. 1972)). This means *liability* can become irrevocable before the *transaction* does.

Since "the point at which the parties become irrevocably bound . . . can be used to determine the locus of a securities purchase or sale," to satisfy *Morrison*, "it is sufficient for a plaintiff to allege facts leading to the plausible inference" that either "the purchaser incurred irrevocable liability within the United States to take and pay for a security, or . . . the seller incurred irrevocable liability within the United States to deliver a security." *Id.*

1

"[I]rrevocable liability may attach in 'more than one location,' and at more than one time," *Williams v. Binance*, 96 F.4th 129, 137 (2d Cir. 2024) ["*Binance*"] (citation omitted) (quoting *Fed. Hous. Fin. Agency for Fed Nat'l Morg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 156 (2d Cir. 2017), and citing *Choi v. Tower Research Cap. LLC*, 890 F.3d 60, 68 (2d Cir. 2018)); *accord Messieh v. HDR Global Trading Ltd.*, 2024 WL 1436755, at *3 (S.D.N.Y. Apr. 3, 2024) ("[I]rrevocable liability is not something that must happen only once; it may occur in more than one transactional step and in multiple locations." (citation omitted)); *SEC v. Ahmed*, 308 F. Supp. 3d 628, 669 (D. Conn. 2018) ("[T]here are several points at which parties might be bound, and the parties may become bound at two separate times and locations." (citing *Butler v. United States*, 992 F. Supp. 2d 165, 178 (E.D.N.Y. 2014)).

Because "territoriality under *Morrison* concerns where, physically, the purchaser or seller committed him or herself," *United States v. Vilar*, 729 F.3d 62, 77 n.11 (2d Cir. 2013); *accord United States v. Georgiou*, 777 F.3d 125, 136 (3d Cir. 2015), if there is a "point at which the parties may have been irrevocably bound . . . that at least one party . . . was acting from the United States," then "the transactions are domestic under *Morrison*," *Ahmed*, 308 F. Supp. 3d at 669.

Dismissal under *Morrison* is "proper where . . . the plaintiff pleads facts that suggest that nothing about the transaction is domestic—that is, the security purchased was listed on a foreign exchange, and the purchase and sale took place outside the United States." *Combs v. Safemoon LLC*, 2024 WL 1347409, at *6 (D. Utah Mar. 29, 2024). By contrast, facts that show "the substantive indicia of a contractual commitment" by at least one party in the U.S., or "the formal weight of a transfer of title" in the U.S., satisfy *Morrison*. *In re Petrobas Secs. Litig.*, 150 F. Supp. 3d 337, 342 (S.D.N.Y. 2015).

"To determine whether irrevocable liability was incurred within the United States, courts look to the terms, timing, and place of the parties' contracting and liabilities thereunder." *Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018) (citation omitted). "[A]llegations concerning contract formation, placement of purchase orders, passing of title,

2

*Azad et al. v. Jenner et al.*, Case No. 2:24-cv-9768-SB-JC
OPPOSITION TO MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

and the exchange of money are directly related to the consummation of a securities transaction." *Stoyas*, 896 F.3d at 949 (citing *Ficeto*, 677 F.3d at 70).

### 1. The Parties Incurred Irrevocable Liability in the U.S.

Jenner was "the deployer and owner of the smart contract behind the ERC-20 $JENNER token[.]" (SAC ¶¶ 138, 220.) She wrote a 3% transaction tax into it (*see id.* ¶¶ 96, 175, 193 & n.17), and "created three wallet addresses, controlled by Jenner, into which proceeds from the 3% transaction tax would flow: a Deployer wallet, a Liquidity wallet, and a Marketing wallet" (*id.* ¶ 195; *see also* Ex. 2). "[O]n May 29, 2024, Jenner, from California, funded or directed an agent to fund the . . . Jenner (ETH) Deployer Wallet[] with Ethereum transferred from a Coinbase account" in the United States. (*Id.* ¶ 221.) It then "minted 1,000,000,000 $JENNER" (*id.* ¶ 222), and "transferred ownership of the . . . tokens to the token's smart contract[]" (*id.* ¶ 223).[1] Jenner then "provided 100% of the initial liquidity . . . on Uniswap" (*id.* ¶ 220; *see also id.* ¶¶ 32-33 (describing mechanics of creating liquidity pool). "Once that occurred . . . trading was immediately available" (*id.* ¶ 223).

Uniswap "[l]iquidity pools are token pairs stored in a Uniswap pool contract," which "allow users to swap against the tokens within a pool," and "rely on users for funding." (*Id.* ¶ 29(b).) *See generally Risley v. Universal Navigation Inc.*, 690 F. Supp. 3d 195, 205 (S.D.N.Y. 2023) ["*Risley I*"] (describing Uniswap liquidity pools). As Jenner did here, "[u]sers create initial market liquidity by providing token pairs to commence a pool." (SAC ¶ 29(b).) "To incentivize pooling liquidity, there is compensation for liquidity providers" (*id.*), which permits both "accumulat[ing] trading fees" and "creat[ing] a liquid market for [a] token" (*id.* ¶ 31).

---

[1] Defendants argue "[i]t is legally nonsense that Jenner 'transferred ownership of the . . . tokens to the token's smart contract[.]'" (Mot. at 9 (quoting SAC ¶ 223).) But Plaintiff alleges the *Jenner (ETH) Deployer Wallet* "transferred ownership" of the newly-minted tokens "to the token's smart contract[.]" (*See* SAC ¶ 223 & Ex. 3.) This parlance indicates the application of a smart contract's instructions to newly-minted tokens, and is not an allegation that *Jenner* then released title.

3

*Azad et al. v. Jenner et al.*, Case No. 2:24-cv-9768-SB-JC
OPPOSITION TO MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

When someone stakes a token pair on Uniswap, they receive "LP Shares" in return. (*Id.* ¶ 30 (graphic showing "Output: 4 LP Shares").) These "operate as a receipt . . . represent[ing] a given provider's percentage contribution to a pool, plus their *pro rata* share of transaction fees for that pool." *Risley I*, 690 F. Supp. 3d at 205 (record citation omitted); *accord Risley v. Universal Navigation Inc.*, 2025 WL 615185, at *3 (2d Cir. Feb. 26, 2025) (Mem.) ("[I]t is the token issuers and liquidity providers who retain title of their tokes through pool tokens that may be turned in . . . to recover the value of their originally-deposited tokens that created the trading pool."). "To retrieve their underlying liquidity . . . plus any funds accrued through fees, the liquidity provider must 'burn' their liquidity tokens, effectively exchanging them for their portion of the liquidity pool, plus the proportional fee allocation." *Risley I*, 690 F. Supp. 3d at 205 (record citations omitted). This means liquidity providers like Jenner retain title to the tokens they place in liquidity pools. *See id.* at 220.

### a.  Contract Formation

"Detailed factual allegations describing contract formation in the United States will typically satisfy the domestic transaction test." *Banco Safra S.A.-Cayman Islands Branch v. Smamarco Mineracao S.A.*, 849 Fed. App'x 289, 293 (2d Cir. 2021) (Mem.) (citing *Giunta*, 893 F.3d at 76-77, 80; *Vilar*, 729 F.3d at 76-78). Here, Plaintiff alleges he purchased $JENNER pursuant to its smart contract, which Jenner wrote, owned, and deployed from California. (SAC ¶¶ 138, 193 & n.17, 195, 215-17.) "Smart contracts are self-executing contracts with the terms of the agreement between the buyer and seller being directly written into lines of code." *Rensel v. Centra Tech., Inc.*, 2018 WL 4410110, at *10 (S.D. Fla. June 14, 2018) (citation omitted). Defendants thus argue "the existence of an enforceable contract," which "is between Jenner and any putative seller or purchaser of $JENNER"—including Plaintiff. (Mot. at 18 & n.3.) Their assertion Jenner was in privity with Plaintiff from California concedes domesticity.

### i.  Upon Plaintiff's Acceptance of Jenner's Offer

In fact, the smart contract was a unilateral contract—an "*offer* . . . which a third-party user could accept by transferring Ether to the . . . smart contract." *See Van Loon v. Dep't of*

4

*Azad et al. v. Jenner et al.*, Case No. 2:24-cv-9768-SB-JC
OPPOSITION TO MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

*Treasury*, 122 F.4th 549, 568 (5th Cir. 2024). Plaintiff accepted by placing a swap order. The Uniswap protocol then matched him with Jenner, the only liquidity provider, and instructed the blockchain to validate and record the transaction. Thus, the parties arrived at a meeting of the minds—and irrevocable *liability*—prior to the transaction being finalized on the Ethereum blockchain, when the *transaction* became irrevocable (*see* SAC ¶ 235).

Indeed, "the parties here agree that at least one time at which irrevocable liability attaches is at the time when transactions [we]re 'matched,'" *see Binance*, 96 F.4th at 138 (citations omitted). (*See* SAC ¶ 236; Mot. at 6.) Once Plaintiff's orders were matched, then, Jenner was "irrevocably 'committed to the [transactions] while in' [her] state[] of residence." *See Binance*, 96 F.4th at 140 (quoting *Vilar*, 729 F.3d at 77).

Defendants' focus on the allegation that "a *transaction* on the Ethereum blockchain becomes 'irrevocable *only* after it is validated' on the blockchain (Mot. at 7 (first emphasis added) (quoting SAC ¶ 235)), is misplaced, as it "says nothing about whether either trading party is free to revoke error-free acceptance of a trade after matching." *Choi*, 890 F.3d at 68. And Defendants concede "the 'meeting of the minds,' and thus the imposition of liability, traditionally occur[s] . . . before any transactions clear[]," and that "the electronic matching of parties involves the same dynamics." (Mot. at 6 (citing *Binance*, 96 F.4th 137; *Stoyas*, 896 F.3d at 949).)

Accordingly, Jenner incurred irrevocable liability to *deliver* securities while in the U.S., regardless of what node later validated the transaction. *See SEC v. Scoville*, 913 F.3d 1204, 1225 (10th Cir. 2019) (Briscoe, J., concurring) ("[T]he securities acts . . . cover Defendants' domestic activity even if a large percentage of the AdPack buyers purchased the securities while abroad."); *Barron v. Helbiz Inc.*, 2023 WL 5672640, at *6 (S.D.N.Y. Sept. 1, 2023) (domesticity where the "wallet . . . that automatically created a HelbizCoin whenever a purchaser executed the smart contract," was allegedly "controlled by Palella, a New York resident, and operated out of New York"); *Zalazar v. Capital Force LLC*, 2023 WL 4186397, at *6 (S.D. Fla. June 26, 2023) (Domesticity where "the investments were solicited by Defendants in Miami" and the "securities . . . were prepared in Miami."); *cf. SEC v. Bio*

5

*Azad et al. v. Jenner et al.*, Case No. 2:24-cv-9768-SB-JC
OPPOSITION TO MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

*Defense Corp.*, 2019 WL 7578525, at *12 (D. Mass. Sep. 6, 2019) ("Bio Defense, as the seller, incurred irrevocable liability within the United States when [an officer] counter-signed subscription agreements" from "overseas investors").

In *Scoville*, the defendant "was based in the United States[,] . . . operated out of the United States when selling its securities," and "executed all the AdPack sales [at issue] in an automated manner in the United States." 913 F.3d at 1226. The concurrence found "[u]nder any common sense reading of *Morrison*," the defendant "made several securities sales in the United States" and the fact "[t]hat many AdPack buyers were abroad when they purchased the securities over the internet does not alter this conclusion." *Id.*; *cf. SEC v. World Capital Mkt., Inc.*, 864 F.3d 996, 1009 n.11 (9th Cir. 2017) ("Given the undisputed evidence regarding the scale and scope of [defendants'] operations in the United States, we consider it beyond peradventure that far in excess of $5 million was raised via domestic transactions under any reasonable interpretation of *Morrison*.").

### ii.    Upon Jenner Locking Liquidity

Usually, unilateral contracts "can be revoked 'at any time until performance has been completed by the offeree." *See Van Loon*, 122 F.4th at 568 (citations omitted). This is like a "vending machine's owner [who] can revoke the open offer to purchase . . . []by turning off the vending machine[]." *Id.* at 569.

Plaintiff alleges Jenner incurred irrevocable liability to sell when, on May 30, from California, she locked liquidity through November 2025. (*See* SAC ¶¶ 231-32.) Before doing so, Jenner had "the ability to remove liquidity from the Uniswap liquidity pool[.]" (*Id.* ¶ 232.) "[O]nce she locked the liquidity," however, "Jenner's obligation to sell any tokens she had placed in the pool, which any other person wished to purchase, became irrevocable." (*Id.* ¶ 233.) "[T]hat meant Jenner was irrevocably obligated to sell Plaintiff every ERC-20 $JENNER token he purchased after May 30." (*Id.*)

For irrevocable liability, it makes no difference buyers had not yet appeared: "irrevocable liability may attach . . . at more than one transactional step," *Binance*, 96 F.4th at 139 (citing *Choi*, 890 F.3d at 67-68), and "[a] smart contract asks its parties to tie themselves

6

*Azad et al. v. Jenner et al.*, Case No. 2:24-cv-9768-SB-JC
OPPOSITION TO MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

to the mast like Ulysses and *ex ante* commit to abiding by the terms of the agreement." Max
Raskin, "The Law and Legality of Smart Contracts," 1 Geo. L. Tech. Rev. 305, 309 (2017).
*Cf. Giunta*, 893 F.3d at 81 ("liability [i]s irrevocable when the party 'no longer had the
discretion to revoke acceptance,' notwithstanding that the transaction was not completed until
other conditions were met abroad" (citations omitted)); *In re Sanofi-Aventis Secs. Litig.*, 293
F.R.D. 449, 458 (S.D.N.Y. 2013) (irrevocable liability incurred in "prior act by the parties that
sets the trade in motion").

By locking liquidity, Jenner rendered it *impossible* to back out of her sale of ERC-20s
to anyone who accepted her offer. Under the Uniswap protocol, she was "contractually
obligated and [s]he could not, on h[er] own accord, revoke the Agreement" to sell her
$JENNER. *See Giunta*, 893 F.3d at 81. This was not altruistic, since it meant "any investor
could use the liquidity pool to purchase ERC-20 $JENNER tokens without fear that the market
for it would be shuttered" (*id.* ¶ 232), making the investment attractive. *See Risley I*, 690 F.
Supp. 3d at 205 (a liquidity provider's ability to "retrieve their underlying liquidity" can
"devalue the issuer's token" and is "detriment[al] [to] issuers, other liquidity providers, and
purchasers" (record citation omitted)). That is why Jenner so prominently publicized it. (SAC
¶ 231.)

### b.    Passing of Title

Allegations that a U.S. defendant "held title to the Tokens at the time of the[ subject]
transactions," and "transact[ed] with the user—as opposed to two users transacting with each
other. . . . assist plaintiffs in pleading" the domestic passing of title. *See Underwood v.
Coinbase Global, Inc.*, 654 F. Supp. 3d 224, 235 (S.D.N.Y. 2023).

In a liquidity pool, investors trade with liquidity providers—not each other. (*See* SAC
¶ 30.) Placing a pair of tokens in a pool is an offer to sell the provider's interest in *either* token
for someone else's interest in the other. Here, Jenner was offering investors the opportunity to
swap *either* coin. Thus, she not only held title to every $JENNER and $WETH token in the
pool upon providing initial liquidity, but also obtained title to any $WETH swapped for
$JENNER, and reclaimed title to any $JENNER swapped out of and back into the pool. As a

result, unless and until there were other liquidity providers—and the Complaint does not allege there ever were—every transaction in which Jenner *sold* $JENNER represented a transaction in which she passed title directly. The allegation that "for some time after the token's launch, there was a high probability purchasers were purchasing $JENNER tokens directly from Jenner, *i.e.*, purchasing tokens that had never yet been purchased by a third party and re-sold back into the liquidity pool" (SAC ¶ 225), is thus superfluous: since all "tokens . . . purchased by a third party and re-sold back into the liquidity pool" were sold *to* Jenner, even subsequent sales were transfers of title from her to subsequent buyers. Moreover, because Plaintiff purchased "about 90 minutes after Jenner launched the token," it "is likely [he] purchased some . . . with title never having passed from Jenner to any other person prior to his purchase." (*Id.* ¶¶ 226, 228.) Indeed, Defendants concede privity. (Mot. at 18 n.3.)

### c.    Exchange of Money

$JENNER's "transaction tax is collected in $JENNER . . . automatically converted to $ETH, then sent in $ETH to various wallets" owned and controlled by Jenner from California. (SAC ¶¶ 193 n.17, 195.) Plaintiff alleges Jenner converted more than $432,000 worth into personal Coinbase accounts, to trade for personal gain. (*Id.* ¶ 194.) Because he alleges Jenner "accepted without reservation [nearly] a million dollars in investor funds," much of which was "wrongfully diverted by [Jenner] and placed into [her] United States [crypto] accounts," he adequately alleges domesticity. *See SEC v. Liu*, 549 F. Supp. 3d 1087, 1092 (C.D. Cal. 2021) (record citation omitted); *see also Cheng v. Liu*, 2021 WL 12313014, at *3 (D. S.C. May 20, 2021) (domesticity where "money paid by Plaintiffs was collected and . . . . transferred . . . to . . . South Carolina, wherein Liu allegedly made false statements to Plaintiffs regarding how the proceeds would be invested"); *cf. SEC v. Levine*, 462 Fed. App'x 717, 719 (9th Cir. 2011) ("[T]he Securities Act governs the [defendants'] sales because the actual sales closed in Nevada when [a defendant] received completed stock purchase agreements *and payments*." (emphasis added) (citation omitted)).

8

*Azad et al. v. Jenner et al.*, Case No. 2:24-cv-9768-SB-JC
OPPOSITION TO MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

#### d.     Placement of Purchase Orders

Plaintiff's domesticity argument is primarily that Jenner incurred irrevocable liability to deliver, and passed title to the ERC-20s, in the U.S. To the extent the location of the nodes that validated his purchases is relevant, because Plaintiff was not in the U.S. when he made his purchases, to show the domesticity of his own irrevocable liability, if at all, he must rely on the location of the nodes that validated his purchases, alleging it is likely a substantial portion were in the U.S. (SAC ¶¶ 35, 235-36.) Similar allegations have plausibly shown domesticity. *In re Tezos Secs. Litig.*, 2018 WL 4293341, at *8 (N.D. Cal. Aug. 7, 2018).

Jenner argues that by virtue of its reliance on a statistical likelihood, this theory of domesticity is precluded under *Pirani v. Slack Techs., Inc.*, 127 F.4th 1183 (9th Cir. 2025), and *In re Century Aluminum Co. Secs. Litig.*, 729 F.3d 1104 (9th Cir. 2013). (Mot. at 6-7.) But those cases concern claims under 15 U.S.C. § 77k. Jenner cites no case applying them to a § 77*l* claim, and Plaintiff has located none, which is unsurprising, since a Section 11 claim requires "trac[ing] the chain of title . . . back to the [relevant] offering" after a series of secondary purchases, *see Century Aluminum*, 729 F.3d at 1106, a substantially narrower inquiry than *Morrison's* domesticity analysis. Moreover, *Pirani* section on which Jenner relies is dicta—the litigant waived the issue—and further depends on a conclusion the *Century Aluminum* court "implicitly" rejected allegations plaintiffs there never raised and the court never discussed. *See* 127 F.4th at 1189.

#### 2.     Jenner Offered Unregistered Securities From the U.S.

"*Morrison* requires that courts assess 'the particular statutory provision' at issue when determining if violations are domestic." *SEC v. Ripple Labs, Inc.*, 2022 WL 762966, at *13 (S.D.N.Y. Mar. 11, 2022) ["*Ripple I*"] (quoting *Choi*, 890 F.3d at 67). "Section 5 applies to offers as well as sales." *Id.* (citing 15 U.S.C. § 77e(c)). And "an offer does not require that . . . the issuer legally bind a purchaser[.]" *Id.* (citing *SEC v. Blockvest, LLC*, 2019 WL 625163, at *9 (S.D. Cal. Feb. 14, 2019)). Nevertheless, "[a]ny person who[] offers . . . a[n unregistered] security . . . shall be liable . . . to the person purchasing such security from him . . . ." 15 U.S.C. § 77*l*(a)(1). Thus, where, as here, a defendant's offer of an unregistered security results in the

9

sale of an unregistered security—and here, the nature of the smart contract is the sale tends to merge with the acceptance of the offer—the purchaser has a cause of action under Section 12(a)(1) if *either* the offer *or* the transaction was domestic.

"When assessing offers, as opposed to sales, the focus 'is on the person or entity [offering] securities.'" *Ripple I*, 2022 WL 762966, at *13 (quoting *SEC v. Goldman Sachs & Co.*, 790 F. Supp. 2d 147, 165 (S.D.N.Y. 2011)). "Therefore, it is the location of the offerors . . . that is relevant." *Id.* Here, Plaintiff alleges Jenner "resided in California during the time period in question" and "directed . . . offers and sales of [$JENNER] from within the United States[.]" *See id.* For example, Plaintiff alleges California-based Jenner was "the deployer and owner of the smart contract behind the ERC-20" (SAC ¶ 220). She funded the token, deployed the smart contract, and initiated the liquidity pool from the U.S. (*Id.* ¶¶ 26, 221-24.) Then, using her "California" based X account, she "post[ed] the 'Official contract address,'" with a video from her Malibu home saying, "Let the trading begin[.]" (*Id.* ¶ 91.) To "bring[] new investors into the project," she "tweeted a 'Screen recording step by step tutorial to trade $Jenner on $ETH.'" (*Id.* ¶ 103.) Defendants also registered a website URL for the token with "Arizona-based domain registrar, GoDaddy.com," and posted "a link to the Uniswap pool" there. (*Id.* ¶ 166.) As a result of Jenner's offer, Plaintiff purchased $JENNER. (*Id.* ¶ 215.)

### 3.     Jenner Caused Unregistered Securities to be Carried in Interstate Commerce

Section 5(a)(2) makes it unlawful "to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any [unregistered] security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a)(2). (*See* SAC ¶ 263.) Here, Jenner's smart contract caused 1 billion ERC-20s to flow from her Deployer wallet, into the Uniswap pool, and ultimately to purchasers throughout the U.S. and abroad. Each of those transactions was validated by a node, and each of those validations was confirmed by all other nodes on the Ethereum network (*id.* ¶ 34). *See Williams v. Block one*, 2022 WL 5294189, at *7 (S.D.N.Y. Aug. 15, 2022) ("[E]ach blockchain transaction becomes irrevocable *for the purchaser and seller* when the transaction has been crypto graphically

10

*Azad et al. v. Jenner et al.*, Case No. 2:24-cv-9768-SB-JC
OPPOSITION TO MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

validated by a single node. Other nodes subsequently validate the transaction before it becomes a permanent part of the blockchain[.]"). Since "about 40% of global nodes" performing the validation check are in the U.S. (SAC ¶ 35), Jenner caused ERC-20s to be "carried through . . . interstate commerce . . . for the purpose of sale or for delivery after sale," in violation of 15 U.S.C. § 77e(a)(2). *See In re Elec. Data Sys. Corp. "ERISA" Litig.*, 224 F.R.D. 613, 619 (E.D. Tex. 2004) (certifying class based on violation of § 77e(a)(2)), *rev'd on other grounds*, 476 F.3d 299 (5th Cir. 2007).

### B.    $JENNER is a Security

$JENNER and the manner in which it was offered and sold, constitutes an investment contract under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ["*Howey*"], because it was an investment of money in a common enterprise with the reasonable expectation of profit to be derived from Defendants' efforts. (*See* SAC ¶ 238.) Defendants do not dispute investment of money (*id.* ¶ 239), nor that investors had an expectation of profits. (*See* Mot. at 10-11, 13). Instead, they contest the existence of a common enterprise (*id.* at 11-12), and investors' expectation of profit *from Jenner* (*id.* at 13-14).

### 1.    There was a Common Enterprise

In a common enterprise, "the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties." *SEC v. Goldfield Deep Mines Co. of Nev.*, 758 F.2d 459, 463 (9th Cir. 1985) (quotation omitted). "The thrust . . . is that the investors have no desire to perform the chores necessary for a return and so must rely on the work of others after handing over their assets." *De Ford v. Koutoulas*, 2023 WL 2709816, at *14 (M.D. Fla. Mar. 30, 2023) (cleaned up). This "demand[s] either an enterprise common to the investor and the seller, promoter or some third party (vertical commonality)," or "common to a group of investors (horizontal commonality)." *Patterson v. Jump Trading LLC*, 710 F. Supp. 3d 692, 710-11 (N.D. Cal. 2024) (quoting *Hocking v. Dubois*, 885 F.2d 1449, 1455 (9th Cir. 1989)). Both are present here.

11

*Azad et al. v. Jenner et al.*, Case No. 2:24-cv-9768-SB-JC
OPPOSITION TO MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

### a.    Horizontal Commonality

When an enterprise is "marked by horizontal commonality, the fortunes of each investor depend upon the profitability of the enterprise as a whole," *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d. Cir. 1994). It "exists when the use of investor proceeds to develop an [enterprise]—the success or failure of which will impact all investors—ties the financial fortunes of the investors together." *SEC v. Wahi*, 2024 WL 896148, at *5 (W.D. Wash. Mar. 1, 2024) (collecting cases). This occurs "when investors' assets are pooled and the fortunes of each investor is tied to the fortunes of other investors as well as to the success of the overall enterprise." *SEC v. Dalius*, 2023 WL 3988425, at *8 (C.D. Cal. May 24, 2023) (quoting *SEC v. Telegram Group, Inc.*, 448 F. Supp. 3d 352, 369 (S.D.N.Y. 2020)). Thus, "pooling occurs when the funds received by the promoter . . . are, essentially, reinvested by the promoter into the [enterprise]," to "increase[] the value of the instrument offered." *Id.* (quoting *Friel v. Dapper Labs, Inc.*, 657 F. Supp. 3d 422, 436 (S.D.N.Y. 2023)).

Plaintiff alleges assets were pooled through the 3% tax Jenner promised to reinvest as part of the project's "value prop[osition]." (SAC ¶¶ 96, 102, 175.) Similar allegations have supported horizonal commonality. *See SEC v. Ripple Labs*, 682 F. Supp. 3d 308, 325-26 (S.D.N.Y. 2023); *SEC v. Kik Interactive, Inc.*, 492 F. Supp. 3d 169, 178-79 (S.D.N.Y. 2020).

Defendants contend there is no commonality because $JENNER did not involve "profit beyond the coin itself." (Mot. at 11 (citation omitted).) But they "planned to make a pro-rata distribution" (SAC ¶ 247; *see also id.* ¶¶ 178-84), and a "formalized profit-sharing mechanism is not required for a finding of horizontal commonality" anyway. *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 354 (S.D.N.Y. 2019) ("the value of" a digital asset "was dictated by the success of the [blockchain] enterprise as a whole, thereby establishing horizonal commonality"). Here, "[r]ather than receiving a pro-rata distribution of profits," $JENNER investors "reaped their profits in the form of the increased value of" $JENNER. *See Kik Interactive*, 492 F. Supp. 3d at 178 (citation omitted).

Finally, "[b]y their very nature, cryptocurrencies" that "lack utility other than as a store and transfer of value, represent proportional shares of the token's market capitalization at any

12

*Azad et al. v. Jenner et al.*, Case No. 2:24-cv-9768-SB-JC
OPPOSITION TO MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

given moment, so that all holders' fortunes are necessarily tied together in a one-to-one manner[.]" (SAC ¶ 246.) *Cf. Telegram Group*, 448 F. Supp. 3d at 369 ("The plain economic reality is that, post-launch, the [tokens] themselves continue to represent the Initial Purchasers' pooled funds.").

### b.    Vertical Commonality

Vertical commonality "may be established by showing that the fortunes of the investors are linked with those of the promoters." *Dalius*, 2023 WL 3988425, at *8 (quotation omitted). That occurs where "issuers retain[] substantial tokens . . . to align the financial fortunes of management and token-holders," *see Wahi*, 2024 WL 896148, at *5 (record citation omitted), or otherwise when the issuer's "fortunes are directly tied to the fortunes of the [investors], which will rise and fall with the success or failure of the [cryptocurrency project]," *Telegram Group*, 448 F. Supp. 3d at 371.

Defendants argue that because Jenner "collected almost $1 million in transaction taxes and paid little to nothing for $JENNER herself," she "did not bear the same risk as investors," so that vertical commonality is lacking. (Mot. at 12 (citing SAC ¶ 223).) But Plaintiff alleges she may have "sniped" a substantial portion (SAC ¶ 92), and further alleges Jenner's attorney represented she acquired ERC-20s "on the open market in the millions of market cap[.]" (*Id.* ¶ 188.) Moreover, while wallets controlled by Jenner received the transaction tax, far from "a separate revenue stream" (Mot. at 12), Jenner represented the taxes belonged to the project, disclaiming personal ownership (SAC ¶¶ 175-76). Even if they were a separate revenue stream, it would be highly correlated to the price and transaction volume of $JENNER, creating vertical commonality. So too with Jenner's liquidity providing fees (*id.* ¶ 20).

### 2.    Investors Expected Profits from Defendants' Efforts

To satisfy the third *Howey* prong, "investments must be substantively passive and depend on the 'entrepreneurial or managerial efforts of others.'" *Harper v. O'Neal*, 746 F. Supp. 3d 1360, 1375 (S.D. Fla. 2024) (quoting *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975)). Defendants argue "market forces," rather than their efforts, "determined $JENNER's price." (Mot. at 13.) Plaintiff and others invested, however, not

because they believed market fluctuations would increase $JENNER's value, but because they believed *Defendants' entrepreneurial and managerial efforts* would. (*See* SAC ¶¶ 96-97, 101, 103, 108-109, 115-17, 119-23, 126, 128, 130-31, 133-34, 136, 138-40, 144-53, 158, 160, 166, 175, 184, 185, 195-206, 220-25, 231-32, 251-52.) Defendants' focus on market forces also "ignores the essential role of [Jenner] in establishing the market" in the first place. *See Kik Interactive*, 492 F. Supp. 3d at 180; *accord Friel*, 657 F. Supp. 3d at 443.

Jenner's reliance on *De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*, 608 F.2d 1297 (9th Cir. 1979), is misplaced. That case involved land sale contracts requiring defendants "to do no more than transfer title," and defendant "did not represent that it would develop, improve, or manage" the land. *Id.* at 1301. The decision "merely noted the absence of" such "a contractual obligation, along with other factors, when determining that the promotional statements in that case were insufficient to confer upon the plaintiff a reasonable expectation of profits from the efforts of others." *SEC v. Payward, Inc.*, 2024 WL 4511499, at *17 (N.D. Cal. Aug. 23, 2024). Here, Defendants' promises to grow, build, develop, and maintain the $JENNER project are far more explicit than the promotional statements in *De Luz Ranchos*.

## C.    Hutchins Was a Statutory Seller

Section 12 liability extends to someone "who successfully solicits the purchase" of a security, "motivated in part by a desire to serve his own financial interests or those of the security owner." *Pinter v. Dahl*, 486 U.S. 622, 647 (1988); *see also Davy v. Paragon Coin Inc.*, 2021 WL 2940200, at *7 (N.D. Cal. Mar. 26, 2021) (Plaintiffs must "show that the [individual] defendants solicited purchase of the securities for their own financial gain' or for Paragon's gain."). "Solicitation is broadly construed in the Ninth Circuit." *Houghton v. Leshner*, 2023 WL 6826814, at *3 (N.D. Cal. Sep. 20, 2023). "A person 'solicits' the purchase of a security 'where she petitions, entices, lures, or urges another to purchase a security.'" *Samuels v. Lido Dao*, 757 F. Supp. 3d 951, 968 (N.D. Cal. 2024) (quotation omitted). This need not be "direct or personal to a particular purchaser," or akin to "contractual privity." *Pino v. Cardone Capital, LLC*, 55 F.4th 1253, 1258-59 (9th Cir. 2022). Rather, it can occur by "promoting a security in mass communication," and "efforts at persuasion [need not] be

personal or individualized," *Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341, 1345-46 (11th Cir. 2022). A plaintiff pleads solicitation where he alleges defendant was "comprehensive[ly] involve[d] with the design, operation and monetization of a cryptocurrency enterprise." *Houghton*, 2023 WL 6826814, at *3 (citation omitted).

Plaintiff alleges Hutchins was the project's CEO. (SAC ¶¶ 56, 63, 65, 150.) Only she and Jenner controlled its X account. (*Id.* ¶¶ 85, 123; *see also*, *e.g.*, *id.* ¶¶ 140-43, 147, 149-51, 153, 157, 159, 161, 163-65.)[2] Hutchins was also involved in creating and managing the Telegram Group, and "frequently interacted with [Plaintiff] and other investors by posting voice and video messages directly; responding directly to investor questions; and providing mechanisms for investor input[.]" (*Id.* ¶¶ 119-20.) She participated in marketing, touting the project and its potential for profit. (*See*, *e.g.*, *id.* ¶¶ 58 (Hutchins "appreciate[d] everybody buying and . . . taking a serious look at . . . the coin [Jenner's] offering."); *id.* ¶ 85 (Telling investors "[t]his is a way for people to play the market, obviously, hopefully make money."); *id.* ¶ 122 (touting Jenner's qualifications in Telegram Group); *id.* ¶ 145 (interview with crypto influencer).) And she was extensively involved in negotiating exchange listings. (*See id.* ¶¶ 57-58, 109, 111, 149.)

Because Hutchins "was comprehensively involved in the creation and issuance of [$JENNER] and in efforts to get people to purchase it," "worked to get crypto exchanges to list [$JENNER]," and "promoted the listings and increases in [$JENNER's] price through posts on social media," she is a statutory seller. *See Samuels*, 757 F. Supp. 3d at 968.

## II.   PLAINTIFF STATES A COMMON LAW FRAUD CLAIM

Plaintiff alleges that after the Solana rug-pull (*see* SAC ¶¶ 72-77), on May 27, Jenner denied she was "launching again" and represented instead "buying more and more $JENNER" on Solana. (*Id.* ¶ 79; *see also id.* ¶ 90 (Hutchins representing on behalf of Jenner "we don't

---

[2] Defendants fault Plaintiff for not specifying who made each tweet from the project's X account (Mot. at 14), but it was jointly controlled and used. Moreover, Jenner had her own X account, and sometimes the language of a project tweet suggests Hutchins is the author (*see*, *e.g.*, SAC ¶ 161 ("We noticed a certain new follower on Caitlyn's X profile")).

15

*Azad et al. v. Jenner et al.*, Case No. 2:24-cv-9768-SB-JC
OPPOSITION TO MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

plan to focus any efforts on ads for other coins" and "the full focus is this token or this coin").)
Plaintiff "was following Jenner's tweets that day and recalls her making many statements
affirming her dedication to the project and token notwithstanding" the "rug-pull, which had
by then come to light." (*Id.* ¶¶ 210-211.) In particular, "[h]e recalls seeing statements, either
from Jenner directly or those relaying her statements on May 27, that she did not intend to
launch another token." (*Id.* ¶ 211.) "[I]n reliance on Jenner's representation, on May 28, Lead
Plaintiff purchased . . . Solana $JENNER[.]" (*Id.* ¶ 278.)

Jenner argues the SAC "does not provide any facts to support that [she] had a plan to
launch an Ethereum token at the time of the post." (*See* Mot. at 16.) But "intent and knowledge
'may be alleged generally,'" *Lemus v. Rite Aid Corp.*, 613 F. Supp. 3d 1269, 1281 (C.D. Cal.
2022) (quoting Fed. R. Civ. P. 9(b)), and "may be inferred by the circumstances," *see Gelow
v. Cent. Pac. Mortg. Corp.*, 656 F. Supp. 2d 1217, 1228 (E.D. Cal. 2009) (citations omitted).

Jenner represented she was not relaunching at 8:24 p.m. PST on May 27. (*See* Dkt. No.
63-5.) She relaunched at 4:54 p.m. on May 29 (SAC ¶ 90), less than 48 hours later. Creating
and deploying an ERC-20, then creating a Uniswap trading pair, takes some technical
sophistication. (*See id.* ¶¶ 26, 32-33, 221-24.) It is reasonable to infer launching took time,
such that Jenner was likely well underway—or at least knowledgeable about the plan—less
than 48 hours before launch. Moreover:

> At the time Jenner made this statement, she knew she had no control over the
> Solana token, held only about $25 worth, and could not substantially profit from
> it. But she had already put substantial resources and efforts into developing the
> project and also knew she needed to keep attention on the project and not alienate
> Solana token holders until . . . an ERC-20 token Jenner controlled[ ]could be
> enacted.

(*Id.* ¶ 277; *see also id.* ¶¶ 82, 106, 117.)

That Jenner "viewed the ERC-20 coin as a second iteration of the same underlying
project through which she hoped to enrich herself" (*id.* ¶104), does not suggest she "thought
listing via Ethereum was []consistent with her promise not to launch again," as she now claims.

16

*Azad et al. v. Jenner et al.*, Case No. 2:24-cv-9768-SB-JC
OPPOSITION TO MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

(Mot. at 16.) To the contrary, until the ERC-20 was minted, Jenner continued to tout her commitment to the Solana token. (*Id.* ¶¶ 77, 81-83, 86.)

Jenner's assertion that Plaintiff's reliance is inadequately pleaded (Mot. at 16-17), is wrong. (*See* SAC ¶¶ 221, 278.) To the extent any ambiguity could be read into these reliance allegations, Plaintiff alleges how information spreads through the "Twittersphere" (*id.* ¶ 88), and Jenner provides no authority he must have heard the misrepresentation directly from her to have been defrauded.

Nor does Plaintiff's purchase of additional Solana-based $JENNER on May 31 "contradict[]" his "allegations of reliance" (Mot. at 17), since Jenner briefly promoted both tokens simultaneously (SAC ¶¶ 106-108).

Finally, contrary to Jenner's assertion (Mot. at 17), because Plaintiff relied on Jenner's misrepresentation, he need not show he purchased directly from her. *See Kearns v. Ford*, 567 F.3d 1120, 1125-27 (9th Cir. 2009).

## III.    PLAINTIFF STATES A QUASI CONTRACT CLAIM

Jenner argues that because "there was an enforceable, binding agreement defining the rights of the parties," the $JENNER smart contract, Plaintiff "is barred from seeking equitable relief" (Mot. at 17-18).[3] But Plaintiff "may assert inconsistent theories of recovery," including "inconsistent claims alleging both the existence and the absence of an enforceable contract[.]" *In re Ethereummax Investor Litig.*, 2023 WL 6787458, at *8 (C.D. Cal. Oct. 3, 2023) (quotation omitted).

The Fifth Circuit has opined that while a smart contract might "facilitate the creation of a contract between the smart contract's operator and a third party . . . the smart contract itself is not a contract." *Van Loon*, 122 F.4th at 568 (quotation marks omitted). The Court "should

---

[3] Jenner characterizes the smart contract's 3% transaction tax as an "access" fee (*id.* at 18), but nothing in the SAC supports this self-serving claim, and Jenner could have permitted trading without taxes. (SAC ¶¶ 25(b), 26, 116.) Her representations are also contrary to her present claim it was an access fee. (*See id.* ¶¶ 88, 96, 98, 102, 116, 148, 175-76.)

not be required to determine the factual question of whether a contract exists at the pleading stage." *In re Ethereummax Investor Litig.*, 2023 WL 6787827, at *16 (C.D. Cal. Jun. 6, 2023).

Jenner's reliance on *Letizia v. Facebook Inc.*, 267 F. Supp. 3d 1235 (N.D. Cal. 2017), is misplaced. *Letizia* involved metrics to measure Facebook's advertising services, and the court found the "fact that Facebook's contracts do not expressly mention the two advertising metrics at issue here does not mean the contract does not govern . . . Facebook's advertising services." *Id.* at 1253. Moreover, "Plaintiffs conceded during oral argument that . . . the advertising services that are part of the parties' contract include performance metrics." *Id.* (cleaned up). Here, by contrast, the smart contract's code imposed a 3% tax but said nothing of its use or purpose. (*See* SAC ¶ 282.) Her promise to use taxes for the project's betterment was an inducement for Plaintiff to purchase $JENNER (*id.* ¶¶ 216-17, 286), a distinct obligation, not a term of or condition governed by the smart contract.

Jenner alternatively contests the claim under *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2024), arguing Plaintiff could state a claim for common law fraud. (Mot. at 19.) But she does not explain why such a claim is viable, and her bald assertion contradicts the Complaint. (SAC ¶ 286.)

Jenner also argues Plaintiff's claim is "premised on fraudulent conduct" so that Rule 9(b) applies. (Mot. at 19 (citing *Marques v. Fed. Home Loan Morg. Corp.*, 2013 WL 1932920, at *5 (S.D. Cal. May 8, 2023)). In *Marques*, Plaintiffs alleged Freddie Mac collected payments under an "Assignment [that] was 'a false document fraudulently created and executed,'" 2013 WL 1932920, at *5. Here, Plaintiff's claim sounds in contract. He alleges Jenner promised to "use all of the transaction taxes for the betterment of the project," but "this promise was not expressed in a written instrument" (SAC ¶ 286). Rule 9(b) does not apply. If it does, Plaintiff satisfies it, alleging the promises Jenner made and her admission the taxes did not belong to her. (*See id.* ¶¶ 88, 96, 98, 102, 116, 148, 175-76.) He alleges she did not spend the money as promised (*id.* ¶¶ 185-93), and converted it for her own use (*id.* ¶¶ 177, 194-206 & Ex. 2).

Contrary to Jenner's assertion, Plaintiff has not "directly contradic[ted]" his prior pleading. (Mot. at 20-21 (quotation omitted).) That "Jenner [did] not properly disclose[]," and

that many "paid this transaction tax unknowingly" (Dkt. No. 22, First. Am. Compl. ("FAC") ¶ 70), does not admit or even suggest *Plaintiff* paid the tax unknowingly. (*See id.* ¶ 84(j) ("Jenner has directly stated that a portion of funds from the transaction tax would be used to fund the common enterprise," and "[i]nvestors relied upon these promises when deciding whether to invest in $JENNER[.]").) Contrary to Jenner's contention, Plaintiff is not using "turnabout to establish reliance" (Mot. at 21). (*See* FAC ¶¶ 116-17 (Jenner's "communications contained materially false and misleading statements," including "about using transaction tax revenue" and "Plaintiff and other Class Members relied on these materially false and misleading statements").)

## CONCLUSION

The Court should deny Defendants' motion.


Dated: July 7, 2025                                Respectfully Submitted,

                                                   /s/ Jack Fitzgerald

                                                   **FITZGERALD MONROE FLYNN PC**
                                                   JACK FITZGERALD
                                                   *jfitzgerald@fmfpc.com*
                                                   MELANIE R. MONROE
                                                   *mmonroe@fmfpc.com*
                                                   TREVOR FLYNN
                                                   *tflynn@fmfpc.com*
                                                   PETER GRAZUL
                                                   *pgrazul@fmfpc.com*
                                                   ALLISON FERRARO
                                                   *aferraro@fmfpc.com*
                                                   2341 Jefferson Street, Suite 200
                                                   San Diego, California 92110

                                                   ***Lead Counsel***

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 6,988 words, which complies with the word limit of L.R. 11-6.1.


Dated: July 7, 2025                          /s/ Jack Fitzgerald
                                             Jack Fitzgerald

20

*Azad et al. v. Jenner et al.*, Case No. 2:24-cv-9768-SB-JC
OPPOSITION TO MOTION TO DISMISS THE SECOND AMENDED COMPLAINT