UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| NAEEM AZAD et al.,<br><br>     Plaintiffs,<br><br>  v.<br><br>CAITLYN JENNER et al.,<br><br>     Defendants. | Case No. 2:24-cv-09768-SB-JC<br><br><br>ORDER GRANTING IN PART MOTION TO DISMISS SECOND AMENDED COMPLAINT [DKT. NO. 63] AND DECLINING SUPPLEMENTAL JURISDICTION |

Lead Plaintiff Lee Greenfield lost more than $40,000 investing in $JENNER cryptocurrency tokens developed and promoted by Caitlyn Jenner and her manager, Sophia Hutchins.  The Court dismissed Greenfield's First Amended Complaint (FAC), which alleged a variety of federal and state claims against Jenner and Hutchins on behalf of a putative class of investors.  Greenfield's Second Amended Complaint (SAC) adds extensive factual allegations but narrows his claims to three causes of action:  (1) sale of unregistered securities, (2) common-law fraud, and (3) quasi contract.  Defendants move to dismiss the SAC for failure to state a claim.  The Court held a hearing on January 30, 2026, and took the matter under submission.  The Court now finds that Greenfield has not stated a plausible claim for relief under the Securities Act and declines supplemental jurisdiction over his state claims.

I.

The Court's May 9, 2025 order dismissing the FAC contained an explanation of cryptocurrency and blockchain technology, as well as a summary of Defendants' alleged misconduct, which need not be repeated.  Dkt. No. 38 at 1–4.  The core of the allegations is that Jenner launched the $JENNER cryptocurrency token on the Solana blockchain on May 26, 2024, encouraging her followers to

invest in it, before launching a second $JENNER token on the Ethereum blockchain just three days later.  Defendants described the Ethereum token as "a memecoin on the Ethereum blockchain intended solely for entertainment purposes."  Dkt. No. 44 ¶ 173.  Jenner used her celebrity to "hype" the token and suggested that her promotion efforts would cause its value to rise.  *Id*. ¶ 121; *see, e.g.*, *id*. ¶ 137 (Jenner's tweet of "an AI-generated image of Jenner in a 'JENNER ETH' T-shirt, carrying an American flag through a crowd in which one member holds up a sign reading, 'LETS MAKE EVERYONE RICH!'").  Jenner received a 3 percent "tax" on every transaction with the Ethereum token, which she and Hutchins began promoting at the expense of the Solana token.  There is no plausible allegation that Defendants invested the tax proceeds in any product or business to create value apart from the token itself, or that $JENNER has any utility other than being able to be traded for other cryptocurrencies.  After Defendants eventually abandoned their efforts to promote either token, they both became worthless.

The Court found that the FAC failed to state a plausible claim as to any of its nine causes of action but granted Greenfield's request for leave to amend, cautioning that "[t]he Court expects the [SAC] to be more focused and judiciously pleaded than the 68-page FAC."  Dkt. No. 38 at 14–15.  In response, Greenfield filed a 103-page SAC, much of which recites Defendants' social media posts about (and promotion of) the $JENNER tokens.  Dkt. No. 44.  The SAC alleges three claims:  (1) against both Defendants for selling an unregistered security—the Ethereum token—in violation of the Securities Act, 15 U.S.C. §§ 77e(a) and 77l(a)(1); (2) against Jenner for common-law fraud based on a May 27, 2024 statement that she would not relaunch $JENNER; and (3) against Jenner for quasi contract to recover the transaction taxes she obtained from the Ethereum token.

Defendants moved to dismiss the SAC for failure to state a claim.  Dkt. No. 63.  Before the briefing was complete, Hutchins died, and the Court stayed the case to await appointment of a successor.  After Hutchins's mother, Amy Andrus, was appointed the administrator of her estate, the Court granted Greenfield's unopposed motion to substitute her as a defendant in Hutchins's place, and Andrus is now jointly represented by Jenner's counsel (as was Hutchins).  Defendants filed their reply, and the Court held a hearing on the motion.

## II.

To survive a Rule 12(b)(6) motion, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570 (2007).  A claim has "facial plausibility" if the plaintiff pleads facts
that "allow[] the court to draw the reasonable inference that the defendant is liable
for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  All
well-pleaded factual allegations must be accepted as true, but a court need not
credit "[t]hreadbare recitals of the elements of a cause of action" or "a legal
conclusion couched as a factual allegation."  *Id.* (cleaned up).  There is no
plausibility "where the well-pleaded facts do not permit the court to infer more
than the mere possibility of misconduct."  *Id.*

III.

The Court begins with Greenfield's claim for sale of unregistered securities
in Count 1—the only claim for which original jurisdiction is asserted.  Defendants
raise three challenges to the claim, arguing that:  (1) Greenfield, a U.K. citizen, has
not plausibly alleged a domestic transaction; (2) the Ethereum $JENNER token is
not a security; and (3) Hutchins was not a statutory seller.  Because the Court finds
the second argument dispositive, it need not reach the others.

Greenfield alleges that Defendants violated §§ 5(a) and 12(a)(1) of the
Securities Act, codified at 15 U.S.C. §§ 77e(a) and 77*l*(a)(1).  The former prohibits
the sale of an unregistered "security," while the latter provides a private right of
action against a person who "offers or sells a security in violation of section 77e."
Thus, Greenfield's claim can proceed only if the $JENNER tokens on the
Ethereum blockchain are securities.  Greenfield contends that they are "investment
contracts," which are included in the statutory definition of a "security."  15 U.S.C.
§ 77b(a)(1).

Under the longstanding *Howey* test, "an investment contract for purposes of
the Securities Act means a contract, transaction or scheme whereby a person
invests his money in a common enterprise and is led to expect profits solely from
the efforts of the promoter or a third party."  *Warfield v. Alaniz*, 569 F.3d 1015,
1020 (9th Cir. 2009) (quoting *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 298–99
(1946)).  In *Howey*, promoters sold land with fruit trees as well as "service
contracts" to cultivate and market the crops, with an allocation of the net profits
going to the purchaser, and the Supreme Court found that the enterprise was an
investment contract subject to the Securities Act.  The Court noted that its
definition of investment contract "embodies a flexible rather than a static principle,
one that is capable of adaptation to meet the countless and variable schemes
devised by those who seek the use of the money of others on the promise of
profits."  328 U.S. at 299.

The Ninth Circuit has "distilled *Howey*'s definition into a three-part test requiring '(1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others.'"  *Warfield*, 569 F.3d at 1020 (quoting *SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003)).  Defendants do not dispute that Greenfield invested money to purchase $JENNER on Ethereum, but they argue that he fails to state a claim as to the second and third prongs.

A.

A common enterprise can be established by showing either horizontal or vertical commonality.  *Hocking v. Dubois* (*Hocking I*), 839 F.2d 560, 566 (9th Cir.), *opinion withdrawn*, 863 F.2d 654 (9th Cir. 1988); *Hocking v. Dubois* (*Hocking II*), 885 F.2d 1449, 1459 (9th Cir. 1989) (en banc) ("We agree with Judge Reinhardt's discussion for the panel [in *Hocking I*] of the Ninth Circuit law on *Howey*'s common enterprise requirement.").  "Horizontal commonality describes the relationship shared by two or more investors who pool their investments together and split the net profits and losses in accordance with their pro rata investments" and is "usually evidenced by a pooling of assets from two or more investors into a single investment fund."  *Hocking I*, 839 F.2d at 566.

Vertical commonality, in contrast, "describes a common enterprise between the investor and the seller, promoter or some other party," regardless of whether additional investors are involved in the venture.  *Id*.  A key feature of vertical commonality is that "the fortunes of the investors are linked with those of the promoters."  *SEC v. R.G. Reynolds Enters., Inc.*, 952 F.2d 1125, 1130 (9th Cir. 1991) (quoting *SEC v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 463 (9th Cir. 1985)).  Thus, where "the success or failure of [the promoter] does not correlate with individual investor profit or loss," vertical commonality may be lacking.  *Brodt v. Bache & Co.*, 595 F.2d 459, 461 (9th Cir. 1978) (finding no common enterprise where "[the promoter] could reap large commissions for itself and be characterized as successful, while the individual accounts could be wiped out" and "[w]eak efforts or failure by [the promoter] will deprive [the investor] of potential gains but will not necessarily mean that [the promoter] will suffer serious losses").

Greenfield alleges both horizontal and vertical commonality.

4

1.

The SAC acknowledges that "[b]y their very nature, cryptocurrencies like the [Ethereum] $JENNER token . . . lack utility other than as a store and transfer of value."  Dkt. No. 44 ¶ 246.  It alleges, however, that since the tokens "represent proportional shares of the token's market capitalization at any given moment," it follows that there is horizontal commonality because "all holders' fortunes are necessarily tied together in a one-to-one manner (*i.e.*, every holder experiences the same percent gain or loss over the same period of time)."  *Id.*

The fact that investors' fortunes rise or fall together does not, by itself, demonstrate the horizontal commonality required for a common enterprise because "a finding of horizontal commonality requires a sharing or pooling of funds." *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994) (quoting *Hart v. Pulte Homes of Michigan Corp.*, 735 F.2d 1001, 1004 (6th Cir. 1984)); *cf. Hocking II*, 885 F.2d at 1459 ("The simple purchase of real estate lacks any horizontal commonality, as no pooling of interests or profits is involved.").  Thus, horizontal commonality is present when "[t]he participants pool their assets; they give up any claim to profits or losses attributable to their particular investments in return for a pro rata share of the profits of the enterprise; and they make their collective fortunes dependent on the success of a single common enterprise."  *Hocking II*, 885 F.2d at 1459; *accord Hocking I*, 839 F.2d at 566 ("Horizontal commonality describes the relationship shared by two or more investors who pool their investments together and split the net profits and losses in accordance with their pro rata investments.") (citing *Brodt*, 595 F.2d at 460).

In the cases on which Greenfield relies, courts have found horizontal commonality when a seller of cryptocurrencies pools the proceeds and uses them to finance the development of technology that increases the value of the currency. *E.g.*, *SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 325 (S.D.N.Y. 2023) (finding horizontal commonality where blockchain developer "used the funds it received from its Institutional Sales to promote and increase the value of [its cryptocurrency] by developing uses for [the currency] and protecting the [token's] trading market"); *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 178 (S.D.N.Y. 2020) (finding horizontal commonality where owner of messaging application developed digital currency for use on its platform, deposited funds in a single bank account, and "used the funds for its operations, including the construction of the digital ecosystem it promoted" because "[t]he success of the ecosystem drove demand for [the currency] and thus dictated investors' profits"); *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 369 (S.D.N.Y. 2020) (finding horizontal

5

commonality where software developer "pooled the money received from the Initial Purchasers and used it to develop the TON Blockchain as well as to maintain and expand [its instant messaging product]"); *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 353 (S.D.N.Y. 2019) (finding horizontal commonality where "the funds raised through the [initial coin offering] were pooled together to facilitate the launch of the ATB Blockchain, the success of which, in turn, would increase the value of Plaintiff's ATB Coins").

Here, in contrast, Defendants did not pool the proceeds of the investors' purchases or use them to develop any related product or technology. As alleged in the SAC, Defendants stated that "[t]he $JENNER token is a memecoin on the Ethereum blockchain intended solely for entertainment purposes," Dkt. No. 44 ¶ 173, and that its value would increase because Jenner would use her fame and influence to promote it, increasing demand—not because Defendants were raising capital to develop new technology or products, *see, e.g., id.* ¶ 122 (alleging that Hutchins "touted Jenner's ability to bring attention and investors into the project" by cataloging Jenner's awards, fame, television viewership, and connections to other powerful people). Promotion alone, however, does not establish a common enterprise absent pooling or a structure linking investor fortunes. *See Hocking II*, 885 F.2d at 1459 (participants "pool their assets" in return for "a pro rata share of the profits of the enterprise"). The cases on which Greenfield relies are therefore inapposite. *See Real v. Yuga Labs, Inc.*, No. 22-CV-8909-FMO, 2025 WL 3437389, at *8–9 (C.D. Cal. Sept. 30, 2025) (distinguishing *Balestra* and *Telegram Group* and finding no horizontal commonality where digital assets were recorded on the Ethereum blockchain and plaintiffs had not alleged "'interplay' between the alleged securities and [a] proprietary 'ecosystem'" under defendants' control).

Greenfield contends that the SAC alleges pooling of assets because Defendants promised that after $JENNER reached market capitalization of $50 million, they would use the 3 percent transaction tax to (1) donate to the presidential campaign of Donald Trump, (2) engage in buybacks, (3) invest in marketing efforts, and (4) distribute pro rata shares of a token representing a fractionalized ownership interest in Jenner's Olympic gold medal. Dkt. No. 44 ¶¶ 96, 102, 175. The SAC does not explain how Greenfield or other investors believed that Defendants' planned donations to President Trump's campaign—the promise on which the SAC focuses most heavily—would provide a financial return to investors. Nor is it clear that the alleged plan to distribute fractionalized ownership interests in Jenner's gold medal has any bearing on Greenfield's claim, since the plan was not announced until August 2024—after the last of his

6

purchases—and was never executed. *Id*. ¶¶ 178–79; Dkt. No. 44-1 at 3–4 (certification listing Greenfield's transactions).

As for the vague allegations of buybacks and marketing, Greenfield does not discuss them in his opposition. The SAC contains only two references to buybacks of the Ethereum tokens. First, on May 29, "Jenner participated in a now-deleted Twitter Spaces chat with investors and potential investors" in which she "represented that . . . there was a 3% transaction tax on the token, which would be used (i) to donate to the presidential campaign of Donald Trump, (ii) for buybacks, and (iii) for marketing efforts, such as getting $JENNER listed on prominent U.S.-based CEXs, especially Coinbase." Dkt. No. 44 ¶ 96. The next month, an X user responded to a Jenner tweet, "Use half of the taxes for buybacks. The community doesn't like to just fund Trump. It would be fair to do half and half," to which Jenner responded, "Not all taxes going for Trump. The first distribution would be made when we hit 50m MC. And never said it would be ALL of them. Some have been used for buybacks, marketing, etc." *Id*. ¶ 148. Neither allegation explains the nature of any buybacks or how they demonstrate horizontal commonality, and nothing in the SAC plausibly suggests that any buybacks were conducted from pooled investor funds or affected investors in a uniform, pro rata manner.

Nor does the SAC provide details about any "marketing" efforts beyond urging people to buy $JENNER based on an expectation that the coins would increase in value. The alleged marketing efforts consisted principally of social media posts and video events by Defendants, and there is no allegation about whether or how they used pooled transaction taxes to fund their posts. The SAC further alleges that Defendants refused to use the tax proceeds to pay listing fees. *Id*. ¶¶ 187, 190. But even if Greenfield could allege Defendants' use of a portion of the transaction fees for marketing efforts, he identifies no legal authority finding a common enterprise based on the marketing of a cryptocurrency with no corresponding product or software—let alone any authority finding the requisite pooling based only on the use of a transaction tax.

In sum, the SAC alleges that Greenfield and other investors separately bought and sold $JENNER on Ethereum, hoping it would increase in value over time as Jenner encouraged more people to buy it, reflecting parallel speculation rather than a common enterprise tying investor fortunes together. Taken together, the allegations in the SAC do not plausibly allege that the investors agreed to split profits and losses or that they pooled their resources to create capital for investment in anything other than the coin itself, including through the alleged

7

transaction tax, buybacks, or marketing efforts.  Greenfield therefore has not plausibly alleged a common enterprise based on horizontal commonality.

2.

As to vertical commonality, the SAC conclusorily alleges that "Defendants and the Jenner project had a financial interest in the value of the [Ethereum] $JENNER token, because they had substantial holdings of Jenner's own coin"— more than 20 million tokens at the time the SAC was filed—and, "[a]s a result, investors' fortunes were tied to the fortunes of the project and its promoters, *i.e.*, Defendants." *Id*. ¶¶ 242–44.  But Greenfield also alleges that Jenner obtained a 3 percent tax on every transaction of the Ethereum $JENNER token. *E.g.*, *id*. ¶ 247. Thus, even if an investor lost money on the transaction, Jenner would still receive transaction-based fees.  Because Jenner paid little to nothing for her tokens and enjoyed an independent, risk-free tax revenue stream, her overall financial success did not depend on investor profits or losses.  Indeed, Greenfield alleges that Jenner kept hundreds of thousands of dollars in tax revenues for herself even as the investments of Greenfield and others became nearly worthless. *Id*. ¶¶ 193–194, 206, 208.

These factual allegations preclude a finding of vertical commonality.  The Ninth Circuit has held that where a promoter "could reap large commissions for itself and be characterized as successful, while the individual accounts could be wiped out," there was no vertical commonality. *Brodt*, 595 F.2d at 461; *accord Gugick v. Melville Cap., LLC*, No. 11-CV-6294, 2014 WL 349526, at *5 (S.D.N.Y. Jan. 31, 2014) (no vertical commonality where defendant "was entitled to a commission . . . regardless of whether Plaintiff made a profit from the sale of the Policy").  Greenfield identifies no contrary authority.  He cites only three district court decisions, none of which found vertical commonality between investors and a promoter who earned commissions or taxes on transactions. *SEC v. Wahi*, No. 2:22-CV-01009, 2024 WL 896148 (W.D. Wash. Mar. 1, 2024); *SEC v. Dalius*, No. 2:18-CV-08497-FWS, 2023 WL 3988425 (C.D. Cal. May 24, 2023); *Telegram Grp. Inc.*, 448 F. Supp. 3d 352.  Accordingly, Greenfield has not plausibly alleged vertical commonality.[1]

---

[1] After briefing and argument on Defendants' motion, the SEC issued a 67-page interpretive rule addressing the application of federal securities laws to crypto assets.  Dkt. Nos. 98–99.  The rule conveys the SEC's nonbinding views on how *Howey* applies in the crypto context.  Dkt. No. 98-1 at 8.  The SEC acknowledges

8

3.

Because Greenfield does not plausibly allege either horizontal or vertical commonality, he has not alleged the existence of a common enterprise. The Court therefore need not determine whether he has plausibly alleged the third prong of the *Howey* test—whether investors expected profits solely from Jenner's efforts.

\*    \*    \*

Greenfield has not plausibly alleged that $JENNER on Ethereum was a security, and his claim for violation of the Securities Act is dismissed for failure to state a claim.

B.

Rule 15(a)(2) requires that "[t]he court should freely give leave [to amend] when justice so requires." Leave may be denied, however, for reasons such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Greenfield did not seek

---

that the diversity and evolving nature of crypto assets can complicate categorical application of *Howey* but identifies certain assets—such as "meme coins"—as digital collectibles with limited or no functionality whose value is driven primarily by supply and demand rather than managerial efforts. *Id*. at 5, 18. It further explains that an investment contract arises only where purchasers are induced to invest based on representations that the promoter will undertake essential managerial efforts, and that such representations must create a reasonable expectation of profit attributable to those efforts—an essential element of *Howey*. *Id*. at 24–27. Such expectations are more likely where the promoter makes explicit, detailed commitments—such as a development plan with milestones, timelines, personnel, and funding sources—rather than vague or aspirational statements. *Id*. On the alleged facts, Defendants are not alleged to have offered a concrete development plan or made specific, actionable promises of managerial efforts, but instead made general promotional statements lacking such detail. Although the parties dispute the rule's significance, the Court does not rely on the SEC's interpretation, which has not been published in the Federal Register and is not binding, and which merely appears consistent with the Court's independent conclusion that $JENNER is not a security.

9

leave—either in his opposition or at the hearing—to amend his pleading again if the Court grants the motion. As the Court noted when granting leave to file the SAC, "Greenfield's counsel stated at the hearing [on the motion to dismiss the FAC] that he sought 'only one more shot' and that 'if we can't make a case next time, [it will] be dismissed.'" Dkt. No. 38 at 14. Moreover, it appears that amendment of the Securities Act claim would be futile, as the $JENNER Ethereum token is not a security. Accordingly, the Court declines to grant leave to amend.

## IV.

Defendants also challenge the adequacy of Greenfield's remaining claims for common-law fraud and quasi contract. Those claims, however, arise under California law, and the sole jurisdictional basis asserted for them in the SAC is supplemental jurisdiction, contingent on federal-question jurisdiction over the Securities Act claim. Dkt. No. 44 ¶ 5.

When a district court "has dismissed all claims over which it has original jurisdiction," it may decline supplemental jurisdiction over any remaining state-law claims. 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

Notwithstanding the delays occasioned by Hutchins's death, this case is still at a relatively early stage; no case management order has been entered, and discovery has not begun. *See* 15 U.S.C. § 78u-4(b)(3)(B) ("In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss . . . ."). Now that Greenfield's sole remaining federal claim has been dismissed, the Court concludes that, considering the factors of judicial economy, convenience, fairness, and comity, the remaining state claims are best resolved in state court. Accordingly, the Court declines to exercise supplemental jurisdiction over Greenfield's claims for common-law fraud and quasi contract, and those claims are dismissed without prejudice.

## V.

Defendants' motion to dismiss the SAC is granted in part, and Lead Plaintiff Lee Greenfield's claim for violation of the Securities Act in Count 1 is dismissed with prejudice for failure to state a claim. The Court declines supplemental jurisdiction over the remaining claims, which are dismissed without prejudice.

10

A final judgment will be entered separately.

Date: April 16, 2026

_____
Stanley Blumenfeld, Jr.
United States District Judge